UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELAN PHARMA INTERNATIONAL LIMITED, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No.    06-438-GMS |
| ABRAXIS BIOSCIENCE, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

## ABRAXIS'S ANSWERING CLAIM CONSTRUCTION BRIEF

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP
Josy W. Ingersoll (No. 1088)
Elena C. Norman (No. 4780)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600
kkeller@ycst.com

OF COUSEL:
Michael A. Jacobs
MORRISON & FOERSTER, LLP
425 Market Street
San Francisco, CA  94105-2482
(415) 268-7000   Telephone
MJacobs@mofo.com

Emily A. Evans
MORRISON & FOERSTER, LLP
755 Page Mill Road
Palo Alto, CA  94304-1018
(650) 813-5600  Telephone
EEvans@mofo.com

Dated:  June 22, 2007

*Attorneys for Defendant*
*ABRAXIS BIOSCIENCE, INC.*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...............................................................................................1

II. THE CLAIMS DO NOT COVER PARTICLES CONTAINING
AMORPHOUS MEDICAMENT ........................................................................2

    A. Elan Cannot Rewrite "Crystalline" in the '363 and '025 Patents to
Cover Amorphous Particles ......................................................................2

    B. Elan's Proposed Construction of "Consisting Essentially of" in the
'363 and '025 Patents Ignores the Intrinsic Evidence ..............................6

    C. The "Organic Drug Substance" In Claim 13 of the '025 Patent Must
Be Crystalline ..........................................................................................8

III. OTHER TERMS APPEARING IN BOTH THE '363 AND '025 PATENTS .....10

    A. Elan's Proposed Constructions of "Surface Modifier" and
"Adsorbed on the Surface" Disregard the Intrinsic Evidence..................10

    B. Elan Wrongly Equates "Effective Average Particle Size" With
"Average Effective Particle Size" And Ignores "Sufficient To
Maintain." ...............................................................................................11

IV. THE REMAINING '363 PATENT CLAIM TERMS .........................................12

    A. Abraxis's Amended Proposed Definition of "Medicament Useful in
Treating Cancer" Addresses Elan's Only Legitimate Concern................12

    B. Elan's Proposed Definition of "Non-Crosslinked" Is Overly Broad.........13

    C. Elan's Definition of "Surfactant" Ignores Required Physical
Characteristics .........................................................................................14

V. THE REMAINING '025 PATENT CLAIM TERMS .........................................14

    A. Elan's Proposed Construction of "Without Eliciting Adverse
Hemodynamic Effects" Ignores the Phrase "Without Eliciting" and
Seeks to Redefine "Mammal." .................................................................14

    B. Elan Chose to Define "Infusion Rate Not Exceeding 10 Mg/min" By
the Weight of the Entire Drug Composition .............................................16

    C. Elan Improperly Construes the "Colloidal Polymeric Material" To
Be The "Pharmaceutically Acceptable Carrier," Which Is A
Separate And Distinct Limitation.............................................................18

VI. CONCLUSION.................................................................................................19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen Eng'g Corp. v. Bartell Indus.,*
299 F.3d 1336 (Fed. Cir. 2002) ...................................................................16

*Comark Commc'ns v. Harris Corp.,*
156 F.3d 1182 (Fed. Cir. 1998) ...................................................................15

*Gentry Gallery, Inc. v. Berkline Corp.,*
134 F.3d 1473 (Fed. Cir. 1998) .....................................................................9

*Hakim v. Cannon Avent Group, PLC,*
479 F.3d 1313 (Fed. Cir. 2007) .....................................................................4

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
452 F.3d 1312 (Fed. Cir. 2006) .....................................................................9

*Intamin Ltd. v. Magnetar Techs., Corp.,*
483 F.3d 1328 (Fed. Cir. 2007) ...................................................................18

*Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.,*
309 F.3d 1365 (Fed. Cir. 2002) ...................................................................14

*LizardTech, Inc. v. Earth Resource Mapping, Inc.,*
424 F.3d 1336 (Fed. Cir. 2005) .....................................................................9

*Power Mosfet Techs., L.L.C. v. Siemens AG,*
378 F.3d 1396 (Fed. Cir. 2004) .....................................................................9

*Seachange Int'l, Inc. v. C-Cor Inc.,*
413 F.3d 1361 (Fed. Cir. 2005) .....................................................................5

*Vitronics Corp. v. Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996) .......................................................................5

*Wright Med. Tech. v. Osteonics Corp.,*
122 F.3d 1440 (Fed. Cir. 1997) .....................................................................9

## I.    INTRODUCTION

To maintain a viable case for infringement, Elan asks this Court to rewrite the claims of the patents.  This explains Elan's considerable effort to obtain through claim construction what the Patent and Trademark Office (PTO) properly refused to allow during prosecution.  Elan's proposed constructions should be rejected because they are inconsistent with the language of the claims, the specifications, and the patents' prosecution histories.

