**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ELAN PHARMA INTERNATIONAL LIMITED, | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-438-GMS |
| | ) | |
| v. | ) | |
| | ) | |
| ABRAXIS BIOSCIENCE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF ELAN PHARMA INTERNATIONAL LIMITER'S ANSWERING BRIEF TO DEFENDANT ABRAXIS BIOSCIENCE, INC.'S MOTION TO COMPEL PRODUCTION OF WITHHELD AND/OR UNREDACTED VERSIONS OF DOCUMENTS CREATED BY OR FOR THIRD PARTIES**

*Of Counsel:*

Stephen Scheve
Linda M. Glover
BAKER BOTTS LLP
One Shell Plaza
910 Lousiana Street
Houston, TX 77042-4995
Telephone: (713) 229-1659

Paul F. Fehlner
Jeffrey D. Sullivan
Lisa Chiarini
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112-4498
Telephone: (212) 408-2527

William J. Sipio
1375 Brentwood Road
Yardley, PA 19067
Telephone: (215) 801-3625

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff Elan Pharma International Limited*

Dated: August 22, 2007

## TABLE OF CONTENTS


I. Nature And Stage Of The Proceedings - 1 -

II. Summary Of The Argument - 2 -

III. Statement Of The Facts - 4 -

A. Elan Acquired All Of Nanosystems Assets And Liabilities. - 4 -

B. Elan Continues The Business Operations Of Nanosystems To This Day. - 4 -

C. Nanosystems Was A subsidiary Of Eastman Kodak And A Sister Company Or Affiliate To Sterling Drug, Inc., Sterling Winthrop, And Particulate Prospects Corporation. - 5 -

D. Sterling Winthrop's Privilege Did Not Pass To Sanofi, As Abraxis contends. - 6 -

IV. Argument And Authorities - 7 -

A. The Attorney-Client Privilege Serves A Valuable Public Interest. - 7 -

B. The Supreme Court's Decision In *Weintraub* Provides Guidance Concerning When A Successor May Assert Privileges - 7 -

C. The *Weintraub* Rationale Applies Outside The Bankruptcy Arena - 8 -

D. Whether Control Of A Business Passes To A Successor Requires An Examination Of All The Surrounding Business Circumstances. - 10 -

E. Because Elan Purchased All Of Nanosystems' Assets, And Continued Nanosystems' Business Operations, Elan Also Assumed The Right Tto Assert Any Privileges Held By Nanosystems. - 11 -

V. Conclusion - 13 -

# TABLE OF AUTHORITIES

## CASES

902 F.2d 244 (4th Cir. 1990) ....................9

*Admiral Ins. Co. v. United States Dist. Court for the Dist. of Arizona*, 881 F.2d 1486 (9th Cir. 1989) ....................12

*Coffin v. Bowater Inc.*, Civil No. 03-227-P-C, Lexsee U.S. Dist. LEXIS 9395 at 5-8 (D. Me. May 13, 2005) ....................11

*Crabb v, KFC Nat'l Mgmt Co.*, No. 91-5474, 1992 WL 1321 (6th Cir. 1992)....................11

*Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146 (D.S.C. 1974)....................12

*Glidden Co. v. Jandernoa*, 173 F.R.D. 459 (W.D. Mich. 1997)....................9, 11

*Graco Children's Prods. v. Regalo Int'l LLC*, No. Civ. A. No. 97-6885, 1999 WL 553478 (E.D. Pa. July 29, 1999)....................9

*In re Crescent Beach Inn*, 37 B.R. 894 (Bankr. D. Me)....................9

*In re Fin. Corp. of Am.*, 119 B.R. 728 (Bankr. C.D. Cal. 1990)....................9

*In re Grand Jury Subpoenas*, 734 F. Supp. 1207 (E.D. Va. 1990) ....................8, 10

*Madison Mgmt. Group, Inc. v. Zell*, 212 B.R. 897 (Bankr. N.D. Ill. 1997) ....................12

