# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON

ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN
JOHN E. TRACEY
EDMON L. MORTON

JOSEPH M. BARRY
RYAN M. BARTLEY
SEAN M. BEACH
SANJAY BHATNAGAR
DONALD J. BOWMAN, JR.
MICHELE SHERRETTA BUDICAK
JEFFREY T. CASTELLANO
DOUGLAS T. COATS (MD ONLY)
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
KERRIANNE MARIE FAY
IAN S. FREDERICKS
JAMES J. GALLAGHER
WILLIAM E. GAMGORT
SEAN T. GREECHER
NATHAN D. GROW
STEPHANIE L. HANSEN
JAMES L. HIGGINS
PATRICK A. JACKSON
DAWN M. JONES
KAREN E. KELLER

JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI
EVANGELOS KOSTOULAS
JOHN C. KUFFEL
TIMOTHY E. LENGKEEK
ANDREW A. LUNDGREN
MATTHEW B. LUNN
ADRIA B. MARTINELLI
KATHALEEN MCCORMICK
MICHAEL W. MCDERMOTT
TAMMY L. MERCER
MARIBETH L. MINELLA
D. FON MUTTAMARA-WALKER
JENNIFER R. NOEL
ADAM W. POFF
ROBERT F. POPPITI, JR.
SARA BETH A. REYBURN
CHERYL A. SANTANIELLO
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
CHAD S.C. STOVER
RICHARD J. THOMAS
TRAVIS N. TURNER
MARGARET B. WHITEMAN
SHARON M. ZIEG

SPECIAL COUNSEL
JOHN D. MCLAUGHLIN, JR.
KAREN L. PASCALE
SETH J. REIDENBERG
PATRICIA A. WIDDOSS

SENIOR COUNSEL
CURTIS J. CROWTHER

OF COUNSEL
BRUCE M. STARGATT
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE  19801

P.O. BOX 391
WILMINGTON, DELAWARE  19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

WWW.YOUNGCONAWAY.COM

DIRECT DIAL: 302-571-6554
DIRECT FAX: 301-576-3467
kkeller@ycst.com

January 9, 2008

**BY CM/ECF**

**REDACTED -
PUBLIC VERSION**

The Honorable Gregory M. Sleet
U.S. District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street, Lockbox 19
Wilmington, DE  19801

Re:     *Elan Pharma Int'l Ltd. v. Abraxis BioScience, Inc.*, C.A. No. 06-438-GMS

Dear Chief Judge Sleet:

This is Abraxis's response to Elan's January 2, 2008 letter requesting permission to file motions for summary judgment.  As we demonstrate below, Elan's requested motions are either (1) inappropriate, because Elan has not established that it can prevail as a matter of law; or (2) not necessary, because Abraxis will stipulate to the relief Elan seeks in, for example, the pre-trial order.

We respond using the numbering in Elan's letter.

## (1) Entry of Judgment on the '025 Patent

As Elan notes, it is not seeking summary judgment on the '025 patent but rather is withdrawing its claim for infringement.  Elan also appears to be asking the Court to enter judgment against it on this patent so that it can expedite an appeal, but fails to note that Abraxis's counterclaims would remain pending even if judgment on its complaint were entered.  In any case, we believe Elan's proper course is to file a motion under Fed. R. Civ. P. 54, which we will oppose.

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Gregory M. Sleet
January 9, 2008
Page 2

### (2) Obviousness-Type Double Patenting

Elan's argument that its filing of a terminal disclaimer (first disclosed to Abraxis with the filing of Elan's letter) resolves Abraxis's double patenting defense as a matter of law is incorrect. At most, a terminal disclaimer *prospectively* overcomes invalidity based on double patenting. In *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005), which Elan fails to cite, the Federal Circuit made clear that it has not decided the question of whether the filing of a terminal disclaimer has retrospective effect. *Id.* at 1375 ("...this court makes no determination about the retrospective effect of such a terminal disclaimer."). In analogous circumstances, however, the Federal Circuit has held that the cure is prospective only. For example, in *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280 (Fed. Cir. 2000), the Federal Circuit held that where a certificate of correction to correct an error by the patent office was necessary to cure a patent's validity, the cure was prospective only and the patentee could not sue for activities that pre-dated issuance of the certificate of correction:

> In such a case, where the claim is invalid on its face without the certificate of correction, it strikes us as an illogical result to allow the patent holder, once the certificate of correction has issued, to sue an alleged infringer for activities that occurred before the issuance of the certificate of correction. Moreover, it does not seem to us to be asking too much to expect a patentee to check a patent when it is issued in order to determine whether it contains any errors that require the issuance of a certificate of correction.

