# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

January 9, 2008

The Honorable Gregory M. Sleet
United States District Court
844 King Street
Wilmington, Delaware 19801

**REDACTED
PUBLIC VERSION**

Re:   *Elan Pharma International Ltd. v. Abraxis Bioscience, Inc.*,
       C.A. No. 06-438-GMS

Dear Chief Judge Sleet:

    Plaintiff Elan Pharma International Limited ("Elan") hereby answers Defendant Abraxis BioScience, Inc.'s ("Abraxis's") letter brief of January 2, 2008 requesting permission to move for summary judgment of non-infringement of U.S. Patent No. 5,399,363 (the "'363 Patent"). Because there are significant disputed genuine issues of material fact regarding Abraxis's infringement of the '363 Patent as described below, Abraxis's request should be denied.

    Elan's experts have established using accepted testing methods that Abraxane® contains particles of paclitaxel coated with a surface modifier, human serum albumin, in which greater than 10% by weight of the particles is crystalline paclitaxel. Abraxis disputes the conclusions of this testing. Thus, there are significant and disputed issues of material fact as to literal infringement, which preclude summary judgment.

    The parties further materially dispute whether a combination of amorphous paclitaxel and crystalline paclitaxel in nanoparticles of a medicament would be functionally equivalent to the '363 Patent's claimed "crystalline medicament [taxol] useful for treating cancer."[1] Accordingly, summary judgment is not available to Abraxis on infringement under the doctrine of equivalents.

---

[1]  The Court construed this term as a unity, and thus equivalence cannot properly be determined solely on the basis of comparing "crystalline" versus "amorphous," while disregarding that both the claimed invention and Abraxane® clearly meet the "medicament useful for treating cancer" portion of the unitary term. Few persons evaluating whether a purple, 505 horsepower Corvette substantially met their Christmas wish for a red, 505 horsepower Corvette would determine its suitability as an equivalent based on the difference between "red" and "purple" paint jobs while ignoring the other respective useful functional characteristics of the two cars.

A. **The Court's Construction Of "Consisting Essentially Of" In No Way Precludes Proof That Paclitaxel Is Crystalline In Particles Present In Abraxane®**

1. **Abraxis's Primary Argument Would Overrule The Court's *Markman* Order**

Abraxis has conceded that if the Court construed the phrase, "consisting essentially of" according to its ordinary meaning, it would "permit the claims [of the '363 Patent] to cover particles containing crystalline medicament, a surface modifier, trace amounts of solvent contamination, and *anything else*, including amorphous medicament." D.I. 140 at 17 (italic emphasis in original, underline emphasis supplied). Abraxis conceded during the claim construction process that the ordinary meaning of "consisting essentially of" would permit some amount of amorphous medicament to exist in a product that infringes the '363 Patent. *Id.* Abraxis's present argument that it does not infringe the '363 Patent under "a proper application" of "consisting essentially of" thus is thinly-coded language indicating an attempt to avoid the Court's *Markman* order by re-arguing construction of this term.

In its claim construction, the Court adopted the ordinary meaning of "consisting essentially of" as meaning "the particles, composed of crystalline medicament and surface modifier, may also include other ingredients that do not affect their basic and novel properties, and are essentially free of solvent and other contaminants." *Markman* Order (D.I. 271) at 1. The Court noted that:

> In making this ruling, the court rejects the defendant's construction as being unduly narrow, because a patentee's use of the phrase "consisting essentially of" has "long been understood to permit inclusion of components not listed in the claim, provided they do not 'materially affect the basic and novel properties of the invention.'" *Id.* at n.1.

Nothing in the Court's claim construction or the '363 Patent implicitly or explicitly requires that all or almost all of the total particle population be pure crystalline particles, as long as the crystalline phase particles meet the claimed crystallinity parameters. *See, e.g.*, *Markman* Order (D.I. 271) at 2, n. 4 (finding no support for reading a quantity limitation into the claim). Thus, Elan having shown substantial evidence of the essential presence of crystalline particles in Abraxane, there is at a minimum substantial factual dispute as to how these should be quantified and found to meet (or not meet) the claim limitation as already construed.

