## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELAN PHARMA )
INTERNATIONAL LIMITED, )
         )
    Plaintiff, )
         )    Case No. 06-438-GMS
    v. )
         )    **REDACTED**
ABRAXIS BIOSCIENCE, INC., )    **PUBLIC VERSION**
         )
    Defendant. )
         )

## DECLARATION OF JEFFREY D. SULLIVAN IN SUPPORT OF ELAN PHARMA INTERNATIONAL LIMITED'S OPPOSITION TO ABRAXIS'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE OF ELAN'S SSNMR TESTING OF ABRAXANE

I, Jeffrey D. Sullivan, hereby declare as follows under penalty of perjury pursuant to 28 U.S.C. Section 1746:

1.     I am an attorney licensed to practice in the State of New York, and I am admitted *pro hac vice* to practice in Cause No. 06-438-GMS; *Elan Pharma International v. Abraxis BioScience, Inc.*; In the United States District Court; District of Delaware ("*Elan v. Abraxis*"). I am a partner with the law firm of Baker Botts L.L.P. and counsel of record for Elan Pharma International Limited. I submit this Declaration in Support of Elan Pharma International Limited's Opposition to Abraxis's Motion In Limine No. 2 To Exclude Evidence Of Elan's SSNMR Testing Of Abraxane. I have personal knowledge of the matters set forth herein, and if called upon to do so, I could and would competently testify thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of selected portions of the Expert Report of Cory Berkland, Ph.D.

3.     Attached hereto as Exhibit 2 is a true and correct copy of selected portions of the deposition transcript of Cory Berkland, Ph.D.

4.      Attached hereto as Exhibit 3 is a true and correct copy of selected portions of the Expert Report of Eric J. Munson.

5.      Attached hereto as Exhibit 4 is a true and correct copy of selected portions of the deposition transcript of Cory Berkland, Ph.D.

6.      Attached hereto as Exhibit 5 is a true and correct copy of selected portions of the deposition transcript of Eric J. Munson.

7.      Attached hereto as Exhibit 6 is a true and correct copy of selected portions of the deposition transcript of Dewey Barich.

8.      Attached hereto as Exhibit 7 is a true and correct copy of selected portions of the Expert Report of Eric J. Munson.

9.      Attached hereto as Exhibit 8 is a true and correct copy of selected portions of the deposition transcripts of Eric J. Munson and Dewey Barich.

10.      Attached hereto as Exhibit 9 is a true and correct copy of selected portions of the deposition transcript of Dewey Barich.

11.      Attached hereto as Exhibit 10 is a true and correct copy of selected portions of the deposition transcript of Eric J. Munson.

12.      Attached hereto as Exhibit 11 is a true and correct copy of selected portions of the deposition transcript of Jerry L. Atwood.

13.      Attached hereto as Exhibit 12 is a true and correct copy of selected portions of the deposition transcript of Dewey Barich.

14.      Attached hereto as Exhibit 13 is a true and correct copy of selected portions of the deposition transcript of Jeffrey D. Winkler.

15.    Attached hereto as Exhibit 14 is a true and correct copy of selected portions of the deposition transcript of Jerry L. Atwood.

16.    Attached hereto as Exhibit 15 is a true and correct copy of selected portions of the deposition transcript of Cory Berkland, Ph.D.

17.    Attached hereto as Exhibit 16 is a true and correct copy of selected portions of the deposition transcript of Patrick Soon-Shiong, M.D.

Pursuant to 28 U.S.C. Section 1746, I hereby affirm and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**FURTHER DECLARANT SAYETH NOT.**

Executed this 3rd day of April 2008 in New York, New York.

Jeffrey D. Sullivan

# EXHIBIT 1

# REDACTED

# EXHIBIT 2

1          UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF DELAWARE

2

ELAN PHARMA                    )

3   INTERNATIONAL LIMITED,         )

          Plaintiff,             )

4                                  )

vs.                            ) Case No. 06-438-GMS

5                                  )

ABRAXIS BIOSCIENCE, INC.,      )

6        Defendant.              )

7

8          ORAL VIDEOTAPED DEPOSITION

9             CORY BERKLAND, Ph.D.

10              DECEMBER 14, 2007

11

12       ORAL VIDEOTAPED DEPOSITION OF CORY BERKLAND, Ph.D.,

13   produced as a witness at the instance of the Plaintiff

14   and duly sworn, was taken in the above-styled and

15   numbered cause on the 14th day of December, 2007, from

16   9:12 a.m. to 7:36 p.m., before Melinda Barre, Certified

17   Shorthand Reporter in and for the State of Texas,

18   reported by computerized stenotype machine at the

19   offices of Baker Botts, 910 Louisiana, 32nd Floor,

20   Houston, Texas, pursuant to the Federal Rules of Civil

21   Procedure and the provisions stated on the record or

22   attached hereto.

23

24

25

1  also directed you to produce all notebooks, paper and

2  basically any other data regarding your preparation

3  of the manipulated samples?

4      A.    Yes.  I'm aware.

5              MR. SULLIVAN:  Object.

6      Q.    (By Ms. Kruze)  Are you aware that the

7  subpoena also included any paper generated by a

8  person working for you like David Shi?

9              MR. SULLIVAN:  Object.

10     A.    Yes.  I'm aware of that.

11     Q.    (By Ms. Kruze)  Did you produce all your

12 hard-copy notes?

13     A.    Yes, I did.

14     Q.    And did you produce all data relating to any

15 work you conducted?

16     A.    Yes, I did.

17     Q.    Are you aware that you didn't produce a

18 single hard-copy piece of paper about your sample

19 preparation in the case?

20     A.    Yes.  I'm aware of that; and I'd like to

21 clarify that, if I may.

22              So for this particular case I was

23 directly involved with David Shi -- Lianjun Shi.

24 I'll refer to him as David probably throughout most

25 of this deposition.  And David and I exchanged

Page 72

1  verbally on multiple occasions what was done, how

2  samples were handled, what were the experimental

3  variables that were used.

4          I then recorded those in what I would

5  consider to be a precursor document to the report.

6  That's something that would end up being modified

7  into the final report.  So much in the same way that

8  when you start executing a Word document, when you

9  start writing a letter, it's not common practice for

10 you to include when you've pasted a letterhead into

11 that letter.  It's not common practice for you when

12 you write the greeting on that letter to include that

13 document.  So what I included was all that

14 information compiled in my expert report.

15     Q.    Did you keep a lab notebook with regards to

16 your sample preparation?

17     A.    No.  I did not keep a lab notebook.

18     Q.    Did David Shi keep a lab notebook of his

19 experiments?

20     A.    David Shi did not keep a lab notebook, and

21 I'd like to put that in context.  So previously when

22 I was asked questions regarding whether or not it was

23 common practice for my students to keep lab

24 notebooks, I answered in the affirmative; and then I

25 further said that it would be for any procedures that

Page 73

1   were not considered to be routine or common in the

2   laboratory.

3            In addition, in this particular case,

4   rather than writing this down in a lab notebook and

5   then translating it into a report document, we chose

6   to take that information, put it into a document that

7   was refined into the report.

8        Q.    Is it your testimony that preparing

9   manipulated samples of Abraxane is routine in your

10  lab?

