# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON

ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN
EDMON L. MORTON
JOHN E. TRACEY

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

WWW.YOUNGCONAWAY.COM

DIRECT DIAL: 302-571-5029
DIRECT FAX: 302-576-3402
enorman@ycst.com

JOSEPH M. BARRY
RYAN M. BARTLEY
SEAN M. BEACH
SANJAY BHATNAGAR
DONALD J. BOWMAN, JR.
MICHELE SHERRETTA BUDICAK
JEFFREY T. CASTELLANO
DOUGLAS T. COATS (MD ONLY)
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
KERRIANNE MARIE FAY
IAN S. FREDERICKS
JAMES J. GALLAGHER
WILLIAM E. GAMGORT
SEAN T. GREECHER
NATHAN D. GROW
STEPHANIE L. HANSEN
JAMES L. HIGGINS
PATRICK A. JACKSON
DAWN M. JONES
KAREN E. KELLER

SPECIAL COUNSEL
JOHN D. MCLAUGHLIN, JR.
KAREN L. PASCALE
SETH J. REIDENBERG
PATRICIA A. WIDDOSS

JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI
EVANGELOS KOSTOULAS
JOHN C. KUFFEL
TIMOTHY E. LENGKEEK
ANDREW A. LUNDGREN
MATTHEW B. LUNN
ADRIA B. MARTINELLI
KATHALEEN MCCORMICK
MICHAEL W. MCDERMOTT
TAMMY L. MERCER
MARIBETH L. MINELLA
D. FON MUTTAMARA-WALKER
JENNIFER R. NOEL
ADAM W. POFF
ROBERT F. POPPITI, JR.
SARA BETH A. REYBURN
CHERYL A. SANTANIELLO
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
RICHARD J. THOMAS
TRAVIS N. TURNER
MARGARET B. WHITEMAN
SHARON M. ZIEG

SENIOR COUNSEL
CURTIS J. CROWTHER

OF COUNSEL
BRUCE M. STARGATT
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND

May 21, 2008

**BY CM/ECF AND HAND DELIVERY**

The Honorable Gregory M. Sleet
U.S. District Court District of Delaware
844 N. King Street, Lockbox 19
Wilmington, DE 19801

    Re:    *Elan Pharma International Limited v. Abraxis BioScience, Inc.*
            Case No. 06-438-GMS

Dear Chief Judge Sleet:

    Abraxis writes in response to Elan's May 20, 2008 letter to the Court regarding the form of order for Abraxis motions *in limine* no. 1 and 4.

    Abraxis notes at the outset that the Court's order clarifying its claim construction should conclusively resolve infringement issues because even Elan's experts agree that the paclitaxel in Abraxane is overwhelmingly amorphous. Abraxis has written to Elan asking for confirmation that Elan no longer intends to pursue infringement at trial. Elan has not responded, but it would appear from Elan's letter to the Court that it intends to persist with its infringement case.

    As we noted in our letter to the Court accompanying the proposed orders [DI 567], we proposed language we believed necessary to effectuate the Court's order. In particular, in addition to specifying that Abraxis could cross-examine Dr. Brittain using Dr. Brittain's testing document privilege log, we anticipated (correctly) that Elan might attempt to eviscerate this relief by not calling Dr. Brittain at trial and instead replacing him with another of its multiple experts. Accordingly, Abraxis also requested that the Court order Elan to produce Dr. Brittain, not another expert, at trial on the topic of Abraxis's XRPD testing.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Gregory M. Sleet
May 21, 2008
Page 2

Elan's letter reinforces the need for the requested relief. Elan now proposes not to call Dr. Brittain and to call Dr. Berkland instead to testify about XRPD. In doing so, it evidently hopes to hamstring Abraxis from cross-examining its expert regarding the withheld tests – which was the whole point of the relief Abraxis requested, and the Court was inclined to grant, at the pretrial conference. To the extent Elan chooses to introduce testimony at trial criticizing Abraxis's XRPD testing, Elan should be required to do so through Dr. Brittain.

Elan's effort to relitigate its underlying wrongdoing should be rejected. Elan withheld over 400 testing documents while falsely representing to the Court that it had (1) produced all non-privileged testing documents, (2) maintained the walls between testifying experts and consultants and (3) logged all testing documents it had withheld. When Abraxis attempted to explore Dr. Brittain's testing in deposition, he *admitted* he had conducted testing on Abraxane, but counsel instructed him not to answer questions regarding the type of studies he had performed, whether he had performed XRPD testing, and whether his studies concerned the question of whether XRPD was a reliable method for testing the paclitaxel in Abraxane. Brittain Depo. Tr. at 6:10-7:13, 11:3-10, 18:7-13, 18:20-19:9 (copy attached).

