UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELAN PHARMA INTERNATIONAL LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 06-438-GMS |
| ABRAXIS BIOSCIENCE, INC., | ) ) | |
| Defendant. | ) ) ) | |

**ABRAXIS'S RESPONSE TO ELAN'S MOTION FOR
RECONSIDERATION REGARDING CLAIM CONSTRUCTION**

## I.    INTRODUCTION

During claim construction, the Court properly rejected Elan's argument that only a portion of the medicament need be crystalline. Elan's reiterated argument should again be rejected and Elan's Motion for Reconsideration ("Mot.") denied.

Elan's argument is largely a rehash of its earlier arguments. These arguments, addressed briefly below, deviate from the language of the claims and ignore the intrinsic evidence. As the Court is by now well aware, the '363 patent's specification and file history reflect a sharp distinction between the crystalline medicament of the claimed particles and the amorphous medicament in the prior art. Elan's persistent efforts to maintain its infringement case by pressing for a claim construction fundamentally at odds with the patent must fail.

## II.  THE COURT SHOULD AGAIN REJECT ELAN'S ARGUMENTS THAT THE CLAIMS ENCOMPASS PARTICLES THAT CONTAIN A "PORTION" OF CRYSTALLINE MEDICAMENT.

Most of Elan's arguments repeat, in some instances nearly verbatim, arguments it made in support of the claim construction rejected by the Court that only a portion of the medicament need be crystalline.  This is not surprising as the Court's rejection of the limitation of "a portion" by clear implication required the entire medicament to be crystalline.  Elan's arguments are once again without merit.

Elan argues that the patent does not distinguish between particles containing crystalline and amorphous medicament, but that the inventors only disavowed "solvent precipitated nanoparticles contaminated with solvent."  Mot. at 4 [D.I. 575].  Elan made this same argument in its claim construction briefing.  Elan Op. Br.[1] at 10-11 [D.I. 141], Elan Ans. Br. at 7-8 [D.I. 148].  It was wrong then and it is wrong now.  The specification and file history repeatedly, and sharply, distinguish the claimed crystalline medicament from amorphous medicament.  *See, e.g.* D.I. 144, Joint Appendix at A0001-A0010, '363 patent, col. 2:28-31 ("The anticancer agent is present in one or more discrete crystalline phases.  The crystalline phase differs from an amorphous i.e., non-crystalline phase…"); D.I. 144, Joint Appendix at A0236, '105 App. (from which U.S. Patent No. 5,145,684 issued, which is the parent of the '363 patent) Nov. 18, 1991 Amendment at 9 ("The crystalline phase differs from non-crystalline and amorphous phases.  The crystalline particles of this invention exhibit improved stability compared to particles containing a drug substance in an amorphous phase."); D.I. 144, Joint Appendix at

---

[1] References to "Op. Br." and "Ans. Br." are to the parties' claim construction briefs.

A0161, '125 App. (from which the '363 patent issued) Oct. 29, 1992 IDS at 3 ("amorphous materials and formulations tend to exhibit unacceptably poor stability and/or short shelf lives."); D.I. 144, Joint Appendix at A0169, '125 App., Sept. 13, 1993 Amendment at 5 ("Furthermore, there is no suggestion in the cited references or in the art as a whole of the unexpected advantageous properties associated with the claimed crystalline anticancer particles."); D.I. 144, Joint Appendix at A0241, Nov. 18, 1991 Amendment at 14 ("The office action indicates that Violante teaches a crystalline drug substance. However, Violante teaches a solvent precipitation technique for preparing amorphous, non-crystalline particles. In fact Violante teaches that the crystalline state is to be avoided . . . . Consequently, Violante teaches away from applicants claimed particles."); *see also* Abraxis Op. Br. (D.I. 140) at 18-20; Abraxis Ans. Br. (D.I. 143) at 2-6.

Elan also argues, as it did before, that extrinsic evidence shows that its milling process introduces areas of amorphousness into its crystalline drug, Mot. at 7 [D.I. 575]; Elan Op. Br. (D.I. 141) at 19, and lest the repetitiveness be overlooked, even *quotes* from its claim construction brief for the argument that "'crystallinity is a variable property'" encompassing anything above 0% crystallinity. *Id.* at 8 (*quoting* Elan Op. Br. (D.I. 141) at 19). Neither of these arguments has merit. As Abraxis explained during claim construction, the '363 specification distinguishes the milling technique which is used to create crystalline particles, from other techniques, such as solvent precipitation, that create amorphous particles. D.I. 143, Abraxis Ans. Br. at 4; D.I. 144, Joint Appendix at A0001-A0010, '363 patent, at 2:30-34. Elan's arguments overstate the extrinsic evidence and, in any event, no weight is to be given in claim construction to extrinsic evidence that

contradicts the claims, specification and file history of the patent.[2] D.I. 143, Abraxis

Ans. Br. at 5, 6, *citing Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 (Fed.

Cir. 1996) (extrinsic evidence that is "inconsistent with the specification and file history"

should be "accorded no weight".).

Elan's argument that the Court's construction reads the percentage ranges out of

the claims is wrong.  The percentage ranges define the percentages of medicament and

surface modifier in the particles.  Thus, a particle containing 95% non-crosslinked surface

modifier and 5% crystalline medicament would fall outside the scope of claim 1 of the

'363 patent, which requires at least 10% crystalline medicament and no more than 90%

non-crosslinked surface modifier.  Elan's attempt to bootstrap the range in the claim to

permit the inclusion of an overwhelming majority of amorphous medicament is contrary

to the claim language, and ignores the transitional "consisting essentially of" language,

which precludes materials inconsistent with the basic and novel properties of the

invention, including crystallinity.  *See, e.g., Atlas Powder Co. v. E. I. Du Pont de

Nemours & Co.,* 750 F.2d 1569, 1574 (Fed. Cir. 1984) ("the claim phrase 'consisting

essentially of' excludes ingredients that would 'materially affect the basic and novel

characteristics' of the claimed composition").

Elan's argument that the Court's construction would preclude more than one

---

[2] Moreover, Elan's own later patents have also stated that the '363 patent and its '684 parent cover crystalline, "not amorphous" drug compounds. Ex. A [U.S. Pat. No. 6,656,504] at 2:33-36; 4:35-41 ("Nanoparticulate compositions containing crystalline, but not amorphous, cyclosporine are disclosed in U.S. Pat. Nos. 5,494,683 and 5,399,363....Because the surface stabilizer adsorbs to the surface of the crystalline drug, and does not chemically interact with the drug, it was thought that amorphous drugs could not be utilized in nanoparticulate compositions described by the '684 patent. Amorphous drugs do not have an intermolecular lattice structure, which is characteristic of the crystalline solid state.").

crystalline polymorph and would require perfect crystals that are not found in nature
(Mot. at 8, 9 [D.I. 575]) is incorrect, and a red herring. Nothing in the Court's
interpretation that the entire medicament be crystalline even touches on possible
polymorphs or the form of the crystals. In any event, there is no issue in the case
concerning multiple crystalline polymorphs or whether any alleged crystalline content in
Abraxane represents perfect crystals, and thus no possible need to clarify this
construction.

Elan's argument all but ignores the claim term "consisting essentially of," which
the Court recited in its clarification order and is fatal to Elan's claim construction
position. On page 9 of its motion, Elan argues that the Court's construction of
"consisting essentially of" would preclude the presence of "any additional ingredients,"
when that phrase only precludes additional ingredients that affect the basic and novel
properties of the invention. Elan ignores the fact that one of the basic and novel
properties of the invention is that the medicament is crystalline and that therefore
amorphous medicament, the opposite of crystalline medicament, is precluded. *Atlas
Powder*, 750 F.2d at 1574.

Elan also presses a variant of its "portion" argument by asserting that the claims
should be construed to permit Elan to prove infringement if it can show that a portion of
the particles contain only crystalline medicament, i.e., at least two particles out some 65
trillion in a vial of Abraxane (according to Elan).[3] Since it has no way to identify, let

---

[3] Elan purports to quote from the deposition testimony of Katherine Melody, the Micron
laboratory technician who conducted Abraxis's XRPD tests. (Mot. at 11-12 n.3 [D.I.
575].) Ms. Melody's testimony is taken out of context, as Elan removed testimony which
makes clear that Ms. Melody was simply confused regarding the question asked. (Ex. B.
(Footnote continues on next page.)

alone measure, such particles, Elan evidently expects to meet its burden of proof by asking its experts to speculate that they exist somewhere within a vial of Abraxane. This argument, which finds no support in the claims, specification or file history, should be rejected.

Nowhere does the specification suggest that the "particles" of the claimed invention include "an infinitesimally small portion" of particles containing medicament that is crystalline, with the rest amorphous. The specification and file history make clear that the crystalline medicament is present in the particles as they are obtained through the manufacturing process, and that the crystallinity of the medicament in those particles confers particular allegedly beneficial characteristics for use in treating cancer, including increased stability. D.I. 144, Joint Appendix at A0002, A0004-6, '363 patent at 2:28-30 ("The particles of this invention comprise an anticancer agent. The anticancer agent *is present* in one or more crystalline phases.") (emphasis added), Abstract ("Dispersible particles consisting essentially of a crystalline [medicament] ...."); 7:5-8 ("A simple screening process has been developed whereby compatible surface modifiers and anticancer agents can be selected which provide stable dispersions of the desired particles"); 7:46-48 ("The resulting dispersion is stable and consists of the dispersion medium and the above-described particles."); 5:22-26 ("The particles of this invention can be prepared by a method comprising the steps of dispersing an anticancer agent in a liquid dispersion medium and applying mechanical means in the presence of grinding media to reduce the particle size of the anticancer agent ...."); D.I. 144, Joint Appendix at

---

(Footnote continued from previous page.)

at 105-106 [Melody Depo. Tr.].)  In any event, Elan still has no evidence that the paclitaxel in Abraxane is crystalline, not amorphous.

A0236, '105 App., Nov. 18,1991 Amendment at 9 ("The crystalline particles of this invention exhibit improved stability compared to particles containing a drug substance in an amorphous phase."); D.I. 144, Joint Appendix at A0161, '125 App., Oct. 29, 1992 IDS at 3 ("amorphous materials and formulations tend to exhibit unacceptably poor stability and/or short shelf lives.").