Elan's opening brief makes it ever more apparent that Elan seeks claim constructions that are not supportable.  Going beyond the Joint Claim Construction Chart, Elan now asks the Court to construe "crystalline" to cover a broad *range* of crystalline and non-crystalline (*i.e.* amorphous) particles.  Elan in essence asks the Court to rule that "red" means "red all the way to blue," even though the meaning of "red" is not in doubt and the specifications of both patents-in-suit make clear that red is different from blue. The specifications of both the '363 and '025 patents explicitly state that "crystalline" is fundamentally different than amorphous.  Moreover, during prosecution Elan distinguished prior art on the precise ground that the existing art was amorphous, whereas the allegedly inventive particles contained only crystalline medicament.

Elan's fallback argument is to redefine "consisting essentially of" so that it loses its well-settled meaning.  Under Elan's construction, the claimed particles could contain not only crystalline medicament and a surface modifier, but virtually anything else, including the *amorphous* medicaments specifically disclaimed in the specification and during prosecution.

Similarly, in construing the '025 patent claims, Elan ignores express claim language that the infusion rate refers to the entire "drug composition," not only to the nanoparticles in the drug composition.

This Court cannot, and should not, rewrite the claims to expand their scope beyond that granted by the PTO.

## II.    THE CLAIMS DO NOT COVER PARTICLES CONTAINING AMORPHOUS MEDICAMENT.

By their terms, the claims of the patents-in-suit do not cover particles containing amorphous medicament or the administration of such particles. The paclitaxel in Abraxane is amorphous. We address this issue first because it is dispositive of infringement. The other disputed terms are addressed in the order raised by Elan.

### A.    Elan Cannot Rewrite "Crystalline" in the '363 and '025 Patents to Cover Amorphous Particles.

The proper construction of "crystalline" is "having a regular arrangement of atoms [or molecules] in a space lattice, as distinguished from amorphous." (Abraxis Op. Br. (D.I. 105) at 18-19.) In the Joint Claim Construction Chart, Elan construed "crystalline" as a "nanoparticulate phase different from an amorphous phase."[1] Realizing that it failed to give a positive definition of "crystalline" in the Joint Claim Construction Chart, Elan now proffers an extreme definition of "amorphous." (Elan Op. Br. (D.I. 104) at 19.) Relying solely on extrinsic evidence, Elan now argues that one of skill in the art

---

[1]    Abraxis addressed Elan's original formulation of its construction of "crystalline" in Abraxis's Opening Brief. (Abraxis Op. Br. (D.I. 105) at 18-20, 34.) As we explained, Elan attempts to conceal the purpose of its construction — defining "crystalline" to encompass amorphous Abraxane — by using confusing language ("in a nanoparticulate phase") that finds no support in the specification and would introduce ambiguity into an otherwise clear term.

would understand crystalline to mean "a variable property that ranged from 100% (a perfect crystal) to 0% (amorphous) depending on the state of order/disorder in the lattice." (Elan Op. Br. (D.I. 104) at 18-19.) In other words, Elan's construction makes any material that is 99.9% amorphous "crystalline," effectively rendering "crystalline" meaningless as a limitation.

Elan's construction is flatly contradicted by the intrinsic evidence. The specifications of both patents make clear that the therapeutic or diagnostic agents exist in crystalline phases, which differ from an "amorphous, *i.e.* non-crystalline phase."

> The particles of this invention comprise an anticancer agent. ***The anticancer agent is present in one or more discrete crystalline phases. The crystalline phase differs from an amorphous, i.e., non-crystalline phase*** which results from conventional solvent precipitation techniques for the preparation of particles in the submicron size range, such as described in U.S. Pat. No. 4,826,689." (Ex. 1[2] at A0002,'363 patent, 2:28-34 (emphasis added).)

> ***The therapeutic or diagnostic agent exists as a discrete crystalline phase. The crystalline phase differs from a non-crystalline or amorphous phase*** which results from precipitation techniques, such as described in EPO 275,796. (Ex. 2 at A0015, '025 patent at 7:28-32 (emphasis added).)

In light of the sharp distinction in the specifications between crystalline and amorphous, Elan's argument that its construction is consistent with the statement that the medicament "is present in one or more discrete crystalline phases" is plainly incorrect. (Elan Op. Br. (D.I. 104) at 19 (citing '363 patent at 2:28-29).) That phrase does not go to what percentage of the medicament is crystalline vs. amorphous. Rather, it relates to the fact that an entirely crystalline medicament may have portions with differing crystalline lattice structures. (Ex. 29 at A0363-364, *Remington's Pharmaceutical Sciences*, 17th

---

[2]     All references to "Ex. __" are to the June 22, 2007 Joint Appendix of Intrinsic and Extrinsic Evidence.

edition, 1985, Chapter 13 (the same drug substance may exist in several crystalline forms); Ex. 48 at A0921-922, "Guideline for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances," Center for Drug Evaluation and Research, FDA, DHHS  Feb. 1987 (same).).