*NCL Corp. v. Lone Star Bldg. Ctrs (Eastern)., Inc.*, 144 B.R. 170 (S.D. Fla. 1992) ....................9

*Ramada Franchise Sys. v. Hotel of Gainesville Assocs.*, 988 F. Supp. 1460 (N.D. Ga. 1997) ....................9

*Soverain Software LLC v. Gap, Inc.*, 340 F. Supp.2d 760 (E.D. Tex. 2004)....................10, 11

*The Jordan (Bermuda) Inv. Co. v. Hunter Green Investments. Ltd.*,
No. 00 Civ. 9214 (RWS), 2006 WL 2773022 (S.D.N.Y. September 27, 2006)................12

*Upjohn Co. v. United States*,
449 U.S. 383 (1981)......................................................................................................7, 8

## I. Nature And Stage Of The Proceedings

On July 19, 2006, Plaintiff Elan Pharma International Limited ("Elan") filed suit alleging that Abraxis BioScience, Inc. ("Abraxis") infringes U.S. Patent Nos. 5,399,363 (the "'363 Patent") and 5,834,025 (the "'025 Patent") (collectively, the "Patents-In-Suit"). Elan's '363 Patent is directed to a nanoparticulate anticancer drug composition; and Elan's '025 Patent is directed to an intravenous method of administering a nanoparticulate drug composition so as to avoid eliciting adverse hemodynamic effects. The accused product, Abraxane®, is a nanoparticulate anticancer drug composition, which is intravenously administered.

During fact discovery, which concluded on August 13, 2007, Elan produced over 313,000 pages of documents to Abraxis. Elan also withheld or redacted certain documents based on privilege, as permitted by the Federal Rules of Civil Procedure, in each case lodging proper objections on either privilege or other evidentiary grounds. Elan produced a detailed privilege log to Abraxis. Elan also produced a comprehensive redaction log. Both logs contain meticulous descriptions of why Elan claims privilege over the individually listed documents.

On August 8, 2007, Abraxis filed a Motion To Compel Production Of Withheld And/Or Redacted Versions Of Documents Created By Or For Third Parties (the "Motion"). In its Motion, Abraxis seeks a wholesale disclosure of Elan's privileged documents, erroneously claiming that Elan does not have the right to assert privilege over documents and other materials created by or communicated among its direct predecessor-in-interest and affiliated companies (collectively, "Predecessors-In-Interest") and their counsel.[1] Abraxis completely ignores the fact

[1] Notably, Abraxis does not contend that the documents listed in Elan's privilege log do not qualify for protection by virtue of their content; rather, Abraxis merely contends that Elan did not succeed to the privilege held by Third Parties.

that Elan is continuing the same business enterprise and activities as its Predecessors-In-Interest in a continuous line of business and legal privity.

## II. Summary Of The Argument

Abraxis's analysis of whether Elan is entitled to assert privilege over documents created by or communicated among Predecessors-In-Interest and their counsel is both factually and legally flawed. First, Abraxis inaccurately represents the historical transactions among the Predecessors-In-Interest, and between the Predecessors-In-Interest and Elan. Then, selectively citing case law that Abraxis believes supports its position — and ignoring far more substantial case law to the contrary —Abraxis mistakenly contends that to the extent documents privileged as to the Predecessors-In-Interest were transferred to Elan, any privilege or protection has been waived.

The proper analysis, based on applying the facts to well-established law, compels a far different conclusion than that reached by Abraxis. Determining whether Elan is entitled to assert privilege over documents created by or communicated among Predecessors-In-Interest and their counsel requires a two-part inquiry. First, when Elan acquired Nanosystems LLC ("Nanosytems"), did Elan acquire control over substantially all of Nanosystems assets and continue the business under new management? If so, then Elan acquired the right to assert any privileges held by Nanosystems at the time of acquisition.