*Id.* at 1295-1296. This same rationale applies here. Where a claim is facially invalid without a terminal disclaimer, it is illogical to permit a patentee to sue for activities undertaken before the filing of the disclaimer.

### (3) Patent Misuse and Unclean Hands

Contrary to Elan's contention, Abraxis has ample evidence supporting these defenses.



Y O U N G  C O N A W A Y  S T A R G A T T  &  T A Y L O R, LLP
The Honorable Gregory M. Sleet
January 9, 2008
Page 3

███████████████████████████████████████████████

     Elan's conduct in this litigation further confirms that this suit was brought in bad faith for anti-competitive purposes and/or to disrupt Abraxis's business, and provides additional support for these defenses.  For example, Elan has asserted claim construction positions that the Court has emphatically rejected as lacking any support.  In addition, Elan has never produced test results that it obtained prior to filing this lawsuit, and instead continues to withhold them based on alleged attorney-client and work-product protection, even though at least some of the testing was conducted or supervised by Elan's testifying experts.  ██████████████████████
███████████

     Accordingly, based on both direct and circumstantial evidence, there is at least a triable issue of fact whether Elan has brought the litigation for an improper purpose and engaged in "sham" litigation.  *See, e.g., Glaverbel Societe Anonyme v. Northlake Mktg. & Supply*, 45 F.3d 1550, 1558 (Fed. Cir. 1995) (holding that to show patent misuse, "there must be bad faith and improper purpose in bringing the suit, in implementation of an illegal restraint of trade").  These same facts support Abraxis's unclean hands defense, which, contrary to Elan's assertions, is not limited to "recognized categor[ies]" (D.I. 447 at 4 (Elan SJ Ltr.).)  Instead, "[t]he maxim of unclean hands is applied broadly, giving substantial discretion to the officer of the court in its application . . . and is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Aptix Corp. v. Quickturn Design Sys.*, 269 F.3d 1369, 1378-79 (Fed. Cir. 2001) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245-46 (1933)) (internal citations omitted).  Accordingly, litigation misconduct is a legitimate basis on which the doctrine of unclean hands may be invoked. *Id. at* 1374 ("The district court's finding of litigation misconduct fully justified its decision to invoke the unclean hands doctrine and dismiss [the patentee] from suit.").

### (4) Inequitable Conduct on the '363 Patent

    a.  Elan's claim that there is no evidence of intent or materiality on the "Domb" reference ignores the evidence cited in Abraxis's pleadings and interrogatory response.



*see McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 917-18 (Fed. Cir. 2007) (circumstantial evidence plus lack of credible explanation for failure to cite sufficient to infer deceptive intent).  As for materiality, Abraxis has adduced expert evidence that the Domb reference

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Gregory M. Sleet
January 9, 2008
Page 4

would have been important to a reasonable examiner, and is non-cumulative. (Ex. E, Opening Expert Report of Mansoor M. Amiji ("Amiji Opening Expert Report") ¶¶ 452-461.)

b. Elan's argument on withheld evidence relevant to enablement misstates Abraxis's argument.  In the '363 patent, Elan broadly claims nano-size particles consisting of a wide range of combinations of anti-cancer medicaments and surface modifiers.



At the very least, there is a triable issue of fact on this defense.

### (5) Partial Summary Judgment Relating to Certain Claim Limitations

Elan has overstated the extent of Abraxis's agreement on the presence of certain '363 patent claim limitations in Abraxane.  Elan claims, for example, that Abraxis has admitted that bovine serum albumin is equivalent to human serum albumin, but three of Abraxis's experts offered opinions contending precisely the opposite.  (Ex. F., Rebuttal Expert Report of Dr. Mansoor M. Amiji ¶¶ 208-223; Ex. G, Expert Report of Michael R. Hamrell, Ph.D. ¶¶ 56-57; Ex. H., Rebuttal Expert Report of Johnson Tai Wong at p. 14.)  Indeed, several of *Elan*'s witnesses conceded that non-human ("foreign") proteins, such as BSA, could cause dangerous immune responses in humans, and that the FDA likely would not approve an injectable product using BSA, making HSA and BSA not equivalent.  (Ex. I, Manning Dep. at 109:7-111:7; Ex. J, Berkland Dep. at 160:6-161:6.)

YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Gregory M. Sleet
January 9, 2008
Page 5

Following Elan's sequence, here is the status of the claim limitations in question in view of the Court's claim construction. Where there is agreement, there is no need for a motion for summary judgment (or a motion for summary adjudication); the agreement can be reflected in the pre-trial order.

(a) "particles consisting essentially of" – Abraxis agrees that Abraxane contains "particles" but does not agree that the particles consist "essentially of." Abraxis's disagreement on this limitation is highlighted by the non-infringement argument set out in Abraxis's January 2 letter.

(b) "medicament useful for treating cancer" – Abraxis agrees with Elan that this limitation is met.

(c) "said medicament having a solubility in water of less than 10 mg/ml" – Abraxis agrees with Elan that this limitation is met.

(d) "taxol" – Abraxis agrees with Elan that this limitation is met.

(e) "surface modifier – Abraxis agrees with Elan that this limitation is met.

(f) "adsorbed on the surface thereof" – Abraxis agrees that this limitation is met.

(g) "average effective particle size of less than [the recited amounts]"– Abraxis agrees with Elan that this limitation is met.

(h) "surfactant" – Abraxis agrees with Elan that this limitation is met.

(i) "bovine serum albumin" – Abraxis disputes this limitation, as discussed above.

<u>Conclusion</u>

Elan has not established that it should be granted leave to file any motion for summary judgment. Where the parties are in agreement, no motion is necessary; where the parties are not in agreement, Elan has not shown how it can prevail as a matter of law.

Respectfully submitted,

Karen E. Keller (#4489)

KEK:mcm
Attachments
cc:    Clerk of Court (Redacted version by CM/ECF)
       John G. Day, Esq. (Redacted version by CM/ECF)
       Steven J. Balick, Esq. (Redacted version by CM/ECF)
       Tiffany Geyer Lydon, Esq. (Redacted version by CM/ECF)
       Stephen Scheve, Esq. (by electronic mail)
       Paul F. Fehlner, Esq. (by electronic mail)
       William J. Sipio, Esq. (by electronic mail)
       Emily A. Evans, Esq. (by electronic mail)
       Diana B. Kruze, Esq. (by electronic mail)
       Michael A. Jacobs, Esq. (by electronic mail)

# EXHIBITS A-F

## REDACTED IN THEIR ENTIRETY

# EXHIBIT G

**EXPERT REPORT OF MICHAEL R. HAMRELL, PH.D.**

**RESTRICTED CONFIDENTIAL**

# I.    INTRODUCTION

## A.    Professional Background and Qualifications.

1.    I have been employed since 1994 as president of MORIAH Consultants, a professional consulting services firm located in Yorba Linda, California. In this capacity I provide comprehensive regulatory affairs consulting and training to the pharmaceutical, biotechnological and medical device industries.

2.    I received a B.S. Degree in Biochemistry from The University of California, Los Angeles in 1973, and a Ph.D. in Pharmacology from the University of Southern California in 1977. I received my Regulatory Affairs Certification from the Regulatory Affairs Professionals Society in 1996.

3.    During the course of my career I have been involved in virtually all aspects of product development in the pharmaceutical, biotech and medical device industry. As set forth in more detail in the following paragraphs, I have over 30 years of experience in basic research, both domestic and international product development and the pharmaceutical industry, including over 25 years experience in drug, biologic and medical device regulatory affairs. During this time, I have conducted basic research studies, set up regulatory affairs departments for pharmaceutical companies, developed regulatory plans, performed audits to assure compliance with regulatory requirements, and managed the preparation of marketing applications for both domestic and international regulatory agencies. I have extensive experience in regulatory affairs, product development strategies, clinical research,

Contains Restricted & Confidential Information
Subject to Protective Order

specified in the labeling...." (HAMRELL 0000124.).    The bioavailability of a drug product must be demonstrated in pharmacokinetic studies in humans and can not be based on animal models or inferred from limited antitumor studies conducted in animals.

55.    Based on this definition, Abraxane and the Elan formulations would not be considered pharmaceutical equivalents, or bioequivalent products and would not be considered interchangeable or substitutable.    The FDA approved package insert for Abraxane indicates that it is not bioequivalent to Taxol, based on adequate and well-controlled clinical trials.  Elan to my knowledge has not conducted any human trials to demonstrate the pharmacokinetic properties of any of their formulations.