2. **Whether Abraxane® Has The Basic And Novel Properties Of The '363 Patent, Reduced Toxicity And Enhanced Efficacy, Is A Disputed Issue Of Material Fact**

This Court has construed the phrase "consisting essentially of" to exclude only those unlisted ingredients that affect the basic and novel properties of the '363 Patent's claimed invention. Abraxis now proffers the untenable contention that the alleged presence of some (disputed) quantity of nanoparticulate amorphous paclitaxel affects the disclosed basic and novel properties of the '363 Patent's claimed nanoparticulate crystalline paclitaxel. Elan has presented substantial evidence that the anti-cancer and bioavailability properties of crystalline paclitaxel nanoparticles meeting the claim limitation are not affected by the possible concurrent presence of amorphous paclitaxel in the nanoparticles.

The proper source for determining the basic and novel properties of a claimed invention is the specification. *See, e.g., AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1239 (Fed. Cir. 2003) ("To determine [the basic and novel] properties we need to look no further than the present

specification."). The '363 Patent specification notes that "methods to reduce toxicity and/or enhance efficacy of anticancer drugs, and thus increase the therapeutic indices of such drugs, would be of great value in the treatment of cancers." *See* '363 Patent 1:29-33 (D.I. 1 at Exh. A). The specification further teaches that enhanced efficacy and reduced toxicity are the basic and novel properties of the claimed invention:[2]

- We have discovered that anticancer compositions comprising anticancer agents in the form of surface modified nanoparticles exhibit **reduced toxicity** and/or enhanced efficacy.
- [T]here is provided a method of enhancing the efficacy **and/or reducing the toxicity** of an anticancer agent which includes the step of administering the agent in the form of the above-described particles.
- It is an advantageous feature of this invention that anticancer compositions are provided exhibiting **reduced toxicity**.
- It is another advantageous feature of this invention that anticancer compositions are provided exhibiting **improved efficacy**.[3]

It would be strange indeed if Abraxis were heard to argue that the anti-cancer drug it is marketing, Abraxane®, is toxic and non-efficacious, in contrast to the basic and novel attributes of the '363 Patent's invention. At a minimum, Elan has substantial evidence that particles within Abraxane® both satisfy the "consisting essentially of" limitation, despite Abraxis's attempt to re-assert a construction of this term already rejected by the Court, and satisfy these basic and novel properties.

### 3. Abraxis's Invocation Of Prosecution History Estoppel Is Unsupported By The Law And Inconsistent With The Facts

Abraxis invokes the prosecution history of the '363 Patent in furtherance of its effort to import additional (and already-rejected) limitations into the Court's construction of "consisting essentially of." The authority it cites is legally inapposite, and the parties have taken diametrical positions on how one of ordinary skill would construe statements identified by Abraxis within Elan's prosecution record for the '363 Patent.

Interestingly, the case Abraxis cites in support of seeking summary judgment of non-infringement based on the prosecution history, *Talbert Fuel Systems Patents Co. v. Unocal Corp.*, 275 F.3d 1371 (Fed. Cir. 2002), *vacated and remanded on other grounds*, was one in which the plaintiff stipulated that on the Court's claim construction, no literal infringement was possible. *Id.* at 1376. Thus, only doctrine of equivalents infringement was at issue, and hence recourse to the restrictive doctrine of prosecution history estoppel was appropriate. Here, on the other hand, the

---

[2]

**REDACTED**

[3]    '363 Patent col. 1, lns. 44-48, col. 1, lns. 61-65, col. 1, lns. 66-68, col. 2, lns. 1-3 (emphasis supplied). (D.I. 1 at Exh. A.).

parties hotly dispute literal infringement, so Abraxis's citation of doctrine of equivalents case-law cannot justify adding further limitations to the literal infringement application of an already-construed claim. As to Elan's concurrently-asserted doctrine of equivalents claims, for the reasons below, there is significant and genuine factual dispute as to the content of the prior art and Elan's distinctions over it, rendering summary judgment inappropriate.