11            MR. SULLIVAN:   Object.

12       A.    It is my opinion that working with

13  nanoparticles and separating them is incredibly

14  routine in our laboratory, specifically --

15       Q.    (By Ms. Kruze)  So it's your testimony --

16       A.    I'd like to further my answer.  So

17  specifically I think you'll see from the years of

18  experience of David Shi, he has worked for nearly a

19  decade in industry.  He has a Ph.D. degree.  He is a

20  doctor.  He has experience in two different

21  postdoctoral positions, and he now works in the

22  pharmaceutical industry.  So David Shi is trustworthy

23  to carry out these routine experiments.  And based on

24  my knowledge and my expertise, we have also worked

25  with micron-sized particles, nanosized particles,

1  time that I've asked you that question, actually.

2              So if you were working on a

3  peer-reviewed article, would you keep a laboratory

4  notebook of your experiments?

5              MR. SULLIVAN:  Object.

6      A.    The question you asked previously, I

7  believe, was is it routine in your laboratory to keep

8  a laboratory notebook.  And I addressed that question

9  with some additional information.  So I'll try to

10  reiterate that information here as well.

11              When we generate data that we would

12  like to publish, it is important for us to take the

13  essential data that we would need to reproduce in

14  that document and record it in some way.

15              As I said before, in this way and

16  this -- on this particular instance instead of

17  recording it into a laboratory notebook, I recorded

18  it into a precursor document for the final report

19  that I submitted.  So it's not as if this information

20  was lost at some point along the way and we're

21  relying on recollection or speculation.  We're

22  relying on information that was recorded.

23              Here it was not recorded in the context

24  of a laboratory notebook because we have a particular

25  machine in the laboratory, a centrifuge in the

Page 248

1    that.

2                How many times has David prepared

3    samples of a nanoparticulate drug formulation for NMR

4    testing?

5                MR. SULLIVAN:  Object.

6        A.    To the best of my knowledge, on several

7    occasions David has prepared samples for NMR testing.

8    In addition, he has prepared countless polymers,

9    molecules that were tested by NMR.  So in the context

10   of nanoparticles, he has several experiences.  In the

11   context of sample preparation for NMR in general, he

12   has a wealth of experience.

13       Q.    (By Ms. Kruze)  And how many times have you

14   personally prepared samples of a nanoparticulate drug

15   formulation for NMR testing?

16       A.    To the best of my recollection, I have not

17   prepared samples specifically for NMR testing,

18   although I have prepared samples on countless

19   occasions for similarly sensitive techniques that

20   require careful care of the sample.

21       Q.    Do you consider that the samples that David

22   prepared are correctly called Abraxane?

23                MR. SULLIVAN:  Object.

24       A.    I referred to those in my report as the

25   nanoparticle portion of Abraxane.

Page 251

1    size that we used and we have three remaining vials,

2    I think I can say with a -- actually, now that I

3    think about it, I can say with a high level of

4    assurance that we sent two samples that we prepared

5    to Professor Munson.

6         Q.    (By Ms. Kruze)  And these two samples were

7    prepared at different times.  Is that correct?

8         A.    That's correct.  First we prepared the

9    lyophilized sample, and then there was some

10   speculation that the sample may have an increased

11   level of amorphousness as a result of the

12   lyophilization process.  So then we prepared the

13   air-dried samples, and just scientifically that's a

14   good thing to do.  Anytime you can validate the

15   composition of what you're analyzing using two

16   different methods, that's a scientifically sound

17   approach.

18        Q.    Let's take another break.

19        A.    Okay.

20              THE VIDEOGRAPHER:  We're off the

21   record.  The time is 5:41 p.m.

22              (Recess taken)

23              THE VIDEOGRAPHER:  We're on the record.

24   The time is 5:59 p.m.

25        Q.    (By Ms. Kruze)  Just before the break we

Page 252

1  were discussing David's preparation of the samples.

2  Did David, when he was finished preparing the

3  samples, transfer them directly to Dewey Barich?

4      A.    Yes.   To the best of my knowledge, the

5  samples were transferred directly to Dewey Barich; or

6  I think there was an occasion or occasions where

7  Dewey and Eric Munson both came over together.

8      Q.    How long did the samples sit around before

9  Dewey and/or Eric Munson came to pick them up?

10     A.    For the lyophilized samples the time before

11 pickup was about two days or so.  For the air-dried

12 samples they were picked up the next morning.  In my

13 report I indicate that they were dried overnight.

14 They were picked up the next morning.

15     Q.    For the lyophilized samples where were the

16 samples kept for those two days before Dewey picked

17 them up?

18              MR. SULLIVAN:  Object.

19     A.    They were -- okay.  So when those samples

20 were prepared, they were actually lyophilized in the

21 centrifuge tubes.  The centrifuge tubes were then

22 removed from the lyophilizer, capped and placed in

23 the refrigerator.

24     Q.    (By Ms. Kruze)  So the samples sat in a

25 refrigerator for two days?

# EXHIBIT 3

# REDACTED

# EXHIBIT 4

Page 1

1                    UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF DELAWARE
2

      ELAN PHARMA                    )
3     INTERNATIONAL LIMITED,         )
            Plaintiff,               )
4                                    )
      vs.                            ) Case No. 06-438-GMS
5                                    )
      ABRAXIS BIOSCIENCE, INC.,      )
6           Defendant.               )

7

8                    ORAL VIDEOTAPED DEPOSITION

9                      CORY BERKLAND, Ph.D.

10                     DECEMBER 14, 2007

11

12        ORAL VIDEOTAPED DEPOSITION OF CORY BERKLAND, Ph.D.,

13   produced as a witness at the instance of the Plaintiff

14   and duly sworn, was taken in the above-styled and

15   numbered cause on the 14th day of December, 2007, from

16   9:12 a.m. to 7:36 p.m., before Melinda Barre, Certified

17   Shorthand Reporter in and for the State of Texas,

18   reported by computerized stenotype machine at the

19   offices of Baker Botts, 910 Louisiana, 32nd Floor,

20   Houston, Texas, pursuant to the Federal Rules of Civil

21   Procedure and the provisions stated on the record or

22   attached hereto.

23

24

25

Page 27

1  yours, Doctor.  Is that correct?

2      A.    May I take a moment to familiarize myself

3  with the document?

4      Q.    Of course.

5      A.    Do you know if this was obtained --

6  downloaded from the web as a preprint article?

7      Q.    No, sir.  It was produced by you in this

8  litigation.

9      A.    Okay.

10     Q.    I don't know if you can see.  It's Berkland

11 0000171 for the record.

12     A.    Okay.  So I just want to note that based on

13 the information given at the top of this document,

14 there's no volume and issue number given.  So it

15 actually is -- it's what's called the publication

16 on-line.  It had not yet appeared in print in the

17 journal.

18     Q.    Okay.  And, Dr. Munson, Eric J. Munson, is

19 listed as a coauthor with you.  Is that correct?

20     A.    Yes.  That's correct.

21     Q.    The aim of this work was to encapsulate

22 nanoparticles of the antibiotic Cipro into larger

23 microspheres.  Is that a fair characterization?

24     A.    Yeah.  Generally speaking, that's a fair

25 characterization.

Page 42

1  related, especially considering the context in which

2  I've used the word "intensive."  Perhaps you're

3  referring to the word "intensive" as -- oh, I

4  probably ...

5      Q.    (By Ms. Kruze)  I'm sorry.  Let me clarify.

6  I wasn't trying to say that intensive means

7  contamination.

8      A.    Okay.

9      Q.    I was just asking you if the process that I

10  outlined above would cause contamination.