Elan newly cites *United States v. 215.7 Acres of Land, Situated in Kent County, State of Delaware*, 719 F. Supp. 273 (D. Del. 1989). But this case was based on the earlier, more restrictive version of Rule 26. See *Western Resources, Inc. v. Union Pac. R.R. Co., Inc.*, 2002 U.S. Dist. Lexis 1911 at *26 n. 10 (D. Kan. Jan. 11, 2002).

Elan's disagreement with our proposed adverse inference instruction ignores caselaw from this very Court. The absence of an explicit court order is not a bar to an adverse inference instruction. *Mosel Vitelic Corp. v. Micron Tech., Inc.*, 162 F. Supp. 2d 307, 311 (D. Del. 2000) (Sleet, J.) (adverse inference instruction ordered where party failed to preserve evidence). See also Fed. R. Civ. P. 37(c)(1)(B), (C) (sanctions for failure to produce information required under Rule 26(e) include "inform[ing] the jury of the party's failure" and other appropriate sanctions, including those listed in Rule 37(b)(2)). Indeed, "adverse inference instructions are one of the least severe sanctions which the court can impose …." *Mosel Vitelic*, 162 F. Supp. 2d at 315. In any event, as the Court noted at the October 2007 hearing, Elan "understands from this discussion … that it is the Court's order. That is inherent, before we ever convened on this once." Tr. 92:18-21 [D.I. 365].

Respectfully submitted,

Elena C. Norman (No. 4780)

ECN:mm
Enclosure

YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Gregory M. Sleet
May 21, 2008
Page 3

cc:    Clerk of Court (by CM/ECF)
       John G. Day, Esq. (by CM/ECF and hand delivery)
       Steven J. Balick, Esq. (by CM/ECF and hand delivery)
       Stephen Scheve, Esq. (by electronic mail)
       Paul F. Fehlner, Esq. (by electronic mail)
       William J. Sipio, Esq. (by electronic mail)
       Michael A. Jacobs, Esq. (by electronic mail)
       Emily A. Evans, Esq. (by electronic mail)
       Diana B. Kruze, Esq. (by electronic mail)

Contains Confidential Portions

Page 1

1

2             UNITED STATES DISTRICT COURT

3             FOR THE DISTRICT OF DELAWARE

4    - - - - - - - - - - - - - -x

5    ELAN PHARMA

6    INTERNATIONAL LIMITED,

7             Plaintiff,

8                               Case No. 06-438-GMS

9             vs.

10   ABRAXIS BIOSCIENCE, INC.,

11            Defendant.

12   - - - - - - - - - - - - - -x

13           DEPOSITION OF HARRY G. BRITTAIN

14                 New York, New York

15                 November 16, 2007

16

17   Reported by:

18   MARY F. BOWMAN, RPR, CRR

19   JOB NO. 14024

20

21

22

23

24

25

## Page 6

Contains Confidential Portions

```
 1            BRITTAIN
 2      A.   Good morning.
 3      Q.   The Center for Pharmaceutical Physics
 4   is your center?
 5      A.   Yes, it is.
 6      Q.   Do you have any employees?
 7      A.   No.
 8      Q.   Is it located in your house?
 9      A.   Yes.
10      Q.   Do you have equipment in your house to
11   perform studies?
12      A.   I do.
13      Q.   Did you use that equipment to perform
14   any studies on Abraxane?
15      A.   Yes.
16      Q.   When did you do that?
17      A.   Early in 2007, probably -- certainly
18   before April. My recollection is the last study
19   I performed ended in April of 2007.
20      Q.   And what did you -- what studies did
21   you perform?
22           MR. SCHEVE: Don't answer that
23      question, privileged, objection.
24      Q.   Are you going to follow that
25   instruction?
```
TSG Reporting - Worldwide    877-702-9580

## Page 7

Contains Confidential Portions

```
 1            BRITTAIN
 2      A.   I suppose, yes.
 3      Q.   Was Abraxane the target of your
 4   studies?
 5           MR. SCHEVE: Objection, that's
 6      privileged. If you are talking about which
 7      time period?
 8           MR. JACOBS: I think the record is
 9      clear.
10           MR. SCHEVE: Then I object to the form
11      of the question, but I also instruct you not
12      to answer as privileged under the consulting
13      attorney work product doctrine.
14      Q.   When were you first retained by Elan
15   or its counsel in connection with this
16   litigation?
17      A.   My recollection, it was in August of
18   2007.
19      Q.   Meaning only three or four months ago,
20   two months ago?
21      A.   Yes, I think so.
22      Q.   So the studies you did in April '07
23   were not at the request -- were not part of your
24   retention by Elan or its counsel?
25      A.   No, that's correct.
```
TSG Reporting - Worldwide    877-702-9580