Indeed, in the parent application, which is incorporated by reference into the '363 patent (D.I. 144, Joint Appendix at A0002, '363 patent at 1:8-11), Elan determined crystallinity by performing XRPD on the "solid dispersed particles" created by its manufacturing process, not on individual particles that might exist in that dispersion. *Id.* at A199-200, '105 App. (parent application of the '363 patent). The '363 specification and file history has absolutely no support for reading the claim on occasional crystalline particles and Elan's attempt to read the term "particles" out of context to broaden the claim scope is unwarranted.[4] *See Finisar Corp. v. DirectTV Group, Inc.*, 2008 U.S. App. LEXIS 8404, at *13 (Fed. Cir. Apr. 18, 2008) (precedential) ("In isolation, the term 'information database' suggests a very broad coverage. In context, however, this claim term repeatedly appears within a framework that requires referencing, embedding, assigning, and transmitting portions of the database.").

---

[4] Elan's claim differentiation argument is without merit. Claim 8 is not written in customary dependent claim format, and Elan's reliance on claim 8 being dependent is misplaced. In fact, during prosecution, Elan treated claim 8 as an independent claim when calculating its fees to the PTO, not as a dependent claim, as it now argues to this Court. Ex. C (ABRX 150 (fee calculation for original claims), ABRX 177-179 (original claims), and ABRX 232 (final fee sheet indicating no fee change).). In any event, the "claim differentiation" doctrine cited by Elan, even if applicable, is not dispositive. *Fantasy Sports Props., Inc. v. SportsLine.com, Inc.*, 287 F.3d 1108, 1115-6 (Fed. Cir. 2002) ("the doctrine of claim differentiation creates only a presumption that each claim in a patent has a different scope").

## III.  CONCLUSION

For the foregoing reasons, the Court should deny Elan's motion for reconsideration.

Dated: May 23, 2008

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Josy W. Ingersoll (#1088)
jingersoll@ycst.com
Elena C. Norman (#4780)
enorman@ycst.com
Karen E. Keller (#4489)
kkeller@ycst.com
Michele Sherretta Budicak (#4651)
mbudicak@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
(302) 571-6600
*Attorneys for Defendant*
*ABRAXIS BIOSCIENCE, INC.*

OF COUNSEL:

MORRISON & FOERSTER, LLP

Michael A. Jacobs
425 Market Street
San Francisco, CA  94105-2482
(415) 268-7000
MJacobs@mofo.com

Emily A. Evans
755 Page Mill Road
Palo Alto, CA 94304-1018
(650) 813-5600
EEvans@mofo.com

## CERTIFICATE OF SERVICE

I, Elena C. Norman, Esquire, hereby certify that on May 23, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on May 23, 2008, I caused a true and correct copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

> **BY E-MAIL**
>
> Linda Glover, Esquire
> Stephen Scheve, Esquire
> BAKER BOTTS L.L.P.
> One Shell Plaza
> 910 Louisiana Street
> Houston, TX  77002-4995
> steve.scheve@bakerbotts.com
>
> Paul F. Fehlner, Esquire
> BAKER BOTTS L.L.P.
> 30 Rockefeller Plaza
> New York, NY  10112-4498
> paul.fehlner@bakerbotts.com

William J. Sipio, Esquire
1375 Brentwood Road
Yardley, PA  19067
sipz25@aol.cm

YOUNG CONAWAY STARGATT
&  TAYLOR, LLP

_Karen E Keller_

Josy W. Ingersoll (No. 1088)
jingersoll@ycst.com
Elena C. Norman (No. 4780)
enorman@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
Michele Sherretta Budicak (No. 4651)
mbudicak@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899
(302) 571-6600

*Attorneys for Defendant*
*ABRAXIS BIOSCIENCE, INC.*

2

# EXHIBIT A

US006656504B1

(12) **United States Patent**
Bosch et al.

(10) Patent No.: **US 6,656,504 B1**
(45) Date of Patent: **Dec. 2, 2003**

(54) **NANOPARTICULATE COMPOSITIONS COMPRISING AMORPHOUS CYCLOSPORINE AND METHODS OF MAKING AND USING SUCH COMPOSITIONS**

(75) Inventors: **H. William Bosch**, Bryn Mawr, PA (US); **Kevin D. Ostrander**, Reading, PA (US); **Douglas C. Hovey**, Collegeville, PA (US)

(73) Assignee: **Elan Pharma International Ltd.**, Shannon (IE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/392,557**

(22) Filed: **Sep. 9, 1999**

(51) Int. Cl.$^7$ ............................ **A61K 9/14**; A61K 9/50; A61K 38/00

(52) U.S. Cl. ...................... **424/489**; 424/501; 424/502; 514/11

(58) Field of Search ................................ 424/489, 501, 424/502; 514/11, 937

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,911,099 A | * 10/1975 | DeFoney et al. | |
| 4,540,602 A | 9/1985 | Motoyama et al. | 427/213.31 |
| 4,727,077 A | 2/1988 | Haga et al. | 514/274 |
| 4,783,484 A | 11/1988 | Violante et al. | 514/535 |
| 4,826,689 A | 5/1989 | Violanto et al. | 424/489 |
| 4,851,421 A | 7/1989 | Iwasaki et al. | 514/352 |
| 4,904,668 A | 2/1990 | Kondo et al. | 514/274 |
| 4,983,605 A | 1/1991 | Kondo et al. | 514/247 |
| 4,997,454 A | 3/1991 | Violante et al. | 23/305 A |
| 5,002,952 A | 3/1991 | Kondo et al. | 514/274 |
| 5,098,907 A | 3/1992 | Kondo et al. | 514/274 |
| 5,145,684 A | 9/1992 | Liversidge et al. | 424/489 |
| 5,264,213 A | 11/1993 | Shihahara et al. | 424/409 |
| 5,389,382 A | * 2/1995 | List et al. | |
| 5,399,363 A | 3/1995 | Liversidge et al. | 424/490 |
| 5,429,824 A | 7/1995 | June | 424/489 |
| 5,439,686 A | 8/1995 | Desai | 424/451 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 262 560 A2 | 9/1987 |
| FR | 2 608 427 | 6/1988 |
| WO | WO 96/14079 | 5/1996 |
| WO | WO 96/31202 | 10/1996 |
| WO | WO 97/35603 | 10/1997 |
| WO | 98/14174 | 4/1998 |

OTHER PUBLICATIONS

Physicians Desk Reference "Neoral Sandimmune", 2000.*
Kondo et al., "Improved Oral Absorption of Enteric Coprecipitates of a Poorly Soluble Drug," *J. Pharm. Sciences, 83*(4):566–570 (1994).
Kondo et al., "Improved Oral Absorption of a Poorly Water–Soluble Drug, HO–221, by Wet–Bead Milling Producing Particles in Submicron Region," *Chem. Pharm. Bull.*, 41(4):737–740 (1993).
Kondo, et al., "Pharmacokinetics of a Micronized, Poorly Water Soluble Drug, HO–221, in Experimental Animals, "*Biol. Pharm. Bull.*, 16(8):796–800 (1993).
The Merck Index: An Encyclopedia of Chemicals, Drugs, and Biologicals (12th Ed. 1996) pp. 464–465.

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Amy E Pulliam
(74) *Attorney, Agent, or Firm*—Foley & Lardner

(57) **ABSTRACT**

Nanoparticulate amorphous cyclosporine formulations, and nanoparticulate cyclosporine formulations comprising a mixture of amorphous and crystalline cyclosporine, having effective average particle sizes of less than about 2000 nm are described. The compositions exhibit increased bioavailability and increased consistency of bioavailability as compared to prior macro-sized cyclosporine and formulations. Methods of making and using the compositions are also described.

**59 Claims, 3 Drawing Sheets**



REPRESENTATIVE X-RAY POWDER DIFFRACTION
PATTERN OF CRYSTALLINE CYCLOSPORINE DRUG SUBSTANCE

Case No. 06-438-GMS

**DX-559**

**US 6,656,504 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,494,683 A | | 2/1996 | Liversidge et al. ......... 424/490 |
| 5,510,118 A | * | 4/1996 | Bosch et al. ............... 424/489 |
| 5,518,187 A | | 5/1996 | Bruno et al. ................. 241/5 |
| 5,565,188 A | | 10/1996 | Wong et al. ............. 424/9.411 |
| 5,587,143 A | | 12/1996 | Wong ........................ 424/9.1 |
| 5,622,938 A | | 4/1997 | Wong ........................ 424/493 |
| 5,718,388 A | | 2/1998 | Czekai et al. ............... 241/21 |
| 5,741,522 A | | 4/1998 | Violante et al. ............ 424/489 |
| 5,766,629 A | * | 6/1998 | Cho et al. .................. 424/455 |
| 5,776,496 A | | 7/1998 | Violante et al. ............ 424/489 |
| 5,827,822 A | * | 10/1998 | Floc'H et al. ................ 514/11 |
| 5,834,017 A | * | 11/1998 | Cho et al. .................. 424/455 |
| 5,862,999 A | | 1/1999 | Czekai et al. ............... 241/21 |
| 6,228,399 B1 | | 5/2001 | Parikh et al. |

* cited by examiner



**FIG. 1**

REPRESENTATIVE X-RAY POWDER DIFFRACTION
PATTERN OF CRYSTALLINE CYCLOSPORINE DRUG SUBSTANCE

4P0143.RD



FIG. 2

X-RAY POWDER DIFFRACTION PATTERN OF A MILLED CYCLOSPORINE FORMULATION HAVING PLURONIC® F108 AS A SURFACE STABILIZER.



**FIG. 3**

X-RAY POWDER DIFFRACTION PATTERN OF A MILLED CYCLOSPORINE FORMULATION HAVING HPC-SL AS A SURFACE STABILIZER.

US 6,656,504 B1

1

# NANOPARTICULATE COMPOSITIONS COMPRISING AMORPHOUS CYCLOSPORINE AND METHODS OF MAKING AND USING SUCH COMPOSITIONS

## FIELD OF THE INVENTION

The present invention is directed to nanoparticulate compositions comprising amorphous cyclosporine, or a mixture of amorphous and crystalline cyclosporine, and methods of making and using such compositions.

## BACKGROUND OF THE INVENTION

Cyclosporine is a hydrophobic, cyclic, undecapeptide that exerts immunosuppressive, antiinflammatory, antifungal, and antiparasitic activities. Immunosuppressive medications play a large part of the management of many pediatric illnesses. Cyclosporine is the primary tool used to prevent rejection following solid organ and bone marrow transplantation; the drug helped revolutionize transplantation by improving transplant survival, reducing hospitalization, and reducing patient morbidity. It has been estimated that cyclosporine is given to more than 90% of children who have received a kidney transplant in the United States. Cyclosporine also has been effective in various other autoimmune conditions such as uveitis, psoriasis, type I diabetes mellitus, rheumatoid arthritis, inflammatory bowel disease, certain nephropathies, refractory Crohn's disease, ulcerative colitis, biliary cirrhosis, aplastic anemia, rheumatoid arthritis, myasthenia gravis, and dermatomyositis.