The specifications also contradict Elan's argument regarding milling. Specifically, Elan argues that the patent teaches milling and, based on extrinsic evidence, one of ordinary skill in the art would have known that milling can introduce some amorphous content into otherwise crystalline material.  (Elan Op. Br. (D.I. 104) at 19.) The specifications, however, distinguish the milling technique, which results in crystalline particles, from other techniques, such as solvent precipitation, that create amorphous particles.  (Ex. 1 at A0002, '363 patent, 2:30-34; Ex. 2 at A0015, '025 patent, 7:28-32.)

Elan's proposed construction is also contradicted by the prosecution history. During prosecution of the '684 patent,[3] Elan distinguished prior art on the basis that it disclosed particles with only amorphous medicament.[4]  (Abraxis Op. Br. (D.I. 105) at 9-11; *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007) (disclaimer in parent application applies to a later application where the disclaimer is not clearly rescinded).)  For example, in November 1991, Elan distinguished the Violante reference on the basis that its particles contained *amorphous* medicament:

---

[3]     The parties agree that the '684 patent and its file wrapper are highly relevant to claim construction for the terms of both patents-in-suit.  (Elan Op. Br. (D.I. 104) at 10-11; Abraxis Op. Br. (D.I. 105) at 33.)

[4]     Although Elan was not the assignee at the time the patents-in-suit were prosecuted, we refer to the applicants and patentees as "Elan" for convenience.

> Violante teaches a solvent precipitation technique for preparing amorphous, non-crystalline particles. ***In fact, Violante specifically teaches that the crystalline state is to be avoided.*** For example, Violante teaches "When properly practiced, this invention enables the trapping of a compound in the metastable particle state, <u>precluding transformation to the crystalline state</u> (column 4, lines 48-51)." (Emphasis added) Consequently, Violante teaches away from applicants' claimed particles and wet grinding method.

(Ex. 6 at A0051, 11/18/1991 Amendment (emphasis added).) Thus, Elan argued that

Violante's amorphous particles *taught away* from "applicants' claimed particles,"

reinforcing that the claimed particles were crystalline. (*Id.*) The crystalline nature of the

medicament in the claimed particles was relied on throughout the amendment. (*See*

*generally, id.* at A0043-047, A0049-056, 11/18/1991 Amendment.) In fact, Elan stated

that this distinction rendered the Violante particles "radically different" than the claimed

particles. (*Id.* at A0050.) Elan also argued that the teachings of Violante were "so far

removed from the applicants' invention" that the reference should not even be combined

with other art for obviousness purposes. (*Id.* at A0055.) Elan's proposed construction

therefore includes subject matter specifically distinguished from the prior art during

prosecution. This is improper. *See, e.g.*, *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d

1361, 1372-73 (Fed. Cir. 2005) ("Where an applicant argues that a claim possesses a

feature that the prior art does not possess in order to overcome a prior art rejection, the

argument may serve to narrow the scope of otherwise broad claim language."); *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

　　　　Finally, Elan's extrinsic evidence has little or no probative value. First, the Court

should give no weight to extrinsic evidence that contradicts the language of the claims,

the specification, and the prosecution history. *See Vitronics,* 90 F.3d at 1584 (extrinsic

evidence that is "inconsistent with the specification and file history" should be "accorded no weight".)  Second, Elan overstates its evidence.  One reference specifically describes the idea of "crystallinity as a variable range" as an "alternative concept."  (Ex. 9 at A0084.)  The other two articles cited by Elan do not even discuss Elan's "alternative" theory.  (*See* Exs. 10 & 11.)  In any event, Elan's extrinsic citations support Abraxis's proposed construction of "crystalline" — a regular arrangement of atoms or molecules in a lattice.  (*See* Exs. 9, 10 & 11.)  In fact, Elan cites three treatises for the proposition that crystallinity is a property defined by a lattice structure.  (Elan Op. Br. (D.I. 104) at 19.)  Elan's proposed construction of "crystalline" should be rejected.

> **B.**    **Elan's Proposed Construction of "Consisting Essentially of" in the '363 and '025 Patents Ignores the Intrinsic Evidence.**

Elan concedes, as it must, that "consisting essentially of" is a standard transitional phrase in patent law that permits elements not recited in a patent claim only if they do not materially affect the "basic and novel properties" of the invention.  (Elan Op. Br. (D.I. 104) at 9; *see also* Abraxis Op. Br. (D.I. 105) at 14-15.)  Elan's contention that this phrase was broadened during prosecution of the '363 patent's parent to mean, in effect, "comprising," except as to contaminating solvents, is unsupportable.  (Elan Op. Br. (D.I. 104) at 9-11.)  In fact, Elan *narrowed* the claims to overcome a prior art rejection.  Elan defined the meaning of "consisting essentially of" in the context of this patent by stating that the *only* addition to the composition that would not materially effect that basic and novel properties of the invention was trace amounts of solvent or other contaminants.  Elan never said, "Except as to solvent or other contaminants, which must be present only in trace amounts, anything else can be present in the claimed particles."  At least such a statement might have signaled to a busy patent examiner, "We are changing the well-

settled meaning of 'consisting essentially of' to 'comprising' (except as to solvents and other contaminants)." But this is exactly what Elan now seeks to do.