Second, at the time it was acquired by Elan, was Nanosystems entitled to assert privilege over documents created by or communicated among Eastman Kodak, Sterling Drug, Inc., Sterling Winthrop and Particulate Prospects Corporation? If so, then Nanosystems' right to assert privilege over these documents passed to Elan.

The only element in case law cited by Abraxis that is germane to control over privilege is the proposition that a naked transfer of assets, without more, is not sufficient to effect

a transfer of privileges. Rather, control of the business possessing the privilege must also pass for privileges to pass. Whether privileges transfer to new owners turns on the facts and circumstances of the business transaction as a whole, rather than on the mere formality of the transaction, as Abraxis would have this Court believe. If the practical consequences of a transaction as a whole result in the transfer of control of the business and the continuation of the business as a going concern under new corporate ownership or management, the authority to assert privileges will follow as well. Thus, whether Elan may assert privilege over documents privileged as to Predecessors-In-Interest must be determined in light of the surrounding circumstances.

These circumstances reveal that Elan acquired control over all of the assets of Nanosystems. To this day, Elan continues the research begun by Nanosystems and its affiliates into the preparation and delivery of stable nanoparticulate formulations for use in pharmaceuticals. Indeed, Elan assumed Nanosytems' personnel, facilities, research pursuits and commercial relationships. This commonality of business operations establishes that there is no break in privity between Nanosystems and Elan, and that Elan is entitled to maintain any privileges relating to their common business.

Precedent then establishes that Nanosystems was entitled to assert privileges over documents created by or communicated among Eastman Kodak, Sterling Drug, Inc., Sterling Winthrop and Particulate Prospects Corporation, which were sister companies or affiliates of Nanosystems by virtue of their common ownership by Eastman Kodak. When Elan acquired Nanosystems and its documents, Elan also acquired any privileges Nanosystems claimed as to those documents. Accordingly, Abraxis's attempt to violate the important interests implicated by legal privilege is without foundation in fact or law.

## III. Statement Of The Facts

### A. Elan Acquired All Of Nanosystems Assets And Liabilities.

REDACTED Elan purchased all of the assets and liabilities of Nanosystems.

REDACTED

The Nanosystems assets purchased by Elan included REDACTED

Elan also agreed to

REDACTED

### B. Elan Continues The Business Operations Of Nanosystems To This Day.

Nanosystems focused on the preparation and delivery of stable nanoparticulate formulations for use in the pharmaceutical and drug industry. *See* Decl. of David Czekai ¶ 6, attached as Exhibit B. Elan maintains that same focus today. Ex. B. at ¶ 7. Indeed, Elan has continued the research initiated by Nanosystems or its affiliate companies in the same laboratories and with the same personnel as Nanosystems. *See id.* at ¶ 9.

### C. Nanosystems Was A Subsidiary Of Eastman Kodak And A Sister Company Or Affiliate To Sterling Drug, Inc., Sterling Winthrop, And Particulate Prospects Corporation.

Prior to its purchase by Elan, Nanosystems was a subsidiary of Eastman Kodak, and a sister company or affiliate to Sterling Drug, Sterling Winthrop, Inc. and Particulate Prospects, Inc, by virtue of their common ownership by Eastman Kodak.[2] *Id.* at ¶ 3. Each of these companies were involved to some extent in the preparation and delivery of stable nanoparticulate formulations for use in the pharmaceutical and drug industry. *Id.* at ¶ 4. As these Eastman Kodak subsidiaries were involved in similar enterprises, they often shared certain proprietary and/or confidential documents and information of Eastman Kodak and/or of the respective subsidiaries. *Id.* at ¶ 5. Specifically, these affiliated companies often shared documents or communications containing or reflecting legal advice and/or the mental impressions of legal counsel for one or more of Eastman Kodak subsidiaries, with all such legal documents or communications remaining under the common ownership of Eastman Kodak. Such confidential documents or communications were not, however, shared or revealed to third parties, other than for the purposes of obtaining legal advice and/or possibly for pursuing on terms of confidentiality a common legal purpose with another party. *Id.*