Abraxane with HSA is not equivalent to Abraxane with BSA

56.    I understand that Elan has contended that Abraxane, which uses HSA would be equivalent or interchangeable with a nonocrystalline paclitaxel formulation made with BSA.  I disagree with this contention.  According to the FDA web page (http://www.accessdata.fda.gov/scripts/cder/iig/index.cfm), there are currently no approved products that contain BSA as a solubilizer or excipient and thus Elan would face significant regulatory hurdles to develop a product containing BSA that is injected into humans.  Abraxane on the other hand is formulated as a suspension using human serum albumin (HSA).  According to the same FDA web page there are a number of products that contain HSA as a component or as the active ingredient.  In the Abraxane NDA summary, Abraxis describes using an approved HSA source for the formulation of their product.  Abraxis has conducted a complete set of toxicology studies as described in

Contains Restricted & Confidential Information
Subject to Protective Order

the NDA Summary (ABRX 0220243- 0220259) and thus have demonstrated to FDA's satisfaction that their formulation containing HSA is safe and effective. The FDA did not request that Abraxis conduct any additional toxicology studies beyond those already performed for the whole product to address any toxicity concerns regarding the use of HSA.

57.    It is likely that Elan would be required to perform additional nonclinical toxicology studies beyond what was required for Abraxis in their formulation.    In particular, the use of any material that is sourced from bovine origin must undergo additional testing and safety evaluations to certify that it is derived from herds of animals free from transmissible spongiform encephalopathies (TSE) organisms (the virus-like particle responsible for BSE or 'mad-cow disease').    There is also a high likelihood that BSA in a drug product injected intravenously would be highly immunogenic and could trigger an allergic or anaphylactic reaction in patients (ABRX0532833-836, ABRX0532858-863).    This type of reaction, if severe, could be more dose-limiting that the use of Cremophor in humans.

58.    I have also been asked to provide an opinion on whether Abraxis' publication of some of their early study data could somehow be interpreted as an 'inducement to infringe' a patent held by another company.    It should be noted, that section 113 of the FDA Modernization Act of 1997 (FDAMA, PL 105-115) requires that specific information on clinical trials of drugs for serious and life-threatening diseases (i.e., cancer) conducted under FDA's IND regulations be made available to the public in

Contains Restricted & Confidential Information
Subject to Protective Order

Executed on October 29, 2007 at Yorba Linda, CA.


Michael R. Hamrell, Ph.D.

Contains Restricted & Confidential Information
Subject to Protective Order

# EXHIBIT H

## REDACTED IN ITS ENTIRETY

# EXHIBIT I

Page 1

1                    MARK C. MANNING, PH.D

2            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

3
     Case No. 06-438-GMS
4

     ELAN PHARMA
5    INTERNATIONAL LIMITED,

6    Plaintiff,

7    vs.

8    ABRAXIS BIOSCIENCE, INC.,

9    Defendant,

10   _____

     VIDEOTAPE DEPOSITION OF:  MARK C. MANNING, PH.D
11                             November 15, 2007
                               (CONFIDENTIAL)
12   _____

13          PURSUANT TO NOTICE, the videotape deposition of
     MARK C. MANNING was taken on behalf of the Defendant at
14   370 17th Street, Suite 5200, Denver, Colorado 80202, on
     November 15, 2007, at 9:04 a.m., before Lynnette L.
15   Copenhaver, Registered Merit Reporter, Certified
     Realtime Reporter, and Notary Public within Colorado.
16
                     A P P E A R A N C E S
17
     For the Plaintiff        LINDA M. GLOVER, ESQ.
18   and the Deponent:        ROBERT RIDDLE, ESQ.
                              Baker Botts LLP
19                            910 Louisiana St.
                              Houston, Texas 77002
20
     For the Defendant:       ERIC WALTERS, ESQ.
21                            Morrison Foerster
                              755 Page Mill Road
22                            Palo Alto, California 94304

23   Also Present:            Jerry DeBoer, Videographer

24

25

Confidential

Page 109

1                          MARK C. MANNING

2    products, we try very hard both to use excipients that

3    are safe, and we also try very hard to make sure that

4    the protein does not undergo any sort of confirmation or

5    physical change that would increase the risk of

6    immunogenicty for the patient.

7         Q.   What does immunogenicity mean, to your

8    understanding?

9         A.   To my understanding, I'm not an immunologist,

10   but my understanding is that when you administer a

11   protein -- proteins, because of their chemical

12   composition of having a sequence of amino acids, can be

13   recognized by the immune system as either being foreign

14   or not; and if they're foreign, there's a chance that

15   there can be either a cell or an antibody-mediated

16   response in the immune system some of which may lead to

17   significant adverse events.