In the '363 Patent specification and file history, Elan distinguished the crystalline medicament ingredient in its invention from certain medicaments *contaminated by solvents*, as found in the prior art. The medicaments of the particular solvent-contaminated prior art reference happened to be characterized as amorphous, but Elan disputes Abraxis's suggestion that amorphousness, as opposed to contamination from a solvent preparation, was the basis on which the '363 Patent (whose purpose was reduced toxicity) distinguished that reference. Despite these facts, Abraxis contends that Elan disclaimed the existence of *any* amorphous medicament in its claimed invention during prosecution of the '363 Patent. Confirming that toxicity of solvent-precipitated prior art preparations, and not their amorphous, crystalline, or other conformation, was a focus of the '363 Patent prosecution, Elan argued elsewhere that its invention was distinguishable from those contaminated by solvents as follows:

> The only medicinal containing nanocapsules prepared by Devissaguet are prepared by a precipitation technique, i.e., substance B (core which can be medicinal) is first dissolved in a solvent. Such solvent precipitation techniques provide non-crystalline, *e.g.*, amorphous, cores which are contaminated with solvent. Such solvents are often toxic and can be very difficult, if not impossible to adequately remove to pharmaceutically acceptable levels to be practical. *See* Amendment dated September 10, 1993, Paper No. 6/a. (Attached as Exh. 2).

It is undisputed that the paclitaxel in Abraxane® is free of toxic solvents — their presence would certainly come as quite a surprise to the FDA. Consequently, it is difficult to see how Elan's disclaimer of toxic solvents in the claimed particles is even relevant to the case at bar.[4] At a minimum, the parties dispute the purpose, nature, and extent of Elan's prosecution statements, and summary adjudication is not a feasible mechanism to decide this dispute.

**B.    Elan's Expert Reports Substantially Support A Showing
That The Crystalline Medicament Limitation In The '363 Patent Is Met By
The Particles In Abraxane Literally And Under The Doctrine Of Equivalents**

**REDACTED**

---

[4] **REDACTED**

**REDACTED**

Abraxis erroneously contends that even applying the Court's construction of "consisting essentially of," Elan cannot prove that at least 10% by weight of individual particles in Abraxane® are crystalline. However, Abraxis cannot refute Dr. Munson's findings with any testing of its own, as it performed no NMR testing and hence cannot quantify a proportion of NMR-detected crystalline particles.

**REDACTED**

Abraxis's claim that Abraxane® is amorphous rests solely on testing done on the entire drug composition (nanoparticles mixed with and possibly obscured by albumin). Abraxane® contains 90% human serum albumin (which is indisputably amorphous and could skew any measurement of the paclitaxel/albumin mixture toward appearing amorphous), and only 10% paclitaxel particles.

**REDACTED**

Abraxis's calculations aimed at establishing the greatest amount of crystalline paclitaxel contained in individual Abraxane® particles are pure misdirection. First, the Court did not mandate a minimum number of particles that are crystalline in nature. Second, there is no evidence of record supporting Abraxis's assumption that a 12% measurement of a population of mixed crystalline and amorphous particles is an upper limit on the weight of crystalline paclitaxel *in each individual particle*. Thus, Abraxis's speculation that only 9.8% by weight of Abraxane as a whole is crystalline paclitaxel does not address the claimed particles, and represents a disputed issue of material fact.

**C.    Conclusion**

Abraxis's summary judgment letter brief amounts to a second request to jettison the well-established definition of "consisting essentially of" in an effort to keep central and disputed issues of material fact with respect to Abraxis's infringement (literal and by equivalents) from reaching the jury. The Court should accordingly deny Abraxis's request for permission to brief and file a motion for summary judgment of non-infringement.

Respectfully,

/s/ *John G. Day*

John G. Day (I.D. #2403)

---
5

**REDACTED**

# EXHIBIT 1

**REDACTED**

Case 1:06-cv-00438-GMS    Document 456    Filed 01/16/2008    Page 7 of 20

# EXHIBIT 2

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of          :
Liversidge et al              :   Group Art Unit: 1502
                              :
Title: SURFACE MODIFIED       :   Examiner: W. Benston, Jr.
ANTICANCER NANOPARTICLES      :
                              :
Serial No.: 07/908,125        :   Malvern, Pa   19355
                              :
Filed: July 1, 1992           :

Honorable Commissioner of Patents and Trademarks
Washington, DC   20231

RECEIVED
SEP 1 5 1993
GROUP 1500

AMENDMENT

Sir:

In response to the Office Action mailed March 11, 1993, the period for response having been extended by 3 months to expire on September 11, 1993, by the petition and fee authorization enclosed herewith, please amend this application, without prejudice, as follows:

In the Claims

Please rewrite claim 1 as follows:

1. (Amended) Particles consisting essentially of 99.9-10% by weight of a crystalline anticancer agent having a solubility in water of less than 10 mg/ml, said anticancer agent having a non-crosslinked surface modifier adsorbed on the surface thereof in an amount of 0.1-90% by weight and sufficient to maintain an average effective particle size of less than about 1000 nm.