11              MR. SULLIVAN:  Object.

12      A.    Again, I can't extrapolate if there would be

13  contamination present or not.  And I think that

14  perhaps you're misconstruing the way I've used the

15  word "intensive" here as well.  I've tried to make it

16  clear that intensive refers to, you know, the

17  requirement of a large piece of equipment, the

18  addition of milling media, et cetera.

19      Q.    (By Ms. Kruze)  Let's go back to your

20  article, which is Exhibit 2.  You testified earlier

21  that Dr. Munson ran some experiments to determine the

22  physical characteristics of these nanoparticles.  Is

23  that correct?

24              MR. SULLIVAN:  Object.

25      A.    I think I said physical and chemical

Page 43

1    characteristics.

2        Q.    (By Ms. Kruze)  And did he perform

3    experiments to determine the crystallinity of the

4    nanoCipro that you prepared?

5                MR. SULLIVAN:  Object.

6        A.    This collaboration was done, as I mentioned,

7    with the formulation work and the particle handling

8    being done in our lab and the particle design.  And

9    then that portion of the analytical work was handled

10   by Professor Munson's laboratory.

11       Q.    (By Ms. Kruze)  Did Dr. Munson conduct

12   solid-state NMR on the particles of nanoCipro that

13   you prepared?

14       A.    His laboratory conducted those experiments.

15       Q.    They were run in his laboratory?

16                MR. SULLIVAN:  Object.

17       A.    To the best of my knowledge, they were run

18   using equipment that is under his control.

19       Q.    (By Ms. Kruze)  And were the results of his

20   NMR tests subjected to deconvolution?

21                MR. SULLIVAN:  Object.

22       A.    The first thing I'd like to state is that

23   within the context of this paper, I think I was

24   fairly clear in defining the roles of everyone on

25   this paper.  Just to remind you, my role was to come

# EXHIBIT 5

Page 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
   ELAN PHARMA              )
 3 INTERNATIONAL LIMITED,   )
        Plaintiff,          )
 4                          )
   vs.                      ) Case No. 06-438-GMS
 5                          )
   ABRAXIS BIOSCIENCE, INC.,)
 6      Defendant.          )

 7

 8           ORAL VIDEOTAPED DEPOSITION

 9             ERIC J. MUNSON, Ph.D.

10              NOVEMBER 29, 2007

11

12     ORAL VIDEOTAPED DEPOSITION OF ERIC J. MUNSON, Ph.D.,

13 produced as a witness at the instance of the Plaintiff

14 and duly sworn, was taken in the above-styled and

15 numbered cause on the 29th day of November, 2007, from

16 9:07 a.m. to 7:15 p.m., before Melinda Barre, Certified

17 Shorthand Reporter in and for the State of Texas,

18 reported by computerized stenotype machine at the

19 offices of Baker Botts, 910 Louisiana, 32nd Floor,

20 Houston, Texas, pursuant to the Federal Rules of Civil

21 Procedure and the provisions stated on the record or

22 attached hereto.