## Page 8

Contains Confidential Portions

```
 1            BRITTAIN
 2      Q.   In what capacity did you do those
 3   studies?
 4      A.   I was retained as a consulting expert
 5   by a lawyer named William Sipio.
 6      Q.   And who is Mr. Sipio representing?
 7           MR. SCHEVE: If you know?
 8      A.   I don't. He said he was working for
 9   Elan I suppose but I really don't -- I think so
10   but I'm not sure.
11      Q.   He told you he was working on behalf
12   of Elan?
13      A.   I'm not sure whether he said he was
14   working on behalf of Elan or he would be working
15   on behalf of Elan. Mr. Sipio was apparently
16   works for himself and so I'm not sure of his
17   business arrangements.
18      Q.   But you understood you were doing
19   studies in connection with a dispute between
20   Elan and Abraxis?
21      A.   My understanding at the time was there
22   might be a dispute. I wasn't sure at the time
23   whether there would be one or not.
24      Q.   When did Mr. Sipio retain you?
25      A.   Oh, that's a good question. I'm not
```
TSG Reporting - Worldwide    877-702-9580

## Page 9

Contains Confidential Portions

```
 1            BRITTAIN
 2   sure whether it was the beginning of 2007 or at
 3   the end of 2006, but it was somewhere around
 4   there.
 5      Q.   When did you first become aware of the
 6   existence of Abraxane?
 7      A.   I would say probably halfway through
 8   the time period when I was working with
 9   Mr. Sipio.
10      Q.   What was his first assignment to you?
11           MR. SCHEVE: Don't answer that
12      question, objection, privileged.
13      Q.   Are you going to follow that
14   instruction?
15      A.   Yes.
16      Q.   Do you have retainer agreement,
17   written agreement with Mr. Sipio?
18      A.   I thought I did. I have been looking
19   for it. I haven't been able to find it.
20      Q.   Where have you looked?
21      A.   Well, I have a binder in which I keep
22   all retainer agreements that I have signed and
23   there is not one in there, which -- I said I
24   thought I signed one, but if it is not in my
25   binder, then I really don't know where. That's
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 10

```
 1                BRITTAIN
 2    the only way I can keep track of things is to
 3    keep them all in this one binder.
 4        Q.   Did you send invoices to Mr. Sipio?
 5        A.   Yes, I did.
 6        Q.   How did you address them?  What was
 7    the -- next to the "To," what did it say?
 8        A.   Oh, we probably since my arrangement
 9    was with Mr. Sipio, it probably said invoice to
10    William J. Sipio, Esquire.
11        Q.   At what address?
12        A.   I sent them by e-mail, so I presume it
13    went to -- I'm not -- I don't know whether he
14    has an office or whether he works out of his
15    home, but wherever that is, that's where they
16    would go.  I sent it to an e-mail address.
17        Q.   Did you have some kind of identifier
18    for the project or the title of the engagement?
19        A.   No, I only had this one project
20    working with Mr. Sipio.
21        Q.   And what was that project called?
22        A.   We never called it anything.  It was
23    just working on these compounds.
24        Q.   What compounds were you working on?
25             MR. SCHEVE:  Objection, work product,
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 11

```
 1                BRITTAIN
 2    don't answer the question.
 3        Q.   Did you do x-ray crystallography
 4    studies on the unnamed compounds?
 5             MR. SCHEVE:  Objection, privileged,
 6    instruct you not to answer the question.
 7             MR. JACOBS:  Can we have a standing
 8    stipulation that he will be following, for
 9    the purposes of --
10             MR. SCHEVE:  Sure.
11             MR. JACOBS:  For the purposes of
12    establishing the record on the privilege
13    assertion, so that I don't have to ask him
14    each time, are you following counsel's
15    instruction?  Can you and I have an
16    instruction that he will be following this,
17    following your instruction?
18             MR. SCHEVE:  Absolutely.  For the
19    record, Michael, anything that he has
20    reviewed, looked at, considered for the
21    purposes of forming his opinions, you have
22    got a copy of.  My objection goes to any
23    consultation that he did in terms of his
24    relationship with Mr. Sipio prior to his
25    agreeing and being asked to serve as an
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 12