Cyclosporine is in clinical use worldwide under the trade names SANDIMMUNE® (Novartis), NEORAL® (Novartis), and SANGCYA® (SangStat). SANDIMMUNE®, introduced in 1983, suffered from poor and widely variable absorption rates. This prompted development of a second generation cyclosporine formulation, NEORAL®, which is a microemulsion formulation having better absorption than SANDIMMUNE®-both in quantity and consistency. Since 1995, when NEORAL® was introduced, about 70% of patients have switched from SANDIM-MUNE® to NEORAL®, indicating the severity of poor and inconsistent absorption of cyclosporine. SANGCYA®, which is a modified oral solution bioequivalent to NEORAL®, was introduced in 1998.

Cyclosporine is administered orally and intravenously (IV). After oral administration, roughly 20 to 50% is absorbed, although absorption is highly variable. First-pass metabolism, mode of administration, and drug interactions all affect cyclosporine absorption. Food decreases the absorption of NEORAL® and SANGCYA®.

Cyclosporine is extremely hydrophobic. The IV formulation contains 33% alcohol and a castor oil vehicle to solubilize the drug, which is believed to account for occasionally severe hypersensitivity reactions. Oral preparations can contain corn, castor or olive oil and ethanol, but in lower concentrations. The dose normalized area under the curve (AUC) is 23% greater for NEORAL® or SANGCYA® as compared to SANDIMMUNE® in renal transplant, rheumatoid arthritis, and psoriasis patients, and 50% greater in liver transplant patients. Data for cardiac transplant patients is limited, but similar increases have been noted. Increases in peak blood cyclosporine concentrations (NEORAL® and SANGCYA® related to SANDIMMUNE®) range from 40 to 106% for renal transplant patients and 90% for liver transplant patients.

2

While NEORAL® and SANGCYA® are an improvement over SANDIMMUNE®, the conventional cyclosporine formulations suffer from poor bioavailability because, among other things, cyclosporine is poorly water soluble. Moreover, currently marketed cyclosporine formulations are known to have disadvantageous "intersubject variability," i.e., it has been found that, given the same dosage amount, actual blood levels of cyclosporine vary significantly from patient to patient. See *Physicians' Desk Reference* (1998) at 1882 et seq. This represents an important shortcoming of these drugs. Specifically, because cyclosporine has a narrow therapeutic index (a narrow range between an effective dosage and a harmful dosage), the inability to predict drug absorption requires that physicians closely monitor each patient to establish baseline absorption levels. Such monitoring is expensive and time consuming. In addition, the poor absorption and patient variability of known cyclosporine formulations can make dosage formulation difficult. Proper dosage formulation for cyclosporine is critical because the drug is a general immunosuppressive. Therefore, the drug can result in an increased susceptibility to infection. Too much drug can result in uncontrolled infection while too little can result in organ rejection.

One drug delivery method that can result in increasing the bioavailability, increasing the absorption rate, quantity, and consistency, and decreasing the toxicity of a drug is formulation of the drug into a nanoparticulate composition. Nanoparticulate compositions, first described in U.S. Pat. No. 5,145,684 ("the '684 patent"), are particles consisting of a poorly soluble crystalline therapeutic or diagnostic agent onto which are adsorbed a non-crosslinked surface stabilizer. Nanoparticulate compositions comprising cyclosporine are not described by the '684 patent. Nanoparticulate compositions containing crystalline, but not amorphous, cyclosporine are disclosed in U.S. Pat. Nos. 5,494,683 and 5,399,363.

Conventional large particle sized amorphous cyclosporine compositions are described in U.S. Pat. Nos. 5,389,382 ("the '382 patent") and 5,827,822 ("the '822 patent"). These disclosures suffer from various deficiencies. For example, the '382 patent describes hydrosols of cyclosporine in an intravenous applicable, stabilized, pharmaceutically acceptable form, which is suspended or dry. The hydrosol formulations are obtained by controlled precipitation methods. Such methods are disadvantageous in that they result in solid dose formulations having a low drug to surface stabilizer ratio, and liquid dispersion formulations having a low solid content. This is because controlled precipitation methods require an excess amount of surface stabilizer and water to produce small-sized precipitated particles. The excess of surface stabilizer produces solid dose compositions having a large quantity of surface stabilizer and a small quantity of drug, and the excess of water produces a liquid dispersion formulation having a low solids content and, therefore, a low drug content.

A high drug content for a solid dose or liquid dispersion formulation is preferred because it produces a more concentrated dosage formulation. Concentrated dosage forms of cyclosporine are particularly desirable because the dosage for this drug is relatively high, i.e., about 100 mg a day or more. A dosage formulation having a low drug content, but requiring a high daily dosage, results in either a large pill, capsule, or quantity of fluid, or multiple doses of such formulations, to be administered to the patient. In contrast, a concentrated dosage form allows minimization of the size of the orally administered pill or capsule or number of daily administrations.

US 6,656,504 B1

3

The '822 patent is directed to aqueous suspension formulations of amorphous cyclosporin A containing lower alkanols as solubilizing agents and a polyoxyalkylene surfactant. The addition of alcohol solubilizing agents is frequently undesirable because they can an trigger an allergic response in a patient. Such solubilizing agents are often required for prior art cyclosporine compositions to increase the solubility of the cyclosporine. A drug must be absorbed by a patient prior to taking effect. Thus, often pharmaceutical formulations of highly insoluble drugs additionally contain solubilizing agents to aid in absorption of the drug following administration.

There remains a need in the art for cyclosporine formulations that can be delivered in high dosage formulations, that exhibit consistent and effective absorption, that have decreased toxicity as compared to known cyclosporine formulations, and which do not require the presence of alcohol solubilizing agents. The present invention satisfies these needs.

SUMMARY OF THE INVENTION

The present invention is directed to nanoparticulate compositions of amorphous cyclosporine and, adsorbed to the surface of the cyclosporine, at least one non-crosslinked surface stabilizer. The cyclosporine particles of the nanoparticulate composition have an effective average particle size of less than about 2000 nm.

In another embodiment, the invention encompasses nanoparticulate compositions of a mixture of amorphous and crystalline cyclosporine and, adsorbed to the surface of the cyclosporine, at least one non-crosslinked surface stabilizer. The cyclosporine particles of the nanoparticulate composition have an effective average particle size of less than about 2000 nm.

Another aspect of the invention is directed to pharmaceutical compositions comprising one or more nanoparticulate compositions of the invention. The pharmaceutical composition preferably comprises a nanoparticulate composition described above and a pharmaceutically acceptable carrier, as well as any desired excipients. The compositions, which can be delivered in high dosage formulations, provide for improved consistency of cyclosporine absorption from patient to patient for a given dosage amount, exhibit decreased toxicity, and exhibit increased absorption as compared to conventional cyclosporine formulations.

This invention further discloses methods of making nanoparticulate compositions according to the invention. A first method comprises contacting amorphous cyclosporine, or a mixture of amorphous and crystalline cyclosporine, with at least one surface stabilizer for a time and under conditions sufficient to provide a stable nanoparticulate composition. The surface stabilizer can be contacted with the cyclosporine particles either before, during, or after size reduction of the cyclosporine particles. The cyclosporine particles of the nanoparticulate composition have an effective average particle size of less than about 2000 nm.

The present invention is further directed to methods of treatment comprising administering to a mammal in need a therapeutically effective amount of a nanoparticulate composition according to the invention. The nanoparticulate cyclosporine composition can be administered via any conventional route.

Both the foregoing general description and the following detailed description are exemplary and explanatory and are intended to provide further explanation of the invention as claimed. Other objects, advantages, and novel features will

4

be readily apparent to those skilled in the art from the following detailed description of the invention.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1: Shows the results of x-ray powder diffraction of raw cyclosporine drug substance;

FIG. 2: Shows the results of x-ray powder diffraction of a milled cyclosporine formulation having Pluronic® F108 as a surface stabilizer; and

FIG. 3: Shows the results of x-ray powder diffraction of a milled cyclosporine formulation having HPC-SL as a surface stabilizer.

DETAILED DESCRIPTION OF THE
INVENTION

The present invention is directed to compositions comprising nanoparticulate amorphous cyclosporine, or a mixture of amorphous and crystalline cyclosporine, and methods of making and using such nanoparticulate compositions. As used herein, singular terms are used for simplicity of expression only and are not intended to limit the invention or aspects of the invention to singular embodiments. Thus, the description of, for example, "a surface stabilizer" is meant to describe "one or more" surface stabilizers unless explicitly indicated otherwise.

Prior to the present invention, it was known that crystalline drugs could be formulated into nanoparticulate compositions, as taught by the '684 patent. In such compositions, a surface stabilizer adsorbs to the crystalline surface of the drug and acts as a steric barrier to other drug particles to prevent agglomeration. This results in a stable nanoparticulate composition, in which the particle size of the composition does not significantly increase over time via solubilization and recrystallization or agglomeration. Because the surface stabilizer adsorbs to the surface of the crystalline drug, and does not chemically interact with the drug, it was thought that amorphous drugs could not be utilized in nanoparticulate compositions described by the '684 patent. Amorphous drugs do not have an intermolecular lattice structure, which is characteristic of the crystalline solid state. Surprisingly, it was discovered that amorphous cyclosporine can be incorporated into a nanoparticulate composition.

An amorphous compound has a higher energy level than a crystalline compound. Because of this, an amorphous compound is generally unstable, as in nature the compound prefers to convert to the lower energy crystalline state. Because amorphous compounds have a higher energy level than crystalline compounds, it is preferable that a drug be in an amorphous state. The amorphous state is less stable than the crystalline state; therefore, a solid will be more soluble in the amorphous state than in the crystalline state. Improved solubility will lead to rapid and more complete dissolution, and in the case of a poorly soluble drug substance, improved bioavailability.

A. Compositions

The compositions of the invention comprise nanoparticulate amorphous cyclosporine, or a mixture of amorphous and crystalline cyclosporine, having one or more surface stabilizers adsorbed to the surface of the cyclosporine. Surface stabilizers useful herein physically adhere to the surface of the nanoparticulate cyclosporine but do not chemically react with the cyclosporine itself. Individually adsorbed molecules of the surface stabilizer are essentially free of intermolecular crosslinkages.

The present invention also includes nanoparticulate compositions formulated into compositions together with one or

US 6,656,504 B1

5

more non-toxic physiologically acceptable carriers, adjuvants, or vehicles, collectively referred to as carriers, for parenteral injection, for oral administration, for rectal or topical administration, or the like. The present invention further includes nanoparticulate compositions in solid dose formulations and liquid dispersion formulations.