By seeking to convert "consisting essentially of" into "comprising" and thereby allowing the claims to cover an amorphous medicament, moreover, Elan once again runs flatly into the specifications. The specifications make it abundantly clear that a basic and novel property of the invention is that the medicament is crystalline rather than amorphous. (Ex. 1 at A0002, '363 patent at 2:28-34; Ex. 2 at A0012 and A0015,'025 patent at 1:23-27, 7:23-32.) This essential aspect of the invention is reinforced throughout the prosecution history. (*See, e.g.*, Ex. 16 at A0168-169, 9/13/93 Amendment; Ex. 17 at A0233-237 and A0239-246, 11/91 Amendment.) For example, as discussed above, Elan distinguished Violante on the grounds that it taught away from the crystalline state. (Ex. 6 at A0051, 11/18/1991 Amendment.) These arguments broadly disclaim particles containing amorphous medicament and confirm that the *absence* of amorphous medicament is a fundamental and "basic and novel" part of the alleged invention.

As a last-ditch effort, Elan argues that its construction is necessary to avoid excluding the preferred embodiment of the '363 patent. (Elan Op. Br. (D.I. 104) at 11.) Elan's argument relies on a reference in the specification to a "dispersion medium" that is not recited in the claims. (*Id.*; *see also* Ex. 1 at A0008, '363 patent, claim 1.) As the patent makes clear, the "dispersion medium" is a liquid that is *not* part of the particle. (*See, e.g.*, *id.* at A0005, '363 patent, 7:46-48 ("The resulting dispersion is stable and consists of the liquid dispersion medium *and* the above-described particles.") (emphasis added).) The particles, however, are what matters here because "consisting essentially

of" modifies the word "particles" in claim 1. (*Id.* at A0008, '363 patent, 14:7 ("particles consisting essentially of…").) Abraxis's proposed construction therefore does not exclude a preferred embodiment.

Pursuant to the language of the claims, the particles of both the '363 and '025 patents contain two components, the sum of which constitutes roughly 100% of the particle. (Abraxis Op. Br. (D.I. 105) at 16-17.) During prosecution of the '684 patent, Elan explained that the invention would permit only trace amounts of solvents or other contaminants — an addition that would not contradict the plain language of the claims. (*Id.*) In other words, the particles consist essentially of the two components, with only trace amounts of other material, in this case solvents or other contaminants. Abraxis's proposed construction captures the plain meaning of the claims, the specification, and the prosecution history. Elan's constructions fail all basic tests of patent law.

### C.    The "Organic Drug Substance" In Claim 13 of the '025 Patent Must Be Crystalline.

The parties agree that "organic drug substance" means a therapeutic or diagnostic agent. (Elan Op. Br. (D.I. 104) at 28.) Once again, the most significant issue is whether the organic drug substance is necessarily crystalline. The answer is "yes."

There is no support in the '025 patent for a therapeutic or diagnostic agent that is not crystalline. (Abraxis Op. Br. (D.I. 105) at 35.) Instead, the patent specifically teaches therapeutic and diagnostic agents in a discrete crystalline phase. (Ex. 2 at A0012 and A0015, '025 patent at 1:66-67 and 7:28-32.) The '025 patent references the disclosure of nanoparticles from the '684 patent, which "informs one skilled in the art that the nanoparticles comprise a drug substance which exists as a discrete, crystalline phase that differs from a noncrystalline or amorphous phase." (Elan Op. Br. (D.I. 104) at

27 (citing '025 patent at 1:24-27; '684 patent at 3:32-36 and 4:28-31).)  The specification

also makes clear that the invention does *not* include particles of amorphous therapeutic or

diagnostic agents.[5]  (Ex. 2 at A0012 and A0015, '025 patent at 1:66-67 and 7:24-32

("The particles comprise a therapeutic or diagnostic agent. … The therapeutic [ ] agent

exists as a discrete, crystalline phase.").)  Because Elan disclaimed the use of amorphous

drug substances, the phrase "organic drug substance" should be limited to crystalline

substances.  *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir.

2006) (disclaimed feature is not within the scope of a claim, even if the claim's plain

language is otherwise broad enough to encompass that feature).

Elan contends that this construction renders the term "crystalline" in claim 1

superfluous.  As the Federal Circuit has held, "while interpretations that render some

portion of the claim language superfluous are disfavored, where neither the plain

meaning nor the patent itself commands a difference in scope between two terms, they

may be construed identically."  *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d

1396, 1409-10 (Fed. Cir. 2004).   That is the case here.