---

[2] Abraxis's contention that Sanofi bought Sterling Winthrop, and that Sterling Winthop's privilege thereby passes to Sanofi, rather than to Elan, is simply wrong. On February 23, 1988, Eastman Kodak purchased Sterling Drug, Inc., which was best known for its pharmaceutical and household products, such as Bayer Aspirin and Lysol, for $5.1 billion. In 1991, Eastman Kodak merged some of the Sterling Drug, Inc. business operations with the operations of another pharmaceutical company to create Sterling Winthrop, Inc., which manufactured both pharmaceuticals and non-pharmaceutical consumer products. In 1993, Eastman Kodak formed Nanosystems, Inc., which reported to Particulate Prospects Corporation and Captech Corporation, both other Eastman Kodak entities. Also in 1993, Sterling Winthrop/Eastman Kodak formed a joint venture with the French firm, Elf Sanofi S.A. seeking penetration of the European pharmaceutical market. In 1994, Elf Sanofi acquired *only* the prescription drug operations of Sterling Winthrop for $1.675 billion, at which time Elf Sanofi changed its name to Sanofi, S.A. In 1994, Eastman Kodak sold the over-the-counter operations of Sterling Winthrop, including the rights to Bayer Aspirin, for $4.6 billion. The nanoparticulate operations of Sterling Winthrop remained under the auspices of Nanosystems L.L.C. and Eastman Kodak.

**D. Sterling Winthrop's Privilege Did Not Pass To Sanofi, As Abraxis Contends.**

Abraxis's contention that Sanofi bought Sterling Winthrop, and that Sterling Winthop's privilege thereby passed to Sanofi, rather than to Elan, is simply wrong. On February 23, 1988, Eastman Kodak purchased Sterling Drug, Inc., which was best known for its pharmaceutical and household products such as Bayer Aspirin and Lysol, for $5.1 billion. *See* AP Online, "Biggest Drug Company Mergers," August 21, 1995, attached as Exhibit E.

In 1991, Eastman Kodak merged some of the Sterling Drug, Inc. business operations with the operations of another pharmaceutical company to create Sterling Winthrop, Inc., which manufactured both pharmaceuticals and non-pharmaceutical consumer products. *See* History of Kodak: 1999-1999, attached as Exhibit 7.

In 1993, Eastman Kodak formed Nanosystems, Inc., which reported to Particulate Prospects Corporation and Captech Corporation, also Eastman Kodak subsidiaries. *See* Mary Welch, "Nanosystems' Crystal Method Nets $30M Deal With Merck," Bioworld Today 9:157, August 17, 1998, attached as Exhibit D. Also in 1993, Sterling Winthrop/Eastman Kodak formed a joint venture with the French firm, Elf Sanofi S.A. seeking penetration of the European pharmaceutical market. *See* Milt Freudenheim, "New Venture May Resolve Kodak Issue," New York Times, January 10, 1991, attached as Exhibit G.

In 1994, Elf Sanofi acquired *only* the prescription drug operations of Sterling Winthrop for $1.675 billion, at which time Elf Sanofi changed its name to Sanofi, S.A. *See* AP Online, "Biggest Drug Company Mergers," August 21, 1995; Excerpts of Eastman Kodak Co., Form 10-Q, filing date November 14, 1994, attached as Exhibits E, H. In 1994, Eastman Kodak sold the over-the-counter operations of Sterling Winthrop, including the rights to Bayer Aspirin, for $4.6 billion. *See* "Bayer Group," Med Ad News 47, September 1, 1996, attached as Exhibit C. The nanoparticulate operations of Sterling Winthrop remained under the auspices of

Nanosystems L.L.C. and Eastman Kodak, as is evident by the transfer of former Sterling Winthrop employees to Elan in the Nanosystems acquisition. *See* Eastman Kodak Co., Form 10-Q, filing date November 14, 1994, attached as Exhibit H.