18        Q.   And what types of significant adverse events,

19   to your understanding, can be caused by immunogenic

20   response?

21             MS. GLOVER:   Objection, vague.

22        A.   At the least you talk about responses like

23   fever, achiness.  At the very worst example, you have

24   the recent study that was in the press where the

25   patients experienced something called a cytokine.  Their

Confidential

Page 110

MARK C. MANNING

1

2    immune system just became overloaded and

3    nearly -- nearly killed those people.

4        Q.   Are you aware of any -- of a risk of

5    anaphylactic shock from immunogenic response?

6        A.   My understanding, that's certainly a

7    possibility.

8        Q.   What is anaphylactic shock, to your

9    understanding?

10       A.   Again my understanding is that it's similar to

11   this cytokine storm that I mentioned where the immune

12   system becomes so activated that it -- that it starts to

13   express all manner of cytokines; and those are

14   self-signaling agents, and the body basically starts to

15   shut down because it can't cope with the response.

16       Q.   You used the term "cytokine storm" a few

17   moments ago.  What do you understand a cytokine storm to

18   be?

19       A.   Yeah.  I understand it to be -- and again, I'm

20   not an immunologist -- is that the way that cells

21   communicate with each other is by -- by expressing and

22   secreting certain proteins and many of these are

23   classified broadly as cytokines; so they tend to include

24   things like various interleukins, interferons, and so

25   on.  So in a cytokine storm, it's not just one or two of

Page 111

MARK C. MANNING

1

2  those and not small amounts, it's a variety of those.

3        Basically it's the same way if the body -- you

4  know, if you think about -- you know, if you're part of

5  a battleship, you would start firing all of your guns at

6  once kind of thing.  That's kind of what happens, is my

7  understanding.

8      Q.   And what -- what types of things have you done

9  in the work -- on your work on IV formulations to reduce

10  the risk of an immunogenic response?

11        MS. GLOVER:  Objection, calls for a narrative.

12      A.   Yeah.  There's two primary things you need to

13  focus on as a formulation scientist in my field.  The

14  first is to make sure that the -- that the protein

15  remains in a near native confirmation as possible, and

16  so there's a variety of tools and techniques to do so.

17        The second is that you want to make sure that

18  not only is there some -- make sure that not only is a

19  reduction in terms of long-term damage to the protein

20  but that whatever processing is done acutely doesn't

21  generate immunogenic species.  And those immunogenic

22  species can be either confirmation altered protein or

23  the regulatory agencies tend to consider aerogated

24  protein to be the highest risk in that category.

25      Q.   And when you say "protein," what types of

Page 293

1                          MARK C. MANNING

2                        REPORTER'S CERTIFICATE

3    STATE OF COLORADO          )
                                ) ss.
4    CITY AND COUNTY OF DENVER  )

5                I, LYNNETTE L. COPENHAVER, Certified
     Shorthand Reporter and Notary Public, State of Colorado,
6    do hereby certify that previous to the commencement of
     the examination, the said MARK C. MANNING, Ph.D., was
7    duly sworn by me to testify to the truth in relation to
     the matters in controversy between the parties hereto;
8    that the said deposition was taken in machine shorthand
     by me at the time and place aforesaid and was thereafter
9    reduced to typewritten form; that the foregoing is a
     true transcript of the questions asked, testimony given,
10   and proceedings had.

11                I further certify that I am not employed
     by, related to, nor of counsel for any of the parties
12   herein, nor otherwise interested in the outcome
     of this litigation.

13

14                IN WITNESS WHEREOF, I have affixed my

15   signature this 16th day of November, 2007.

16

17

18                My commission expires April 26, 2010.

19

20

21   __x__ Reading and Signing was requested.

22

23   _____ Reading and Signing was waived.

24

25   _____ Reading and Signing was not required.