Please add claims 28-33 as follows:

- 2 -

12. The particles of claim 1 wherein said surface modifier is a surfactant.

13. The particles of claim 1 wherein said surface modifier is a nonionic surfactant.

14. The particles of claim 1 wherein said surface modifier is an anionic surfactant.

15. The particles of claim 1 wherein said surface modifier is selected from the group consisting of gelatin, casein, gum acacia, cholesterol, tragacanth, stearic acid, benzalkonium chloride, calcium stearate, glyceryl monostearate, cetostearyl alcohol, cetomacrogol emulsifying wax, sorbitan esters, polyoxyethylene alkyl ethers, polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters, polyethylene glycols, polyoxyethylene stearates, colloidol silicon dioxide, phosphates, sodium dodecylsulfate, carboxymethylcellulose calcium, carboxymethylcellulose sodium, methylcellulose, hydroxyethylcellulose, hydroxypropylcellulose, hydroxypropylmethylcellulose phthalate, noncrystalline cellulose, magnesium aluminum silicate, triethanolamine, polyvinyl alcohol, polyvinylpyrrolidone, poloxomers, tyloxapol, poloxamines, dextran, a dioctyl ester of sodium sulfosuccinic acid, sodium lauryl sulfate, an alkyl aryl polyether sulfonate, a mixture of sucrose stearate and sucrose distearate, hexyldecyl trimethyl ammonium chloride, bovine serum albumin and $C_{18}H_{37}CH_2(CON(CH_3)CH_2(CHOH)_4CH_2OH)_2$.

16. The particles of claim 1 wherein said surface modifier is present in an amount of 10 to 60% by weight based on the total weight of the dry particle.

- 3 -

~~25.~~ 17. The particles of claim 1 wherein said surface modifier is present in an amount of 10 to 30% by weight based on the total weight of the dry particle.

## REMARKS

Claims 1-27 are pending in this application. Claims 7-15 and 17-23 have been withdrawn from consideration. Claims 28-33 have been added by this amendment. The present application is a continuation-in-part of U.S. Patent Application Ser. No. 647,105 filed January 25, 1991, now U.S. Patent No. 5,145,684. Favorable reconsideration of this application is respectfully requested in view of this amendment and the accompanying remarks.

Applicants' claims are directed to particles consisting essentially of a crystalline anticancer agent having a non-crosslinked surface modifier adsorbed on the surface thereof in an amount sufficient to maintain an effective average particle size of less than about 1000 nm. Applicants' claims are further directed to anticancer compositions comprising such particles and to methods of treating mammals comprising administering the particles, whereby the efficacy of the anticancer agent is enhanced and/or the toxicity of the agent is reduced. The particles are prepared by wet grinding coarse crystals of the anticancer agent in the presence of fine grinding media and in conjunction with a surface modifier.

The rejection of claims 1-6, 16 and 24-27 under 35 U.S.C. § 103 as being unpatentable over King (U.S. Patent No. 5,124,338) in view of Devissaguet et al (U.S. Patent No. 5,049,322) is respectfully traversed. It is respectfully submitted that applicants' claims are patentable over these references taken individually or in combination.

King describes potentiating agents, i.e., specific acrivatine esters, which enhance the efficacy of antineoplastic agents. However, the pharmaceutical formulations of King are conventional, i.e., they are prepared by methods known in the

- 4 -

art (column 5, lines 55-58). Consequently, as noted in the Office Action, King does not suggest a particulate anticancer agent having an average effective particle size of less than 1000 nm.

Devissaguet et al describe a process for preparing nanocapsules. However, the nanocapsules described by Devissaguet et al are radically different than applicants' particles. The Devissaguet et al nanocapsules feature a wall of film-forming polymer (substance A) and a core (substance B), which can be a medicinal. On the other hand, applicants' claimed particles consist essentially of a crystalline anticancer agent and a non-crosslinked surface modifier adsorbed on the surface thereof. Moreover, the only medicinal containing nanocapsules described by Devissaguet et al are prepared by a precipitation technique, i.e., substance B is first dissolved in a solvent. For example, as illustrated in Example 2 therein, indomethecin is dissolved in acetone. Such solvent precipitation techniques provide non-crystalline, e.g., amorphous, cores which are contaminated with solvent. Such solvents are often toxic and can be very difficult, if not impossible, to adequately remove to pharmaceutically acceptable levels to be practical. On the other hand, applicants' crystalline particles, prepared by wet grinding, a technique entirely different than the technique of Devissaguet et al, are essentially free of solvent contamination.