23

24

25
```

Page 31

1    although there may be other aspects as well

2    associated with that.

3        Q.    What other aspects?

4        A.    I don't recall specifically what that would

5    be.  Certainly I am an expert in many areas and would

6    not try to restrict my limitations at this point.

7        Q.    And did you analyze certain samples by

8    solid-state NMR in connection with this litigation?

9        A.    Could you be a little bit more specific?

10       Q.    In what way?

11       A.    For example, when you talk about you.

12       Q.    So am I correct that Elan hired you to do

13   certain experiments, solid-state NMR analyses of

14   samples; but you didn't personally do them; you had

15   somebody else do them.  Is that correct?

16            MR. SULLIVAN:  Objection.

17       A.    Could you be a little bit more specific?

18       Q.    (By Ms. Evans)  What do you not understand,

19   Doctor?

20       A.    For example, are you referring to -- Elan

21   hired me for the samples, to run certain samples.

22   Could you be a little more specific as it relates

23   to -- so, for example, with respect to the analysis,

24   Elan asked me to analyze those samples.  And in order

25   to do that, I gave those samples to Dr. Dewey Barich

1    and asked him to run them under my supervision.

2        Q.   Who is Dr. Dewey -- could you spell his

3    name, please, for the record, the person who actually

4    did the experiments?

5        A.   Could you be a little more specific what you

6    mean by "do the experiments"?

7        Q.   Well, you just told me that you gave the

8    samples to Dr. Dewey Barich to run the analyses.

9    That's the person who did the experiments, the

10   hands-on person, right?

11            MR. SULLIVAN:   Objection.

12       A.   Once again, I guess, what are you referring

13   to?  Are you talking about Dr. Barich as -- well,

14   could you be a little bit more specific when you talk

15   about running the experiments?

16       Q.   (By Ms. Evans)  Well, in your report you set

17   forth certain solid-state NMR data, correct?

18       A.   That is correct.

19       Q.   Who did the experiments to acquire that

20   data?

21       A.   So are you talking about who sat down at the

22   NMR spectrometer and acquired the data?

23       Q.   That would be the person who ran the

24   experiments, yes.  That's what I'm referring to,

25   Doctor.

1           MR. SULLIVAN:  Objection.  Don't argue

2    with the witness.

3       A.   So the person who ran the experiments and

4    acquired the data is Dr. Dewey Barich.

5       Q.   (By Ms. Evans)  Could you spell --

6       A.   His name is D-e-w-e-y, B-a-r-i-c-h.

7       Q.   Why did you ask Dr. Barich to do the

8    experiments for this litigation?

9           MR. SULLIVAN:  Objection.

10      A.   Could you be a little bit more specific?

11   You're asking why I did this?

12      Q.   (By Ms. Evans)  That's right.  Why didn't

13   you do it yourself?

14          MR. SULLIVAN:  Objection.

15      Q.   (By Ms. Evans)  Why didn't you do the

16   experiments yourself, Doctor?

17          MR. SULLIVAN:  Objection.

18   Mischaracterizes.

19      A.   Well, once again, can you be a little bit

20   more specific when you're talking about the question

21   of why I did not run the experiments?

22      Q.   (By Ms. Evans)  No, I don't think so,

23   Doctor, because I don't know why you didn't run the

24   experiments yourself.  I need you to tell me that.

25          MR. SULLIVAN:  Objection.

1    Argumentative.

2        A.    So one of the reasons that I asked

3    Dr. Barich to run these particular experiments is the

4    fact that he is eminently qualified to do solid-state

5    NMR spectroscopy, especially as it's related to the

6    analysis of paclitaxel.  Dr. Barich has a Ph.D.

7    degree in chemistry.

8        Q.    Has a what?

9        A.    Ph.D. in chemistry.

10        Q.    Uh-huh.

11        A.    He also did a postdoctoral associate at the

12    University of Utah for four years.  During the time

13    he was at the University of Utah, he acquired some of

14    the first solid-state NMR spectra of paclitaxel.  So

15    he has extensive experience with analyzing paclitaxel

16    using solid-state NMR spectroscopy.  He is also a

17    very competent scientist.  And those are some of the

18    reasons why I asked Dr. Barich.

19        Q.    So in your opinion Dr. Barich was more

20    qualified to run the studies set forth in your report

21    than you were?

22            MR. SULLIVAN:  Objection.

23    Mischaracterizes.

24        Q.    (By Ms. Evans)  Is that your testimony?

25        A.    Once again, I would not agree with that

# EXHIBIT 6

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ELAN PHARMA INTERNATIONAL      )
LIMITED,                       )
                               )
          Plaintiff,           )
                               )
vs.                            )   Case No.   06438GMS
                               )
ABRAXIS BIOSCIENCE, INC.,      )
                               )
          Defendant.           )


VIDEOTAPED DEPOSITION OF DEWEY H. BARICH, PhD
TAKEN BY DIANA B. KRUZE
ON BEHALF OF THE DEFENDANT
JANUARY 25, 2008
9:15 a.m.


REPORTED BY NAOLA C. VAUGHN
REGISTERED PROFESSIONAL REPORTER
CERTIFIED COURT REPORTER (MO #1052
CERTIFIED REALTIME REPORTER

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1  entire process for whichever ones he might have been

2  present for.

3      MS. KRUZE:  Okay.  I know we're probably about to

4  run out of tape; so this is a good time for us to take

5  another break.

6      THE VIDEOGRAPHER:  We're off the record.  It's

7  11:23 a.m. Central Standard Time.

8      (Recessed from 11:23 a.m. to 11:37 a.m.)

9      THE VIDEOGRAPHER:  We're back on the record.  It's

10  11:37 a.m. Central Standard Time.

11      Q.  BY MS. KRUZE:  So before the break, we were

12  talking about Dr. Munson's presence while you were

13  doing these samples.

14          Did you save all of the data associated with

15  your 34 runs?

16      A.  Yes.

17      Q.  And did you ever print out a hard copy of any

18  of the data?

19      A.  For some of the conference calls that I was

20  asked to attend, I believe that I was -- I believe we

21  had some printouts at at least some of those

22  teleconferences.

23      Q.  Did you ever save over original data?

24      A.  No.

25      Q.  Did you ever rename a file name?

# EXHIBIT 7

# REDACTED

# EXHIBIT 8

Page 1

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE
2

ELAN PHARMA              )
3  INTERNATIONAL LIMITED, )
        Plaintiff,        )
4                         )
vs.                       ) Case No. 06-438-GMS
5                         )
ABRAXIS BIOSCIENCE, INC., )
6      Defendant.         )

7

8          ORAL VIDEOTAPED DEPOSITION

9          ERIC J. MUNSON, Ph.D.

10         NOVEMBER 29, 2007

11

12      ORAL VIDEOTAPED DEPOSITION OF ERIC J. MUNSON, Ph.D.,

13  produced as a witness at the instance of the Plaintiff

14  and duly sworn, was taken in the above-styled and

15  numbered cause on the 29th day of November, 2007, from

16  9:07 a.m. to 7:15 p.m., before Melinda Barre, Certified

17  Shorthand Reporter in and for the State of Texas,

18  reported by computerized stenotype machine at the

19  offices of Baker Botts, 910 Louisiana, 32nd Floor,

20  Houston, Texas, pursuant to the Federal Rules of Civil

21  Procedure and the provisions stated on the record or

22  attached hereto.

23

24

25

Page 57

1    particular spectrum.

2        Q.   How do you know the conditions under which

3    the spectrum was acquired?

4        A.   Those conditions are recorded in the

5    information that's present in the NMR spectrum and

6    the file associated with it.

7        Q.   What do you mean "the file associated with

8    it"?

9        A.   So when you acquire a free induction

10   decay --

11       Q.   Yes.

12       A.   -- you will save that free induction decay

13   as a file.  That file also contains the experimental

14   parameters associated with that particular analysis,

15   and additional information may be found as well

16   within the file name.

17       Q.   So all the experimental parameters of the

18   solid-state NMR experiments should be recorded in

19   these electronic files that you've just described?

20       A.   Could you be a little bit more specific, I

21   guess, when you're talking about ...

22       Q.   Well, would the parameters on how you ran

23   the solid-state NMR analysis, would that be recorded

24   in these electronic files you've identified?

25       A.   If you could be a little bit more specific

1    as to what parameters.

2        Q.    Residence time, the time that you run the

3    sample.

4        A.    So the total sample time?

5        Q.    All right.  Yes.

6        A.    Or the -- I apologize.  It should be better

7    characterized as the total experiment time.

8        Q.    All right.

9        A.    Is that what you mean?

10       Q.    Is that recorded?

11       A.    I don't know if it's recorded directly, but

12   it's certainly something that is calculated.

13       Q.    Calculated based on what?

14       A.    In order to calculate that, you use the

15   number of acquisitions times the recycle delay.  In

16   theory you should also include the acquisition time

17   and also some other parameters as well.  But

18   essentially it comes down to those two main

19   parameters, the number of acquisitions times the

20   recycle delay.

21       Q.    Is the recycle delay recorded in those

22   electronic files you've referenced?

23       A.    Yes, it is.

24       Q.    Is the number of acquisitions recorded in

25   those files you've referenced?

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ELAN PHARMA INTERNATIONAL    )
LIMITED,                     )
                             )
          Plaintiff,         )
                             )
vs.                          )   Case No.   06438GMS
                             )
ABRAXIS BIOSCIENCE, INC.,    )
                             )
          Defendant.         )


VIDEOTAPED DEPOSITION OF DEWEY H. BARICH, PhD
TAKEN BY DIANA B. KRUZE
ON BEHALF OF THE DEFENDANT
JANUARY 25, 2008
9:15 a.m.


REPORTED BY NAOLA C. VAUGHN
REGISTERED PROFESSIONAL REPORTER
CERTIFIED COURT REPORTER (MO #1052
CERTIFIED REALTIME REPORTER

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