```
 1                BRITTAIN
 2    expert witness in this lawsuit for
 3    testifying purposes.  I think he said that
 4    was in August of this past year, so you have
 5    a clear sense of where I am coming from.
 6             MR. JACOBS:  It is your -- it is your
 7    view that Mr. Sipio was acting on behalf of
 8    Elan in retaining him?
 9             MR. SCHEVE:  I'm not privy to exactly
10    what Mr. Sipio's relationship was.  In other
11    words, I don't know the parameters or the
12    extent or the details.  I didn't participate
13    in all of those.  I've never seen whatever
14    engagement letter he has with Elan.
15             Clearly, Mr. Sipio was providing
16    consultative services to Elan as an attorney
17    and this doctor was hired by Bill Sipio to
18    provide advice and consultation with
19    Mr. Sipio up until a point in time when he
20    was asked whether or not he would be willing
21    to serve as an expert on behalf of Elan.  My
22    objection goes and will consistently go to
23    any questions that seek to inquire into his
24    consultative efforts with Mr. Sipio.
25             MR. JACOBS:  And maybe so we can don't
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 13

```
 1                BRITTAIN
 2    have to ask him a zillion questions, that
 3    began and ended when?
 4             MR. SCHEVE:  The word "that" means?
 5             MR. JACOBS:  The relationship with
 6    Mr. Sipio as to which you are asserting
 7    privilege?
 8             MR. SCHEVE:  I can't testify for him
 9    and I will let you ask that.
10             The relationship, first time I met
11    this gentleman and asked him whether or not
12    he would be willing to serve as an expert, I
13    believe was on around -- it was in the
14    middle of August of 2007.
15             I don't know the extent to which he
16    has had any conversations with Mr. Sipio
17    since then, but his contact has been three
18    people within the firm of Baker Botts since
19    that date and anything that he has reviewed
20    or looked at, reviewed, relied upon for the
21    purposes of the opinions or reports in this
22    case, we have given that to you.
23        Q.   And so just to make had clear, sir,
24    the beginning date of your relationship with
25    Mr. Sipio?
```
TSG Reporting - Worldwide    877-702-9580

Contains Confidential Portions

Page 18

BRITTAIN
Mr. Sipio?
A. I am trying to remember.
I don't -- I mean I really don't recall any such discussions and nothing comes to mind.
Q. Did any of your work, the work that you did on behalf of Mr. Sipio, bear on the question whether Abraxane paclitaxel is crystalline or amorphous?
MR. SCHEVE: I am going to object that that invades the attorney work product doctrine and instruct him not to answer.
Q. Did any of your work with, on behalf of Mr. Sipio bear on the question whether the HSA in Abraxane is cross-linked or not?
MR. SCHEVE: Same objection, violates the attorney work product doctrine and instruct the witness not to answer.
Q. Did any of your work with Mr. Sipio bear on the question whether x-ray crystallography or x-ray powder diffraction are reliable techniques for testing whether the paclitaxel in Abraxane is crystalline or amorphous?

Contains Confidential Portions

Page 19

BRITTAIN
MR. SCHEVE: Objection, attorney work product privilege and instruct the witness not to answer. And I do need to have it read back, read that back. Did you include the words "Mr. Sipio" in that question.
MR. JACOBS: Yes.
MR. SCHEVE: Then I have a standing objection.
Q. Do you consider yourself a scientist?
A. Yes.
Q. And when you use that word, "a scientist," what does that mean to you?
A. A scientist is an individual who is in -- becomes interested in determining underlying causes for some physical phenomenon. All of my science is physically oriented, so I am primarily interested in the physical phenomena and a scientist would be one who, in seeking to understand scientific phenomena, determines answers to the questions that he is trying to understand, either through experimentation or through consultation with the published literature, ultimately taking all of these facts, observations and deducing

Contains Confidential Portions

Page 20

BRITTAIN
conclusions from these.
And then in the process, it usually works out that if possible, sometimes, that work then is written up in the form of a publication that becomes peer reviewed and published in the literature.
Q. Does being a scientist mean applying the scientific method?
A. It certainly should, yes.
Q. What do you understand the scientific method to mean?
A. The scientific method usually begins with the development of a -- first there is a statement of the problem. From the statement of the problem, then comes the procedure of developing perhaps a hypotheses or multiple hypotheses as ways to understand how to investigate the nature of the problem.
From my personal research then, there is -- usually involves the conduct of experimental studies to either approve or disprove the hypothesis, accumulate observations, and from the accumulation of observations, to then deduct results which

Contains Confidential Portions

Page 21

BRITTAIN
hopefully turn into conclusions. The conclusions either support the initial hypothesis or they don't.
Q. How is the scientific method validated over time as to any particular problem? How is the quality of the science tested?
A. The -- well, there is a number of ways you can test the quality of science. If you are conducting experimental work, it is -- one of the criteria is always to make sure that whatever instrumentation you use is indeed capable of providing reliable results. So we refer to that as validation.
Assuming all the work has been obtained by methods that are verifiable and validatable, then if true science is then typically written up in the form of a publication and submitted to, if it is original research, would be submitted to a journal where it would undergo review by those who have knowledge in that particular area. If the science is good, then it will withstand the peer review process and ultimately be published.
Q. One of the tests for whether the