1. Cyclosporine

The cyclosporins comprise a class of cyclic non-polar oligopeptides having valuable immunosuppressive, anti-inflammatory, and anti-parasitic activity. The first of the cyclosporins to be isolated and what has been termed the "parent" compound of the class is the naturally occurring fungal metabolite referred to simply as "cyclosporine" or as "cyclosporin A."

Since the discovery of cyclosporin A, a wide variety of naturally occurring cyclosporins have been isolated and identified and other non-naturally occurring cyclosporins have been prepared by synthetic means or via modified culture techniques. Such compounds are known in the art and are described, for example, in U.S. Pat. No. 5,389,382 and in *The Merck Index* (12th ed. 1996) at 464–465. As used herein, the term cyclosporine is meant to include both cyclosporin A and other cyclosporins, such as cyclosporins B through I and synthetic analogues thereof. The preferred cyclosporin used herein is cyclosporin A.

The cyclosporine compositions of the present invention are either partially or predominantly amorphous in nature. This is so even though the starting cyclosporine compound used to obtain the nanoparticulate compositions may be predominantly crystalline in nature. The term "amorphous" is a term with a recognized meaning in the chemical arts and describes a structure that is non-crystalline, i.e., a structure that lacks an intermolecular lattice structure. Whether the nanoparticulate composition is in a crystalline or amorphous state can be determined, for example, by X-ray powder diffraction patterns or other methods known to the skilled artisan.

2. Surface Stabilizers

Suitable surface stabilizers can preferably be selected from known organic and inorganic pharmaceutical excipients. Such excipients include various polymers, low molecular weight oligomers, natural products, and surfactants. Preferred surface stabilizers include nonionic and ionic surfactants. Two or more surface stabilizers can be used in combination.

Representative examples of surface stabilizers include cetyl pyridinium chloride, gelatin, casein, lecithin (phosphatides), dextran, glycerol, gum acacia, cholesterol, tragacanth, stearic acid, benzalkonium chloride, calcium stearate, glyceryl monostearate, cetostearyl alcohol, cetomacrogol emulsifying wax, sorbitan esters, polyoxyethylene alkyl ethers (e.g., macrogol ethers such as cetomacrogol 1000), polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters (e.g., the commercially available Tweens® such as e.g., Tween 20® and Tween 80® (ICI Specialty Chemicals)); polyethylene glycols (e.g., Carbowaxs 3350® and 1450®, and Carbopol 934® (Union Carbide)), dodecyl trimethyl ammonium bromide, polyoxyethylene stearates, colloidal silicon dioxide, phosphates, sodium dodecylsulfate, carboxymethylcellulose calcium, hydroxypropyl celluloses (e.g., HPC, HPC-SL, and HPC-L), hydroxypropyl methylcellulose (HPMC), carboxymethylcellulose sodium, methylcellulose, hydroxyethylcellulose, hydroxypropylcellulose, hydroxypropylmethyl-cellulose phthalate, noncrystalline cellulose, magnesium aluminum silicate, triethanolamine, polyvinyl alcohol (PVA), polyvinylpyrrolidone (PVP), 4-(1,

6

1,3,3-tetramethylbutyl)-phenol polymer with ethylene oxide and formaldehyde (also known as tyloxapol), poloxamers (e.g., Pluronics F68® and F108®, which are block copolymers of ethylene oxide and propylene oxide); poloxamines (e.g., Tetronic 908®, also known as Poloxamine 908®, which is a tetrafunctional block copolymer derived from sequential addition of propylene oxide and ethylene oxide to ethylenediamine (BASF Corporation, Parsippany, N.J.)); a charged phospholipid such as dimyristoyl phophatidyl glycerol, dioctylsulfosuccinate (DOSS); Tetronic 1508® (T-1508) (BASF Corporation), dialkylesters of sodium sulfosuccinic acid (e.g., Aerosol OT®, which is a dioctyl ester of sodium sulfosuccinic acid (American Cyanamid)); Duponol P®, which is a sodium lauryl sulfate (DuPont); Tritons X-200®, which is an alkyl aryl polyether sulfonate (Rohm and Haas); Crodestas F-110®, which is a mixture of sucrose stearate and sucrose distearate (Croda Inc.); p-isononylphenoxypoly-(glycidol), also known as Olin-10G® or Surfactant 10-G® (Olin Chemicals, Stamford, Conn.); Crodestas SL-40® (Croda, Inc.); and SA90HCO, which is C$_{18}$H$_{37}$CH$_2$(CON(CH$_3$)—CH$_2$(CHOH)$_4$(CH$_2$OH)$_2$ (Eastman Kodak Co.), triblock copolymers of the structure -(-PEO)--(-PBO-)--(-PEO-)- (known as B20–5000), and the like.

Most of these surface stabilizers are known pharmaceutical excipients and are described in detail in the *Handbook of Pharmaceutical Excipients*, published jointly by the American Pharmaceutical Association and The Pharmaceutical Society of Great Britain (The Pharmaceutical Press, 1986), specifically incorporated by reference. The surface stabilizers are commercially available and/or can be prepared by techniques known in the art.

The invention includes that each of the above-described stabilizers or other stabilizers described herein or described in a reference cited herein can be used either alone, in combination with each other, or with other surface stabilizers.

3. Nanoparticulate Particle Size

Preferably, the compositions of the invention contain nanoparticles which have an effective average particle size of less than about 2000 nm, less than about 1500 nm, less than about 1000 nm, less than about 800 nm, less than about 700 nm, less than about 600 nm, less than about 500 nm, less than about 400 nm, less than about 300 nm, less than about 200 nm, less than about 100 nm, or less than about 50 nm, as measured by light-scattering methods or other methods accepted in the art. By "an effective average particle size of less than about 2000 nm" it is meant that at least 50% of the drug particles have a weight average particle size of less than about 2000 nm when measured by light scattering or other conventional techniques. Preferably, at least 70% of the drug particles have an average particle size of less than about 2000 nm, more preferably at least 90% of the drug particles have an average particle size of less than about 2000 nm, and even more preferably at least about 95% of the particles have a weight average particle size of less than about 2000 nm.

4. Concentration of Cyclosporine and Surface Stabilizer

Preferable ratios of cyclosporine to surface stabilizer are about 10:1 to about 1.5:1, by weight. With liquid dispersions, preferred drug content is about 50% to about 2% by weight.

B. Methods of Making Nanoparticulate Formulations

Exemplary methods of making nanoparticulate compositions are described in the '684 patent. The optimal effective average particle size of the invention can be obtained by controlling the process of particle size reduction, such as by controlling the milling time and the amount of surface

US 6,656,504 B1

7

stabilizer added. Particle growth and particle aggregation can also be minimized by milling the composition under colder temperatures and by storing the final composition at colder temperatures.

Milling to obtain a nanoparticulate composition comprises dispersing cyclosporine particles in a liquid dispersion medium, followed by applying mechanical means in the presence of grinding media to reduce the particle size of the cyclosporine to the desired effective average particle size. The cyclosporine particles can be reduced in size in the presence of one or more surface stabilizers. Alternatively, the cyclosporine particles can be contacted with one or more surface stabilizers after attrition. Other compounds, such as a diluent, can be added to the cyclosporine/surface stabilizer composition during the size reduction process. Dispersions can be manufactured continuously or in a batch mode. The resultant nanoparticulate cyclosporine dispersion can be utilized in solid or liquid dosage formulations. Exemplary useful mills include low energy mills, such as a roller or ball mill, and high energy mills, such as Dyno mills, Netzsch mills, DC mills, and Planetary mills.

The starting cyclosporine composition can be predominantly crystalline, predominantly amorphous, or a mixture thereof. The resultant cyclosporine composition is predominantly amorphous.

A solid dosage formulation can be prepared by drying the nanoparticulate amorphous cyclosporine, or mixture of amorphous and crystalline cyclosporine, following grinding. A preferred drying method is spray drying. The spray drying process is used to obtain a nanoparticulate powder following the milling process used to transform the cyclosporine into nanoparticles. Such a nanoparticulate powder can be formulated into tablets for oral administration.

C. Methods of Using Nanoparticulate Compositions of the Invention

The nanoparticulate compositions of the invention can be administered to humans and animals either orally, rectally, parenterally (intravenous, intramuscular, or subcutaneous), intracisternally, intravaginally, intraperitoneally, locally (powders, ointments or drops), or as a buccal or nasal spray.

Compositions suitable for parenteral injection may comprise physiologically acceptable sterile aqueous or nonaqueous solutions, dispersions, suspensions or emulsions and sterile powders for reconstitution into sterile injectable solutions or dispersions. Examples of suitable aqueous and nonaqueous carriers, diluents, solvents, or vehicles including water, ethanol, polyols (propyleneglycol, polyethyleneglycol, glycerol, and the like), suitable mixtures thereof, vegetable oils (such as olive oil) and injectable organic esters such as ethyl oleate. Proper fluidity can be maintained, for example, by the use of a coating such as lecithin, by the maintenance of the required particle size in the case of dispersions and by the use of surfactants.

The nanoparticulate compositions may also contain adjuvants such as preserving, wetting, emulsifying, and dispersing agents. Prevention of the growth of microorganisms can be ensured by various antibacterial and antifungal agents, such as parabens, chlorobutanol, phenol, sorbic acid, and the like. It may also be desirable to include isotonic agents, such as sugars, sodium chloride, and the like. Prolonged absorption of the injectable pharmaceutical form can be brought about by the use of agents delaying absorption, such as aluminum monostearate and gelatin.

Solid dosage forms for oral administration include capsules, tablets, pills, powders, and granules. In such solid dosage forms, the active compound is admixed with at least one of the following: (a) one or more inert excipients (or

8

carrier), such as dicalcium phosphate; (b) fillers or extenders, such as starches, lactose, sucrose, glucose, mannitol, and silicic acid; (c) binders, such as carboxymethylcellulose, alignates, gelatin, polyvinylpyrrolidone, sucrose and acacia; (d) humectants, such as glycerol; (e) disintegrating agents, such as agar-agar, calcium carbonate, potato or tapioca starch, alginic acid, certain complex silicates, and sodium carbonate; (f) solution retarders, such as paraffin; (g) absorption accelerators, such as quaternary ammonium compounds; (h) wetting agents, such as cetyl alcohol and glycerol monostearate; (i) adsorbents, such as kaolin and bentonite; and (j) lubricants, such as talc, calcium stearate, magnesium stearate, solid polyethylene glycols, sodium lauryl sulfate, or mixtures thereof. For capsules, tablets, and pills, the dosage forms may also comprise buffering agents.