Finally, Elan improperly ignores the term "organic."  *See Wright Med. Tech. v.

Osteonics Corp.*, 122 F.3d 1440, 1444 (Fed. Cir. 1997).  Although "organic" is not

---

[5]     Moreover, because the specification contains no disclosure of non-crystalline drug
substances, failure to construe the term "organic drug substance" as crystalline would
render claim 13 invalid for lack of written description.  "To fulfill the written description
requirement, the patent specification must clearly allow persons of ordinary skill in the
art to recognize that [the inventor] invented what is claimed."  *Gentry Gallery, Inc. v.
Berkline Corp.*, 134 F.3d 1473, 1479-80 (Fed. Cir. 1998) (internal quotation omitted)
(invalidating broad claims because specification clearly indicated the invention was of a
narrower scope, and stating "claims may be no broader than the supporting disclosure.");
*accord LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed.
Cir. 2005) (same).

defined in the patent, it ordinarily means "carbon-based." (Abraxis Op. Br. (D.I. 105) at 35.) As such, the Court should adopt Abraxis's construction.

## III.    OTHER TERMS APPEARING IN BOTH THE '363 AND '025 PATENTS.

### A.    Elan's Proposed Constructions of "Surface Modifier" and "Adsorbed on the Surface" Disregard the Intrinsic Evidence.

For both patents, Elan argues that the "surface modifier" need only be defined by its function. (Elan Op. Br. (D.I. 104) at 12-13.) By defining "surface modifier" only by its function (that is, hindering aggregation), Elan expands its claims with absurd results, such as permitting the claims to cover drug particles trapped in concrete. (Abraxis Op. Br. (D.I. 105) at 23-25.) Elan also proposes different constructions for the term "surface modifier" as used in both patents (*see* Elan Op. Br. (D.I. 104) at 12), but never explains why this scientific term needs two separate constructions. There is no logical reason why the surface modifier of the '025 patent should be "surface active," while the surface modifier of the '363 patent should not.

Moreover, Elan ignores that the claimed surface modifier has required characteristics, including that it is part of the claimed particle. Indeed, Elan mistakenly argues that "the surface modifier function[s] as a barrier *between drug particles*…." (*Id.* at 12-13 (emphasis added).)

Elan compounds its error by arguing that "adsorbed on the surface" encompasses mere transitory contact. (Elan Op. Br. (D.I. 104) at 13-14.) Again, the claim language contradicts Elan's construction; the surface modifier must actually adhere to the drug to form a particle. Elan bases its argument on the statement in patent that "[u]seful surface modifiers are believed to include those which physically adhere to the surface of the anticancer agent…." (*Id.* at 14 (quoting '363 patent at 3:57-60).) Elan argues that if they

"include" those which physically adhere, they necessarily include those which do not physically adhere. (Elan Op. Br. (D.I. 104) at 14.) This is nonsensical.

Elan can point to no description in the patents of anything other than particles composed of a surface modifier that physically adheres to a drug substance. Instead, Elan cites only to a description of the process for making the claimed particles as support for its transitory "contact" construction of "adsorbed," but that has nothing to do with the nature of the particles themselves. (*See* Abraxis Op. Br. (D.I. 105) at 25 (citing '363 patent at 5:28-31).) Moreover, Elan admits that the ordinary meaning of "adsorbed" — which is supported by the extrinsic evidence — requires more than transitory contact: "collection of one substance on the surface of another." (Elan Op. Br. (D.I. 104) at 14 (citing Steven S. Zumdahl, *Chemistry* A25 (1986).) Elan's proposed constructions ignore that the surface modifier and medicament together form the claimed particles, and must therefore be rejected.

**B.    Elan Wrongly Equates "Effective Average Particle Size" With "Average Effective Particle Size" And Ignores "Sufficient To Maintain."**

Elan conflates two different claim phrases in its proposed constructions without ever acknowledging that the phrases have different definitions in the patents' respective specifications. Although the claim language is superficially similar, the '025 patent defines "effective average particle size" by "weight average." The '363 patent defines "average effective particle size" according to "number average." (*Compare* Ex. 2 at A0019, '025 patent 15:39-44 *with* Ex. 1 at A0003-004, '363 patent 4:65-5:1.) Abraxis's constructions — which are taken verbatim from the respective specifications — reflect this difference. Despite admitting that "[t]his is a clear instance of the patentee acting as

his own lexicographer," Elan entirely ignores the intrinsic definition of "effective average particle size" in the '025 patent:

> "By 'an effective average particle size of less than about 1000 nm' it is meant that at least 90% of the particles have a **weight** average particle size of less than about 1000 nm...." (Ex. 2 at A0019, '025 patent 15:39-44 (emphasis added).)

Instead, Elan's construction improperly parrots from the "effective average particle size" language of the claim, without ever defining the term.