Because Eastman Kodak did not transfer all of the Sterling Winthrop assets to Sanofi, and because Sanofi only continued a part of Sterling Winthop's business operations, *Weintraub* and its progeny dictate that Sanofi did not succeed to any privileges held by Sterling Winthrop, despite Abraxis's assertions in its Motion to the contrary.

## IV. Argument And Authorities

### A. The Attorney-Client Privilege Serves A Valuable Public Interest.

The attorney-client privilege is the oldest of privileges relating to confidential communications known to the common law. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege "encourage[s] full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice. *Id.*; *In re Keeper of Records*, 348 F.3d 16, 22 (2nd Cir. 2003). The privilege rests on the need for the lawyer to know everything that relates to the client's reasons for seeking representation. *Trammel v. U.S.*, 445 U.S. 40, 51 (1980). Thus, the privilege exists to promote full disclosure by the client to its attorney and foster a relationship of trust. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). This trust should not be lightly broken.

### B. The Supreme Court's Decision In *Weintraub* Provides Guidance Concerning When A Successor May Assert Privileges.

The Supreme Court's decision in *Weintraub* makes clear that a successor company may assert a predecessor corporation's legal privileges under certain factual and business conditions. Those conditions are clearly met here. The issue raised in *Weintraub* was

whether the trustee of a corporation in bankruptcy had the power to waive the debtor corporation's attorney-client privilege with respect to communications that took place before the filing of the bankruptcy petition. The Court noted that "for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Id.* at 348. The Court further stated that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349. Indeed, "new managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply by normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors." *Id.* Naturally, that right which may be waived by a successor entity may, by definition, also be maintained by the successor.

The *Weintraub* Court found that because the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the person whose duties most closely resemble those of management should control the privilege in bankruptcy. *Id.* at 351-52. The court noted that the Bankruptcy Code gives the trustee wide-ranging management authority over the debtor while the debtor's directors retain virtually no power during bankruptcy. *Id.* at 352. Therefore, the court found that the "trustee plays the role most closely analogous to that of a solvent corporation's management." *Id.* at 353. Accordingly, the *Weintraub* court found that "the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to pre-bankruptcy communications." *Id.* at 358.

**C. The *Weintraub* Rationale Applies Outside The Bankruptcy Arena.**

The Court in Weintraub explicitly contemplated that a variety of scenarios or transactions (including but not limited to insolvency and installation of a trustee) could lead to a successor standing in the shoes of the prior owner of a business (for instance, the bankruptcy

trustee, or another new manager). Following the rationale in *Weintraub*, courts have routinely found that the power to invoke or waive a corporation's attorney-client privilege is an incident of control of the corporation. *See In re Grand Jury Subpoenas*, 734 F. Supp. 1207, 1211 (E.D. Va. 1990), *aff'd in relevant part*, 902 F.2d 244 (4th Cir. 1990) (finding that "the principle that emerges from *Weintraub* and the subsequent decisions is that 'when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.'"); *Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 472 (W.D. Mich. 1997) (recognizing that invoking or waiving the corporation's privilege is an incident of control of the corporation); *NCL Corp. v. Lone Star Bldg. Ctrs (Eastern)., Inc.*, 144 B.R. 170, 174 (S.D. Fla. 1992) (commenting that the right to assert the attorney-client privilege is an incident of control of the corporation and remains with the corporation as it undergoes mergers, takeovers, and name changes); *Graco Children's Prods. v. Regalo Int'l LLC*, No. Civ. A. No. 97-6885, 1999 WL 553478, at * 3 (E.D. Pa. July 29, 1999) (stating that the authority to invoke or waive the corporation's attorney-client privilege follows the passage of control of the corporation).