# EXHIBIT J

Page 1

1                  UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF DELAWARE

2

   ELAN PHARMA                    )

3  INTERNATIONAL LIMITED,         )

        Plaintiff,               )

4                                )

   vs.                           ) Case No. 06-438-GMS

5                                )

   ABRAXIS BIOSCIENCE, INC.,      )

6        Defendant.              )

7

8                 ORAL VIDEOTAPED DEPOSITION

9                   CORY BERKLAND, Ph.D.

10                   DECEMBER 14, 2007

11

12     ORAL VIDEOTAPED DEPOSITION OF CORY BERKLAND, Ph.D.,

13  produced as a witness at the instance of the Plaintiff

14  and duly sworn, was taken in the above-styled and

15  numbered cause on the 14th day of December, 2007, from

16  9:12 a.m. to 7:36 p.m., before Melinda Barre, Certified

17  Shorthand Reporter in and for the State of Texas,

18  reported by computerized stenotype machine at the

19  offices of Baker Botts, 910 Louisiana, 32nd Floor,

20  Houston, Texas, pursuant to the Federal Rules of Civil

21  Procedure and the provisions stated on the record or

22  attached hereto.

23

24

25

Page 160

1   albumin?

2          MR. SULLIVAN:  Object.

3       A.   I'm not really sure how that question

4   pertains directly to something I've not answered

5   already.

6       Q.   (By Ms. Kruze)  You have no opinion on

7   whether injecting 900 milligrams of bovine serum

8   albumin would be toxic to a human?

9       A.   Again, in my opinion, as I said previously,

10  it would not be a good idea; and, according to FDA

11  regulations, it's not a good idea to include

12  animal-derived products or proteins, if you will, in

13  an FDA-approved formulation.

14          And, again, I'll say that the '363

15  patent in no way suggests that to implement their

16  technology, it has to be an FDA-approved product.

17      Q.   Do you agree that Abraxane is an

18  FDA-approved product?

19      A.   Yes.  I answered that question previously.

20  Yes, Abraxane is FDA approved.

21      Q.   And if you interchanged the human albumin in

22  Abraxane with bovine serum albumin, would the FDA

23  approve that product?

24          MR. SULLIVAN:  Object.

25      A.   I could speculate; and if I were to

1   speculate, I would say that the FDA would probably

2   not approve that product.  But in the context of the

3   formulation, my opinion is that it would be -- that

4   the albumin that's associated with the surface of the

5   nanoparticles would be equivalent regardless of

6   whether it's human derived or bovine derived.

7       Q.   (By Ms. Kruze)  Or rat derived?

8       A.   Or the other animals we talked about.

9       Q.   Or an elephant?

10      A.   Well, I mean, I would have to know something

11  about the structure of those molecules and make sure

12  that they were performing a similar function.

13      Q.   Let's talk about crosslinking.  Are you an

14  expert on crosslinking of protein molecules?

15      A.   I would consider myself to be an expert on

16  crosslinking of protein molecules because of -- I

17  won't go through my CV again and bore you with that

18  information.  But I've also peer-reviewed many, many

19  journal articles that deal with crosslinked protein

20  molecules.  We have filed a patent application for a

21  crosslinker that we have designed that is applied to

22  polymers.  It's not specifically applied to proteins

23  in that instance.  But I am very familiar with

24  crosslinking, and I'm very familiar with proteins and

25  combinations of the two.

Page 314

1                  UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF DELAWARE

2

ELAN PHARMA                      )

3   INTERNATIONAL LIMITED,        )

        Plaintiff,                )

4                                 )

vs.                               ) Case No. 06-438-GMS

5                                 )

ABRAXIS BIOSCIENCE, INC.,         )

6        Defendant.               )

7

8                   REPORTER'S CERTIFICATE

9       ORAL VIDEOTAPED DEPOSITION OF CORY BERKLAND, Ph.D.

10                    DECEMBER 14, 2007

11

12      I, Melinda Barre, Certified Shorthand Reporter in

13   and for the State of Texas, hereby certify to the

14   following:

15      That the witness, CORY BERKLAND, Ph.D., was duly

16   sworn and that the transcript of the deposition is a

17   true record of the testimony given by the witness;

18      That the deposition transcript was duly submitted on

19   _____ to the witness or to the attorney for

20   the witness for examination, signature, and return to me

21   by _____.

22      That a copy of this certificate was served on all

23   parties shown herein on _____ and filed

24   with the Clerk.

25      I further certify that I am neither counsel for,

1    related to, nor employed by any of the parties in the

2    action in which this proceeding was taken, and further

3    that I am not financially or otherwise interested in the

4    outcome of this action.

5        Further certification requirements pursuant to

6    Rule 203 of the Texas Code of Civil Procedure will be

7    complied with after they have occurred.

8        Certified to by me on this 17th day of

9    December, 2007.

10

11              _____

12              Melinda Barre, Texas CSR 2192

                Expiration Date:  December 31, 2008

13              Firm Registration No. 189

14

15

16

17

18

19

20

21

22

23

24

25