Thus, it is urged that the references individually do not suggest applicants' claimed particles. Furthermore, applicants' respectfully submit that the combined teachings of the references in no way suggest the claimed invention. Nothing in the cited references or the prior art as a whole offers any suggestion that the teachings could be so modified and combined to yield anything resembling applicants' claimed particles of a crystalline anticancer agent. Devissaguet et al disclose nanocapsules, radically different than applicants' crystalline particles, of a size embraced by the range specified in applicants' claims. However, there is no reason for one skilled

- 5 -

in the art to expect that the claimed crystalline particles could be prepared according to the teaching of Devissaguet et al. Nor does King, teaching conventional pharmaceutical formulation preparation techniques, remedy the deficiency in the teaching of Devissaguet et al. Even if the teaching of Devissaguet et al were applied to the anticancer agents listed by King, the resulting nanocapsules, as discussed above, would be radically different than the claimed crystalline particles.

Further, applicants' crystalline nanoparticles are obtained by a specific wet grinding technique which is not disclosed or suggested in the prior art. As stated in EPO 411,629 (cited in applicants' disclosure statement) "preparation of submicron particles of less than 1 $\mu$m in diameter is almost impossible". The reason for this is the inherent tendency of such particles to agglomerate, aggregate, solidify and/or adhere to the particle size decreases. Additionally, as discussed in the instant specification, applicants' attempts to reproduce the closest prior art wet grinding technique described by Motoyama et al in U.S. Patent No. 4,540,602 resulted in particles having an average particle size of much greater than 1 micron. Thus, the prior art as a whole does not disclose or suggest, and cannot be construed to disclose or suggest, applicants' claimed crystalline particles having an average effective particle size of less than 1000 nm.

Furthermore, there is no suggestion in the cited references or in the art as a whole of the unexpected advantageous properties associated with the claimed crystalline anticancer particles. The particles of this invention have been formulated into anticancer compositions which demonstrate enhanced efficacy and/or reduced toxicity and which can be administered by IV bolus injection. These advantages are illustrated in the working examples set forth on pages 13-22 of the instant specification.

To further evidence the nonobviousness of the claimed particles, applicants' proffer herewith the attached Rule 132 Declaration of Gary G. Liversidge, Ph.D., pointing out that the

- 6 -

above-noted differences between the particles of the claimed invention and particles prepared by prior art techniques, such as solvent precipitation techniques, are commercially significant.

Claim 1 has been amended consonant with the amendment to the claims in parent U.S. Patent No. 5,145,684 for reasons discussed fully in the parent relating to the § 112 rejection and prior art cited therein. More specifically, claim 1 has been amended to recite minimal and maximal amounts of the crystalline anticancer agent and surface modifier present, that the surface modifier is non-crosslinked, and that the anticancer agent has a specific, i.e., low, solubility in water. Ample support for such amendments can be found, e.g., on page 9, lines 1-5; page 7, lines 19-21; and page 3, lines 23-29 of the instant specification.

New claims 28-33 added by this amendment are directed to various embodiments of the surface modifier component of the particles of this invention. Ample support for such claims can be found, e.g., on page 5, line 32 - page 7, line 5 of the instant specification. The new claims are dependent from claim 1 and thus are patentable over the prior art for the reasons discussed above.

In conclusion, applicants' claimed invention is nonobvious over the prior art because the art does not suggest the invention or its unexpected, advantageous properties. In view of the foregoing amendment, remarks and the attached Rule 132 Declaration, it is respectfully asserted that the Examiner's rejection cannot be sustained and should be withdrawn. It is respectfully urged that claims 1-6, 16 and 24-33 are patentable and in condition for allowance. Notice of Allowance or early action to that end is earnestly solicited.

# EXHIBIT 3

# REDACTED

# EXHIBIT 4

**REDACTED**

# EXHIBIT 5

# REDACTED