```
 1   academic research activities.
 2        Q.   BY MS. KRUZE:  So -- but do you consider
 3   doing testing for litigation routine?
 4        MR. RIDDLE:  Objection, form.
 5        A.   The data that we collect is quite routine.
 6   It doesn't really matter what the purpose of collecting
 7   the data is.  It doesn't have any impact on how we do
 8   the analysis, on how we operate the instrument.  The
 9   data ultimately is the data.
10        Q.   BY MS. KRUZE:  Okay.  So would you consider
11   doing testing for litigation routine then?
12        MR. RIDDLE:  Objection, form.  I mean, how many
13   times are you going to ask the same question, Diana?
14        Q.   BY MS. KRUZE:  And, again, you can go ahead
15   and answer.  I know that's --
16        A.   Well, I believe I already have.
17        Q.   So you would consider testing for litigation
18   routine?
19        MR. RIDDLE:  Objection, form.
20        A.   Well, again, I believe that you've asked that
21   question.  I gave an answer.  Could we ask the court
22   reporter to read back?
23        MR. RIDDLE:  Do you want Ms. Vaughn to read --
24   Ms. Vaughn; is that correct? -- to read back your
25   previous answer?  We can do that.
```

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1  been instructed not to answer that question.

2      Q.   BY MS. KRUZE:  Were attorneys present at that

3  meeting in January?

4      A.   It was my understanding -- I didn't get

5  introduced to everyone on the other end of the

6  teleconference.  It is my understanding that some or

7  all of those people are attorneys.

8      Q.   Do you remember any of the names of the

9  people around that teleconference?

10     A.   I believe one name was Bill.  And that's the

11  only name I remember.

12     Q.   Okay.  Did you ever have any discussions

13  about your NMR testing outside of the presence of

14  attorneys or what you thought were attorneys?

15     A.   Could you just repeat that one?

16     Q.   Sure.  Did you ever have any discussions

17  about your NMR testing without attorneys?

18     MR. RIDDLE:  Objection, form.

19     A.   As part of collecting the data on these

20  samples, I was doing it under the direction of

21  Professor Munson.  And so he and I discussed at times

22  what I was -- what the status of that work was.  I came

23  to him to find out what parameters he might like to

24  have used for any future analyses.

25          When you're collecting solid state NMR data,

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

1  there are a number of parameters that you must

2  optimize.  Some of these are done simply to calibrate

3  the instruments.  This is done with a standard compound

4  as opposed to the actual sample that you're going to

5  analyze.

6        But then each sample has its own properties.

7  You might have to learn what some of those properties

8  are in order to collect data.  Even after you've done

9  that, there are still some other choices that can be

10  made.  And with the work I do for Professor Munson that

11  I'm doing as part of this service center that he has,

12  where we're working on external samples as opposed to

13  academic research samples, I usually speak with him

14  directly to find out how he wants that work, what

15  parameters he might like to have used.

16        Q.   When Dr. Munson first contacted you about

17  this case, what expertise did he request that you

18  provide?

19        MR. RIDDLE:  Objection, form.

20        A.   I'm not sure that any expertise I have was

21  his motivation.  These service center projects that

22  come to him are carried out by different people in his

23  lab.  Some of the graduate students perform the

24  experiments on other projects.  I happened to be his

25  choice for this one.  I don't know why.

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

1      Q.    BY MS. KRUZE:  What was the assignment that

2  he gave you?

3      A.    He told me that there was a project coming up

4  that would be associated with Professor Berkland.  And

5  some period of time before I was provided any

6  samples -- he told me this a few days perhaps.  And he

7  said that he would let me know that something was

8  coming up, and at some point he said, you know, we're

9  ready to start this work; talk to Professor Berkland

10  about the samples.

11      Q.    Okay.  And what work specifically did either

12  Dr. Munson or Dr. Berkland request that you do?

13      A.    Professor Munson asked me to collect routine

14  solid state NMR experiments on the samples that were

15  provided by Professor Berkland.

16      Q.    And what are your qualifications for that

17  work?

18      A.    I've been operating solid state NMR

19  spectrometers for -- I suppose at the time about

20  13 years.  Although the work that we were doing is so

21  routine that -- as I mentioned, some of this other

22  service center work is done by graduate students.  We

23  even have -- for example, the Pharmaceutical Chemistry

24  Department at the University of Kansas has a very nice

25  summer student program.  And we have one to two

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1    students a year in our lab who we train to operate the

2    instrument.  And the work that we actually did on these

3    samples, those students could have done once they were

4    trained to use the instrument.

5        Q.    Do you consider yourself an expert in solid

6    state NMR?

7        MR. RIDDLE:  Objection, form.

8        A.    Solid state NMR can be used for quite a

9    variety of things.  I have a fair bit of experience

10   doing a number of those.  I'm not exactly sure what

11   constitutes being an expert in something.

12       Q.    BY MS. KRUZE:  Well, how would you define the

13   term "expert"?

14       MR. RIDDLE:  Objection, form.

15       A.    Well, that's a good question.

16            I guess in very simple terms it's someone who

17   has a fairly extensive knowledge of something.

18       Q.    BY MS. KRUZE:  And you testified earlier that

19   you've written approximately 25 to 30 papers about

20   solid state NMR; is that right?

21       MR. RIDDLE:  Objection, form.

22       A.    I don't recall exactly what I said.

23       Q.    BY MS. KRUZE:  And I'm not trying to trick

24   you.  So -- let me just rephrase the question.

25            Do you think that you have extensive

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1    knowledge regarding solid state NMR?

2        A.    As I said, I've been operating NMR

3    spectrometers for quite a few years.  In my graduate

4    work actually I didn't, because my project was to

5    combine both theoretical calculation work and

6    experimental work.  As it turns out, quite a bit of the

7    work that I did on those projects was actually the

8    calculation side.  I was the only one in those

9    projects, at least in most of those projects, who did

10   any of the calculation work.  And in quite a few of

11   those, in fact, the solid state NMR was done by someone

12   else on the paper.  This is how, of course, academic

13   research is done.  It's usually a -- several graduate

14   students may be asked to --

15       Q.    Pardon me.

16       A.    Several graduate students may be asked to

17   contribute to a particular project.

18             As a post-doc at the University of Utah, in

19   the sense of splitting my time between both calculation

20   and experimental work, I did that as well.

21       Q.    So do you think that you have extensive

22   experience in solid state NMR?

23       A.    I suppose if working with something for over

24   10 years is, yes.

25       Q.    Okay.  What expertise do you have in

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1  interpreting solid state NMR results?

2        MR. RIDDLE:  Objection, form.

3        A.    The majority of the work that I have done, if

4  you look at what I did as a graduate student and as a

5  post-doc at the University of Utah, I was interested

6  there in a facet of solid state NMR that involves

7  the -- what's called the chemical shift tensor.

8              And most of the work that I did, in

9  particular at the University of Utah, was to perform

10  experiments on various samples where we would measure

11  those chemical shift tensors and compare those to

12  theoretical calculations that were meant to complement

13  that work.

14              When I got to Professor Munson's group, one

15  thing I was actually a little surprised at was that the

16  majority of the work we do is very simplistic.  It is

17  some of the -- these are some of the simplist

18  experiments you can do with solid state NMR.