Liquid dosage forms for oral administration include pharmaceutically acceptable emulsions, solutions, suspensions, syrups, and elixirs. In addition to the active compounds, the liquid dosage forms may comprise inert diluents commonly used in the art, such as water or other solvents, solubilizing agents, and emulsifiers. Exemplary emulsifiers are ethyl alcohol, isopropyl alcohol, ethyl carbonate, ethyl acetate, benzyl alcohol, benzyl benzoate, propyleneglycol, 1,3-butyleneglycol, dimethylformamide, oils, such as cottonseed oil, groundnut oil, corn germ oil, olive oil, castor oil, and sesame oil, glycerol, tetrahydrofurfuryl alcohol, polyethyleneglycols, fatty acid esters of sorbitan, or mixtures of these substances, and the like.

Besides such inert diluents, the composition can also include adjuvants, such as wetting agents, emulsifying and suspending agents, sweetening, flavoring, and perfuming agents.

Actual dosage levels of active ingredients in the nanoparticulate compositions of the invention may be varied to obtain an amount of active ingredient that is effective to obtain a desired therapeutic response for a particular composition and method of administration. The selected dosage level therefore depends upon the desired therapeutic effect, on the route of administration, on the desired duration of treatment, and other factors.

The total daily dose of the compounds of this invention administered to a host in single or divided dose can vary widely depending upon a variety of factors, including the body weight, general health, sex, diet, time and route of administration, rates of absorption and excretion, combination with other drugs, and the severity of the particular condition being treated. For example, the recommended daily dosage for NEORAL® ranges from 9±3 mg/kg/day for renal transplant patients to 2.5 mg/kg/day for psoriasis and rheumatoid arthritis, while the suggested initial oral dosage of SANDIMMUNE® for transplant patients is 10–18 mg/kg/day.

The following examples are given to illustrate the present invention. It should be understood, however, that the invention is not to be limited to the specific conditions or details described in these examples. Throughout the specification, any and all references to a publicly available document, including U.S. patents, are specifically incorporated into this patent application by reference.

EXAMPLE 1

The purpose of this example was to prepare nanoparticulate cyclosporine formulations in which the cyclosporine is predominantly amorphous.

The nanoparticulate amorphous cyclosporine formulations described in Table 1 were obtained using high energy

US 6,656,504 B1

9

media milling techniques. All milling experiments utilized a DYNO-MILL® Type KDL (Willy Bachofen AG, Basel, Switzerland) assembled with a 0.15 L chamber. Cyclosporine was manufactured by the North China Pharmaceutical Corporation (Shijiazhuang, China). Particle size distributions were determined using a Horiba LA-910 light-scattering particle size analyzer (Horiba Instruments, Irvine, Calif.)

(1) 10% Cyclosporine, 6% F108, 0.1% SLS

The nanoparticulate composition (1) was prepared by dissolving 5.1 g of Pluronic® F108 and 0.085 g of sodium lauryl sulfate (SLS) in 71.32 g of deionized water. The stabilizer solution, along with 8.5 g of cyclosporine drug substance and 500 $\mu$m polymeric attrition media were charged into the milling chamber. The formulation was processed for 6 hours, then harvested and filtered. The final particle size distribution was mean=275 nm, 90%<420 nm.

(2) 5% Cyclosporine, 1.5% HPC-SL, 0.15% SLS

The nanoparticulate composition (2) was prepared by dissolving 1.28 g of HPC-SL (Nippon Soda) and 0.085 g of sodium lauryl sulfate (SLS) in 79.38 g of deionized water. The stabilizer solution, along with 4.25 g of cyclosporine drug substance and 500 $\mu$m polymeric attrition media were charged into the milling chamber. The formulation was processed for 4 hours. The concentration of SLS was then increased to 0.15%. The dispersion was milled for an additional 0.5 hour and then isolated from the attrition media by filtration. The final particle size distribution was mean=268 nm, 90% <380nm.

(3) 5% Cyclosporine, 1% Tyloxapol

The nanoparticulate composition (3) was prepared by dissolving 0.85 g of tyloxapol (Nycomed) in 79.9 g of deionized water. The stabilizer solution, along with 4.25 g of cyclosporine drug substance and 500 $\mu$m polymeric attrition media were charged into the milling chamber. The formulation was processed for 3 hours and then isolated from the attrition media by filtration. The final particle size distribution was mean=213 nm, 90%<304 nm.

(4) 5% Cyclosporine, 2% B20~5000

The nanoparticulate composition (4) was prepared by dissolving 0.85 g of B20~5000 (Dow Chemical) in 79.9 g of deionized water. The stabilizer solution, along with 4.25 g of cyclosporine drug substance and 500 $\mu$m polymeric attrition media were charged into the milling chamber. The formulation was processed for 4.5 hours. At that time, an additional 0.85 g of B20~5000 was added. The dispersion was milled for an additional 2.25 hours and then isolated from the attrition media by filtration. The final particle size distribution was mean=292 nm, 90%<411 nm.

(5) 5% Cyclosporine, 2% F108, 1% Tyloxapol

The nanoparticulate composition (5) was prepared by dissolving 1.7 g of Pluronic® F108 (BASF) and 0.85 g of tyloxapol (Nycomed) in 78.2 g of deionized water. The stabilizer solution, along with 4.25 g of cyclosporine drug substance and 500 $\mu$m polymeric attrition media were charged into the milling chamber. The formulation was processed for 7 hours and then isolated from the attrition media by filtration. The final particle size distribution was mean=192 nm, 90%<300 nm by Horiba LA-910.

(6) 5% Cyclosporine, 0.5% SLS

The nanoparticulate composition (6) was prepared by dissolving 0.425 g of sodium lauryl sulfate (Spectrum) in 80.33 g of deionized water. The stabilizer solution, along with 4.25 g of cyclosporine drug substance and 500 $\mu$m polymeric attrition media were charged into the milling chamber. The formulation was processed for 3 hours and then isolated from the attrition media by filtration. The final particle size distribution was mean=182 nm, 90%<265 nm.

10

The drug substance starting material used in these examples was primarily crystalline as determined by x-ray powder diffraction, the results of which are shown in FIG. 1. After two representative experiments the milled colloidal dispersions were also analyzed by x-ray powder diffraction. Upon completion of milling, a portion of each dispersion was centrifuged and the supernatant liquid decanted. The solids were washed with water and re-centrifuged several times, then dried. X-ray powder diffraction of the milled material showed the absence of sharp absorption lines, indicating that the material was amorphous, as shown in FIGS. 2 and 3. FIG. 2 shows the results of x-ray powder diffraction of milled cyclosporine having Pluronic® F108 as a surface stabilizer, and FIG. 3 shows the results of x-ray powder diffraction of milled cyclosporine having HPC-SL as a surface stabilizer. The colloidal dispersions could also be prepared from amorphous drug substance starting material.

TABLE 1

| Nanoparticulate Amorphous Cyclosporine Formulations | |
| --- | --- |
| Formulation | Particle Size |
| (1)  10% cyclosporine, 6% Pluronic ® F108, and 0.1% sodium lauryl sulfate (SLS) | Mean = 275 nm 90% less than 420 nm |
| (2)  5% cyclosporine, 1.5% HPC-SL, 0.1% SLS | Mean = 268 nm 90% less than 380 nm |
| (3)  5% cyclosporine, 1% tyloxapol | Mean = 213 nm 90% less than 304 nm |
| (4)  5% cyclosporine, 2% B20-5000 | Mean = 292 nm 90% less than 411 nm |
| (5)  5% cyclosporine, 2% Pluronic ® F108, 1% tyloxapol | Mean = 192 nm 90% less than 300 nm |
| (6)  5% cyclosporine, 0.5% SLS | Mean = 182 nm 90% less than 265 nm |

The results show that a nanoparticulate amorphous cyclosporine formulation can be made using a variety of surface stabilizers, using various stabilizer concentrations, and using various cyclosporine concentrations, from crystalline cyclosporine starting material.

EXAMPLE 2

The purpose of this example was to compare the pharmacokinetic profiles between a nanoparticulate cyclosporine formulation according to the invention and a conventional cyclosporine formulation, NEORAL®. The cyclosporine present in NEORAL® is solubilized in alcohol and several additional excipients.

A comparative study was performed between a nanoparticulate amorphous cyclosporin A composition and NEORAL®. The nanoparticulate composition consisted of 10% w/w cyclosporine, 6% w/w Pluronic® F1 08, and 0.1% w/w sodium lauryl sulfate (SLS). The composition was prepared by dissolving 90 g of Pluronic FP108 and 1.5 g of SLS in 1258.5 g of sterile water for injection, USP and then adding 150 g of cyclosporine to form a premix. A DYNO-MILL® Type KDL was assembled with a 600 cc recirculation chamber which was charged with 500 $\mu$m polymeric attrition media. The slurry was processed for 12.5 hours and then filtered through a 20 $\mu$m capsule filter to yield a nanoparticulate colloidal dispersion of cyclosporine with a mean particle size of 165 nm and 90% less than 229 nm. The particle size distribution was determined on a Horiba LA-910 particle size analyzer.

US 6,656,504 B1

**11**

Tables 2 and 3 show a summary of the Area Under the Curve (AUC) for a single 100 mg dosage of the nanoparticulate amorphous cyclosporin A composition and NEORAL®, respectively, administered to two groups of three dogs (GROUPS 1 and 2) over a 24 hour period. A greater AUC corresponds to greater bioavailability.

**12**

periodic increments throughout Day 8 for the GROUP 2 dogs, as shown in Table 2. In addition, the AUC values for NEORAL® administration were measured at periodic increments throughout Day 1 for the GROUP 2 dogs and at periodic increments throughout Day 8 for the GROUP 1 dogs, as shown in Table 3.