Elan cannot pick and chose from the specifications. Elan admits, for example, that "average effective particle size" means "a number average particle size" in the claims of the '363 patent. (Elan Op. Br. (D.I. 104) at 15 (citing '363 patent, 4:60-5:10).) Elan cannot simultaneously acknowledge that particle size refers to a "number average" size in the '363 patent, while ignoring the similarly phrased definition in the '025 patent that refers to a "weight average" size.

Elan's constructions also do not account for the phrase "sufficient to maintain." Contrary to Elan's assertion, Abraxis's proposed definitions do not include extraneous limitations. Rather, Abraxis proposed a definition that accounted for the entire claim phrase, including "sufficient to maintain," and gave credence to Elan's decision not to limit that term to maintaining the particle size for a particular time period or under particular conditions. (Abraxis Op. Br. (D.I. 105) at 26, 37-38.)

## IV.     THE REMAINING '363 PATENT CLAIM TERMS.

### A.     Abraxis's Amended Proposed Definition of "Medicament Useful in Treating Cancer" Addresses Elan's Only Legitimate Concern.

Elan raises three arguments. First, Elan insists on using the words "anticancer drug," even though this exact terminology was rejected by the PTO as indefinite.

Second, Elan insists on adding the Markush Group to the definition of "medicament." But the remainder of Claim 1 already lists the Markush group. Elan's construction renders it superfluous. (Abraxis Op. Br. (D.I. 105) at 20-21.) Finally, Elan's concern that the medicament alone need not be suitable for treating cancer in the absence of a carrier is addressed by the following modified construction, which Abraxis hereby proposes: "a medicine suitable for treating cancer when in the form of the particles of claim 1." The Court should thus adopt Abraxis's amended construction.

### B.    Elan's Proposed Definition of "Non-Crosslinked" Is Overly Broad.

Elan improperly defines "non-crosslinked" to cover both the relationship between the surface modifier molecules themselves as well as the relationship between surface modifier molecules and crystalline medicament. (Abraxis Op. Br. (D.I. 105) at 21-23.) This is wrong because the claim term "adsorbed" defines the relationship between surface modifier molecules and the crystalline medicament. (*Id.*) The term "non-crosslinked" refers to the relationship between the surface modifier molecules themselves.

Aside from this issue, Elan's only complaint is that Abraxis's proposed definition does not explain what "free of intermolecular crosslinkages" means. (Elan Op. Br. (D.I. 104) at 20.) To address this concern, Abraxis proposes a modified definition that incorporates the chemical reaction concept proposed by Elan: "non-crosslinked means that the surface modifier molecules are individually adsorbed on the surface of the crystalline medicament and are essentially free of intermolecular crosslinkages [formed by chemical reaction] between surface modifier molecules." (*Id.*)

C.    **Elan's Definition of "Surfactant" Ignores Required Physical Characteristics.**

As Abraxis explained in its opening brief, one of ordinary skill in the art would understand that a "surfactant" meets the functional limitations of Elan's proposed definition and has physical characteristics proposed by Abraxis, *i.e.*, a hydrophobic part and a hydrophilic part. (Abraxis Op. Br. (D.I. 105) at 26-28.) Although Elan complains that Abraxis's definition is too narrow, it fails to identify a single surfactant that would not be covered by Abraxis's proposed definition. Elan's function-only definition results in an overly broad construction that would lead to absurd results. Many substances, such as concrete, could reduce interfacial tension among immiscible substances without being a surfactant. (*Id.* at 28.) Moreover, Elan pulls its definition of "surfactant" from a general purpose dictionary, but fails to explain why one of ordinary skill in the art would look to a general purpose dictionary to define this technical term. *See Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1369 (Fed. Cir. 2002) (Technical dictionaries are useful in providing "specialized meanings [as used] in particular fields of art."). Elan cites no support for defining surfactant as a "stabilizing agent." (Elan Op. Br. (D.I. 104) at 21.)

V.    **THE REMAINING '025 PATENT CLAIM TERMS.**

A.    **Elan's Proposed Construction of "Without Eliciting Adverse Hemodynamic Effects" Ignores the Phrase "Without Eliciting" and Seeks to Redefine "Mammal."**

Elan presses the same three flawed arguments that Abraxis identified in its Opening Brief. (Abraxis Op. Br. (D.I. 105) at 28-30.) First, Elan argues, without citation to any factual or legal authority, that because the claims of the '025 patent are method claims, they are satisfied in each instance where avoiding hemodynamic effects even in a

single individual is achieved.  (Elan Op. Br. (D.I. 104) at 22.)  As Abraxis explained, this assertion runs counter to what Elan claimed as its invention — predictably avoiding certain side effects.  Such an invention makes sense only in the general context of avoiding side effects in a population, and the specification and prosecution history support Abraxis's proposed construction.  (Abraxis Op. Br. (D.I. 105) at 29-30.)