Following the decision and rationale in *Weintraub*, several courts have likewise recognized that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert the attorney-client privilege. *See In re Fin. Corp. of Am.*, 119 B.R. 728 (Bankr. C.D. Cal. 1990) (holding that the authority to assert the corporation's attorney-client privilege passes with the transfer of substantially all of the corporation's assets and liabilities); *In re Crescent Beach Inn*, 37 B.R. 894 (Bankr. D. Me), *reconsid. denied*, 40 B.R. 56 (1984) (holding that the transferee of all the assets of a recognized company was the debtor's successor for purposes of the attorney-client privilege and was therefore entitled to assert the privilege formerly held by the debtor); *Ramada Franchise Sys. v. Hotel of Gainesville Assocs.*, 988 F.

Supp. 1460, 1463 (N.D. Ga. 1997) (finding that the authority to assert or waive the old company's attorney-client privilege passed to the new company when it acquired all of the assets and control of the old company during bankruptcy).

This hardly comes as a surprise given that for a variety of corporate and tax reasons, businesses and their counsel employ variously-denominated transactional documents, such as merger agreements, divestiture or spin-off arrangements, asset sales or purchase agreements, to effect the identical legal and business result: transfer of an entire business for continuing operation as the same going business concern under different corporate ownership.

**D. Whether Control Of A Business Passes To A Successor Requires An Examination Of All The Surrounding Business Circumstances.**

Elan does not dispute that "[a] transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." *In re Grand Jury Subpoenas*, 734 F. Supp. at 1211, n.3; *see also* Motion at 3. This undisputed proposition, when read in the context of relevant case law, fatally hamstrings Abraxis's unfounded attempts to interpose itself into the protected relationship among Elan, Predecessors-In-Interest and their respective counsel, with whom Elan shared a common and successive business and legal interest.

Indeed, in *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp.2d 760, 763 (E.D. Tex. 2004), the court noted that the mere transfer of some assets would not transfer the attorney-client privilege. The court noted, however, that such a "bright line rule does not apply equally to the myriad ways control of a corporation or a portion of corporation can change hands." *Id.* The court, therefore, found "the more appropriate rule to be 'whether the attorney-client relationship transfers . . . to the new owners turns on the practical consequences rather than the formalities of

a particular transaction." *Id.* (citing *Tekni-Plex, Inc. v. Meyer and Landis*, 89 N.Y.2d 123, 128, 674 N.E.2d 663, 668 (N.Y. 1996). The *Soverain* court stated that:

> If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well.

*Id.* Because the plaintiff in *Soverain* not only acquired certain assets, but also continued to operate the particular business it purchased, the court found that control of the business, and with it the right to assert the attorney-client privilege, passed to the plaintiff. *Id.*; *see also Coffin v. Bowater Inc.*, Civil No. 03-227-P-C, Lexsee U.S. Dist. Lexis 9395 at * 5-8 (D. Me. May 13, 2005). The holding of Soverain is directly on point with the facts in this case, and stands, along with Weintraub and its progeny, for the clear proposition that because the practical consequence of Elan's acquisition of Nanosystems was to transfer virtually all control and continuation of Nanosystems business to Elan, there is no basis for denying Elan the right to assert and rely on the privilege it inherited intact from its predecessor in direct business privity.

**E. Because Elan Purchased All Of Nanosystems' Assets, And Continued Nanosystems' Business Operations, Elan Also Assumed The Right To Assert Any Privileges Held By Nanosystems.**

At all times prior to August 21, 1998, Nanosystems was a subsidiary of Eastman Kodak. Sterling Drug, Inc., Sterling Winthrop, and Particulate Prospects were also subsidiaries of Eastman Kodak. The universal rule of law, expressed in a variety of contexts, is that the parent, subsidiary and affiliated companies share a community of interests, such that all are the "client" for purposes of the attorney-client privilege. *See Glidden Co.*, 173 F.R.D. at 472-73 (citing *Crabb v, KFC Nat'l Mgmt Co.*, No. 91-5474, 1992 WL 1321 at * 3 (6th Cir. 1992) ("The cases clearly hold that a corporate "client" includes not only the corporation by whom the attorney is retained, but also parent, subsidiary and affiliated corporations.") (quoting *United*

*States v. AT&T*, 86 F.R.D. 603, 616 (D.D.C. 1979). As a result, disclosure of legal advice to a parent or affiliated company does not waive any privilege because of the complete community of interest between parent, subsidiary and affiliates.