19              And, for example, every time you use a solid

20  state NMR instrument you acquire some data on a

21  standard compound to calibrate the instrument.  And, in

22  fact, the very -- the very experiments that I did in

23  this matter are ultimately the very same experiments,

24  but simply applied to a different sample.

25        Q.    BY MS. KRUZE:  Did Dr. Munson ask you to

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1  entire process for whichever ones he might have been

2  present for.

3      MS. KRUZE:  Okay.  I know we're probably about to

4  run out of tape; so this is a good time for us to take

5  another break.

6      THE VIDEOGRAPHER:  We're off the record.  It's

7  11:23 a.m. Central Standard Time.

8      (Recessed from 11:23 a.m. to 11:37 a.m.)

9      THE VIDEOGRAPHER:  We're back on the record.  It's

10  11:37 a.m. Central Standard Time.

11      Q.  BY MS. KRUZE:  So before the break, we were

12  talking about Dr. Munson's presence while you were

13  doing these samples.

14          Did you save all of the data associated with

15  your 34 runs?

16      A.  Yes.

17      Q.  And did you ever print out a hard copy of any

18  of the data?

19      A.  For some of the conference calls that I was

20  asked to attend, I believe that I was -- I believe we

21  had some printouts at at least some of those

22  teleconferences.

23      Q.  Did you ever save over original data?

24      A.  No.

25      Q.  Did you ever rename a file name?

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

1        MR. RIDDLE:  Objection, form.

2        A.    No.

3        Q.    BY MS. KRUZE:  And where is all of this data

4   stored from these 34 runs?

5        A.    On the Sun computer that's the -- on the

6   console of the spectrometer.

7        Q.    And that computer is a Sun work station?

8        A.    Yes.  It's a Sun Sparkstation I think is its

9   model.

10       Q.    Did you record any information on paper when

11  you conducted your NMR experiments?

12       A.    These experiments are actually so routine

13  that all the parameters that are specific to the

14  experiment are stored as part of the spectrometer

15  software.  So, no, I didn't handwrite anything.

16       Q.    So you did not keep a lab notebook?

17       A.    No.

18       Q.    Did you record any information about the

19  samples you received?

20       A.    No.

21       Q.    For example, what the sample even was?

22       MR. RIDDLE:  Objection, form.

23       A.    The file name on the spectrometer I might

24  include something in its file name that would help

25  determine which spectrum that was.

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

1      Q.    BY MS. KRUZE:  What about the amount of

2  sample you received?  Did you record that information?

3      A.    No.

4      Q.    Do you usually keep a lab notebook in your

5  work as a research associate?

6      A.    No, I do not.

7      Q.    Did you send all of the data from all of the

8  runs to Dr. Munson?

9      A.    At some point he asked me to provide him a CD

10  with all of the data that was collected, and I did

11  provide that to him.

12      Q.    Did you ever send Elan's counsel the data

13  from the runs?

14      A.    No.

15      Q.    Do you know if Dr. Munson sent all of the

16  data from all of the NMR runs to Elan's counsel?

17      A.    I have no personal knowledge of what

18  Professor Munson sent.

19      Q.    Are there any spectra -- actually, strike

20  that.

21          Is there any data that you did not give to

22  Dr. Munson in relation to this case?

23      A.    No.

24      Q.    Did any of the runs fail to produce spectra?

25      MR. RIDDLE:  Objection, form.

# EXHIBIT 9

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ELAN PHARMA INTERNATIONAL    )
LIMITED,                     )
                             )
        Plaintiff,           )
                             )
vs.                          )   Case No.  06438GMS
                             )
ABRAXIS BIOSCIENCE, INC.,    )
                             )
        Defendant.           )


VIDEOTAPED DEPOSITION OF DEWEY H. BARICH, PhD
TAKEN BY DIANA B. KRUZE
ON BEHALF OF THE DEFENDANT
JANUARY 25, 2008
9:15 a.m.



REPORTED BY NAOLA C. VAUGHN
REGISTERED PROFESSIONAL REPORTER
CERTIFIED COURT REPORTER (MO #1052
CERTIFIED REALTIME REPORTER

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1   both the federal and the local rules.

2       Q.   BY MS. KRUZE:  So let's talk about your work

3   for Elan.  When did your work with Elan begin?

4       MR. RIDDLE:  Objection, form.

5       A.   Well, I'm a little confused.  I don't work

6   for Elan.  I work for Professor Munson.

7       Q.   BY MS. KRUZE:  How did you first hear about

8   this case?

9       A.   What do you mean by this case?

10      Q.   This litigation.

11      A.   Let's see.  I think sometime in January of

12  2007 I was invited to a teleconference regarding some

13  data I had collected for Professor Munson.  And at that

14  teleconference I came to find out that these samples

15  had to do with a litigation case.

16      Q.   And what did you discuss in that

17  teleconference?

18      MR. RIDDLE:  Objection, form.

19          And to the extent Dr. Barich that your answer

20  would reveal any attorney-client communication, then I

21  would instruct you not to answer that question.  If

22  your answer -- if you can answer without revealing any

23  attorney-client communication, then you may answer the

24  question.

25      A.   Okay.  Well, on the advice of counsel, I've

1     Q.   BY MS. KRUZE:  What was the assignment that

2 he gave you?

3     A.   He told me that there was a project coming up

4 that would be associated with Professor Berkland.  And

5 some period of time before I was provided any

6 samples -- he told me this a few days perhaps.  And he

7 said that he would let me know that something was

8 coming up, and at some point he said, you know, we're

9 ready to start this work; talk to Professor Berkland

10 about the samples.

11     Q.   Okay.  And what work specifically did either

12 Dr. Munson or Dr. Berkland request that you do?

13     A.   Professor Munson asked me to collect routine

14 solid state NMR experiments on the samples that were

15 provided by Professor Berkland.

16     Q.   And what are your qualifications for that

17 work?

18     A.   I've been operating solid state NMR

19 spectrometers for -- I suppose at the time about

20 13 years.  Although the work that we were doing is so

21 routine that -- as I mentioned, some of this other

22 service center work is done by graduate students.  We

23 even have -- for example, the Pharmaceutical Chemistry

24 Department at the University of Kansas has a very nice

25 summer student program.  And we have one to two

# EXHIBIT 10

1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2

ELAN PHARMA                    )
3  INTERNATIONAL LIMITED,        )
        Plaintiff,              )
4                               )
vs.                            ) Case No. 06-438-GMS
5                               )
ABRAXIS BIOSCIENCE, INC.,      )
6        Defendant.             )

7

8               ORAL VIDEOTAPED DEPOSITION

9               ERIC J. MUNSON, Ph.D.

10                NOVEMBER 29, 2007

11

12      ORAL VIDEOTAPED DEPOSITION OF ERIC J. MUNSON, Ph.D.,

13  produced as a witness at the instance of the Plaintiff

14  and duly sworn, was taken in the above-styled and

15  numbered cause on the 29th day of November, 2007, from

16  9:07 a.m. to 7:15 p.m., before Melinda Barre, Certified

17  Shorthand Reporter in and for the State of Texas,

18  reported by computerized stenotype machine at the

19  offices of Baker Botts, 910 Louisiana, 32nd Floor,

20  Houston, Texas, pursuant to the Federal Rules of Civil

21  Procedure and the provisions stated on the record or

22  attached hereto.

23

24

25

1    more specific when you're referring to sample

2    preparation.  Are you referring to specifically as

3    applies to solid-state NMR spectroscopy?  To general

4    sample preparation?

5        Q.    I'm asking you as applies to the experiments

6    you do in your laboratory.

7        A.    For many of the experiments in our

8    laboratory what we will do is take a particular

9    sample, place it into a rotor and then spin that

10   particular sample to acquire solid-state NMR data.

11       Q.    Where are the details of how you do that

12   experiment recorded?

13       A.    The procedure is very well established.  So

14   because it's the same procedure that we do time and

15   again, we typically don't record those details.

16       Q.    So the people in your laboratory don't keep

17   laboratory notebooks?  Is that your testimony to the