TABLE 2

AUC Values for Nanoparticulate Amorphous Cyclosporine

| Time (hrs) | GROUP 1 (Nanoparticulate Amorphous Cyclosporine AUC (ng/mL/hr) for Day 1) | | | GROUP 2 (Nanoparticulate Amorphous Cyclosporine AUC (ng/mL/hr) for Day 8) | | | Average Nanoparticulate |
|---|---|---|---|---|---|---|---|
| | Dog No. 422/m/1 | Dog No. 464/m/1 | Dog No. 408/f/1 | Dog No. 459/m/2 | Dog No. 471/f/2 | Dog No. 472/f/2 | Amorphous Cyclosporine |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 | 0.00 | 0.00 |
| 0.25 | 517.37 | 623.23 | 402.13 | 593.58 | 454.7 | 408.27 | 499.37 |
| 0.50 | 1245.78 | 988.99 | 489.15 | 847.55 | 651.9 | 842.43 | 844.30 |
| 1.00 | 1109.14 | 1301.33 | 936.85 | 1112.88 | 830.6 | 1722.52 | 1168.88 |
| 1.50 | 867.24 | 913.68 | 785.06 | 1034.71 | 520.1 | 1456.75 | 929.60 |
| 2.00 | 799.95 | 764.94 | 369.95 | 744.93 | 474.4 | 700.33 | 642.43 |
| 3.00 | 590.29 | 519.93 | 484.13 | 537.58 | 297.9 | 499.84 | 488.28 |
| 4.00 | 344.29 | 327.43 | 331.71 | 382.46 | 202.5 | 603.55 | 360.32 |
| 5.00 | 293.91 | 238.02 | 298.99 | 255.72 | 158.9 | 510.80 | 292.72 |
| 6.00 | 190.82 | 159.78 | 242.17 | 196.16 | 108.4 | 299.89 | 199.54 |
| 8.00 | 132.17 | 121.90 | 120.64 | 50.33 | 78.0 | 150.11 | 108.86 |
| 12.00 | 63.96 | 47.17 | 88.16 | 36.76 | 32.7 | 101.69 | 61.74 |
| 16.00 | 28.59 | 25.15 | 39.89 | 12.33 | 7.7 | 34.55 | 24.71 |
| 24.00 | 0.00 | 5.42 | 2.53 | 0.00 | 0.0 | 11.89 | 3.31 |
| AUC (ng/mL/hr) | 4964.2 | 4593.2 | 4473.3 | 4155.9 | 2833.8 | 6387.3 | 4567.0* |

*Standard Deviation = 1154; Relative Standard Deviation = 25.3

TABLE 3

AUC Values for NEORAL®

| Time (hrs) | GROUP 2 (NEORAL® AUC (ng/mL/hr) Day 1) | | | GROUP 1 (NEORAL® AUC (ng/mL/hr) Day 8) | | | Average NEORAL® |
|---|---|---|---|---|---|---|---|
| | Dog No. 459/m/2 | Dog No. 471/f/2 | Dog No. 472/f/2 | Dog No. 422/m/1 | Dog No. 464/m/1 | Dog No. 408/f/1 | |
| 0.00 | 0.00 | 0.0 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.25 | 66.50 | 164.2 | 393.04 | 373.74 | 105.16 | 0.00 | 183.93 |
| 0.50 | 514.48 | 484.0 | 747.36 | 1037.03 | 572.61 | 0.00 | 559.25 |
| 1.00 | 1025.13 | 1077.3 | 1569.62 | 1410.78 | 666.83 | 551.19 | 1066.80 |
| 1.50 | 1384.60 | 1381.5 | 1743.53 | 1454.44 | 872.08 | 1095.92 | 1322.01 |
| 2.00 | 1257.50 | 1315.4 | 1470.21 | 1083.48 | 550.85 | 1242.06 | 1153.25 |
| 3.00 | 897.22 | 742.9 | 1019.74 | 266.04 | 397.52 | 1019.47 | 723.81 |
| 4.00 | 504.60 | 590.3 | 672.18 | 398.97 | 363.83 | 586.29 | 519.37 |
| 5.00 | 377.09 | 476.6 | 560.69 | 296.72 | 197.78 | 118.35 | 337.87 |
| 6.00 | 271.80 | 389.2 | 405.96 | 257.10 | 173.56 | 289.07 | 297.79 |
| 8.00 | 113.10 | 282.9 | 262.83 | 325.91 | 99.31 | 44.87 | 188.15 |
| 12.00 | 105.13 | 189.5 | 412.59 | 66.76 | 14.24 | 100.51 | 148.12 |
| 16.00 | 51.37 | 131.1 | 172.27 | 64.77 | 33.96 | 3.20 | 76.11 |
| 24.00 | 27.85 | 89.7 | 64.67 | 17.14 | 0.00 | 24.76 | 37.35 |
| TOTAL AUC (ng/mL/hr) | 6457.2 | 8982.8 | 12600.6 | 6307.0 | 3355.3 | 5177.1 | 7146.7* |

*Standard Deviation = 3241.9; Relative Standard Deviation = 45.4

To minimize any differences in AUC values observed due to different absorption rates of individual animals, AUC measurements for the nanoparticulate amorphous cyclosporin A composition and NEORAL® were measured following administration to the same animals eight days apart. Thus, the AUC values for the nanoparticulate amorphous cyclosporin A composition were measured at periodic increments throughout Day 1 for the GROUP 1 dogs and at

The results show that for the GROUP 1 dogs absorption of the nanoparticulate amorphous cyclosporin A was dramatically consistent, with AUC values of 4964.2, 4593.2, and 4473.3. In contrast, absorption of NEORAL® for the same group of dogs, GROUP 1, was widely variable, with AUC values of 6307.0, 3355.3, and 5177.1 ng/mL/hr. The results for the GROUP 2 dogs were similar, with relatively consistent AUC values for the nanoparticulate amorphous cyclosporin A of 4155.9, 2833.8, and 6387.9 ng/mL/hr. In

US 6,656,504 B1

13

contrast, the AUC values for the GROUP 2 dogs for NEORAL® administration were 6457.2, 8982.8, and 12600.6 ng/ml /hr. A wide variation in absorption is highly undesirable because it makes dosage formulation difficult and because it can result in requiring constant monitoring of the patient to ensure proper blood levels of the drug. The relative standard deviation (RSD) of the AUC values for each dosage form is a quantitative measure of intersubject absorption variability. Among the dogs receiving nanoparticulate cyclosporine the RSD of the AUC values was 25.4%, whereas the RSD of the AUC values when NEORAL® was adminstered was 45.4%. Thus, the inter-subject variability was ca. 1.8 times greater for the NEORAL® dosage form than it was for the nanoparticulate formulation.

TABLE 4

Consistency of Absorption of the Nanoparticulate
Amorphous Cyclosporine Formulation and NEORAL®

| Animals Studied | Nanoparticulate Amorphous Cyclosporine Formulation Total AUC (ng/ml/hr) | NEORAL® Total AUC (ng/ml/hr) |
|---|---|---|
| GROUP 1 Dogs | | |
| Dog No. 422/m/1 | 4964.2 | 6307.0 |
| Dog No. 464/m/1 | 4593.2 | 3355.3 |
| Dog No. 408/f/1 | 4473.3 | 5177.1 |
| GROUP 2 Dogs | | |
| Dog No. 459/m/2 | 4155.9 | 6457.2 |
| Dog No. 471/f/2 | 2833.8 | 8982.8 |
| Dog No. 472/f/2 | 6387.3 | 12600.6 |
| Relative Standard Deviation | 25.4% | 45.4% |

The variability in absorption for NEORAL® as compared to the nanoparticulate amorphous cyclosporine formulation is also shown by a comparison of the absorption range for each formulation for the same single 100 mg dosage, as shown in Table 5 below. NEORAL® has an intersubject absorption variability in AUC that spans 9245 ng/mL/hr, while the nanoparticulate AUC variability (lowest to highest) is only 3554 ng/mL/hr. Variability in absorption can lead to sub-therapeutic plasma concentrations of drug or, conversely, excessively high plasma concentrations at which the drug substance exerts toxic effects. Such variability is highly undesirable, particularly for a drug such as cyclosporine which has a narrow effective dosage range.

TABLE 5

AUC Variability of NEORAL® as Compared
to the Nanoparticulate Amorphous Cyclosporine Formulation

| Formulation | Highest AUC | Lowest AUC | Difference ng/mL/hr |
|---|---|---|---|
| NEORAL® | 12600.6 ng/mL/hr | 3355.3 ng/mL/hr | 9245.3 |
| Nanoparticulate Formulation | 6387.3 ng/mL/hr | 2833.8 ng/mL/hr | 3553.5 |

Furthermore, the inconsistency in absorption between NEORAL® and the nanoparticulate amorphous cyclosporine formulation is evidenced by the dramatic differences in absorption in the first 0.50 hour post-dosing. Among the dogs receiving nanoparticulate cyclosporine, all six subjects had detectable plasma concentrations (ranging from 405.27 to 623.23 ng/mL/hr) at 15 minutes post-dosing (Table 2).

14

When given NEORAL®, five of the six subjects had detectable plasma concentrations (ranging from 66.50 to 393.04 ng/mL/hr) at 15 minutes post-dosing, but one dog (No. 408/f/1) had no detectable blood levels even thirty minutes after receiving the drug (Table 3).

The results also show that the nanoparticulate amorphous cyclosporine formulation is more rapidly absorbed that the conventional NEORAL® formulation. As seen in Table 2, when the dogs were administered nanoparticulate cyclosporine the peak plasma concentrations were all reached in approximately 1 hour or less. When given NEORAL®, peak plasma levels were reached in approximately 1.5 hours for 5 of the six dogs and in approximately 2 hours for dog no. 408/f/1 (Table 3).

These results demonstrate the superior consistency of bioavailability and more rapid absorption among different subjects of the inventive compositions over a conventional cyclosporine formulation, such as NEORAL®.

It will be apparent to those skilled in the art that various modifications and variations can be made in the methods and compositions of the present invention without departing from the spirit or scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents. The following examples further illustrate the invention and are not to be construed as limiting of the specification and claims in any way.

We claim:

1. A nanoparticulate composition comprising:

(a) amorphous cyclosporin particles; and

(b) at least one non-crosslinked surface stabilizer adsorbed on the surface of the cyclosporin particles,

wherein: (i) the cyclosporin particles have an effective average particle size of less than about 2000 nm, and (ii) the cyclosporin and at least one surface stabilizer are present in a ratio of about 10:1 to about 1.5:1 (w/w), cyclosporin to surface stabilizer and (iii) the nanoparticulate composition does no contain an alcohol solubilizing agent and (iv) wherein the nanoparticulate composition does not contain solvent residues resulting from solvent extraction, solvent precipitation, solvent or solvent-mediated hydrosol formation.

2. The composition of claim 1, wherein the effective average particle size of the nanoparticulate composition is less than about 1500 nm.

3. The composition of claim 1, wherein said composition is a solid dose formulation.

4. The solid dose composition of claim 3, wherein said composition has a drug to surface stabilizer ratio of at least 2:1.