Second, Elan improperly proposes a definition that covers both not eliciting hemodynamic effects and eliminating preexisting ones, though it admits that "[f]rom the plain ordinary meaning of 'elicit,' the claimed method of administration does not 'draw forth' adverse hemodynamic effects."  (Elan Op. Br. (D.I. 104) at 22.).  The only support Elan cites for the elimination of preexisting effects is a statement from the prosecution history: "hemodynamic effects associated with intravenous administration of nanoparticulate formulations can be eliminated…."  (Elan Op. Br. (D.I. 104) at 23 (citing '754 App., 2/4/1998 Amendment at 4).)  This language does not support Elan's theory, as the eliminated effects are only those associated with the intravenous administration and not preexisting effects.

Third, although Elan chose to claim a method of administration that does not cause adverse hemodynamic effects in "mammals," Elan now seeks to redefine "mammals" to mean only dogs and other unspecified "sensitive species."  (Elan Op. Br. (D.I. 104) at 23.)  If Elan wished to limit the claims to "sensitive species," it should have done so, but there is no support for reading this limitation into the claims.  (Abraxis Op. Br. (D.I. 105) at 30.)  Elan cannot read into the claims an unclaimed aspect of a preferred embodiment.  *See Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (improper to read limitation from specification into the claims).  The specification

makes clear that that is precisely what Elan is attempting to do: "as used herein, mammal *preferably* means a dog and other sensitive species including human species." (Ex. 2 at A0012, '025 patent at 2:66-67 (emphasis added).) Elan's decision to claim treating *all* mammals using the specified infusion rate based on tests of only one species may render the claims invalid, but "[i]t is not [the Court's] function to rewrite claims to preserve their validity." *See, e.g., Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).

> **B.**    **Elan Chose to Define "Infusion Rate Not Exceeding 10 Mg/min" By the Weight of the Entire Drug Composition.**

Elan attempts to obscure the language of the claim, which makes clear that the "mg" in "10 mg/min" refers to the entire drug composition, not merely the nanoparticles therein. (Elan Op. Br. (D.I. 104) at 23-27.) Notably, in four pages of argument regarding this claim term, Elan does not once address the language of the *claims themselves.* (*Id.*) But the claims specifically require infusion of the entire *drug composition* at a rate of 10 mg/min, and they make clear that the "pharmaceutically acceptable carrier" is part of the composition.

Claims 1 and 13 of the '025 patent require "intravenously administering to said mammal an effective amount of a nanoparticulate *drug composition* at an infusion rate not exceeding 10 mg/min." The entire "nanoparticulate drug composition," not merely the particles in the composition, is the antecedent for "mg." (*Id.*) It is equally clear that the drug composition is more than just the particles. The composition is the particles and the "pharmaceutically acceptable carrier." (Ex. 2 at A0019-020, '025 patent, claims 1 and 13.)

Elan argues that the construction mandated by the claim language would exclude the embodiment of Table 7 (Elan Op. Br. (D.I. 104) at 24-26.) Table 7, however, does not disclose an embodiment of the claims under either party's construction. In fact, Table 7 nowhere discloses an infusion rate in "mg/min," as claimed. (*See* Ex. 2 at A0014, '025 patent, Table 7.) Moreover, the fourth entry in Table 7 discloses what Elan contends is an infusion rate of 10 mg/min based solely on the nanoparticles, but the "Response" column for that entry shows that adverse hemodynamic effects *were observed*, and not reduced or eliminated. (*Id.*) Finally, Table 7 does not even show the use of a therapeutic or diagnostic agent as required by the claims. (*Id.*)

Elan also argues that the patent makes clear that hemodynamic effects are caused by the particles, and that therefore the reduced infusion rate must be confined to the infusion rate of the particles rather than the entire composition. (Elan Op. Br. (D.I. 104) at 24-25.) But even if the nanoparticles cause the hemodynamic effects, lowering the infusion rate of the drug composition necessarily reduces the rate of infusion of its components, including the nanoparticles.

Elan's assertion that basing the infusion rate on the drug composition in its entirety "would essentially eliminate the contribution of the nanoparticles to the recited administration rate, since the suspension liquid forms a much greater part of the whole composition by weight" (Elan Op. Br. (D.I. 104) at 25), misconstrues the specification. As Elan points out, "[t]he specification notes that '[i]t has now been discovered that hemodynamic effects of suspensions can be eliminated or at least substantially reduced by *controlling the rate of infusion and/or the concentration of the active drug in the suspensions.*'" (Elan Op. Br. (D.I. 104) at 24 (quoting '025 patent at 1:62-65) (emphasis

in original).)  Rather than supporting Elan, this passage appears to support Abraxis's

proposed construction, as it addresses the entire suspension, *i.e.*, the drug composition.