Thus, it is well-settled that the simple distribution of legal advice to similarly-situated decision-makers at affiliated companies would not constitute a waiver of the confidentiality of documents. *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1184-85 (D.S.C. 1974) ("Although an interest of third-party corporation from a commercial standpoint would not establish a sufficient community of interest, the fact that the communications are among formerly different corporate entities which are under common ownership or control leads this court to treat such inter-related corporate communications in the same manner as intra-corporate communications."); *see also Admiral Ins. Co. v. United States Dist. Court for the Dist. of Arizona*, 881 F.2d 1486, 1493 n.6 (9th Cir. 1989) (recognizing privilege not waived across parent-subsidiary relationship). Accordingly, the sharing of privileged information among Eastman Kodak, Sterling Drug, Inc., Sterling Winthrop, Particulate Prospects and Nanosystems does not constitute a waiver of privilege.

When Nanosystems was acquired, it held the privilege to documents created by and communicated among Eastman Kodak, Sterling Drug, Inc., Sterling Winthrop, Particulate Prospects and Nanosystems. Because Elan assumed total control over Nanosystems, it succeeded to any privilege held by Nanosytems, including the privilege over Nanosystems' parent and affiliates' documents that pre-dated the sale. Moreover, the mere fact that Elan continues to share that privilege with Eastman Kodak and Particulate Prospects (to the extent that it still exists) is inconsequential.[3] Indeed, case law is clear that it would take an agreement

[3] Abraxis's suggestion that Elan cannot succeed to privileges held by Nanosytems because Eastman Kodak remains a viable separate entity ignores a substantial body of case law addressing joint privilege holders.

among Elan, Eastman Kodak and Particulate Prospects (to the extent that it still exists) to waive privilege over documents shared by the entities prior to Eastman Kodak's divestiture of Nanosystems. *See Madison Mgmt. Group, Inc. v. Zell*, 212 B.R. 897, 904 (Bankr. N.D. Ill. 1997); *The Jordan (Bermuda) Inv. Co. v. Hunter Green Investments. Ltd.*, No. 00 Civ. 9214 (RWS), 2006 WL 2773022 at * 1-2 (S.D.N.Y. September 27, 2006).

## V. Conclusion

A well-reasoned analysis of Elan's acquisition of Nanosytems compels two conclusions. First, Elan's acquisition of Nanosystems constituted more than a naked transfer of assets. Rather, Elan gained control over Nanosystems and continued its business under new management. Under prevailing case law, this entitles Elan to assert any privileges held by Nanosystems prior to the acquisition. Second, the privileges transferred to Elan include those Nanosystems held over its own documents, as well as over documents created by and communicated among its parent, and affiliates, including Sterling Winthrop and Particulate Prospects, and their attorneys. For these reasons, Abraxis's Motion should be denied.

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Elan Pharma International Limited*

*Of Counsel:*

Stephen Scheve
Linda M. Glover
BAKER BOTTS LLP
One Shell Plaza
910 Lousiana Street
Houston, TX 77042-4995
Telephone: (713) 229-1659

Paul F. Fehlner
Jeffrey D. Sullivan
Lisa Chiarini
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112-4498
Telephone: (212) 408-2527

William J. Sipio
1375 Brentwood Road
Yardley, PA 19067
Telephone: (215) 801-3625

Dated: August 22, 2007
183498.1