18   jury, Dr. Munson?

19              MR. SULLIVAN:  Objection.

20   Mischaracterizes, argumentative.

21       A.    Once again, that's a very -- that is not

22   what I am saying at all; and I find that to be a

23   misleading question because, once again, that's not

24   at all what I've referred to.

25       Q.    (By Ms. Evans)  Well, I'm having a hard time

Page 32

1    and asked him to run them under my supervision.

2        Q.    Who is Dr. Dewey -- could you spell his

3    name, please, for the record, the person who actually

4    did the experiments?

5        A.    Could you be a little more specific what you

6    mean by "do the experiments"?

7        Q.    Well, you just told me that you gave the

8    samples to Dr. Dewey Barich to run the analyses.

9    That's the person who did the experiments, the

10   hands-on person, right?

11                MR. SULLIVAN:  Objection.

12       A.    Once again, I guess, what are you referring

13   to?  Are you talking about Dr. Barich as -- well,

14   could you be a little bit more specific when you talk

15   about running the experiments?

16       Q.    (By Ms. Evans)  Well, in your report you set

17   forth certain solid-state NMR data, correct?

18       A.    That is correct.

19       Q.    Who did the experiments to acquire that

20   data?

21       A.    So are you talking about who sat down at the

22   NMR spectrometer and acquired the data?

23       Q.    That would be the person who ran the

24   experiments, yes.  That's what I'm referring to,

25   Doctor.

1          MR. SULLIVAN:  Objection.  Don't argue

2    with the witness.

3      A.   So the person who ran the experiments and

4    acquired the data is Dr. Dewey Barich.

5      Q.   (By Ms. Evans)  Could you spell --

6      A.   His name is D-e-w-e-y, B-a-r-i-c-h.

7      Q.   Why did you ask Dr. Barich to do the

8    experiments for this litigation?

9          MR. SULLIVAN:  Objection.

10     A.   Could you be a little bit more specific?

11   You're asking why I did this?

12     Q.   (By Ms. Evans)  That's right.  Why didn't

13   you do it yourself?

14         MR. SULLIVAN:  Objection.

15     Q.   (By Ms. Evans)  Why didn't you do the

16   experiments yourself, Doctor?

17         MR. SULLIVAN:  Objection.

18   Mischaracterizes.

19     A.   Well, once again, can you be a little bit

20   more specific when you're talking about the question

21   of why I did not run the experiments?

22     Q.   (By Ms. Evans)  No, I don't think so,

23   Doctor, because I don't know why you didn't run the

24   experiments yourself.  I need you to tell me that.

25         MR. SULLIVAN:  Objection.

1    Argumentative.

2        A.    So one of the reasons that I asked

3    Dr. Barich to run these particular experiments is the

4    fact that he is eminently qualified to do solid-state

5    NMR spectroscopy, especially as it's related to the

6    analysis of paclitaxel.  Dr. Barich has a Ph.D.

7    degree in chemistry.

8        Q.    Has a what?

9        A.    Ph.D. in chemistry.

10       Q.    Uh-huh.

11       A.    He also did a postdoctoral associate at the

12   University of Utah for four years.  During the time

13   he was at the University of Utah, he acquired some of

14   the first solid-state NMR spectra of paclitaxel.  So

15   he has extensive experience with analyzing paclitaxel

16   using solid-state NMR spectroscopy.  He is also a

17   very competent scientist.  And those are some of the

18   reasons why I asked Dr. Barich.

19       Q.    So in your opinion Dr. Barich was more

20   qualified to run the studies set forth in your report

21   than you were?

22             MR. SULLIVAN:  Objection.

23   Mischaracterizes.

24       Q.    (By Ms. Evans)  Is that your testimony?

25       A.    Once again, I would not agree with that

Page 35

1   particular statement.  In many respects -- first of

2   all, as I noted, one of the aspects is that

3   Dr. Barich has extensive experience dealing with

4   paclitaxel, which is related to some of the safety

5   concerns of handling a sample such as paclitaxel.

6           However, as he was doing the analysis,

7   he was constantly in touch with me as to what sort of

8   parameters should be chosen.  So a lot of things that

9   I did was supervise the data acquisition.

10  Q.   Now, you don't have any prior experience

11  with solid-state NMR of paclitaxel.  Is that correct?

12  A.   Could you be a little bit more specific?

13  Q.   No.

14  A.   Well, that's a very vague question.  I don't

15  know if you're talking about, you know, has

16  paclitaxel ever been in my NMR spectrometer?  Has it

17  ever been run in my laboratory?  Is it a question --

18  like I said, this is a very vague question.

19  Q.   Well, you told me that Dr. Barich had prior

20  experience with running solid-state NMR -- with

21  solid-state NMR analysis of paclitaxel.  I'm asking

22  you if you have prior experience.  This is your

23  terminology, Doctor.

24          Do you have as good experience with

25  solid-state NMR of paclitaxel as Dr. Barich does?

1    A.    Once again, that's a very wide-open

2    question.  So I don't know if you're referring to,

3    for example, the safety concerns associated with

4    handling of paclitaxel, if you're concerned with the

5    data acquisition part of obtaining the spectra of

6    paclitaxel, if you're talking about the

7    interpretation of the data that emerges from

8    paclitaxel.  If you could please be more specific, I

9    can try and answer your question better.

10   Q.    Prior to this work, has paclitaxel ever been

11   analyzed in your laboratory in any way prior to the

12   work in this litigation?

13   A.    Not to my knowledge.

14   Q.    And, to your knowledge, Dr. Barich did do a

15   solid-state NMR spectroscopy of paclitaxel

16   previously, correct?

17   A.    Dr. Barich has published a paper related to

18   solid-state NMR spectroscopy of paclitaxel, which

19   means that he is very experienced with the handling

20   of paclitaxel, which is one of the reasons and

21   probably the primary reason associated with asking

22   him to handle the sample preparation and data

23   acquisition steps associated with paclitaxel.

24   Q.    So you said you were in close contact with

25   Dr. Barich regarding parameters, correct, for the

1    experiments in connection with this litigation,

2    right?

3        A.   If you could be a little bit more specific.

4    I assume that you're referring to when I was talking

5    about the timeline Dr. Barich and I were discussing

6    extensively how to acquire the data associated with

7    paclitaxel.

8        Q.   Tell me about that conversation.

9        A.   I don't remember the specific details of

10   each and every conversation that we had.  But, for

11   example, what would typically happen is Dr. Barich

12   would provide anal -- or acquire spectrum.  We would

13   discuss it.  I would then make a decision regarding

14   what parameters might be used to acquire the data.

15       Q.   So the parameters were not identical in

16   every run you did, every analysis you did in

17   connection with this litigation?  You changed the

18   parameters?

19             MR. SULLIVAN:  Objection.

20       Q.   (By Ms. Evans)  Is that correct?

21       A.   Once again, I guess what parameters are you

22   referring to?

23       Q.   The parameters you're referring to, Doctor.

24   It's your word.  What parameters are you referring

25   to?

1    A.    So once we established the parameters that

2    we wanted to use to acquire data of paclitaxel, those

3    are the parameters that we used to obtain all of our

4    data of paclitaxel.

5    Q.    Where did you write down the parameters that

6    you tried along the way and the ones you ended up

7    with?  Where is that written down?

8    A.    I apologize.  Could you repeat the question?

9          MS. EVANS:  Ms. Reporter?

10         (The record was read as requested.)

11   A.    I heard two questions there.  Could you

12   please ...

13   Q.    (By Ms. Evans)  Answer them both, please.

14         MR. SULLIVAN:  Objection.  Compound.

15   A.    Which question would you like me to answer

16   first?

17   Q.    (By Ms. Evans)  Either.

18   A.    Okay.

19         THE WITNESS:  Could you please read

20   back the first question?

21         (The record was read as requested.)

22   A.    Once again, could we get some clarification

23   about the "you" part?  So, for example, from my

24   impression "you" would be referring to as Dr. Barich

25   and I were performing these experiments.

1    Q.    (By Ms. Evans)  Was anyone else involved in

2    these experiments other than you and Dr. Barich?