5. The composition of claim 1, wherein said composition is an liquid dispersion formulation.

6. The liquid dispersion of claim 5, wherein the solid content of said dispersion is about 40% to about 5% (w/w).

7. The composition of claim 5, wherein said composition is an injectable formulation.

8. The composition of claim 1, wherein the surface stabilizer is selected from the group consisting of cetyl pyridinium chloride, gelatin, benzalkonium chloride, calcium stearate, glycerol monostearate, cetostearyl alcohol, cetomacrogol emulsifying wax, sorbitan esters, polyoxyethylene alkyl ethers, polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters, polyethylene glycols, dodecyl trimethyl ammonium bromide, polyoxyethylene stearates, sodium dodecylsulfate, carboxymethylcel-

US 6,656,504 B1

15

lulose calcium, hydroxypropyl celluloses, hydroxypropyl methylcellulose, hydroxypropylcellulose, carboxymethyl-cellulose sodium, methylcellulose, hydroxylethylcellulose, hydroxypropylmethyl-cellulose phthalate, noncrystalline cellulose, polyvinyl alcohol, polyvinylpyrrolidone, 4-(1,1,3, 3-tetramethylbutyl)-phenol polymer with ethylene oxide and formaldehyde, poloxamers, poloxamines, dimyristoyl phophatidyl glycerol, dioctylsulfosuccinate, dialkylesters of sodium sulfosuccinic acid, sodium lauryl sulfate, an alkyl aryl polyether sulfonate, a mixture of sucrose stearate and sucrose distearate, p-isononylphenoxypoly-(glycidol), and triblock copolymers of the structure -(-PEO)--(-PBO)--(-PEO-)-.

**9.** The composition of claim **8**, wherein the surface stabilizer is selected from the group consisting of: (1) a block copolymer of ethylene oxide and propylene oxide, (2) a triblock copolymer of the structure -(-PEO)--(-PBO)--(-PEO- and having a molecular weight of about 5000, (3) 4-(1,1,3,3-tetramethylbutyl)-phenol polymer with ethylene oxide and formaldehyde, (4) hydroxypropyl cellulose, and (5) sodium lauryl sulfate.

**10.** A pharmaceutical composition comprising the amorphous cyclosporine composition of claim **1** and a pharmaceutically acceptable excipient.

**11.** A nanoparticulate composition comprising:

(a) a mixture of amorphous and crystalline cyclosporin particles; and

(b) at least one non-crosslinked surface stabilizer absorbed on the surface of the cyclosporin particles,

wherein: (i) the cyclosporin particles have an effective average particle size of less than about 2000 nm, and (ii) the cyclosporin and at least one surface stabilizer are present in a ratio of about 10:1 to about 1.5:1 (w/w), cyclosporin to surface stabilizer and (iii) the nanoparticulate composition does no contain an alcohol solubilizing agent and (iv) wherein the nanoparticulate composition does not contain solvent residues resulting from solvent extraction, solvent precipitation, or solvent-mediated hydrosol formation.

**12.** The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 1500 nm.

**13.** The composition of claim **11**, wherein said composition is a solid dose formulation.

**14.** The solid dose composition of claim **13**, wherein said composition has a drug to surface stabilizer ratio of at least 2:1.

**15.** The composition of claim **11**, wherein said composition is an liquid dispersion formulation.

**16.** The liquid dispersion of claim **15**, wherein the solid content of said dispersion is about 40% to about 5% (w/w).

**17.** The composition of claim **11**, wherein said composition is an injectable formulation.

**18.** The composition of claim **11**, wherein the surface stabilizer is selected from the group consisting of cetyl pyridinium chloride, gelatin, benzalkonium chloride, calcium stearate, glycerol monostearate, cetostearyl alcohol, cetomacrogol emulsifying wax, sorbitan esters, polyoxyethylene alkyl ethers, polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters, polyethylene glycols, dodecyl trimethyl ammonium bromide, polyoxyethylene stearates, sodium dodecylsulfate, carboxymethylcellulose calcium, hydroxypropyl celluloses, hydroxypropyl methylcellulose, hydroxypropylcellulose, carboxymethyl-cellulose sodium, methylcellulose, hydroxylethylcellulose, hydroxypropylmethyl-cellulose phthalate, noncrystalline cellulose, polyvinyl alcohol, polyvinylpyrrolidone, 4-(1,1,3,

16

3-tetramethylbutyl)-phenol polymer with ethylene oxide and formaldehyde, poloxamers, poloxamines, dimyristoyl phophatidyl glycerol, dioctylsulfosuccinate, dialkylesters of sodium sulfosuccinic acid, sodium lauryl sulfate, an alkyl aryl polyether sulfonate, a mixture of sucrose stearate and sucrose distearate, p-isononylphenoxypoly-(glycidol), and triblock copolymers of the structure -(-PEO)--(-PBO)--(-PEO-)-.

**19.** The composition of claim **18**, wherein the surface stabilizer is selected from the group consisting of: (1) a block copolymer of ethylene oxide and propylene oxide, (2) a triblock copolymer of the structure -(-PEO)--(-PBO)--(-PEO-)- and having a molecular weight of about 5000, (3) 4-(1,1,3,3-tetramethylbutyl)-phenol polymer with ethylene oxide and formaldehyde, (4) hydroxypropyl cellulose, and (5) sodium lauryl sulfate.

**20.** A pharmaceutical composition comprising the amorphous cyclosporine composition of claim **11** and a pharmaceutically acceptable excipient.

**21.** A method of making a nanoparticulate composition comprising:

(a) amorphous cyclosporin particles; and

(b) at least one non-crosslinked surface stabilizer absorbed on the surface of the cyclosporin particles,

wherein: (i) the cyclosporin particles have an effective average particle size of less than about 1000 nm, and (ii) the cyclosporin and the at least one surface stabilizer are present in a ratio of about 10:1 to about 1.5:1 (w/w), cyclosporin to surface stabilizer,

said method comprising contacting cyclosporin with at least one non-crosslinked surface stabilizer for a time and under conditions sufficient to provide a nanoparticulate amorphous cyclosporin composition in which the cyclosporin particles have an average effective particle size of less than about 2000 nm and the composition has a drug to surface stabilizer ratio of about 10:1 to about 1.5:1 (w/w), cyclosporin to surface stabilizer and (iii) the nanoparticulate composition does no contain an alcohol solubilizing agent and (iv) wherein the nanoparticulate composition does not contain solvent residues resulting from solvent extraction, solvent precipitation, or solvent-mediated hydrosol formation.

**22.** The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 1500 nm.

**23.** The method of claim **21**, wherein said composition is obtained by milling.

**24.** The method of claim **23**, wherein said milling is high energy milling.

**25.** The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 1000 nm.

**26.** The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 800 nm.

**27.** The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 700 nm.

**28.** The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 600 nm.

**29.** The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 500 nm.

**30.** The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 400 nm.

US 6,656,504 B1

17

**31**. The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 300 nm.

**32**. The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 200 nm.

**33**. The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 100 nm.

**34**. The composition of claim **1**, wherein the effective average particle size of the nanoparticulate composition is less than about 50 nm.

**35**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 1000 nm.

**36**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 800 nm.

**37**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 700 nm.

**38**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 600 nm.

**39**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 500 nm.

**40**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 400 nm.

**41**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 300 nm.

**42**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 200 nm.

**43**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 100 nm.

**44**. The composition of claim **11**, wherein the effective average particle size of the nanoparticulate composition is less than about 50 nm.

**45**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 1000 nm.

18

**46**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 800 nm.

**47**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 700 nm.

**48**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 600 nm.

**49**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 500 nm.

**50**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 400 nm.

**51**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 300 nm.

**52**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 200 nm.

**53**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 100 nm.

**54**. The method of claim **21**, wherein the effective average particle size of the nanoparticulate composition is less than about 50 nm.

**55**. The composition of claim **1**, comprising as at least one surface stabilizer dioctylsulfosuccinate.

**56**. The composition of claim **1**, comprising as surface stabilizers dioctylsulfosuccinate and polyvinylpyrrolidone.

**57**. The composition of claim **1**, comprising as surface stabilizers dioctylsulfosuccinate and HPC-SL.

**58**. The composition of claim 1, wherein the surface stabilizer is selected from the group consisting of casein, phosphatides, dextran, glycerol, gum acacia, cholesterol, tragacanth, stearic acid, colloidal silicon dioxide, phosphates, magnesium aluminum silicate, and triethanolamine.

**59**. The composition of claim **11**, wherein the surface stabilizer is selected from the group consisting of casein, phosphatides, dextran, glycerol, gum acacia, cholesterol, tragacanth, stearic acid, colloidal silicon dioxide, phosphates, magnesium aluminum silicate, and triethanolamine.

* * * * *

# EXHIBIT B



**WILCOX & FETZER LTD.**

# HIGHLY CONFIDENTIAL
# AND SUBJECT TO PROTECT ORDER

In the Matter Of:

## Elan Pharma International Limited
### v.
## Abraxis Bioscience

### C.A. # 06-438 GMS

———————————————————

Transcript of:

## Katherine Melody

### May 21, 2008

———————————————————

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

HIGHLY CONFIDENTIAL  AND SUBJECT TO PROTECTIVE ORDER
Elan Pharma International Limited v. Abraxis Bioscience

Page 105

```
 1          Q.   Yeah.  That was a long one.  Can you read that
 2     back, please.
 3          A.   I want to make sure I'm answering the right
 4     thing.
 5                    (Question read)
 6                    MS. KRUZE:  I still don't understand
 7     that question.
 8          A.   Yeah.  I'm still a little --
 9                    MS. KRUZE:  Do you mind rephrasing it?
10     I'm sorry.  It's like --
11          Q.   Do you want me to rephrase it?
12          A.   Yeah.  Shorten it up a little bit, so I can
13     try to remember --
14          Q.   Let me try again.  Is the x-ray powder
15     diffraction work that you did for Abraxis sufficient
16     enough to make a conclusion about the nanoparticles in
17     Abraxane, whether they're crystalline or amorphous?
18                    MS. KRUZE:  Objection; form.
19          A.   Whether they are crystalline or amorphous.
20     Whether they are.
21                    MS. KRUZE:  And you know, if you're
22     still not understanding the question, it's important
23     to ask him, because --
24                    THE WITNESS:  Well, I'm just trying to
```

Electronically signed by Juli LaBadia (101-154-409-8234)                    e089f2cc-f4f8-4277-8bb1-d9fd11063ba5

HIGHLY CONFIDENTIAL  AND SUBJECT TO PROTECTIVE ORDER
Elan Pharma International Limited v. Abraxis Bioscience

Page 106

1        think.  I'm still not sure I understand whether they

2        are crystalline or amorphous.  I thought we were

3        discussing whether or not you could detect whether

4        there was a certain level, not whether they were or

5        they weren't.