Regardless, ambiguous statements in the specification cannot override the plain

language of the claim.  As Abraxis explained, the specification discloses three ways of

defining "mg" in the infusion rate: (1) the drug composition, (2) the nanoparticles, and

(3) the drug substance.  (Abraxis Op. Br. (D.I. 105) at 31.)  Elan, however, chose to claim

only the first embodiment — the weight of the entire drug *composition*.  The patentee is

free to claim only certain aspects of the disclosure.  *See, e.g., Intamin Ltd. v. Magnetar

Techs., Corp.*, 483 F.3d 1328, 1336-37 (Fed. Cir. 2007) ("this court has acknowledged

that a claim need not cover all embodiments").  That is precisely what happened here.

The disclosure of other embodiments does not permit Elan to rewrite the asserted claims.

Finally, Abraxis's proposed construction addresses the meaning of the word

"infusion," which Elan ignores.  As Abraxis explained, one of ordinary skill would

understand that an infusion is intravenous administration by means of gravity flow.

(Abraxis Op. Br. (D.I. 105) at 31-32.)  Elan does not dispute this construction, or that the

term "infusion" should be construed.  (Elan Op. Br. (D.I. 104) at 24.)  Elan instead

professes to be confused by the phrase "gravity flow."  (*Id.*)  We do not see the

confusion:  "gravity flow" means that gravity causes the composition to be infused; the

composition "drips" in from an IV bag that is elevated above the infusion site.

**C.    Elan Improperly Construes the "Colloidal Polymeric Material" To Be
The "Pharmaceutically Acceptable Carrier," Which Is A Separate
And Distinct Limitation.**

Without support, Elan first argues that the terms "colloidal," "polymeric" and

"material" must be construed as a single phrase.  Because the specification provides little

insight into the meaning of "colloidal polymeric material," and because that phrase is not

used in the art, Abraxis proposed a definition that accounts for the ordinary meaning of each term in the phrase.  (Abraxis Op. Br. (D.I. 105) at 38.).

Moreover, Elan's proposed construction of "colloidal polymeric material" is not supported by the specification.  Elan argues that the patent teaches that the drug can be entrapped in colloidal particles.  (Elan Op. Br. (D.I. 104) at 30 (citing '025 patent at 2:56-60).)[6]  Elan then argues that the specification teaches that colloids are used as carriers for an active drug and form suspensions.  (*Id.* (citing '025 patent at 1:45-47).)  There is nothing in the specification, however, that states or suggests a definition for "colloidal polymeric material."  Moreover, Elan does not distinguish between a "colloidal" versus a "non-colloidal" carrier, effectively reading that limitation out of the claim.  The Court should adopt Abraxis's proposed construction.

## VI.    CONCLUSION

For the foregoing reasons, the claims should be construed as proposed by Abraxis.

---

[6]    Abraxis notes that Elan failed to cite this portion of the specification in the Joint Claim Construction Chart filed with the Court.  (*See* Joint Claim Construction Chart [D.I. 99] at 54-55.)

Dated:  June 22, 2007                    YOUNG CONAWAY STARGATT
                                           & TAYLOR, LLP


                                         /s/ *Karen E. Keller*
                                         Josy W. Ingersoll (#1088)
                                         Elena C. Norman (#4780)
                                         Karen E. Keller (#4489)
                                         The Brandywine Building
                                         1000 West Street, 17th Floor
                                         Wilmington, DE  19801
                                         (302) 571-6600
                                         kkeller@ycst.com

                                         Michael A. Jacobs
                                         MORRISON & FOERSTER, LLP
                                         425 Market Street
                                         San Francisco, CA  94105-2482
                                         (415) 268-7000   Telephone
                                         (415) 268-7522  Facsimile
                                         MJacobs@mofo.com

                                         Emily A. Evans
                                         MORRISON & FOERSTER, LLP
                                         755 Page Mill Road
                                         Palo Alto, CA  94304-1018
                                         (650) 813-5600  Telephone
                                         (650) 494-0792  Facsimile
                                         EEvans@mofo.com

                                         *Attorneys for Defendant*
                                         *ABRAXIS BIOSCIENCE, INC.*

## CERTIFICATE OF SERVICE

       I, Karen E. Keller, Esquire, hereby certify that on June 22, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

       I further certify that on June 22, 2007, I caused a copy of the foregoing document to be served by hand delivery and e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

> **BY E-MAIL**
>
> Stephen Scheve, Esquire
> BAKER BOTTS L.L.P.
> One Shell Plaza
> 910 Louisiana Street
> Houston, TX  77002-4995
> steve.scheve@bakerbotts.com
>
> Paul F. Fehlner
> BAKER BOTTS L.L.P.
> 30 Rockefeller Plaza
> New York, NY  10112-4498
> paul.fehlner@bakerbotts.com

William J. Sipio, Esquire
1375 Brentwood Road
Yardley, PA  19067
sipz25@aol.cm

YOUNG CONAWAY STARGATT
  &  TAYLOR, LLP

/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
jingersoll@ycst.com
Elena C. Norman (No. 4780)
enorman@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899
(302) 571-6600

Attorneys for Defendant
ABRAXIS BIOSCIENCE, INC.

2