3    A.    Could you be a little bit more specific?

4    What experiments are you referring to?

5    Q.    The experiments done in connection with this

6    litigation.

7    A.    Once again, that's very vague.

8    Q.    How many experiments did you do for Elan's

9    counsel?

10   A.    If you're referring to the experiments that

11   we performed related to the solid-state NMR

12   analysis --

13   Q.    Were there other experiments that you

14   performed for Elan's counsel other than solid-state

15   NMR analysis, Doctor?

16   A.    Not that I can recall.

17   Q.    All right.  So I'm trying to understand what

18   your confusion is then about the experiments.

19   A.    So, once again, as long as we're on the same

20   page in the fact that we're talking about the

21   solid-state NMR experiments that were performed by

22   Dr. Barich and I.

23   Q.    Uh-huh.  Anyone else involved in that?

24   A.    Once again, can you be a little bit more

25   specific?  Anyone else involved in ...

Page 40

1    Q.    The solid-state NMR experiments performed in

2    your laboratory relating to this litigation.

3    A.    No.  Dr. Barich and I were the only ones who

4    were involved.

5    Q.    Did Dr. Barich keep a laboratory notebook?

6    A.    Not to my knowledge.

7    Q.    Did you --

8    A.    Once again, not to my knowledge as it's

9    related to this particular litigation.

10   Q.    So Dr. Barich -- you said you didn't have

11   any postdoctoral fellows, correct, in your

12   laboratory.  Is that correct?

13   A.    That's correct.

14   Q.    So how did you come to ask Dr. Barich to do

15   this work?

16   A.    Dr. Barich is a research associate in my

17   laboratory.

18   Q.    A research associate.  And tell me what a

19   research associate is.

20   A.    The difference between -- well, a research

21   associate is someone who has a higher title than that

22   of a postdoctoral associate.

23   Q.    And you're getting paid for the work that

24   Elan asked you to do in this litigation, correct?

25   A.    Could you be a little bit more specific when

# EXHIBIT 11

**REDACTED**

# EXHIBIT 12

DEWEY H. BARICH, Ph.D. - JANUARY 25, 2008

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ELAN PHARMA INTERNATIONAL    )
LIMITED,                     )
                             )
          Plaintiff,         )
                             )
vs.                          )  Case No.  06438GMS
                             )
ABRAXIS BIOSCIENCE, INC.,    )
                             )
          Defendant.         )


VIDEOTAPED DEPOSITION OF DEWEY H. BARICH, PhD
TAKEN BY DIANA B. KRUZE
ON BEHALF OF THE DEFENDANT
JANUARY 25, 2008
9:15 a.m.


REPORTED BY NAOLA C. VAUGHN
REGISTERED PROFESSIONAL REPORTER
CERTIFIED COURT REPORTER (MO #1052
CERTIFIED REALTIME REPORTER

DEWEY H. BARICH, Ph.D. -  JANUARY 25, 2008

1   been instructed not to answer that question.

2       Q.   BY MS. KRUZE:  Were attorneys present at that

3   meeting in January?

4       A.   It was my understanding -- I didn't get

5   introduced to everyone on the other end of the

6   teleconference.  It is my understanding that some or

7   all of those people are attorneys.

8       Q.   Do you remember any of the names of the

9   people around that teleconference?

10      A.   I believe one name was Bill.  And that's the

11  only name I remember.

12      Q.   Okay.  Did you ever have any discussions

13  about your NMR testing outside of the presence of

14  attorneys or what you thought were attorneys?

15      A.   Could you just repeat that one?

16      Q.   Sure.  Did you ever have any discussions

17  about your NMR testing without attorneys?

18      MR. RIDDLE:  Objection, form.

19      A.   As part of collecting the data on these

20  samples, I was doing it under the direction of

21  Professor Munson.  And so he and I discussed at times

22  what I was -- what the status of that work was.  I came

23  to him to find out what parameters he might like to

24  have used for any future analyses.

25          When you're collecting solid state NMR data,

# EXHIBIT 13

**REDACTED**

# EXHIBIT 14

# REDACTED

# EXHIBIT 15

Page 1

1              UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF DELAWARE

2

   ELAN PHARMA                    )

3  INTERNATIONAL LIMITED,         )

        Plaintiff,                )

4                                 )

   vs.                            ) Case No. 06-438-GMS

5                                 )

   ABRAXIS BIOSCIENCE, INC.,      )

6       Defendant.                )

7

8              ORAL VIDEOTAPED DEPOSITION

9                CORY BERKLAND, Ph.D.

10                DECEMBER 14, 2007

11

12      ORAL VIDEOTAPED DEPOSITION OF CORY BERKLAND, Ph.D.,

13  produced as a witness at the instance of the Plaintiff

14  and duly sworn, was taken in the above-styled and

15  numbered cause on the 14th day of December, 2007, from

16  9:12 a.m. to 7:36 p.m., before Melinda Barre, Certified

17  Shorthand Reporter in and for the State of Texas,

18  reported by computerized stenotype machine at the

19  offices of Baker Botts, 910 Louisiana, 32nd Floor,

20  Houston, Texas, pursuant to the Federal Rules of Civil

21  Procedure and the provisions stated on the record or

22  attached hereto.

23

24

25

Page 80

1  laboratory, that always -- almost always is at the

2  exact same settings.

3          At the time David was in the

4  laboratory, this was the centrifuge he used

5  continually.  He knew how to set up this machine so

6  that it ran samples and separated particulates with a

7  particular size routinely.  In addition, he was used

8  to handling nanoparticulate formulations.  And he did

9  this the way you would expect a professional in the

10  laboratory to do this.  He would use a similar

11  approach and a similar methodology every time.  He

12  would take the same precautions to protect himself.

13  He would take similar precautions to protect the

14  integrity of the sample.

15      Q.   Is it scientifically accepted practice to

16  not write down experiments in a laboratory notebook?

17              MR. SULLIVAN:   Object.

18      A.   I think I addressed that question.

19      Q.   (By Ms. Kruze)  And I think I'm looking for

20  an answer to the question.

21      A.   Okay.

22      Q.   If your recordkeeping practice was

23  challenged by someone on the fact that it's not

24  scientifically accepted practice, how would you

25  respond?

1            MR. SULLIVAN:  Object.

2       A.    I would respond in the same way I've

3   responded previously, that there is no rule that says

4   information has to be recorded into a laboratory

5   notebook.  As a matter of fact, there are a variety

6   of programs out there right now that are

7   computational-based laboratory recording software.

8            So instead of writing this down into a

9   laboratory notebook, you create a document using the

10  appropriate software; and you record your experiments

11  in that manner.  So the use of a laboratory notebook

12  in my mind is not a critical component to good

13  bookkeeping or good recordkeeping.

14      Q.    (By Ms. Kruze)  Did you record the lot

15  number of the Abraxane vials that you received?

16      A.    It was my impression that the lot number of

17  the Abraxane vials was available to me because those

18  particular boxes which show the lot number have been

19  recorded prior to being sent to me.

20      Q.    So you didn't record that?

21      A.    I think I have -- in my expert report I have

22  an image of one of those boxes that shows the lot

23  number.

24      Q.    How many boxes did you receive?

25      A.    I think the total number of boxes we

# EXHIBIT 16

# REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of April, 2008, the attached **REDACTED PUBLIC VERSION OF DECLARATION OF JEFFREY D. SULLIVAN IN SUPPORT OF PLAINTIFF ELAN PHARMA INTERNATIONAL LIMITED'S OPPOSITION TO ABRAXIS'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE OF ELAN'S SSNMR TESTING OF ABRAXANE®** was served upon the below-named counsel of record at the addresses and in the manner indicated:

Josy W. Ingersoll, Esquire                         HAND DELIVERY
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

Michael A. Jacobs, Esquire                         VIA ELECTRONIC MAIL
Morrison & Foerster, LLP
425 Market Street
San Francisco, CA  94105-2482

Emily A. Evans, Esquire                            VIA ELECTRONIC MAIL
Morrison & Foerster, LLP
755 Page Mill Road
Palo Alto, CA  94304-1018

Anders T. Aannestad, Esquire                       VIA ELECTRONIC MAIL
Morrison & Foerster, LLP
12531 High Bluff Drive, Suite 100
San Diego, CA  92130


*/s/ John G. Day*
_____
John G. Day

173077.1