6                       MS. KRUZE:  Well, you know, it's

7        important just to --

8                       MR. RIDDLE:  Yeah, I mean --

9                       MS. KRUZE:  Just to have a clear

10       question and a clear answer on the record.  So if you

11       don't understand something, just ask him to rephrase

12       it, and he'll help you out.

13                      MR. RIDDLE:  Yeah.  I will.  I'll try.

14       BY MR. RIDDLE:

15           A.   I think that it's a fair assumption to state

16       that x-ray diffraction, in general, is a good method to

17       determine whether materials are amorphous and/or

18       crystalline.  Yes.  I believe that.  Whether or not it

19       can -- whether or not we have addressed the ability for

20       this to detect it in this other material, ergo, the

21       Paclitaxel and the human -- I don't know that we have

22       established a limit of detection to be able to say yes,

23       we can still see -- we can or we cannot see it at this

24       level.  So, I think that's probably an issue there, is

Electronically signed by Juli LaBadia (101-154-409-8234)                    e089f2cc-f4f8-4277-8bb1-d9fd11063ba5

# EXHIBIT C

# FILE HISTORY OF

U. S. PATENT 5,399,363

GARY G. LIVERSIDGE    ET AL

ISSUED:   MARCH 21, 1995

SURFACE MODIFIED ANTICANCER
NANOPARTICLES

= = = = = = =

Case No. 06-438-GMS

**DX-017**

m7008195

PATENT APPLICATION

Docket No. PRF-328/92

MAIL ROOM
JUL
1 1
1992
PT. & TRADEMARK

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner of Patents & Trademarks
Washington, D.C. 20231

Transmitted herewith for filing is a continuation-in-part of U.S. Serial No. 647,105

Inventor(s): Gary G. Liversidge, Elaine Liversidge and Pramod P. Sarpotdar

For: SURFACE MODIFIED ANTICANCER NANOPARTICLES

Enclosed are also:

[ ] _____ sheets of drawing.

[X] An assignment of the invention to Sterling Winthrop Inc.

[ ] PTO Form 1449 and copies of items listed thereon.

[ ] Other: _____

## Claims as Filed

| | Number Filed | | Number Extra | Rate | Basic Fee $630.00 |
|---|---|---|---|---|---|
| Total Claims | 27 | -20 = | 7 | $20.00 = | $140.00 |
| Independent Claims | 5 | -3 = | 2 | $72.00 = | $144.00 |
| Multiple dependent claims(s), if any | | | | $200.00 = | |
| | | | | Total Filing Fee: | $914.00 |

[X] Please charge the following fees to Deposit Account No. 19-4325.

   [X] Filing Fee of **$914.00**

   [X] Assignment recordal fee of **$40.00**.

Please charge any additional fees under 37 CFR 1.16 which may be required or credit any overpayment to Deposit Account No. 19-4325. A duplicate copy of this sheet is enclosed.

[ ] This application is being filed without the signature(s) of the inventor(s) pursuant to 37 CFR 1.53(d).

[X] This application is being filed by "Express Mail" as of the date of this letter pursuant to 37 CFR 1.10(b).

### CERTIFICATE UNDER 37 CFR 1.10 (b)

Date: 25 June 1992

_William J Davis_
For Applicant(s) William J. Davis
Registration No. 30,744
Telephone No. (215) 640-8802

Address:
Patent Department
Sterling Winthrop Inc.
81 Columbia Turnpike
Rensselaer, New York 12144

"Express Mail" mailing label number OB245877368
Date of Deposit JULY 1, 1992
I hereby certify that this paper or fee is being deposited with the United States Postal Service " Express Mail Post Office to Address service on the date indicated above and is addressed to Commissioner of Patents and Trademarks, Washington, D.C. 20...

WILLIAM J. DAVIS
(Typed or printed name of person mailing paper or fee)

_William J Davis_
(Signature of person mailing paper or fee)

ABRX 0000150

What is claimed:

1.      Particles consisting essentially of a crystalline anticancer agent having a surface modifier adsorbed on the surface thereof in an amount sufficient to maintain an average effective particle size of less than about 1000 nm.

2.      The particles of claim 1 having an average effective particles size of less than 400 nm.

10    3.      The particles of claim 1 having an average effective particle size of less than 300 nm.

4.      The particles of claim 1 wherein said surface modifier is present in an amount of 0.1 to 15% by weight.

15    5.      The particles of claim 1 wherein said anticancer agent is selected from the group consisting of piposulfan, piposulfam, camptothecin, etoposide, taxol, 1,2,4-benzotriazin-3-amine 1,4-dioxide, 1,2,4-benzotriazin-7-amine 1,4-dioxide and retinoic acid.

20    6.      The particles of claim 1 wherein said surface modifier is selected from the group consisting of polyvinyl alcohol, a tetrafunctional block copolymer derived from sequential addition of ethylene oxide and propylene oxide to ethylenediamine, gum acacia,

25    a block copolymer of ethylene oxide and propylene oxide, a polyoxyethylene sorbitan fatty acid ester, and a sorbitan ester of a fatty acid.

7.      The particles of claim 1 wherein said anticancer agent is

30    piposulfan and said surface modifier comprises in combination a polyoxyethylene sorbitan fatty acid ester and a sorbitan ester of a fatty acid.

8.      The particles of claim 1 wherein said anticancer agent is

35    camptothecin and said surface modifier is polyvinyl alcohol.

- 25 -

ABRX 0000177

9.    The particles of claim 1 wherein said anticancer agent is camptothecin and said surface modifier is a tetrafunctional block copolymer derived from sequential addition of ethylene oxide and propylene oxide to ethylenediamine.

5

10.    The particles of claim 1 wherein said anticancer agent is camptothecin and said surface modifier is gum acacia.

11.    The particles of claim 1 wherein said anticancer agent is
10    etoposide and said surface modifier is polyvinyl alcohol.

12.    The particles of claim 1 wherein said anticancer agent is etoposide and said surface modifier is a block copolymer of ethylene oxide and propylene oxide.

15

13.    The particles of claim 1 wherein said anticancer agent is etopside and said surface modifier is gum acacia.

14.    The particles of claim  1 wherein said anticancer agent
20    is taxol and said surface modifier is polyvinyl alcohol.

15.    The particles of claim 1 wherein said anticancer agent is taxol and said surface modifier is a polyoxyethylene sorbitan fatty acid ester.

25

16.    The particles of claim 1 wherein said anticancer agent is taxol and said surface modifier comprises a polyoxyethylene sorbitan fatty acid ester.

30    17.    The particles of claim 1 wherein said anticancer agent is 1,2,4-benzotriazin-3-amine 1,4-dioxide and said surface modifier is polyvinylpyrrolidone.

18.    The particles of claim 1 wherein said anticancer agent is
35    1,2,4-benzotriazin-7-amine 1,4-dioxide and said surface modifier is gum acacia.

- 26 -

ABRX 0000178

19.      The particles of claim 1 wherein said anticancer agent is
1,2,4-benzotriazin-7-amine 1,4-dioxide and said surface modifier is
polyvinylpyrrolidone.

5

20.      The particles of claim 1 wherein said anticancer agent is
1,2,4-benzotriazin-7-amine 1,4-dioxide and said surface modifier is
a tetrafunctional block copolymer derived from sequential addition
of ethylene oxide and propylene oxide to ethylene diamine.

10

21.      The particles of claim 1 wherein said anticancer agent is
retinoic acid and said surface modifier is tyloxapol.

22.      The particles of claim 1 wherein said anticancer agent is
15    piposulfam and said surface modifier is polyvinylalcohol.

23.      The particles of claim 1 wherein said anticancer agent is
piposulfam and said surface modifier is gum acacia.

20    24.  8   An anticancer composition comprising the particles of
claim 1.

25.  9   A method of treating a mammal comprising administering to
the mammal an effective amount of the anticancer composition of
25    claim 24. 8

26. 10   In a method of treating a mammal comprising administering
to the mammal an effective amount of an anticancer agent, the
improvement wherein the efficacy of said anticancer agent is
30    increased by administering said anticancer agent in the form of the
particles of claim 1.

27. 11   In a method of treating a mammal comprising administering
to the mammal an effective amount of an anticancer agent, the
35    improvement wherein the toxicity of said anticancer agent is

- 27 -

ABRX 0000179

reduced by administering said anticancer agent in the form of the
particles of claim 1.

- 28 -

ABRX 0000180

L ket 61894AHR

## In the United States Patent and Trademark Office

In re Application of:

Gary G. Liversidge, et al

SURFACE MODIFIED ANTICANCER
NANOPARTICLES

Serial No. 908,125

Filed  01 July 1992

Group Art Unit: 1502

Examiner: W. Benston, Jr.

I hereby certify that this correspondence is being
deposited today with the United States Postal
Service as first class mail in an envelope addressed
to Commissioner of Patents and Trademarks,
Washington, D.C. 20231.

Paige A. Hutchins
Name

_Paige A. Hutchins_
Signature

_November 28, 1994_
Date of Signature

RECEIVED GROUP 150
JAN 0 5 1995

Honorable Commissioner of Patents and Trademarks
Washington, D.C.  20231

Transmitted herewith is an amendment in the above-identified application:

[X]  No additional fee is required.
[ ]  The fee has been calculated as shown below:

The filing fee has been calculated as shown below:

|  | (Col. 1) CLAIMS REMAINING AFTER AMENDMENT |  | (Col. 2) * HIGHEST NO. PREVIOUSLY PAID FOR | (Col. 3) PRESENT EXTRA | OTHER THAN A SMALL ENTITY | |
|---|---|---|---|---|---|---|
|  |  |  |  |  | RATE | ADDITIONAL FEE |
| TOTAL |  | MINUS |  |  | X 22 | $ |
| INDEP |  | MINUS |  |  | X 76 | $ |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM |  |  |  |  | + 240 | $ |
|  |  |  |  |  | TOTAL | $ |

* The "Highest Number Previously Paid For" (Total or Independent) is the highest
number found from the equivalent box in Col. 1 of a prior amendment or the number
of claims originally filed.

[ ]  Please charge my Deposit Account No. 05-0225 in the amount of $.
         **A duplicate copy of this sheet is enclosed**

[X]  The Commissioner is hereby authorized to charge payment of the
     following fees associated with this communication or credit any
     overpayment to Deposit Account No. 05-0225
         **A duplicate copy of this sheet is enclosed**

   [X]  Any additional filing fees required under 37 CFR 1.16.

   [ ]  Any patent application processing fees under 37 CFR 1.17.
        (For Extensions of Time and other Petitions to the Commissioner)

Arthur H. Rosenstein/pah
Telephone:  (716) 477-9908
Facsimile:  (716) 477-4646

Attorney for Applicants
Registration No. 24,352