```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        -  -  -

 4    ELAN PHARMA INTERNATIONAL    :      Civil Action
      LIMITED,                     :
 5                                 :
                  Plaintiff,       :
 6                                 :
          v.                       :
 7                                 :
      ABRAXIS BIOSCIENCE INC.,     :
 8                                 :
                  Defendant.       :      No. 06-438-GMS
 9
                          -  -  -
10                    Wilmington, Delaware
                    Thursday, May 15, 2008
11                       9:30 a.m.
                        Conference
12                        -  -  -

13    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

14    APPEARANCES:

15            JOHN G. DAY, ESQ.
              Ashby & Geddes
16                   -and-
              STEPHEN SCHEVE, ESQ.,
17            LINDA M. GLOVER, ESQ.,
              LISA A. CHIARINI, ESQ., and
18            ROBERT RIDDLE, Ph.D., ESQ.
              Baker Botts LLP
19            (Houston, TX)
                     -and-
20            GREGORY BOKAR, ESQ.
              Counsel - Elan Drug Delivery
21
                            Counsel for Plaintiff
22

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2            ELENA C. NORMAN, ESQ., and
              MICHELLE SHERETTA BUDICAK, ESQ.
 3            Young Conaway Stargatt & Taylor, LLP
                        -and-
 4            MICHAEL A. JACOBS, ESQ.,
              EMILY A. EVANS, ESQ., and
 5            ERIC S. WALTERS, ESQ.
              Morrison & Foerster
 6            (San Francisco, CA)

 7                            Counsel for Defendant

 8                        -  -  -

 9            THE COURT:  Good morning.  Please, take your

10    seats.  It's an office conference.  As counsel know, during

11    my office conference process, you are free to stand or sit,

12    however you are comfortable.

13            Why don't we start with, for the record, a round

14    of introductions.

15            MR. DAY:  Good morning, Your Honor.  I feel more

16    comfortable standing.

17            On behalf of Elan, John Day from Ashby & Geddes,

18    local counsel.  At counsel table from Baker & Botts,

19    starting at Your Honor's right, Steve Scheve, Linda Glover,

20    Robert Riddle, and Lisa Chiarini.  In our back row, Your

21    Honor, Greg Bokar, whom you have already been introduced to,

22    vice president of intellectual property and litigation for

23    Elan.  With him, Richard Collier, Elan's executive vice

24    president and general counsel.

25            THE COURT:  Good morning.
```

1     Counsel.

2          MS. NORMAN:  Good morning, Your Honor.  On

3     behalf of Abraxis, Elena Norman from Young Conaway.  With me

4     at counsel table, Michael Jacobs, Morrison & Foerster, Emily

5     Evans, Morrison & Foerster, Eric Walters, Morrison &

6     Foerster, in-house counsel for Abraxis Rick Marone

7     (phonetic), in the second row Michelle Budicak at Young

8     Conaway.

9          THE COURT:  Okay.  The way I generally approach

10    these things is rather randomly.  We will start out with the

11    motions in limine, then go through the tabs that I have

12    marked in Volume I of the proposed pretrial order.  Not

13    necessarily in this order, we will talk about the

14    preliminary jury instructions.  There are some disputes

15    there.  Actually, there are a number of disputes all over

16    the place in this case, which causes me to say to you that

17    time is going to be somewhat at a premium.

18          I can spend the time necessary, hopefully, to

19    resolve those issues, and those that I have to take back to

20    chambers with me I will, those that need further thought.

21          But I do want you to keep the thought in mind

22    that there are a lot of issues between the parties.  So if

23    you would keep your arguments in check, keeping those

24    thoughts in mind, I would appreciate it.  If you don't, I

25    will.

1          I am going to start out -- we will talk about

2     the preliminary instructions.  I don't think we are going to

3     get to the final instructions today.  I don't think we are

4     going to have enough time.

5          We will talk about your proposed voir dire.  We

6     will talk about general nudges and nits that I have and

7     requirements that I have for your conduct before me and the

8     jury.  Then I will entertain whatever agenda items you might

9     want to raise with me.

10          I am going to start out with what may be perhaps

11    an unhappy note for Elan, because I think you have not paid

12    close attention to one of my requirements.  That is that the

13    motions in limine be kept down in number to five.  Depending

14    upon how you count, it seems to me there are anywhere

15    between, I will give you a range, eight and ten separate

16    motions that have been filed, depending upon how you count.

17    I am going to give you a chance to look at your list,

18    whoever is pulling the laboring oar on this, and decide what

19    you want to do.

20          For instance, let me give you a for-instance, I

21    think Abraxis appropriately and correctly points out, in the

22    second motion, it's really three motions in one.  I count

23    Motion No. 1 to be two motions in one.  Again, No. 3.  That

24    is my count.  You may count differently, but I guess since

25    it's my count that counts, if you will, that is the count

1    you are going to have to use.

2          You have got at least, probably, ten.  So you

3    need to think about which of these motions is really

4    important to you, which of those you want to pursue.  I put

5    you on the spot a little.  If you need a few moments, I can

6    retire back to chambers and come back, if you want some time

7    to think about it.  If you want to talk to Mr. Jacobs and

8    talk to his team about it, I am willing to have you do that.

9    But I am going to have to insist on process being adhered

10   to.

11         MR. SCHEVE:  Could we have five minutes, Your

12   Honor?

13         THE COURT:  Sure, no problem.

14         (Recess taken.)

15         THE COURT:  Okay.  What is your pleasure?

16         MR. SCHEVE:  Thank you, Judge.  In light of the

17   Court's request, we first would like to address the generic

18   Abraxane issue that was raised.  In other words --

19         THE COURT:  Do you have a docket item or some

20   way that you have identified that?  Is that No. 2?

21         MR. SCHEVE:  It's what we have in our Tab A as

22   our first motion in limine.  I am not sure I have got it.

23         THE COURT:  Is that styled plaintiff farms

24   motion in limine to exclude products marketed by --

25         UNIDENTIFIED SPEAKER:  That's the motion.

1           THE COURT:  Do you want to do that one or no,

2     sir two.

3           MR. SCHEVE:  Actually, it is just one of the

4     issues that is raised in that motion, Your Honor.  It

5     relates to the issue about admissibility of testimony or

6     evidence about the fact that my client spent a total of

7     $80,000 evaluating whether or not it should look into

8     devoting a development program --

9           THE COURT:  You are talking about the marketing

10    of the product that is embodied by the '363 patent?  The

11    first part of the motion?  The reason I characterize it as

12    two, counsel, is that what I call the second part was your

13    motion to preclude references to patents covering Abraxane.

14          MR. SCHEVE:  It is on Page 3 of our first motion

15    in limine, where we advise the Court that we expect that

16    Abraxis would proffer evidence that Elan considered making a

17    generic Abraxane.  We believe that that particular evidence

18    should not be coming into this lawsuit.  It is on Page 3 of

19    our Motion in Limine No. 1.

20          THE COURT:  Does it start at Argument III,

21    Paragraph A, Evidence that Elan has not manufactured any

22    products embodying the '363 patent should be excluded

23    regarding the '202 and the '403?

24          MR. SCHEVE:  It is in that section, the top of

25    Page 3.

1              THE COURT:  The pages are different, apparently.

2              MR. SCHEVE:  It is the second paragraph, which

3    says, Similarly, Elan expects that Abraxis...

4              THE COURT:  So it's that subheading under III,

5    Subheading A that you want to discuss.

6              MR. SCHEVE:  Yes, Your Honor.

7              THE COURT:  What's next?

8              MR. SCHEVE:  The next would be our Motion in

9    Limine No. 2, relating to efforts by Abraxis's expert, Dr.

10   Amiji, to usurp the Court's authority on claim construction.

11             THE COURT:  That's one that I counted as 3 and

12   1.  You have, I think, a motion to bifurcate in there?

13             MR. SCHEVE:  We are not going to pursue that,

14   Your Honor.  It is only the usurpation of the Court's

15   construction issue.

16             It starts at Subpart A on Page 1.

17             With regard, then, to Dr. Amiji, Your Honor,

18   there are two bits of evidence that we have requested in a

19   separate motion.  If Your Honor used that as being two

20   separate motions, then it's taking up those two pieces of

21   evidence relied upon by Dr. Amiji on the crosslinking issue.

22             THE COURT:  We can discuss that together.  I did

23   note Dr. Amiji.  This is denominated No. 3.  One is an

24   effort to preclude Atwood and Mansoor Amiji.

25             MR. SCHEVE:  That one, Your Honor, which is No.

1    3, goes to qualifications.  We are only going address Dr.

2    Atwood as our fifth motion.

3              There is two particular pieces of evidence on

4    the issue of crosslinking.  It doesn't go to his

5    qualification.  There are two pieces of evidence that under

6    any sort of Daubert standard wouldn't be deemed reliable or

7    admissible.  That is in our motion denominated No. 4.

8              THE COURT:  I know that's your position.  Let me

9    make sure I have the right one.

10             This has to do with the unreliable data

11   concerning human albumin, the crosslinking?

12             MR. SCHEVE:  The crosslinking, yes.

13             THE COURT:  You are going to withdraw stealth

14   Motion for Summary Judgment No. 5.  Okay.

15             With that in mind, let's go ahead and start with

16   your first motion.

17             MR. SCHEVE:  The first motion we would like to

18   address, Your Honor, goes to what we anticipate to be

19   evidence that will be presented by Abraxis about a so-called

20   generic Abraxane program, as characterized by Abraxis.

21             By way of background, Your Honor, Abraxis and

22   some of its representatives starting making presentations at

23   various scientific meetings about their product, claiming

24   that it was both amorphous in terms of the nanoparticles

25   that are in the drug -- and that is really what this case is

1    about.  Our client's invention are nanoparticles.  They sell

2    a product that contains a bunch of free albumin, and albumin

3    is a protein.  Your body has albumin gushing through it.

4    Mine has albumin gushing through it.  Their product has a

5    bunch of free, meaning it's unbound, protein.  Then there

6    are these particles.

7              Our claim, Your Honor, is that those particles,

8    which have some albumin bound to the exterior, that those

9    particles infringe our product.  In other words, contained

10   within the 65 trillion particles in every vial, that there

11   are two or more particles that infringe upon my client's

12   patent, '363.

13             After Abraxis started touting its product as

14   being amorphous, and folks within my client were present at

15   some of this and heard about it, the thought process was,

16   wow, if they have really done this, from a business

17   perspective, should we evaluate as part of our business

18   model whether or not we ought to look at trying to make a

19   generic version of that?  My client spent I believe it's

20   $80,000 evaluating it, determining eventually that this

21   product, Abraxane, actually infringes my client's product

22   because it contains more than ten percent by weight of

23   particles that are crystalline, or contains crystalline

24   medicament, as Your Honor has construed it in the Markman

25   hearing.

1          So the business decision within the company was

2    that it was going to protect its intellectual property.  And

3    it brought this lawsuit, rather than spending money to go

4    out and develop the generic Abraxane.

5          Our position, Your Honor, is the fact that my

6    company spent a total of $80,000, which in development of

7    pharmaceuticals is a drop, and decided from a business

8    perspective not to move forward is, number one, irrelevant

9    to any claim in this lawsuit.  There is no countersuit

10   claiming that by virtue of doing that we somehow infringed

11   Abraxis's patents.  In fact, as Your Honor knows, the Patent

12   Code specifically excepts research for development of

13   products from infringement claims.

14         It, number one, has no relevance under Rules 401

15   and 402.  More importantly, Your Honor, under Rule 403, it

16   would do nothing but confuse and create problems in terms of

17   misleading the jury.  In a sense, it is going to create a

18   lot of frolic and side issue at trial.

19         I point this out in that Abraxis has two arms in

20   its business.  One is that it markets over 75 generic

21   products.  Their business is making generics.  On March the

22   25th, they announced, in a press release, if I may read it,

23   this arm called APP, they have recently reorganized and

24   Abraxis Pharmaceutical Partners, APP, characterized as the

25   leading manufacturer of multi-source and branded injectable

1    pharmaceutical products, today announced that it launched

2    celaphine hydrochloride for injection, the generic

3    equivalent of Maxopene marketed by Elan.

4        They are out marketing, introducing generics of

5    our products.  And it just gives further evidence that what

6    this will create is a bunch of evidence to come in on an

7    absolute side issue that has no relevance toward the

8    question of whether or not they infringe upon the '363

9    patent and any of the other issues relating to invalidity.

10        This is a sideshow to try to create some

11    appearance that, as I understand it, frankly -- I am sure

12    Mr. Jacobs will correct me -- but during the course of

13    discovery, the accusations that have been made are that my

14    client only wanted access to documents in discovery so that

15    it could use it to create a generic form and that we were

16    going to misappropriate it, we were going to misuse it, et

17    cetera.  My clients made the decision before this lawsuit

18    ever started, witnesses have sworn to that, multiple

19    witnesses have been questioned, that this business decision

20    not to pursue a generic version of Abraxane was made before

21    the decision to move forward with this litigation was ever

22    made.

23        So we would ask that evidence about the fact my

24    client for a limited period of time considered, evaluated

25    whether or not it ought to spend money and put in place a

1    development program for a generic Abraxane, based upon their

2    public statements that, in fact, their product was

3    amorphous -- we are going to prove in this lawsuit that, in

4    fact, it contains crystallinity.  And the business decision

5    was made, we are going to protect our IP.  As Your Honor

6    knows, we have an obligation to protect our IP.  So this

7    lawsuit was the course that my client took.

8              So it is not relevant, and if it is even

9    tangentially relevant, 403 should require its exclusion,

10   Your Honor, because as Your Honor has told us, our time is

11   cramped, the Court's time is cramped, and valuable.

12             And this is nothing but a sideshow, a circus,

13   and we will end up in a frolic with the admissibility about

14   who is a bigger problem:  When they filed and started

15   marketing a generic of one of my company's drugs, or when my

16   company considered and spent a total of $80,000 and then

17   decided not to go forward with the generic of Abraxane?

18             We would ask for exclusion of that topic during

19   the course of trial.

20             THE COURT:  Mr. Jacobs, who is going to handle

21   this?

22             MR. JACOBS:  I am a little puzzled, Your Honor.

23   The motion was a motion in general to exclude evidence,

24   commercial embodiments.  We responded to that.  There is a

25   fragmentary -- there is a reference to the generic Abraxane

1    issue.  But it isn't fully developed in their brief.  It's

2    being kind of explicated here for the first time.

3                If the Court were to exclude evidence of the

4    generic Abraxane program, I put "evidence" in quotes, it

5    would be excluding evidence that goes to the similarity or

6    differences between crystalline and amorphous forms.

7                In Elan's generic Abraxane documents, they talk

8    about, well, gee, can we get a crystalline version of this

9    approved?  How will the crystalline version compare with an

10   amorphous version?

11               The question of equivalence is raised by their

12   affirmative case, their own documents, we will adduce, to

13   show that Elan itself considered the crystalline and

14   amorphous forms to be very different.  The documents will,

15   in fact, go to not just this particular effort to develop a

16   paclitaxel-based anticancer drug using the crystalline

17   grinding technology that is described in the '363.  This is

18   an effort that has gone on for over, for about 15 years.

19   This was just another episode in that effort.  And there is

20   documents that talk about the long-term failure of Elan to

21   develop a paclitaxel-based program.

22               All of that evidence is relevant to enablement.

23               So those are just two of the reasons why

24   excluding evidence of generic Abraxane would be highly -- it

25   would be damaging to our ability to put on our case, Your

1    Honor.

2            THE COURT:  I should also say as an aside that

3    enablement, I will permit argument to the jury on that.

4    There is going to be, I think, competing evidence on that

5    issue.  So agreed that it is a matter of law, ultimately.

6    It seems to me that is an issue that should come in.   I

7    think that that is an issue that is raised somewhere in the

8    papers that I have read.

9            You are going to have to be prepared, and I

10   think the whole issue of enablement, both parties should be

11   able to discuss that with the jury at the appropriate time.

12           Do you want to respond, Mr. Scheve?

13           MR. SCHEVE:  Only, Your Honor, by suggesting

14   that, again, their brief does not address this, even though

15   it was clearly raised in our briefing.

16           My client's business model, Your Honor, is --

17   and I don't want to be accused by BASF of stealing their

18   line -- my client doesn't make the drugs, it makes the drugs

19   you make better by providing delivery forms.  In other

20   words, if you have a product and you want to extend it out,

21   you see these controlled-release ads for drugs, Ambien CR,

22   controlled release, there are dozens of those products out

23   there.  My client is the CR.  It's the company that's

24   involved in giving you different ways to deliver drugs.  My

25   client's business model is, it takes that technology, for

```
1    which it has around the world over 1200 patents and

2    applications protecting its drug delivery business.

3              So when they started making public announcements

4    that they had come up with an amorphous product which no one

5    had been able to do for 30 years, then my client started

6    saying, well, should we evaluate whether or not from a drug

7    delivery perspective we ought to spend some time and money

8    doing that?  They spent 80,000, and decided not to pursue

9    it.

10             And what the evidence is, it becomes a sideshow

11   on this whole generics concept because then I am going to be

12   sitting there cross-examining them about the 75 drugs that

13   they have gone out and done investigation on, because you

14   can't file an Abbreviated New Drug Application --

15             THE COURT:  What about that, Mr. Jacobs?

16             MR. JACOBS:  Maybe this will help, Your Honor.

17   There is a certain element of reciprocity on this issue.

18   Elan is going to argue that Abraxis got a copy of their

19   patent in 1996, and studied that patent and, quote, copied

20   from it.  That's going to be part of their case-in-chief.

21             We are going to be saying, look, Elan, when you

22   were trying to create a generic Abraxane, you studied

23   Abraxis patents.  It is typical in the pharmaceutical

24   industry for companies to study each other's patents.  That

25   is not something that is in itself actionable.  To the
```

1      contrary, we all know the patent policies.

2              If Mr. Scheve will argue that there is nothing

3      improper about -- if Mr. Scheve will not advance an argument

4      about impropriety going in our direction, we will not

5      advance an argument about the impropriety per se of Elan

6      trying to develop a generic Abraxane.  It isn't our plan,

7      because everybody knows, the jury knows, that there are

8      generics out there.

9              So maybe that's helpful.  I do not plan to argue

10     that per se their effort to create a generic Abraxane was in

11     some way improper.  I do plan to rely on the documents

12     arising out of that program to prove basic elements of our

13     case.

14              THE COURT:  Mr. Scheve.

15              MR. SCHEVE:  Well, Your Honor, what was the word

16     you used to describe our Motion in Limine 4?  A "stealth"

17     motion for summary judgment?  A very interesting proposal.

18              THE COURT:  5, actually.

19              MR. SCHEVE:  Excuse me.

20              We filed a patent infringement case.  They

21     didn't.  They didn't claim, not before this Court is any

22     claim anywhere that our activity somehow infringed their

23     patent.

24              We will show that they got a packet in 1996 that

25     is just covered with handwritten notes, including copy --

1    it's there to show that they willfully infringed upon our

2    patent.

3                So, hearing his offer, I certainly will decline

4    that, Your Honor, because this issue about who engages --

5    you can't file or seek approval to market a generic unless

6    the product, the marketed or branded product reaches what is

7    called Abbreviated New Drug Application status.  Either the

8    patent expires, the patent is declared invalid, or there are

9    some other enumerated things.  None of that is an issue in

10   this case.

11               So we would be going through a bunch of

12   mini-trials about the fact that that is all they do is study

13   drugs, because over 75 of the products that they sell in

14   order to be marketed have to be studied before you can file

15   an ANDA.  It's the way business is done.  We will end up

16   with a bunch of side trials on prejudicial grounds about, is

17   there anything inappropriate about trying to evaluate and

18   then deciding not to proceed with trying to develop a

19   product because we came to the conclusion they are

20   infringing on our technology, we are going pursue our rights

21   through the courts?

22               THE COURT:  Your colleague may have an

23   additional thought.

24               MR. JACOBS:  I am trying to refine it, Your

25   Honor.  But if it doesn't go anywhere, I have taken my best

1    shot.

2            Neither side should argue that it is improper

3    per se to attempt to development generic pharmaceuticals.

4    We know for all sorts of reasons the statutes favor that.

5    Neither side should argue that it is per se improper to

6    study another party's patents in the course of drug

7    development.  And if that is an agreement, yes, we can avoid

8    having to do some kind of basic, fundamental stuff at trial

9    that may be a bit of a sideshow.  I would actually favor

10   such a stipulation.  That doesn't negate his ability to

11   argue -- I don't know how he is going to argue it, because

12   their patent says crystalline and in handwritten notation on

13   the patent is amorphous or they are crystalline or we are

14   amorphous or something like that.

15           It is the issue of the claims of the patent that

16   goes to willfulness, not the disclosure.

17           That is my proposal for trying to keep this down

18   to a minimum.

19           I would add, under time limits, we don't have

20   time for mini-trials.  I don't see the real risk that Mr.

21   Scheve is arguing.  But I offer that proposal because I

22   think it would make for a better trial.

23           THE COURT:  Mr. Scheve.

24           MR. SCHEVE:  I am not sure what I am responding

25   to, Your Honor.  What I did hear him say is he didn't want

1     any sideshows.  We are in agreement there.  I am asserting

2     they went to our patents and they lifted stuff, it all goes

3     to willfulness, I will be able to prove that.

4               They haven't a claim -- there is no claim before

5     the Court that what we did violated their patents, infringed

6     their patents.  With no claim being present, why would we

7     have any evidence in the case that in any way reflects upon

8     the fact that my client considered for a very discrete

9     period of time:  Should we spend resources and money to try

10    to develop something which they claim was different than our

11    product?

12              THE COURT:  Mr. Jacobs, your reaction to that

13    statement.

14              MR. JACOBS:  There were two.

15              On the first, again, all I am saying is, there

16    is nothing improper per se in studying another company's

17    patents.

18              THE COURT:  Conceded by both parties, I think.

19              MR. SCHEVE:  Correct.

20              MR. JACOBS:  There is nothing improper per se

21    about attempting to develop generic pharmaceutical products.

22              MR. SCHEVE:  Agree.

23              MR. JACOBS:  Then I think that resolves what the

24    primary argument for trying to keep out the generic Abraxane

25    program of Elan is, because if I am not going to argue, And,

1    ladies and gentlemen of the jury, they tried to develop a

2    generic and that was wrong, then the evidence about the

3    generic Abraxane comes in for the purposes that I anticipate

4    using it for.

5              There is another piece of this, just in terms of

6    reviewing the actual briefing we did on this particular

7    topic.  For example, there is a notebook from their chief --

8    one of their inventors on their patent in this generic

9    Abraxane program about the unsuitability of human serum

10   albumin.  We just heard about human serum albumin.  We use

11   human serum albumin.  Once again, they are saying their

12   patent says their patent covers something that we, Elan,

13   with 15 years of experience with the '363 under our belts,

14   we can't use hsa, it's unsuitable, even though Abraxis has

15   launched a blockbuster drug based on this hsa.

16             So to exclude that evidence would harm our

17   ability to prove our nonenablement case.

18             MR. SCHEVE:  What my motion goes to, Judge, is

19   we have heard ad nauseam, I wish I brought the e-mails --

20             THE COURT:  I am glad you didn't, counsel.

21             MR. SCHEVE:  -- accusing my team and my client

22   of stealing.  Their CEO, we took his deposition, and he

23   accused us of stealing and this full lawsuit is motivated by

24   our desire to steal their technology to create a generic.

25             THE COURT:  I don't understand that to be what

1    underlies this current issue.

2              MR. SCHEVE:  That's what we want to keep out of

3    the lawsuit, Your Honor.

4              THE COURT:  I think counsel has agreed with you

5    on that, other than for purposes that I think he has argued,

6    a relevant use.

7              MR. SCHEVE:  If the only thing he is arguing is

8    relevant is enablement, Your Honor, whatever we did to

9    consider creating, mimicking their product, somehow goes to

10   enablement of our invention, which they claim is different

11   than their product, that is nonsensical.

12             THE COURT:  It may be nonsensical, but it is

13   relevant.  You are free to argue that point to the jury,

14   that there is no logic to this assertion.  But I don't know

15   that that drags us down into the mud of the sideshow issue

16   that you are talking about.

17             MR. SCHEVE:  That is the sense of it, Your

18   Honor.  But it is Your Honor's duty as gatekeeper and to

19   apply Rule 403, that if this gets into a recitation about

20   how we tried to mimic their product, et cetera, this generic

21   version, we do --

22             THE COURT:  The reason we are having this

23   discussion and that I take the time that I do to have

24   discussions like this, rather than me get up on the Bench in

25   a robe and have it done in a very formalistic kind of way,

1    is so we can talk about it.  I think in talking about it, we

2    massage the issue to the point where there is appropriate

3    agreement.  I think I have identified an appropriate use of

4    the evidence.

5              I am well-aware of my gatekeeping functions.

6    You better believe I am well-aware.  And lawyers who have

7    been in here -- I don't know who has been in here, Mr.

8    Jacobs has, of course he has -- will tell you that I am

9    pretty -- I don't like to get in your case, just as a

10   general matter, the parties are well-represented here,

11   experienced, smart lawyers.  I am going to do my job as the

12   arbiter of the rules.  Please, I will.  Okay?

13             MR. SCHEVE:  Thank you.

14             THE COURT:  I guess that is to say, I will deny

15   the motion based upon the discussion we have just had and

16   given the parameters that we all agreed on just now and that

17   I have indicated are the parameters.

18             MR. SCHEVE:  Your Honor, if we may proceed to

19   our second motion.

20             THE COURT:  Yes.

21             MR. SCHEVE:  This is the motion that focuses on

22   what we believe is an effort by Abraxis to gain a second

23   bite of the apple on the Court's construction of terms.

24   This is embodied through their witness, Dr. Amiji.  It is

25   our motion that seeks to prevent the usurpation of Your

1    Honor's role as the person to construe the terms.

2           Dr. Amiji, Your Honor, has, in his testimony, in

3    his deposition and in his report, attempted, and what

4    Abraxis has done, in fact, in its briefing and is clearly

5    trying to do, is to get their witness to take issue with

6    Your Honor's claim construction that was memorialized in the

7    Markman hearing on three specific terms, every single one of

8    which were construed by Your Honor, were part of Your

9    Honor's decision.

10          They are going to try to pursue an

11   indefiniteness claim in this lawsuit, and do it by having

12   Dr. Amiji stand up and talk about these terms and open up

13   these terms and try to have a witness give meaning to terms

14   that Your Honor has already --

15          THE COURT:  Let me interrupt.  Mr. Jacobs knows

16   me.  He knows that is not going to be permitted.

17          Mr. Jacobs, do you want to react to this?

18          MR. JACOBS:  Sure.  I think there are two

19   motions.  There is the indefiniteness issue.  Let's take

20   that first.

21          Your Honor, if I may, I think I do know the

22   Court's practices pretty well.  You have told me in cases in

23   which I have been before you, you have told other litigants,

24   we do claim construction.  That doesn't speak to the

25   question of indefiniteness.  The Court does its best job on

1    claim construction that it can, based largely on the

2    intrinsic evidence.  If that leads to an indefiniteness

3    issue, that leads to an indefiniteness issue.  We deal with

4    that later.

5                    Can I spend a minute on that?

6                    THE COURT:  Go ahead.

7                    MR. JACOBS:  The way this issue tees up, and it

8    is an issue of law for the Court, on the question of average

9    particle size, the specification defines average particle

10   size about as specifically as it can do.  The Court in its

11   claim construction order adopts that definition.  And then

12   we take our expert depositions.  And their experts are all

13   over the map in applying the definition provided in the

14   specification that the Court provided in its claim

15   construction.

16                    So the indefiniteness issue that was maybe

17   lurking there has become very tangible, and we intend to

18   argue it to Your Honor.  We win, we lose.  But we don't

19   think you precluded us from doing that with your claim

20   construction ruling.

21                    There are about three issues lurking on the

22   question of the real issue here, which is how are we going

23   to manage between now and trial and in trial debate about

24   what the claim scope is in light of the claim construction.

25                    Issue No. 1, which is really what Amiji's

1   testimony goes to, is that if one concludes as Elan is

2   arguing, that you could have infringement with, say, ten

3   percent crystallinity and .1 percent noncrosslinked surface

4   modifier, then that is not supported in the specification,

5   and there is a written description problem.

6           Again, in doing claim construction, we didn't

7   argue to you, and the Court doesn't generally entertain,

8   here are the validity issues that will follow from the claim

9   construction.  The Court does the claim construction based

10  on the intrinsic evidence.  So there is a written

11  description issue that falls out from the Court's claim

12  construction.

13          The second issue, we actually thought we won

14  from the Court's claim construction on the question of a

15  portion of the medicament being crystalline.  And, indeed --

16  let me back up a second.  We also won on another key claim

17  construction issue that we identified for Your Honor.

18          THE COURT:  Footnote 4 supports that contention,

19  that assertion.

20          MR. JACOBS:  Exactly.  Let me stay with that.

21  The point I was making is after claim construction they

22  dropped the '025 patent but they continued to pursue the

23  '363.  And they are pursuing the '363 based on a theory that

24  consisting essentially of A and B can mean consisting

25  essentially of small amounts of A, large amounts of not A,

1    and moderate amounts of B and moderate amounts of not B.

2    That is their theory, taking Munson at his best.

3              The Court's claim construction took a

4    straight-up approach to construing what "consisting

5    essentially of" means and adopted the sort of verbal

6    formulation, if you will, that the Federal Circuit gives us.

7              That leaves open, in our view, legal issues.  It

8    leaves open the legal question, what are the basic and novel

9    properties?  And we submit, Your Honor, that in deciding the

10   portion of the question, although it is not explicit, that

11   one can infer from everything the Court read and included in

12   the footnote that based on the specification and the file

13   history, a basic and novel property of this invention is

14   crystallinity and not crystallinity, i.e., amorphous, by

15   definition, affects the basic and novel properties.

16             Now, let me just acknowledge a move I am making

17   in this argument to you.

18             You could call that a claim construction issue,

19   and we could have an argument about whether we should have

20   argued that to you earlier, and I can explain that we didn't

21   have their infringement contentions until we got their

22   expert reports.  And I could show you how we did argue the

23   issue.  But I don't think we need -- I would suggest that's

24   not the right way to think about this.  The right way to

25   think about this is this is an issue of claim scope after

1     claim construction.

2              I want to alert Your Honor to a case that I

3     provided to Elan last night, the 02 Micro case.  I have

4     copies of it here.  It is a really interesting case.  My

5     colleagues happened to be on the losing side of it, Your

6     Honor (handing document to Court).

7              If you go to Page 15 of this decision, Your

8     Honor, what was going on at trial was the Court had decided

9     that the words "only if," "only if" -- and I can see exactly

10    what happened.  Right?  The Court thinks, "Only if," why do

11    I have to construe 'only if'"?

12             But the litigants start debating at trial what

13    "only if" means.  Does it really mean "only only only if" or

14    does it mean "only if some of the times not only if"?  It is

15    one of those things we get into in patent cases.  The trial

16    court decided, you know what?  That is an issue I don't need

17    to construe any further.  And the Federal Circuit reversed.

18    It said, look, at trial, an issue of claim scope arose that

19    is an issue of law for the Court.  The trial court needed to

20    decide that issue.  We remand.

21             So in the motion in preliminary briefing, in our

22    pretrial briefing, we have teed up to Your Honor the claim

23    scope issues that we think are outstanding.

24             The question of basic and novel properties --

25    and then there is a Federal Circuit case that says that,

```
 1    that we cited in our papers, that says consisting

 2    essentially of A and B means, at most, consisting

 3    essentially of A and B and small amounts of C.  We think

 4    that, too, is an issue of law.  And we think that, too,

 5    should be decided by the Court.

 6              So we don't think we are in any way acting

 7    inconsistently with the Court's claim construction.  We

 8    think that because of the positions Elan has taken, the

 9    Court's claim construction leaves us with disputes about

10    claim scope that are issues of law for the Court to decide.

11              Thank you.

12              THE COURT:  Mr. Scheve.

13              MR. SCHEVE:  I don't know where to start, Your

14    Honor.

15              Mr. Jacobs talked about average particle size

16    and went on for about five minutes when the actually term is

17    average effective particle size.  To get to the heart of it,

18    the case he just cited was vacated by the United States

19    Supreme Court as well, not the one he handed you, but the

20    other one.

21              Our motion goes to three terms you have already

22    construed, Judge.  The notion about basic and novel

23    properties, I will agree, they didn't ask you to construe it

24    at the Markman hearing.  I will argue they should have,

25    because that's your job.  It's not for Dr. Amiji to preach
```

1    to the jury or tell the jury what those terms mean.  But the

2    three terms that Dr. Amiji purports now to give meaning to

3    are, quote, "particles consisting essentially of," one of

4    which Mr. Jacobs just told you about.

5         Your Honor, you addressed it.  You defined it.

6    We have your Markman order telling us what that term means.

7    And to now suggest that "consisting essentially of" ought to

8    have a different meaning and that Dr. Amiji ought to be able

9    to opine about that meaning is the kind of testimony we seek

10   to exclude.

11        They are also asserting, if you read their

12   brief, that the word maintain, "sufficient to maintain," is

13   indefinite because it doesn't say, well, maintain for six

14   hours, maintain for a day.  Your Honor was asked to

15   construe.  Your Honor did construe that term and phrase.  It

16   has been construed by Your Honor.  And it's not for Dr.

17   Amiji to read into it or to now sort of rehash and try to

18   get a second bite at what the term "sufficient to maintain"

19   means.

20        And then again with regard to the phrase

21   "average effective particle size," we have quoted to you in

22   our brief how Dr. Amiji would define it.  He wants to define

23   it as being the average size of each individual particle.

24   By definition, I don't have an average weight.  I have my

25   weight.  Your Honor doesn't have an average weight.  We have

1    Your Honor's weight.  There is no such thing as the average

2    of an individual particle.

3              So he has attempted to read limitations into

4    terms that Your Honor has already construed.

5              And with regard to this "consisting essentially

6    of," I understand fully why Mr. Jacobs wants to do this,

7    because it goes to, you know, he wants to cut out my ability

8    to argue.  Your Honor construed "consisting essentially of"

9    as containing a crystalline medicament with a surface

10   modifier and other ingredients that don't affect the basic

11   and novel properties of the invention.  They want to read

12   words into that, de minimis other ingredients, almost none

13   other ingredients.  In fact, Dr. Amiji has testified that it

14   has to equal 100 percent.

15             Our point is, you have told us what the

16   definition is.  Our experts have prepared their testimony,

17   we have prepared our case in light of that.  Those are the

18   three examples, Your Honor, where we are asking that they

19   not go out to put on Dr. Amiji to confuse this jury by

20   offering that kind of testimony, which is nothing but a

21   naked effort to end-run what Your Honor has already done on

22   those three specific claim terms.

23             THE COURT:  Anything further you want to add?

24             MR. JACOBS:  To clarify what is going on with

25   maintain.

1          We didn't spot this one until expert

2     depositions.  The question is, do the particles have to

3     exist -- remember, you may recall from Elan's tutorial that

4     the '363 is about keeping these particles separate so they

5     don't agglomerate.  It says maintain average effective

6     particle size.  We thought, maintain means maintain for some

7     pharmaceutically useful purpose because Claim 11 is about

8     using these particles to improve the treatment of cancer.

9          Then we take their expert deposition.  They are

10    looking at the prior art.  They are saying, well,

11    maintaining it for 15 minutes is good enough.  And

12    maintaining them separate for 15 minutes on visual

13    inspection, on visual inspection, is good enough.

14          So all of a sudden, what seemed to us to be

15    pretty clear, actually, from the Court's construction,

16    turned out to be unstable.  That is the indefiniteness issue

17    there.

18          Dr. Amiji, I think counsel for Elan is reading

19    into Dr. Amiji's proposed testimony quarrels with the

20    Court's claim construction.  That is just not there.  He is

21    not going to quarrel with the Court's claim construction.

22          THE COURT:  Okay.  At some point we are going to

23    take a break.  I want to think about this a little more.  If

24    I feel after the break I am still not ready to rule, I will

25    issue some written order.  I think I have a view I am fairly

1    comfortable with.  I will announce it shortly.

2             Okay, Mr. Scheve.

3             MR. SCHEVE:  The next motion, Your Honor, and I

4    interpreted Your Honor to say that you would treat it as two

5    motions, it is the motion to exclude the unreliable test

6    evidence that Dr. Amiji relies upon on the issue of

7    crosslinking of the albumin.

8             It should be denominated as Motion in Limine No.

9    4.  I apologize for not having the document number.

10            THE COURT:  It's 473.  Okay.

11            MR. SCHEVE:  By way just of a little bit of

12   background, Your Honor, again, my client's invention are

13   these particles.  There are medicines or there are compounds

14   that are called water-insoluble or poorly-water-soluble.

15   And those compounds, when you put them in water, since they

16   don't like water, they migrate to one another.  And that

17   migration is called aggregation or the clumping of these

18   particles together.

19            What Dr. Gary Liversidge and his team did when

20   it patented the '363 invention was to recognize a number of

21   things.  Number one, if you could reduce these particles

22   down to very small size so that you increase their

23   dissolution rate, you could increase the bioavailability, in

24   other words, how much of this can actually get into the

25   body, be absorbed by the body, get to the tumor.  But the

1    question then became, how do you engineer this in such a way

2    that you prevent these highly water-insoluble drugs from

3    getting in the body and clumping together and all of a

4    sudden the body treats them as big molecules again, and big

5    molecules create problems because they can't get through the

6    very small vasculature, the capillaries and other things.

7              What Dr. Liversidge and others invented was a

8    way to reduce the particle size, in other words, they

9    invented particles with a specific nanometer limit on them.

10   There are three different claims.  Claim No. 1 is smaller

11   than a thousand nanometers.  To give you an idea of how

12   small that is, Your Honor, their vial of Abraxane is about

13   half this size (indicating).  In terms of particles, it

14   contains 65 trillion, that's how small nanoparticulate size

15   was.  That was the nature of Dr. Liversidge's invention.

16             Then he described these surface modifiers that

17   would be adsorbed -- my secretary, God love her, if I have

18   had to correct the spelling of adsorb once I have had to

19   correct it 50 times, because we are all used to the word

20   absorb, to suck up.  Adsorb describes a physical connection

21   but not a chemical connection, so that the surface modifiers

22   are on the exterior but they are not chemically bonded to

23   it.

24             He described this.  He patented it in the '363.

25             One of the claim elements -- as Ms. Evans told

1    you during discovery, there are really only two issues in

2    this case.  That is, does their product -- they have

3    conceded virtually every other claim limitation.  Their drug

4    contains particles.  They come within the claim limitation

5    for particle size.  They have a surface modifier.  They

6    concede that it's adsorbed onto the surface.  We really get

7    down to, then, do these particles, which are drug and the

8    protein adsorbed on the surface, do they meet the claim

9    limitation of particles that are greater than 10 percent by

10   weight of crystalline medicament.  And secondly, it goes to

11   this crosslinking.  As to these proteins that are on the

12   exterior of the drug, Dr. Liversidge referenced in his

13   patent that these are essentially noncrosslinked.  Your

14   Honor was specifically asked during the Markman hearing to

15   define that term.  We have now Your Honor's construction.

16          So the issue, one of the two issues that this

17   case will be about is, Abraxis seeks to avoid the patent and

18   avoid infringement by claiming that these surface modifiers

19   that are adsorbed onto the surface aren't crosslinked.  Our

20   contention is that they are essentially crosslinked,

21   whatever the magic language is.  I may have misstated that

22   specific word.

23          So they brought in this fellow from Northeastern

24   University, I think it's Dr. Monsoor Amiji, is his first

25   name, I will just refer to him as Dr. Amiji, who is their

1   person who is going to talk about the crosslinking issue.

2   And crosslinking will get down to a bunch of discussion at

3   trial about things called monomers, which are, mono meaning

4   single chemical unit, dimers, which means two units that

5   somehow form together, trimers, oligomers, polymers, et

6   cetera.  But you will hear a lot of discussion about what's

7   the chemical -- I should say the characteristics of that

8   protein.  Are they monomers, which by definition, if it is a

9   single unit, they can't be crosslinked to other monomers or

10  dimers or trimers or whatever.

11          So we have got Dr. Amiji who will testify on

12  that issue.

13          The two pieces of evidence, Your Honor, it's

14  Defendant's Exhibit 50 and Defendant's Exhibit 76, it's

15  DX-050 and DX-076.  I will take them, if I may, Your Honor,

16  if you would like, we can show you copies of what they are.

17          THE COURT:  Aren't they part of your appendices?

18          MR. SCHEVE:  They certainly should be, yes, Your

19  Honor.

20          THE COURT:  Which declaration would they be

21  appended to?  If you have an extra copy, that's probably

22  easier.

23          THE COURT:  If I may.

24          (Counsel confer.)

25          THE COURT:  Would this be in the replacement and

1    supplemental exhibits?

2              MS. EVANS:  This document, which has a lot to

3    it, is not part of the exhibits that were filed with Elan's

4    motion.

5              MR. SCHEVE:  Your Honor, this is the first of

6    the two issues, these two exhibits that relate to one

7    particular test that Dr. Amiji relies upon.

8              The second test that he relies upon is reflected

9    in Defendant's Exhibit 563.  This is the second test.

10             So what we have, Your Honor, again, looking at

11   050 and 076, we have a circumstance where Abraxis back in

12   2000 and 2001 performed a test called size exclusion

13   chromatography -- I call it SEC because I grew up in a small

14   town and I can't say big words very well.  So I refer to it

15   as SEC.  This data was never submitted to the Food & Drug

16   Administration as part of their filing, never published,

17   never went anywhere.  It was just this raw data.

18             Then what happened was after this lawsuit was

19   filed in July of 2006, somebody internally instructed a

20   woman by the name of Sherry C., we have got to deal with

21   these allegations, start digging.  And what she did was she

22   sent an e-mail to their primary scientist, Dr. Desai,

23   purporting to reanalyze after July of 2006 this data that

24   was created back in 2000 or 2001 from this SEC study.

25             Someone at Abraxis created that data back there.

1    Again, it was never reduced to any sort of report or

2    anything of that sort, never peer-reviewed, never submitted

3    to the agency.  Dr. Amiji then gets this Sherry C. e-mail

4    with the so-called analysis, and he relies upon it, after

5    admitting that he never looked at the raw data.

6              So I have got an internal document that purports

7    to identify or analyze data that had never been submitted to

8    the Food & Drug Administration.  And, of course, there is

9    data that was submitted to the FDA to gain approval.  And I

10   am sure Your Honor recognizes and appreciates this.  Every

11   company that seeks to market a drug, one of the FDA's

12   primary concerns, aside from the question of efficacy or, as

13   they say in London, "ef-ic'-a-see" and safety, is the

14   question of can you show us that your product can be

15   consistently produced?  In other words, show us that you

16   have valid manufacturing methods.  Those manufacturing

17   methods and information about the characteristics of your

18   product have to be sent to the FDA under what's called a CMC

19   portion of a New Drug Application.  CMC is another acronym

20   for chemistry, manufacturing, and controls.  You have to

21   submit it to get approved.

22             So they submitted their data that describes what

23   that protein looks like, monomer content.  And now we have

24   got this data that supposedly -- we don't know who did it,

25   we don't know who created it.  Supposedly, it exists back in

1    2000, 2001.  We have got an e-mail from Sherry C. to Dr.

2    Desai.  And this e-mail sort of reanalysis, done only after

3    the lawsuit was filed, is what Dr. Amiji relies upon.  And

4    Dr. Amiji admitted in his deposition, no, I have never gone

5    back and looked at any of the raw data, asking Your Honor to

6    apply a Daubert standard to the admissibility and reliance

7    on this particular document.

8         It simply has no indicia of trustworthiness,

9    never been submitted to the agency to look at.  If it were

10   sufficiently reliable, and by FDA regs Abraxis was required

11   to submit any information that it felt changed the

12   character, quality, safety, or efficacy of its product --

13   character, quality, safety or efficacy -- they never

14   submitted it.  Never been published.  Never been subjected

15   to peer review.  We don't know who did it.

16        All we know is Sherry C., who is one of their

17   R&D people, research and development people, finds this

18   data, does an analysis, and that analysis is what Dr. Amiji

19   relies upon.  How do I cross-examine Dr. Amiji when he

20   hasn't looked at the raw data to form his opinions?  We

21   don't know who created the raw data.

22        What is the significance of that, Your Honor?

23   We don't know how the data was generated.  We don't have any

24   of that scientific sort of background to discern what test,

25   how was the test run, who was involved with it, et cetera.

1              So we ask Your Honor that, first, those two

2     documents that relate to that specific test relied upon by

3     Dr. Amiji does not have any of the indicia of reliability

4     that should go with it.  We are not talking about somebody

5     pulling out a published article that meets the 803(18)

6     learned treatise exception or some published research that's

7     been subjected out there.  This does not have any of the

8     indicia of reliability.  Frankly, it was, oh, my gosh, we

9     don't have anything, let's create something.

10             It sat around for six years before Sherry C.

11    decided, I better create this and send an e-mail to Dr.

12    Desai.  And now their expert is relying upon it.

13             We would ask for the exclusion of those two

14    particular exhibits.

15             MR. JACOBS:  May I introduce our response to

16    this, Your Honor, then turn it over to Ms. Evans on the

17    specifics of those documents?

18             THE COURT:  Sure.

19             MR. JACOBS:  Number one, I am in violent

20    agreement with Mr. Scheve on one point, which is we endorse

21    the Court's role as gatekeeper under Daubert.  And we will

22    get to that in our motions.  Number two, I think we are

23    beginning to see a different sort of sideshow develop, which

24    is accusations about Abraxis's compliance with FDA rules,

25    how what Abraxis did vis-a-vis the FDA relates to the

1    question of infringement in this case.  We may get to that

2    later on in our motions in limine as well.  But I think we

3    can start to see the volume ramp up about the FDA when this

4    is a patent infringement lawsuit.

5            The question is whether Amiji's testimony passes

6    Daubert standards.  I don't think we apply Daubert to

7    individual documents.  That strikes me as a little odd

8    application of it.

9            But I will now turn it over to Ms. Evans to

10   explain some of the things that Mr. Scheve has pointed out.

11           THE COURT:  Ms. Evans.

12           MS. EVANS:  Thank you, Mr. Jacobs.  Thank you,

13   Your Honor.

14           So, a few misimpressions that I think may have

15   been created by Mr. Scheve that I would like to clear up.

16           First of all, as Mr. Scheve said, this work was

17   done in 2000 and 2001.  Mr. Scheve attaches an e-mail from

18   Sherry C. to Neil Desai, who she reports to, attaching a

19   copy of the report in 2006.  That doesn't mean the report

20   was created in 2006, Your Honor.  We will present testimony

21   at trial that, in fact, it was created at or about the time

22   that the experiments were done, which was 2000 and 2001.

23           The other thing I wanted to say, Your Honor, is

24   that Elan knows who was involved in doing some of these

25   experiments involved in the report.  Leslie Liu, they took

1        her deposition, talked to her about those experiments.  They

2        also knew that Sherry C. was involved, and, in fact, had

3        noticed her for deposition, but canceled inexplicably at the

4        last moment, a week before her deposition or less than a

5        week before her deposition, and chose not to take it.

6               So they have had a full opportunity to explore

7        the experiments that are the basis for the disulfide bond

8        report, as Elan has called it in its motion.

9               The next thing I wanted to address was the

10       accusation that Dr. Amiji had not reviewed the underlying

11       data.  And that is not correct, Your Honor.  Dr. Amiji did

12       review the underlying data and did a very thorough analysis

13       of it in his report, which is attached as an exhibit.

14              So I don't know, if you looked at the testimony

15       of Dr. Amiji that Elan cites, it doesn't say that he didn't

16       review the underlying data.  So that's not what the

17       testimony says, Your Honor.

18              The other point I wanted to raise was, Mr.

19       Scheve referred to two different documents.  The first one

20       was this exhibit which he handed up to Your Honor.

21              THE COURT:  DX-050?

22              MS. EVANS:  Yes.  That is not attached to the

23       motion.  So this is a brand-new -- what Elan had sought to

24       exclude previously was not that whole document.

25              I haven't even had an opportunity to review

1    everything that is in there, Your Honor.  What Elan had

2    sought to exclude was just the portion of Dr. Amiji's report

3    about the disulfide bond report, and there is a lot more in

4    that exhibit, in that disulfide bond report.  There is the

5    underlying experimental data there.

6            So this is brand-new.  And I feel a little bit

7    kind of sandbagged, Your Honor, because I haven't had an

8    opportunity to review all that.  But that was not the

9    subject of the motion.

10            THE COURT:  You are talking about DX-076.

11            MS. EVANS:  That's correct, Your Honor.  A small

12    part of it was, you won't find that anywhere in the

13    exhibits.  I think what you will find is Dr. Amiji's very

14    thorough analysis of the disulfide bond report.  And Elan in

15    its papers says that the report is not reliable.

16            I think that experiments have different values

17    depending on the experiment.  And Dr. Amiji didn't find the

18    disulfide bond report to be conclusive, the be-all-end-all

19    proof.  He said it was supportive.  And he considered all

20    the issues with respect to that experiment and discussed it

21    in detail in his report.

22            I should also point out that of the three Elan

23    experts who would testify on the crosslinking issue, they

24    rely -- they don't do any experiments of their own.  They

25    rely on the disulfide bond report, not just criticize it,

```
 1    rely on the numbers in it as the basis for their own

 2    opinion.

 3              So this motion is a little bit odd to me, Your

 4    Honor.

 5              The other thing that Mr. Scheve handed up to you

 6    was a, I believe, since I got a very quick look, Your Honor,

 7    what it says at the top, Purpose to separate and identify

 8    the protein IN interest.

 9              THE COURT:  DX-563?

10              MS. EVANS:  Well, the DX document isn't in the

11    exhibit, so I am not a hundred-percent sure it is the same

12    thing I am thinking of.

13              THE COURT:  Did you want another opportunity to

14    see this?

15              MS. EVANS:  Yes, I absolutely would, Your Honor,

16    to make certain we are talking about the same thing.

17              MR. SCHEVE:  Your Honor, for a little

18    background.

19              THE COURT:  Hold on.

20              MS. EVANS:  I have the background.  I know what

21    this is.  I will be able to address it, Your Honor.

22              MR. SCHEVE:  It's an SOP that they first

23    produced to us in this litigation, first time ever.

24              THE COURT:  4/4/08?

25              MR. SCHEVE:  Yes, on April 4th.
```

1          THE COURT:  It's written on top.

2          MR. SCHEVE:  That's the first time we have seen

3    it in this litigation, first time produced to the defendant

4    in this litigation.

5          THE COURT:  Okay.  Go ahead.

6          MS. EVANS:  Yes, sir.  So the second motion in

7    limine that is part of Motion in Limine 4 has to do with

8    what's called the Vong Trieu experiment.

9          MR. SCHEVE:  Which I haven't addressed yet, Your

10   Honor.

11         THE COURT:  He didn't talk about that.  I think

12   in selecting -- did you select that out?

13         MR. SCHEVE:  No, Your Honor.  The first was

14   relating to this SEC test, and the next one is what's called

15   an SDS page test, which I won't even attempt to tell you

16   what the big words are.

17         THE COURT:  I don't think he talked about that

18   yet.

19         MS. EVANS:  Your Honor, he said he was moving to

20   exclude two documents.  I assume that was the two documents

21   he handed up to you.  The second document is the one I just

22   looked at, Your Honor.  That goes to Vong Trieu.  That has

23   nothing to do with SEC.  That is why I was a little

24   confused.

25         THE COURT:  The one you just looked at.

```
 1              MS. EVANS:  Yes, sir.  I can not address that
 2    now if he is not seeking to exclude that based on the first
 3    motion.  I can wait for that.
 4              THE COURT:  Okay.
 5              MR. SCHEVE:  May I reply, Your Honor?
 6              THE COURT:  Yes.
 7              MR. SCHEVE:  First off --
 8              THE COURT:  You want to talk about the 050.
 9              MR. SCHEVE:  Yes, sir, about the first two
10    patents which relate to the SEC test, the size exclusion
11    chromatography.
12              If Your Honor would like to see cases where
13    courts have routinely applied Daubert to individual pieces
14    of evidence, I am very familiar, because I argue it all the
15    time in pharmaceutical cases, about whether or not experts
16    can rely on what are called anecdotal reports of medical
17    events, whether or not data submitted to the FDA's
18    spontaneous reporting system is reliable.
19              There are a number of published opinions that
20    show that experts can't be giving testimony when the
21    materials they rely upon aren't deemed relevant.  It goes to
22    the question of whether or not their methodology, i.e.,
23    relying on faulty information, is acceptable.  Courts
24    routinely find that.
25              Let me, if I may, Your Honor, here is what Dr.
```

1    Amiji says.  Would you like me to get you some opinions,

2    Your Honor, on that?

3              THE COURT:  I will let you know.

4              MR. SCHEVE:  Dr. Amiji's report, Paragraph 152.

5    He said, "I am informed and it appears that the original

6    chromatograms of these experiments are reported at," then he

7    gives an ABRX number, which is their Bates number.  There is

8    nothing in this record that this gentleman went down and

9    looked at this information.

10             THE COURT:  Let me ask you this, though, Mr.

11   Scheve, and I will let you continue:  Ms. Evans just asserts

12   that these documents that we are talking about right now --

13   I think it's DX-050 and DX-076?  Or just 050?

14             MR. SCHEVE:  050.

15             THE COURT:  This document did not form the only

16   basis for his opinion.  Did I understand that to be an

17   assertion that you are making?

18             MS. EVANS:  It is part of the documents that Dr.

19   Amiji opines on.  I think, I believe his testimony in his

20   report was that it was supportive of his opinion.  But it is

21   not, it is not the primary document on which Dr. Amiji

22   relies.

23             He did evaluate that report, along with all the

24   other experimental evidence on crosslinks.  This is part of

25   a body of evidence.  It is not the primary evidence on which

1    Dr. Amiji relies.

2             THE COURT:  Did you also say that the

3    plaintiff's expert relied on this document?

4             MS. EVANS:  Three plaintiff's experts.

5             THE COURT:  Relied on this document.

6             MS. EVANS:  Yes.  It's in their report.

7             THE COURT:  You can talk about that, too, Mr.

8    Scheve.

9             MR. SCHEVE:  Yes, Your Honor.  What our experts

10   did was -- let's assume Your Honor overrules our motion.

11   Let's assume this becomes an issue, even though we clearly

12   think that it is not reliable.  They have to comment to the

13   jury on why this study has so many flaws in it.  But then

14   they went further and said, even if it comes in and even if

15   you accept the numbers and even if it was valid, here is why

16   it still comes within the claim, because there are some

17   mathematical calculations that are outlined in the claims.

18            But that doesn't solve the problem that you have

19   got a bunch of people testifying about something that there

20   is no scientifically reliable basis for it coming into this

21   case.

22            I would be the first to sit down if she told me

23   he wasn't going to rely on this document.  But she says he

24   is.  Obviously, if it doesn't come into the case, my experts

25   aren't going to talk about it.  But I have got to have them

1    prepared to talk about it since their people dealt with it.

2    But it gets to the basic evidentiary gatekeeping issue.

3                    THE COURT:  Is this going to form part of the

4    opinion upon which Dr. Amiji relies?

5                    MS. EVANS:  I do not anticipate that Dr. Amiji

6    will rely on the disulfide bond report at trial, Your Honor.

7                    THE COURT:  There you go.

8                    Do you want to go on to the next?

9                    MR. SCHEVE:  Yes, please, Your Honor.  The next

10   one.

11                   THE COURT:  I think this is the 076 and the 563.

12                   MR. SCHEVE:  Yes.  I have two problems.  Finding

13   my notes and reading my notes.

14                   THE COURT:  I know how you feel.

15                   MR. SCHEVE:  The second test, Your Honor, is

16   this report done by Mr. Vong Trieu, T-r-i-e-u.  I do not

17   mean to demean him because I don't know what his title is,

18   if it is Dr. Trieu or...

19                   THE COURT:  That would be what has been

20   denominated DX-736, for whatever purpose that number was

21   assigned.  It is not a part of anything that I have.

22                   MS. EVANS:  That is my understanding.  The

23   laboratory notebook excerpt that is the Vong Trieu data that

24   the motion sought to exclude is Exhibit 10 to Elan's motion,

25   Your Honor.

1          THE COURT:  Okay.  Let me find that.

2          Go ahead, Mr. Scheve.

3          MR. SCHEVE:  DX-076 is Exhibit 10 of the motion

4     in limine.

5          I am going to ask Mr. Riddle to pronounce what

6     SDS page is because I don't have a clue.  I can't possibly

7     get it out.

8          MR. RIDDLE:  If you are even interested, it

9     stands for sodium dodecylsulfate polyacrylamide gel

10    electrophoresis.

11         THE COURT:  Very good.

12         MR. SCHEVE:  SDS page is an analysis that was

13    done apparently by one Vong Trieu at Abraxis.  And what we

14    are talking about here are these laboratory notebook

15    pages -- and I can put in the record the Abraxis page

16    numbers by Bates.  It's 0523585 through 0523601.

17         First, Your Honor, this report, Vong Trieu was

18    never identified in interrogatories as anybody with

19    knowledge of facts in this case, to this day.  Never been

20    disclosed.

21         No. 2, we have got this report that Mr. Vong

22    Trieu apparently created that never went to the FDA, never

23    has been peer-reviewed or published.  We don't know anything

24    about the experimental parameters, because they are not

25    detailed in the lab pages.  And then, when we raised the

1    issue, there are no details as to how it was done.

2          So to try to solve that, Abraxis apparently gave

3    us a so-called standard operating procedure.  And I guess

4    one want us to assume that Mr. Trieu, who we don't know

5    because he has never been identified in discovery, followed

6    them.  I guess they want us to assume that.  And those

7    standard operating procedures were first provided to us on

8    April 4.

9          THE COURT:  Are these the 11 paragraphs of --

10   this is a separate document, 563, produced on 4/4.

11         MR. SCHEVE:  Yes.  So there is no way that this

12   document that is relied upon by Dr. Amiji and about which he

13   wants to opine can meet the sort of scientific rigor and

14   reliability that, under Daubert, needs to be applied to

15   this.  Methodically, he has relied on something.

16         Nobody knows who Dr. Vong Trieu is, because he

17   wasn't disclosed in any answer to interrogatory.  He has not

18   been deposed.  There is no elaboration of the experimental

19   parameters.  And what was provided to us as being the

20   standard operating procedure we didn't see until April 4th,

21   so how could Dr. Amiji have seen it when his deposition was

22   taken back in December?

23         So under the indicia of reliability, this

24   clearly, again, unpublished, if it in any way changed what

25   they reported to the FDA, they were required to report it to

1    the FDA and they didn't.  Never been subjected to peer

2    review.  Never been published.  And it's not reliable.  And

3    it shouldn't be allowed for Dr. Amiji to just pick up

4    something and say, I don't know anything about this, I don't

5    know how it was done, but I am going to rely upon it.

6              It's the basic gatekeeper function that we ask

7    Your Honor to exercise as to this document and exclude.  We

8    are not saying Dr. Amiji can't testify.  As Ms. Evans

9    correctly says, there is a universe of information.  We have

10   picked out two, Your Honor, that just can't -- they just

11   can't be characterized as being sufficiently reliable for

12   the jury to hear and we spend time cross-examining it when

13   those basic indicia don't exist.

14             THE COURT:  Ms. Evans.

15             MS. EVANS:  Thank you, Your Honor.

16             I would invite Your Honor to look at the Vong

17   Trieu notebook pages, which are Exhibit 10 to Elan's opening

18   motion.  They are extraordinarily detailed, Your Honor.

19   They have all sorts of conditions.  They have flow rates.

20   They have sizes.  They have data.  They have a lot of

21   information.

22             I also wanted to explain how that other

23   document, DX-50, how that came up, that we produced.  So we

24   produced this Vong Trieu notebook, Your Honor.  And we

25   produced it early in the case.  And in our response to

1    Elan's contention interrogatory about why we believe we did

2    not meet the noncrosslinked limitation, this documentation

3    was right up top.  It was one of the first few documents we

4    cited.  It has always been a document that we have given a

5    great deal of prominence to in our explanation of why we do

6    not meet the noncrosslinked limitation.

7                So a lot is known about this for a long time,

8    many, many months, before expert discovery.  Nevertheless,

9    not one of Elan's three experts, who redundantly opined on

10   the noncrosslinked limitation, addressed the Vong Trieu

11   experiment.

12               They just didn't say a word about it.  Not a

13   word.

14               And then what happened is at the deposition of

15   Dr. Manning, my colleague -- Dr. Manning, who is Elan's

16   expert, my colleague, Dr. Walters, said, why didn't you

17   address the Vong Trieu experiment, because, of course, you

18   know, it will be very prominent in our papers?  And then we

19   just got this big, obviously, prepared speech about how

20   terrible it was.

21               Well, there was no warning for that.  There was

22   nothing in his report.  And that is the speech that's quoted

23   in Elan's paper about why it's unreliable.  And I submit,

24   Your Honor, that that was also sandbagging.  That if they

25   had a criticism of that report, it should have been in Dr.

1    Manning's, in Elan expert's opening report.  It was not.

2            So for the first time we hear, oh, it's not

3    detailed enough.  You didn't say how you ran your SDS page

4    gels.

5            Your Honor, SDS page, a very routine -- if there

6    ever was a routine technique, that is it.  I was doing it

7    back in the early eighties.  This is extraordinarily

8    routine.  But they said, well, this is a problem.  You

9    didn't say how you did it.

10           THE COURT:  You might want to point out,

11   counsel, that wasn't in your current role?

12           MS. EVANS:  Yes, sir.  That was in my former

13   life, my previous incarnation.

14           If you look at Exhibit 10, which is the Vong

15   Trieu laboratory notebook data --

16           THE COURT:  Is this something done in

17   undergraduate school as well?  I think so.

18           MS. EVANS:  Definitely now, yes.  Definitely.

19   It's very routine.

20           But if you look, sir, at Page ADRX0523599, which

21   is a page in the Vong Trieu notebook which is Exhibit 10 to

22   Elan's motion, you will see at the bottom it says SOP.

23           THE COURT:  I see it.

24           MS. EVANS:  Page ABRX0523599.  It says SOP, then

25   there is an arrow, then it says R&D, Bio, 026 was followed.

1          So Elan is complaining, we don't know, you know,

2    how these gels were run.  So we saw this.  We hadn't noticed

3    it previously.  So we went and we got that SOP.  And that

4    SOP is what I believe, although I haven't checked every

5    page, what Elan handed up to you as DX-, I think, 563.

6          THE COURT:  So it's the SOP that Mr. Scheve

7    complains about having been only recently produced.

8          MS. EVANS:  Yes, sir.  We provided that as

9    Exhibit 17 to the Diana Kruze declaration in support of our

10   opposition motion to Motion in Limine No. 4.

11         MR. JACOBS:  You will see, Your Honor, in the

12   upper right-hand corner, it says R&D Bio 26.

13         So this is the SOP that Vong Trieu says, Dr.

14   Trieu says in his notebook was followed.  So we provided it

15   to show he followed specific procedures.

16         You will also note, Your Honor, that there is

17   nothing about Abraxane on this SOP.  Now, we just missed

18   this the first time around.  It's a general procedure used

19   for any time you want to run a gel at a company.  We should

20   have noticed that little reference to an SOP in the Vong

21   Trieu notebook and we probably should have produced that

22   earlier.  We didn't notice it.  After hearing the testimony

23   that came out in deposition, we went and looked for it, and

24   we produced it when we did.

25         But I submit, sir, that there is no prejudice to

1    that, and we could have produced it sooner if we had been

2    alerted that Elan was going to make this attack on the Vong

3    Trieu experiment.

4            I also wanted to address Mr. Scheve's expert

5    opinion that Abraxis was required to submit this data to the

6    FDA.

7            There has been no evidence in this case, and

8    Elan has submitted none, that every experiment done in a

9    company relating to a particular drug has to be submitted to

10   the FDA.  Just saying it means this is nonsensical -- I

11   mean, there are dozens of employees.  Hundreds and hundreds

12   and hundreds of pages of laboratory notebooks, of

13   experiments that are done.  Not all of those have to be

14   submitted to the FDA.  Those that relate to safety, yes,

15   efficacy, other bases of which maybe I am not the most

16   knowledgeable.  But not every single page.  That just can't

17   be right.

18           And Abraxis did submit data to the FDA about the

19   crosslinking of Abraxane, of the albumin in the entire

20   composition, which is what is administered to the patient.

21   What we are talking about now are very detailed analytical

22   experiments looking at subfractions of Abraxane, little

23   portions of Abraxane.  Not the product that is put in the

24   patient.

25           So there was a determination made that we will

1    submit all the data about what's put in the patient, and

2    that this data, which is, you know, really detailed

3    experimental work on subfractions, just is not relevant to

4    safety, it's not relevant, so it need not be submitted.

5           But I don't believe there is any evidence or

6    cases, certainly nothing suggested, nothing in Elan's

7    motion, sir, that suggests that as a matter of law any

8    evidence not submitted to the FDA is per se unreliable or

9    per se should be excluded.

10          Thank you, sir.

11          THE COURT:  Before you sit down.  The assertion

12   has been made that Abraxis somehow hid the ball with regard

13   to this -- perhaps you feel you have already addressed that,

14   if you have, that's fine -- with regard to Trieu.  Mr.

15   Scheve indicates, argues that the name was never disclosed.

16          MS. EVANS:  Yes, sir.  We certainly gave

17   prominence to this notebook.  In our initial disclosures, we

18   gave the main players in the development, the discovery

19   development of Abraxane.  We did not list every single

20   person who had done an experiment characterizing Abraxane.

21   That would have been dozens of people, literally dozens,

22   maybe as many as a hundred.  A lot of people have worked on

23   Abraxane over the years.  It was a major effort by the

24   company.

25          THE COURT:  But you had submitted, you say you

```
 1        featured prominently Exhibit 10.  That is the notebook.
 2                    MS. EVANS:  Yes, sir.
 3                    THE COURT:  What do you mean when you say that?
 4                    MS. EVANS:  I think we have attached -- it was
 5        at the top of our list of documents we relied on.
 6                    THE COURT:  In response to some request for
 7        production of documents?
 8                    MS. EVANS:  In response to a contention
 9        interrogatory saying what documents are you going to rely
10        on.  This was right up there.
11                    THE COURT:  Mr. Trieu's name is on the report?
12                    MS. EVANS:  Yes, sir, it is.
13                    THE COURT:  Mr. Scheve, I will give you a brief
14        reply.
15                    MR. SCHEVE:  First off, Your Honor, just to make
16        sure it's clear, SDS page involves acrylamide, which is
17        neurotoxic.  With all due respect, it is not taught,
18        certainly to high school students.
19                    THE COURT:  She is an expert.
20                    MR. SCHEVE:  It does involve --
21                    THE COURT:  She is a biochemist, she being my
22        law clerk, is familiar with the technology.
23                    MR. SCHEVE:  What we didn't know until the 4th
24        day of April was what was the kind of gel, what was the
25        apparatus.  None of those, quote, details, that were talked
```

1    about.

2                    THE COURT:  I think the remedy that you seek,

3    that of exclusion, is rather extreme.  I think you have

4    other recourse to challenge this information and the basis

5    of the opinion.

6                    MR. SCHEVE:  But all Dr. Amiji did was to go to

7    these lab pages --

8                    THE COURT:  In other words, what I am saying to

9    you, what I have before me is attorney argument,

10   essentially, as to the reliability, your very vigorous

11   assertion that it is unreliable because it wasn't submitted

12   to the FDA, because it wasn't peer-reviewed, because it

13   wasn't published.  You haven't cited any authority that

14   cites that is the test for determining whether something is

15   reliable or not, because you couldn't, because you are not

16   going to find any authority, I suspect --

17                   MR. SCHEVE:  May I submit some?

18                   THE COURT:  You shouldn't interrupt me.  You

19   really shouldn't.

20                   MR. SCHEVE:  My fault, Your Honor.  I apologize.

21                   THE COURT:  No, you may not.

22                   I believe Daubert was not intended to be read as

23   narrowly as you read it.  And it's certainly not read in

24   this circuit, and I mean the Third Circuit, as narrowly, and

25   that is the law that would apply to this particular issue,

1    as narrowly as you read it.

2         I am very familiar with Daubert, all of its

3    progeny.  I am routinely a gatekeeper.

4         So I am going to reject and deny your motion.

5         Next one.

6         MR. SCHEVE:  If I may ask, Your Honor, did you

7    deny as to both documents?

8         THE COURT:  Yes, sir.

9         Let's go to the next one.

10         MR. SCHEVE:  The last one, No. 4, Your Honor,

11    relates to, one of their experts is a Dr. Jerry Atwood from

12    the University of Missouri.  Dr. Atwood is being offered as

13    a crystallographer, meaning an expert on the field of

14    crystallography.  And he is going to offer opinions

15    criticizing the methods utilized by our expert on

16    solid-state nuclear magnetic resonance spectroscopy, which

17    is the application of NMR, or nuclear magnetic resonance, to

18    solid materials as opposed to liquids or to gasses.

19         And, Your Honor, with regard to only that

20    portion of his testimony where he is going to attempt to

21    criticize what Dr. Munson did, from the University of

22    Kansas, Dr. Munson is a member of the Who's Who of

23    solid-state NMRs.  It is a small group of highly trained

24    experts in that particular field.

25         The grounds, as articulated in our motion, Your

 1       Honor, are, number one, this goes to testimony challenging

 2       the method utilized by Dr. Munson.  And as the record is

 3       very clear and elucidated in our motion -- if I can find my

 4       notes -- Dr. Atwood has never personally in his life sat at

 5       a console of an NMR machine and loaded it into the

 6       instrument.  He has never been asked to speak to any group

 7       on solid-state NMR.  He has never published, ever, on

 8       solid-state NMR.  Never given a speech before a group of

 9       solid-state NMR chemists.

10              After you get the NMR data, there is a

11       mathematic calculation called deconvolution.  He

12       acknowledged he hadn't done any of that in ten years.  Never

13       in his life given a speech on the proper use or method of

14       deconvoluting solid-state NMR data.  He has never personally

15       worked with paclitaxel.  And his group doesn't even own an

16       NMR machine.

17              So we have a circumstance where an individual,

18       who is highly published, who has opinions that he will offer

19       about the crystallinity, he didn't do any tests himself in

20       this case.  He advised Abraxis that they shouldn't do any

21       tests, that they should rely on the testing that Abraxis did

22       to defend the lawsuit.  But then he comes in to criticize

23       NMR, a technique for which, by his own concession, if you

24       have never done, you have never sat at an NMR console --

25              THE COURT:  I thought I understood the defendant

```
 1    to reject the notion that he is going to come in and

 2    criticize.  In fact, they write that he has not opined that

 3    the NMR machine was incorrectly operated to generate the raw

 4    data, the NMR raw data, nor has he offered any other

 5    opinions dependent upon persons performing the NMR.

 6              If he is not going to do that, I am perhaps

 7    missing the point.

 8              MR. SCHEVE:  The second aspect of it is the

 9    deconvoluting.  To criticize Dr. Munson on how he applied --

10    this technology is very, as Dr. Atwood has testified in

11    other cases before federal judges, specifically, about NMR

12    and about how difficult it is and how much expertise you

13    have to have in that area, you have to be an expert in NMR,

14    and he hasn't engaged in any deconvolution, ever written

15    about it, ever given a speech about it.  Hasn't done it

16    himself in over ten years, much less having done it with

17    nanoparticles or involving paclitaxel, both of which he

18    agrees he has never had any involvement with.

19              If they concede they are not going to criticize

20    how the experiment was done, so be it, then we get --

21              THE COURT:  They did in the papers, I think.  Do

22    I misread?

23              MR. JACOBS:  That is exactly right.

24              MR. SCHEVE:  Then it gets to the deconvolution,

25    where he is going criticize someone who does this every day
```

1    of his life, when Dr. Atwood doesn't do it and hasn't done

2    it any time in the last ten years.

3              THE COURT:  Okay.  Do you want to talk about

4    deconvolution?

5              MR. JACOBS:  Sure.  The sequence is that, just

6    the way the expert testimony came in during deposition and

7    expert reports, Munson provides his expert report and he

8    shows this deconvolution.  This is getting a little bit into

9    the Munson -- there is a little overlap between our motion

10   on Munson.  I want to note that, Your Honor.

11             Munson says there is a third peak that appeared,

12   and, by the way, that third peak is indicative, establishes

13   crystallinity, and I am now going to tell you the amount of

14   crystallinity based on that.  Atwood offers his critique of

15   that deconvolution, that you usually deconvolute to the

16   minimum number of peaks.  It sounds really complicated, but

17   it isn't all that complicated.  If you have a curve that has

18   varied within it multiple curves, you try and figure out

19   what those subcurves are by deconvolution.  Naturally, what

20   you want to do is you want to get the minimum number of

21   curves that make up the overall curve, because that's what

22   you are trying to, quote, deconvolute to.  This is

23   well-understood in the world of deconvolution, so

24   well-understood that when we then took Dr. Brittain's

25   deposition and asked him about the deconvolution and whether

1    Atwood's critique of Munson was correct, Dr. Brittain being

2    Elan's expert, Dr. Brittain agreed with Atwood.  This is

3    after Brittain comes in with an expert report that says, I

4    have read what Munson did, I wholeheartedly endorse it, it

5    looks reliable and solid to me.

6              What am I getting at with this little episode in

7    the Atwood qualifications issue?  I am getting at

8    deconvolution is a technique that is applied across a wide

9    variety of curve analyses.  It is a well-understood

10   practice.  Atwood has 45 years of experience as a chemist.

11   So what he personally did ten years ago versus what he did

12   last year is a little like asking when was the last time I

13   personally Shephardized a case, Your Honor.

14             You know, we move on in our careers, I hope.

15             So this is really just wrong.  Atwood is

16   qualified.  How do we know that?  Number one, his ssNMR

17   testimony has been credited by other district courts.  Elan

18   may say, well, nobody took a run at his ssNMR expertise.  We

19   are taking a run at his ssNMR expertise.

20             They said in their motion, he is not in any

21   articles describing NMR, ssNMR.  Unlike Exhibit 11 in our

22   exhibits on this motion, Your Honor, if I may hand up the

23   highlighted portion, Dr. Atwood is the lead author on it, in

24   the last position on the paper, and there is a lengthy

25   discussion of ssNMR analysis that we have highlighted in the

```
 1        copy that we gave to you, if they want to take a run --
 2                  THE COURT:  Have you seen this, Mr. Scheve?
 3                  MR. SCHEVE:  I have seen that, yes.
 4                  THE COURT:  Did you want to look at it again?
 5                  MR. SCHEVE:  I guess I do.
 6                  MR. JACOBS:  The best evidence that Dr. Atwood's
 7        critique of Dr. Munson's work, which as Your Honor correctly
 8        noted is not about what Munson, it turns out not Munson, it
 9        turns out somebody else did when he sat at the machine, the
10        best evidence that Dr. Atwood's critique of Munson's work,
11        the period before sitting at the machine, when the sample is
12        being prepared, et cetera, the period after sitting at the
13        machine, when the analysis is being done --
14                  Let me start again.
15                  The best evidence that Dr. Atwood's testimony is
16        reliable is that in our motion in limine, when we submitted
17        a lengthy declaration from Dr. Atwood, they submitted no
18        scientific rebuttal of it.
19                  Thank you, Your Honor.
20                  MR. SCHEVE:  Would you like this paper back?
21                  THE COURT:  No.  You can give it back to Mr.
22        Jacobs.
23                  MR. SCHEVE:  I will address it, though.
24                  I asked Dr. Atwood, recognizing that the vast
25        majority of this paper, these are his students that worked
```

1    on various projects, and each of these people here had a

2    role.   And the person who had the role here for the ssNMR

3    was Yokum Ansberger (phonetic).   And I asked Dr. Atwood

4    point-blank, Have you published anywhere on the performance,

5    the conduct, the analysis, of ssNMR data?   And the answer

6    is:  No.

7             So the fact that his name shows up one, two,

8    three, four -- five, where he is the last named, and the

9    professor, the students do the work, they are writing their

10   thesis, the professor who sort of is involved as their tutor

11   shows up as the last named author doesn't mean that Dr.

12   Atwood -- each of these people had a role.

13            All I can say, Your Honor, is in terms of what

14   he testified to, he had never done this.   And he hasn't done

15   any deconvolution.

16            What I hear Mr. Jacobs saying is that while they

17   may not have any criticisms of how he loaded it, they want

18   to have criticisms about how it was prepared to be going

19   into the machine and how it was handled coming out of the

20   machine.   If you have never done that in your life, never

21   once prepared samples for an NMR machine, loaded the -- I

22   use the word paddle, it's not paddle, what is the word --

23   rotor -- never loaded material in the rotor, never ran it,

24   never handled it, there is no aspect of how that experiment

25   was run that he should be allowed to testify about.

1          THE COURT:  Yet your expert Brittain agrees with

2     him.

3          MR. SCHEVE:  Dr. Brittain didn't comment in any

4     way on how the study was performed.  All he looked at and

5     commented -- and one of the things we understood, Your

6     Honor, was, and counsel agreed yesterday, that one witness

7     per topic.  Dr. Brittain is not going to talk anything about

8     ssNMR.  All he did was, he was shown what Dr. Munson did and

9     he said Dr. Munson is truly one of the experts in the world

10    on this and I don't see that he did anything wrong.  That's

11    all he did.

12         It's a different issue about criticizing how the

13    samples were prepared, loaded, how it was handled before,

14    how it was handled afterwards.

15         If you have never done that in your life, how

16    can you be a reliable expert to testify about any aspect of

17    that?

18         That is our position.

19         THE COURT:  I understand your position.  I don't

20    agree with it.  I think it is telling that Dr. Brittain

21    agrees with the criticism and that there was no scientific

22    response to the declaration that was just discussed by Mr.

23    Jacobs.  That was whose declaration?

24         MR. JACOBS:  Dr. Atwood's.

25         THE COURT:  Dr. Atwood's declaration.  It may be

```
1    the case, Mr. Scheve, with all due respect, that we have a

2    fundamentally different view of what is an appropriate role

3    and application by a federal judge of his or her gatekeeping

4    function.

5                I would suggest to you that we need to be real

6    careful, that is, we federal judges, about exclusion of

7    evidence to the point that it can effectively, without real

8    good reason, only when it's clear to me, at least, that's my

9    standard, when it's clear, that the evidence is going to be

10   unreliable, that the opinion is somehow going to be

11   unreliable because the person is not qualified or because

12   the methodology won't stand up to scrutiny.

13               I am not sure.  But you will get a chance in

14   front of that jury to find out what they think about it.

15               It's denied.

16               All right.  Mr. Jacobs.

17               Let's take a stretch break.  Then we will start

18   on plaintiff's.  For the record, I am going to deny No. 5,

19   which is denominated No. 5, as out of order.

20               (Recess taken.)

21               THE COURT:  Counsel, I have had a chance to

22   reflect a little more on No. 2 and take a look back at my

23   claim construction ruling.  I am comfortable we are going to

24   be able to deal with this in realtime.  I am going to deny

25   the motion.
```

1              Mr. Jacobs, your turn.

2              MR. JACOBS:  Thank you, Your Honor.

3              Our first motion in limine, Your Honor, asks

4    that the Court exclude Elan from in any fashion, whether by

5    way of testimony, cross-examination, introducing exhibits,

6    critiquing, criticizing, arguing against the validity of

7    Abraxis's x-ray powder diffraction data about Abraxane.

8              At first blush, that sounds like a rather

9    sweeping request.  But in light of the history on this

10   issue, as I was re-reading the motion, I was thinking it's

11   maybe a little bit of a mild request.

12             I will mention something towards the end of this

13   that we are also seeking on this issue.

14             Maybe to set the stage for this...

15             I note, first of all, that x-ray powder

16   diffraction is the primary method that has been used for the

17   last 20, 30 years to characterize pharmaceutical substances

18   as to their crystallinity or amorphousness.  X-ray powder

19   diffraction is the technique that Elan used in the '684

20   patent, the parent to the '363.  When it was saying we

21   created crystalline nanoparticles, x-ray powder diffraction

22   was the technique they used.

23             It's a year into the case, and we have seen no

24   testing data from Elan whatsoever.  This is last summer.  We

25   have seen no x-ray powder diffraction data about Abraxane.

1    We have seen nothing else, and we don't really have their

2    infringement contention in any detail.

3              So we have filed first a written motion, and

4    then you may recall the sequence, there was an oral motion

5    that Your Honor held a hearing on the request, really the

6    demands that we had made by way of our motions.

7              By the time of the hearing, Dr. Brittain has

8    already been, if you will, designated as a testifying

9    expert, and his expert report has been submitted.  His

10   expert report is a critique of x-ray powder diffraction as

11   used by Abraxis to characterize Abraxane.  He says x-ray

12   powder diffraction wasn't the right tool, and he says that

13   it was done wrong.

14             At the hearing, Mr. Walters, pressing our case

15   for Elan's testing data -- by that time you may recall, from

16   the very first case management conference, we articulated

17   that amorphousness versus crystallinity was one of the

18   central issues in the case.  We have had the claim

19   construction hearing where that has been a central issue in

20   the case.

21             We press our insistence that Elan produce all

22   testing data, and if they are going to claim work product

23   and privilege, that they log that testing data.

24             Elan represents to the Court that it has all

25   been logged and that there is other testing.  They say, We

1    have done other testing but it has all been done with

2    consultants, and we maintained clear walls between

3    consultants and testifying experts.

4                There is an exchange between the Court and Elan.

5    The Court asks:  You are saying this testing that you

6    contend to be privileged has been identified as such on a

7    log?

8                This is at Page 90 of the transcript.

9                And Elan says, Yes.

10                Then there is a discussion back and forth about

11    what is testing.  And Elan says, There has not been an

12    experiment, a lab experiment...

13                The Court says, I accept your representation as

14    an officer of the Court.

15                Then we actually take Dr. Brittain's deposition.

16    And it turns out that Dr. Brittain, who again is going to

17    testify about x-ray powder diffraction, has his own x-ray

18    powder diffraction equipment, has done extensive testing.

19    How do we know this?  Because we have the privilege log.

20                Your Honor, if you haven't had a chance to

21    actually look at the privilege log, it is a rather striking

22    document.  There are over 400 entries on it -- test results,

23    test data, test reports, test, test, test, test, over and

24    over again, produced the night before his deposition.

25                So at Dr. Brittain's deposition, we ask about

1    the testing.  We are blocked.  Dr. Brittain is instructed

2    not to answer about any of the testing that he conducted.

3    And we hear this explanation that, well, that was a

4    different subject.  That was a different subject.  That is

5    the basis that Elan relied on for not producing to us

6    buckets of testing data.

7              If I could just segue for a moment, we think

8    what's really going on in this case is that they have

9    buckets of testing data that confirm that Abraxane is

10   amorphous and not crystalline, but they are arguing in this

11   court that it's crystalline.  And something about that just

12   doesn't seem right.

13             So we have, honestly, Your Honor, we have a hook

14   into this issue to try and get at the truth.  And the hook

15   is they have designated as a testifying expert someone who

16   had done 400-documents-plus worth of, we think, x-ray powder

17   diffraction testing of Abraxane, and they are relying on a

18   subject matter distinction to justify their non-production.

19             The subject matter distinction doesn't work.  It

20   doesn't just not work in a technical sense.  We are all

21   raised as baby litigators to know that if you designate

22   somebody as a testifying expert, everything that that

23   testifying expert did gets produced.  That's something we

24   work on, we manage to when we are litigating our cases.  We

25   all know that basic rule.

1           To now draw this subject matter distinction --

2      it turns out the cases say, yeah, if there is a true subject

3      matter distinction, then you can have a two-headed expert.

4      He can be a consultant, and that can be a consultancy, and

5      he can be an expert, and that could be -- I will make up a

6      word -- an "experty."

7           But you can't just sort of make it up out of

8      whole cloth, and you can't justify non-production the way

9      Elan has done by submitting a conclusory declaration that

10     just simply says, different subject.

11          We deal in patent cases, we deal with Your Honor

12     about subject matter scope all the time.  When we have to

13     waive the privilege for opinion of counsel, the Court has to

14     adjudicate the boundaries of that.  We know something about

15     what subject matter is here.  It can't be that Dr.

16     Brittain's subject matter, when he is testing Abraxane, that

17     that subject is different from his testimony about Abraxane.

18     It can't be that Dr. Brittain, who we are darned sure did

19     x-ray powder diffraction, that that subject is different

20     from Dr. Brittain's proposed testimony about x-ray powder

21     diffraction.  And it can't be that that testing, which is

22     about one of the basic issues in the case, crystallinity

23     versus amorphousness, is on a different subject than what

24     Dr. Brittain proposes to testify about, which is whether

25     Abraxane is crystalline or not.

1          So the subject matter distinction just doesn't

2     make any sense.  It would turn the rules on expert

3     disclosure into -- as we said in our brief, this gave a red

4     light-green light where you can just manipulate around the

5     rules.

6          So we are here at the motion in limine stage.

7     And we think that, we believe -- we infer from the

8     non-production that this evidence would be helpful to us on

9     the question of both XRPD methodology, actually, the use of

10    XRPD at all, the methodology by which Abraxis did the XRPD

11    that it did and on which we rely for our proof of

12    amorphousness.  We think that at the motion in limine

13    stage -- I honestly thought, Your Honor, should we be

14    talking to you about this, you ought to make them produce it

15    now and we ought to figure out what that means for the trial

16    and what kind of costs they would be imposing on us for

17    having to re-do all the expert discovery.  And I went

18    through that thought process.  And it just doesn't seem like

19    that is the right way to proceed.

20          It isn't as if this should be a surprise to

21    them.

22          In fact, in the post-expert deposition period,

23    we had a lot of back-and-forth with Elan about, we can't

24    believe you are really relying on distinction for Brittain.

25    We think they kind of made this bed and now they need to lie

1      in it.

2                  That is our proposal to you, that they be

3      barred, on the basis of this non-production, from critiquing

4      in any way, by any evidentiary or argumentative means,

5      Abraxis's x-ray powder diffraction.

6                  I flagged for you at the beginning, there is

7      something else we are going to ask of you in this connection

8      when we get to jury instructions, which is an adverse

9      inference, that the jury would be told about, and that we

10     could rely on in opening statements to tell the jury that

11     they can infer from Elan's non-production that the evidence

12     was unfavorable to Elan.

13                 Thank you, Your Honor.

14                 Mr. Scheve.

15                 MR. SCHEVE:  Your Honor, my response is multiple

16     pronged.

17                 First, it's very important that Your Honor

18     understand how Dr. Brittain first became involved.  He was

19     retained by an attorney whose name is William Sipio

20     pursuant to a letter agreement between Mr. Sipio and Dr.

21     Brittain.

22                 Dr. Brittain agreed to provide consulting advice

23     to Mr. Sipio as an attorney.  That letter agreement was

24     entered into in November of 2005.

25                 What happened thereafter was consultation

1    between Mr. Sipio and Dr. Brittain relating to assessment

2    and evaluation of the merits, potential merits, of

3    proceeding with this lawsuit, including some testing that

4    was done.  And the interaction was solely between Mr. Sipio

5    and Dr. Brittain.

6            Clearly, the rules say there is no obligation to

7    disclose consulting experts.  And Mr. Brittain had his own

8    consultant.

9            What this really boils down to, Your Honor, is

10   going to a precise question of whether or not Your Honor is

11   going to allow Abraxis to gain access to privileged work

12   product material that was exchanged between Dr. Brittain and

13   Mr. Sipio.

14           Now, I don't know, Your Honor, if I need to ask

15   you for the opportunity to talk with you in camera, because

16   for me to stand up and say what he didn't do or did do would

17   be extracting the work product as to what was done and what

18   wasn't done.  In other words, for me to defend this and

19   stand up and tell you what tests he did not do, it requires

20   me to disclose what would otherwise be privileged.

21           The facts are that Steve Scheve, in August of

22   2007, approached Dr. Brittain and said, look, I want to talk

23   with you about two specific issues:  the doctrine of

24   equivalents case, and I want you to look at this x-ray

25   powder diffraction testing that was done.  Do you have any

```
 1    opinions that you would be willing to offer in this case on

 2    those distinct issues?

 3              THE COURT:  Here is what I need you to address,

 4    this observation.  And I want to read it.  I want you to be

 5    clear on what I want you to address.  That is at Page 2 of

 6    the reply by Abraxis.  They write, in the second full

 7    paragraph:  That Dr. Brittain was originally retained by

 8    Sipio, rather than Baker Botts -- let me start again.  "That

 9    Dr. Brittain was originally retained by Sipio rather than

10    Baker Botts is irrelevant.  Not surprisingly, Elan has no

11    authority that a party can avoid expert disclosure by the

12    artifice of having one lawyer retain the expert as a

13    'consultant' and another lawyer for the same client later

14    hire the same expert as a testifier."

15              That's what you need to talk about.

16              MR. SCHEVE:  I am not disputing that, Judge,

17    because I have not asked Dr. Brittain to offer any opinions

18    relating to any testing he has done.  I have asked him to

19    offer opinions on other total completely different issues.

20    And we have kept, as the case law says, very clear lines

21    and demarcation between what he did in the context of his

22    consultation with Mr. Brittain, which ended in June of 2007.

23    And I came to him and I said, I don't know what you did with

24    Mr. Brittain -- I have a sense of what you did with Mr.

25    Brittain, but I am not here to talk to you about that.  I am
```

1    asking you now, do you have opinions on these two topics,

2    about the technology that was utilized by Abraxis and about

3    this doctrine of equivalents case?  And he says, Yeah, I

4    have some opinions on that.  And I talked with him.

5         So the only two things that we intend to offer

6    through him -- he is going to come testify about something

7    he did testing on.  I am not going to offer any of that.

8         Now, Mr. Jacobs says, quote, "We are darned sure

9    he did x-ray powder diffraction."

10         THE COURT:  He did say that.

11         MR. SCHEVE:  He didn't do any x-ray powder

12    diffraction on Abraxane in any work he did.  I would like to

13    see the proof that Mr. Jacobs has for supporting his

14    statement, "We are darned sure he did x-ray powder

15    diffraction."

16         He did not do x-ray powder diffraction of

17    Abraxane.  Why?  Because x-ray powder diffraction of

18    Abraxane, which is swamped with albumin, 130-nanometer

19    particles, is incapable of giving you any meaningful

20    information.

21         Now, I run the risk of waiving privilege by

22    telling you that, Your Honor.  But they are sitting there

23    putting this out there as bait.  And I am telling you, as an

24    officer of the Court, he did not do x-ray powder diffraction

25    of Abraxane.

1            We asked him, do you have opinions about the

2     technology that Abraxis used?  And I want to talk with you

3     about some doctrine of equivalents testing.

4            Now, Your Honor, to make Your Honor's job

5     perhaps easier, because this goes right to the heart of work

6     product, is their Motion in Limine No. 4, which is the

7     expert report and the testimony we proffer of Dr. Stephen

8     Byrn.  Dr. Amiji, their expert, was approached by Abraxis,

9     and he says in his report I am not an expert in

10    crystallography.  So they approached him and said, who do

11    you consider to be the foremost experts out there in

12    crystallography?  And he writes a letter or e-mail back to

13    Abraxis and gives them two names:  a fellow from the

14    University of California San Francisco, Dr. Stephen Byrn.

15           Dr. Byrn had been disclosed as an expert by

16    Elan, and had been attending various depositions.  And he

17    supplemented his report.  It's a seven-page supplement.  And

18    it was given to Ms. Evans the day before his deposition.

19           The relief now that's not in the motion -- the

20    motion is to exclude Dr. Brittain.  But what Mr. Jacobs

21    referred to as the motion being mild in terms of the relief

22    sought, what we have now got is a broad, sweeping request

23    that no witness be able to testify about this.  We had two

24    other witnesses who were designated to be able to talk about

25    these limitations.  We thought that Dr. Brittain brought

1    some particular experience to the table because he used to

2    work with Bristol Myers Squibb, who manufactured Taxol,

3    which is the only approved formulation of pacli --

4            THE COURT:  Let me just correct you, and

5    perhaps -- I am not sure if what you say, what you assert is

6    correct or not.  But the motion as styled, at least, the

7    title, does seek, in the title, Abraxis does seek to exclude

8    portions of Dr. Brittain's expert report regarding attacking

9    of Abraxane and to bar related testimony and argument.

10           So I don't know whether it's fair to say that

11   they have expanded unfairly the scope of their request.  You

12   may not agree, quite clearly, you wouldn't agree with that.

13   But go ahead.

14           MR. SCHEVE:  If I may, Your Honor.

15           THE COURT:  Sure.

16           MR. SCHEVE:  I want to make sure the record is

17   clear that his broader-sounding request doesn't mean that we

18   can't elicit this testimony from others that we have

19   designated, again, with the goal of making it easier for the

20   Court to address this.  They have now taken the position we

21   shouldn't be allowed to present Dr. Byrn.  So it's, let's

22   not let Dr. Brittain talk about it, and we are going to put

23   you in a box and argue that you need to give up the stuff

24   that was exchanged between Dr. Brittain and Mr. Sipio, which

25   I will tell this Court did not involve x-ray powder

```
 1    diffraction of Abraxane, and we also don't want you to be

 2    able to present Dr. Byrn.

 3              So these motions are really sort of tied

 4    together, Your Honor.

 5              If we are able to put on Dr. Byrn, even if it's

 6    you got to produce him for another two hours because Ms.

 7    Evans made the decision she wasn't going to question him

 8    about the supplemental report, then we are in a position

 9    where we don't have to ask the Court to confront this

10    attorney-client -- I should say work product issue.  But

11    they want to exclude everybody that is going to criticize

12    the techniques that they relied upon, because -- and it gets

13    to the heart of the case, Judge.

14              What Abraxis did was, they have a product that

15    has nine parts albumin.  It's this stuff that's taken from

16    the body.  It is itself amorphous.  And these are very tiny

17    particles.  What they did is they only tested Abraxis as a

18    lyophilized freeze-dried powder with that nine-to-one ratio.

19    What they never did, and I mean assiduously avoided, was to

20    reconstitute and then they use something called a centrifuge

21    to separate the nanoparticles.  They did that for purposes

22    of characterizing to the FDA how much paclitaxel, how much

23    of this protein is in the nanoparticles, but they have never

24    tested those nanoparticles.  And that's what our case is

25    about.  We have.  And there is crystallinity there.  And we
```

1    will show it.

2              But they don't want the jury to hear from

3    anybody about the flaws and the steps that they have failed

4    to take to explore this.

5              I offer to Your Honor --

6              THE COURT:  Isn't their complaint about Dr.

7    Byrn -- it doesn't seek to exclude his testimony, I don't

8    think, altogether.

9              MR. SCHEVE:  I believe that's correct, Your

10   Honor.

11             THE COURT:  Go ahead.

12             MR. SCHEVE:  They have not addressed the DOE

13   portion of his testimony.  They have simply focused on his

14   giving any opinions or any related testimony about the

15   limitations of x-ray powder diffraction.  When you are

16   trying to use it, the example I like to give is, Your Honor,

17   my wife has a cooking thermometer.  It doesn't get used very

18   often.  She would get mad at me if I said that.  But if I

19   tried to measure my body temperature with it, it is the

20   wrong tool to measure my body temperature.  It doesn't begin

21   to log it until I am 150 degrees.

22             This case is going to get down to a question of,

23   did they use the technology that could even measure it?  And

24   why didn't they go forward and separate those particles and

25   look at the particles?  Because they did it for other tests

1    but never applied crystallinity.

2              So it's let's keep out Dr. Brittain, who was

3    hired by Mr. Sipio.  And I am not here saying this, you

4    know, just because it's a different lawyer.  That's never

5    been our position.  It's that we kept his role separate.  He

6    never was asked, has never done an x-ray powder diffraction

7    of Abraxane.

8              He and Mr. Sipio did a lot of consulting, to

9    understand various concepts.  I came in this August and

10   said, I am not here to talk with you about what you and Mr.

11   Sipio did.  I have got these two discrete issues.  If that

12   implicates the issue of whether I have got to give

13   information over that's privileged, that deals with tests

14   that do not involve x-ray, do not involve x-ray diffraction,

15   then the simple solution is let's go to No. 4.  If I can get

16   that person in, I might be able to turn to my client here

17   and take away this first motion in limine, so that you don't

18   have to address the privilege issue.  That is a substantial

19   issue.

20             THE COURT:  Let's talk about it.

21             MR. JACOBS:  There was an expert.  He was at a

22   deposition.  We could have voir-dired him on the scope of

23   his other consultancy.  Again, we deal with how to create a

24   record around different subject matters all the time.  We

25   don't do that through in camera productions.  We don't do

1      that by claiming work product would be revealed by detailing

2      the basis of the different subject matter.

3              We produce privilege logs all the time that are

4      supposed to be sufficiently detailed to allow an examination

5      of whether the privilege applies.

6              I am sort of working my way through the basics

7      of litigation practice to why this argument should not be

8      credited.

9              The privilege log is Exhibit 6 of the materials,

10     Your Honor.  It says testing, testing, testing.

11             THE COURT:  I have it.

12             MR. JACOBS:  Brittain's expertise is x-ray

13     powder diffraction.  So we are drawing inferences here.  But

14     we have no record evidence.  We have an officer-of-the-Court

15     representation.  But forgive me, Your Honor, we have been

16     there, done that, and that didn't work out very well.

17             So I think, as to Brittain, I think the record

18     is what the record is.  They submitted a declaration.  They

19     didn't meet their burden of proof.  They had their chance to

20     remedy this through back-and-forth in the winter.  And

21     that's where we are with Brittain.

22             On Byrn, one of our themes, as you will perhaps

23     start to see this theme emerge right now, but it will become

24     even more evident when we talk about Munson, is, following

25     the bouncing ball, that, okay, we don't like Brittain, we

1    have exposed him, he has run into trouble.

2            After opening expert reports on their

3    case-in-chief are due, well after, the night before his

4    deposition, we got a supplemental report on Byrn.  Now we

5    are supposed to take Byrn's testimony at trial critiquing

6    x-ray powder diffraction, another theme that you will see in

7    the remainder of our motions in limine, following the

8    Court's rules.

9            We really have tried our best on our side to

10   read the Court's pretrial order, the Court's case management

11   order, and get our expert reports in on time, get our

12   rebuttal expert reports in on time, tee up the depositions,

13   et cetera.  We get an expert report on an issue on which

14   they bear the burden of proof well after the deadline.  And

15   absolutely, Your Honor, we said, we have had it up to here

16   with all the other stuff that we are not arguing about.  And

17   we said, this is a non-event, this late expert report.

18           So we are moving to exclude Byrn.  And we do

19   have a shared understanding about the scope of our motion on

20   Brittain.  We want to bar critique of x-ray powder

21   diffraction by Abraxis from any source, because they had

22   their chance to do this right and they didn't.

23           MR. SCHEVE:  Their expert, Dr. Atwood, submitted

24   a report to us, an amended report on February 29th.  By my

25   calculation, that would be ten weeks after his deposition

1    was taken and after the close of discovery.

2            I could defer to others as to how many documents

3    showed up in expert reports that have never been presented,

4    produced.  In fact, was it just last week, how many new

5    exhibits or new documents came in?

6            I find it interesting, Your Honor, that this

7    claim about somehow we didn't comply, when we get to the

8    discussion that they are also trying to prohibit us from

9    offering any documents after March the 7th, March the 7th

10   was what we interpreted to be the deadline for those parties

11   with burdens of proof to come forward with their

12   disclosures.  We contacted Abraxis and said, do you

13   understand that?  No, we are not going to produce our

14   invalidity stuff on March the 7th.  Even though they had the

15   burden of proof, they didn't produce it until March 21st,

16   two weeks later.

17           Then we came to an agreement.  And Ms. Glover

18   will get into all of this.  It is all to give you a sense,

19   Your Honor, that this is strategic posturing, to try to

20   prevent us from putting on our case.  If the argument is,

21   this was a late supplemental -- report it's only seven

22   pages -- their own Dr. Amiji recommended this guy to them

23   because he is the guy to go to in the United States, so

24   let's posture it now.  Let's just not take his deposition,

25   even though we offered him up, and offer to produce him yet

 1   later on, and let's try to knock this out.

 2          We also disclosed Dr. Berkland, Cory Berkland,

 3   and he was deposed.  We understand that we got to narrow

 4   this down as to which witness is going to offer testimony on

 5   this.  And we have an agreement that it's going to be one.

 6   But now it's a request, I don't want this testimony coming

 7   into the case.

 8          THE COURT:  Let me interrupt for a second.  Why

 9   don't you sit for a second.

10          Dr. Byrn was deposed.  Is that correct?

11          MR. JACOBS:  Yes, he was, Your Honor.

12          THE COURT:  But it was before he got this

13   supplemental.

14          MR. JACOBS:  The morning after.  So we got the

15   supplemental the night before.

16          THE COURT:  I understand the reason for your

17   request.  But have you had, in spite of, or would you need

18   more time, have you had an opportunity to adequately

19   prepare, did you have an opportunity to adequately prepare

20   for Dr. Byrn's deposition?

21          MS. EVANS:  Your Honor, if I may, please,

22   because I was the one who took Dr. Byrn's deposition.

23          Dr. Byrn's opening report, his report that he

24   had first provided, was solely on invalidity and

25   unenforceability.  That was the only thing he opined on.  We

1    have attached that to our papers.  He said this is what I

2    have been asked to talk about.  Nothing on infringement.

3    Zero.  Absolutely zero.

4             So, I mean, he talked about prior art

5    invalidity.  So I came, you know, to take his deposition.  I

6    had all the prior art references.  I was all ready to go

7    with all my exhibits to talk to him about what his report

8    was about, which was prior art.  There were other Elan

9    experts, three other ones -- seven Elan experts talking

10   about infringement in their opening expert reports.  Dr.

11   Byrn wasn't one of them.  He was a rebuttal expert on

12   invalidity and unenforceability.

13            So I arrived ready to take his deposition.  An

14   e-mail comes into my Blackberry at about 5-something,

15   saying, oh, here's is a supplemental report for Dr. Byrn.

16   Of course, I just had my Blackberry.  I am staying at a

17   hotel.  By the time somebody from the office can get it and

18   fax it to me, it is after 7:00 at night, and I have a

19   deposition the next morning at 9.

20            I get this report.  I don't have any exhibits.

21   I don't have the attachments.  I don't have any questioning

22   prepared.  I don't have copies of what he is referring to.

23   I haven't had a chance to consult with my own experts to

24   prepare examination on this.  This is on the last day of

25   expert discovery.

```
 1              We had asked for Dr. Byrn early.  We wanted him
 2      in November.  Elan said, no, no.  He is only available the
 3      last day of expert discovery, the 14th.
 4              Then they also say, Your Honor, that this new
 5      report on infringement by Dr. Byrn, it is based solely on
 6      documents that were available months before, that were
 7      available when the opening expert reports were due.
 8              There is nothing new that is in Dr. Byrn's
 9      report.  It's just that Elan decided, well, no, seven
10      experts is not enough on infringement.  We need an eighth.
11              So they basically sent this to me.  I get it at
12      7:00 the night before.  And, yes, Your Honor, I decided I
13      could not conduct an adequate examination, getting this
14      report, with no exhibits, with no ability, really, to
15      meaningfully cross-examine the witness.
16              So I cross-examined him on what his timely
17      served report was on, which was invalidity.  And I did not
18      cross-examine him on this new issue.
19              THE COURT:  Mr. Jacobs.
20              MR. JACOBS:  I left Mr. Scheve an opening and he
21      took good advantage of it, in broadening the discussion to a
22      whole range of issues.
23              I would like to make a couple of final points
24      about Motion in Limine No. 1.
25              I think I have said to Your Honor that the
```

1    Court's process of resolving discovery motions where

2    attorneys appear and basically argue them out in front of

3    Your Honor is the most efficient process that I have worked

4    with in district courts, because we spend a lot of time

5    restating the obvious when we file discovery motions in

6    written form.  But it does depend on counsel accurately

7    describing to you what is going on in the form of

8    representations to the Court.

9              THE COURT:  I am rather persuaded on your

10   position regarding Dr. Brittain.

11             But what I am interested in doing is, if I can,

12   minimizing the prejudice that Abraxis has suffered by

13   affording you another opportunity to have an informed

14   discussion with Dr. Byrn.

15             I am reluctant to exclude, as you well know, Mr.

16   Jacobs, in the hothouse of this kind of litigation, there

17   are things that are sometimes missed.  There are very able

18   lawyers who are able to, you know, make, what is it, a sow's

19   ear seem like a silk purse sometimes.

20             So I am reluctant to, usually, try to dig too

21   deeply, because I just don't have the time.  Then I would be

22   ending up with a whole lot of rules to show causes as to why

23   I shouldn't be holding lawyers in contempt, quite frankly,

24   because when I read these papers, I made a notation:

25   Serious matter.  May need rule to show cause, Mr. Scheve,

```
1    because these were direct statements that you made to me, if

2    they turned out to be, as an officer of the Court -- this is

3    the only way this system works.  Judges have to be able to

4    rely on the word of lawyers.

5              I am not making any findings.  I am saying these

6    thoughts occurred to me, that this was a very serious

7    matter.  We are not going to go there.

8              What I do want to do, though, is as I just

9    indicated, and I will, order Dr. Byrn to appear at Ms.

10   Evans's convenience, at a location designated by the

11   defendant, at your cost, plaintiff's cost, for an additional

12   deposition.

13             I am going to exclude, pursuant to Mr. Jacobs's

14   request, Dr. Brittain's testimony to the extent that

15   request -- you might want to particularize your request, Mr.

16   Jacobs.

17             MR. JACOBS:  So we are in a sort of funny

18   position.  Can I walk back a little bit?  I am sorry for not

19   answering your question directly.

20             THE COURT:  Yes.

21             MR. JACOBS:  We are in the odd position that if

22   we can't get an exclusion of the testimony in the broadest

23   sense --

24             THE COURT:  You are referencing the jury

25   instruction?
```

1              MR. JACOBS:  There is a point there.  Let me put

2       it all on the table, what the options are, and let's talk it

3       through.

4              There is a long privilege log, testing data.

5       They haven't produced the testing data.  Do we get to

6       examine Dr. Brittain if he were to testify:  Dr. Brittain,

7       you did all this testing.  You haven't told the jury about

8       it.  Don't you think it might be interesting for them to

9       hear about all that testing?

10             Do we do that?  Do we get an adverse inference

11      during instructions?

12             Brittain has fabulous admissions about x-ray

13      powder diffraction and it being the gold standard for

14      determining crystallinity.  Do we get to introduce those

15      admissions by way of his deposition testimony?  That would

16      seem to be difficult if we are going to bar him from talking

17      about x-ray powder diffraction.

18             So we carefully designed our motion.  If we

19      don't get the broadest relief on this, I think we would

20      rather have Brittain testify on x-ray powder diffraction and

21      exclude Byrn.

22             I don't want to have to take a deposition in the

23      last two weeks before trial.  I do want these other

24      opportunities to impeach, cross-examine, Dr. Brittain.

25             THE COURT:  I am prepared to accede to that

1    request.  Would you put that in the form of an order?

2         MR. JACOBS:  I will.

3         THE COURT:  So that we are real clear, if I want

4    to have a second thought about it, I can, and I will

5    reconvene the parties on the phone if necessary.

6         Did you have a question, Mr. Scheve?

7         MR. SCHEVE:  I am not quite sure I understood

8    what was being proposed, Your Honor.

9         MR. JACOBS:  Excluding Byrn, late, et cetera.

10   Allowing Brittain to testify on x-ray powder diffraction.

11   Full opportunity to cross-examine him on x-ray powder

12   diffraction.  No prohibition on asking him about undisclosed

13   tests.

14        And we will ask you, and I don't know if you

15   want to embrace this yet, but the adverse inference.

16        THE COURT:  No, I didn't mean to embrace that

17   yet.  We can talk about that later.

18        MR. SCHEVE:  Your Honor, that gets right to the

19   heart of the work product privilege and the very sensitive

20   nature about that.

21        THE COURT:  If he didn't do x-ray powder

22   diffraction, then that should end the matter.  Right?

23        MR. SCHEVE:  What I hear counsel saying is, and

24   I do want to address, because, you know --

25        THE COURT:  In other words -- and I will let you

```
 1    continue -- but I think Mr. Jacobs is still a little
 2    incredulous about what, in spite of your representations, I
 3    think you just need to say that, as to what Dr. Brittain
 4    did.
 5             MR. SCHEVE:  But if he didn't do x-ray powder
 6    diffraction of Abraxane, are they going to be able to make
 7    entry into the privileged relationship between him and Mr.
 8    Sipio on the test?
 9             THE COURT:  I don't think he seeks to do that.
10             MR. SCHEVE:  I think I hear him saying, yes, he
11    does.
12             THE COURT:  I don't think so.  But maybe I am
13    wrong.  I could be wrong.
14             MR. JACOBS:  To be completely straight up, I
15    have got the privilege log.  I want to be able to ask Dr.
16    Brittain, Dr. Brittain, you did a lot of testing on
17    Abraxane, didn't you?  It's on this privilege log, isn't it?
18    You have not disclosed this testing in this trial, have you?
19    Ladies and gentlemen, draw the inference you would like to
20    draw from that nondisclosure.
21             Do you want me to justify it?
22             The rationale is, they should have produced it.
23    It would create huge trial preparation problems if they
24    produce it now and we have to go off and take Brittain's
25    deposition and sort of penetrate what this was all about.
```

1    So that's not the right answer.  But just letting this

2    proceed as if nothing happened, that can't be the right

3    answer, either.

4              THE COURT:  Wouldn't that, Mr. Scheve, be sort

5    of, if I were to not accede to that, be a back-door way of

6    letting you do exactly what I think is reasonably complained

7    about?  That is, the same client hiring, using the expert

8    for two different purposes, with no meaningful subject

9    matter distinction being offered?  To really oversimplify

10   it, perhaps, I think that's where we are.  It sort of gets

11   back to a concern that I shared with Abraxis regarding

12   Sipio's role in this process, or someone like Sipio.

13             MR. SCHEVE:  Your Honor, if I may.  How could

14   privileged information give rise to a negative inference?

15   If it's truly privileged, how can he argue a negative

16   inference from that?

17             If Mr. Sipio did --

18             THE COURT:  I think he is saying the information

19   should have been produced.

20             MR. SCHEVE:  That gets to the question of the

21   privilege.

22             THE COURT:  Well, Mr. Jacobs, do you want to

23   address that?

24             MR. JACOBS:  I don't think I can say it better,

25   Your Honor.  There is no meaningful subject matter proof.

```
 1    It should have been produced.  They didn't produce it.  Now

 2    we get to deal with the world that they have handed up to us

 3    in the best way we can.

 4                THE COURT:  You should have produced.

 5                MR. SCHEVE:  I would only urge Your Honor, if I

 6    may, for the record, because the appellate court will need

 7    to see this as well, if he has not done x-ray powder

 8    diffraction, and I am not calling him -- I am not calling

 9    him to testify about anything that he did, I don't

10    understand how they can draw a negative inference about that

11    or why my client should be punished and let the jury be

12    inferred that there is something negative.  Because the

13    testing -- again, it's assumed that these tests that were

14    done were on Abraxane, as opposed to tests done on

15    paclitaxel, tests done on --

16                THE COURT:  Let's play through that a little

17    bit.  Dr. Brittain is on the stand, and he is asked by Mr.

18    Jacobs, did you do any XRPD, x-ray powder diffraction tests?

19    And he said no.

20                MR. JACOBS:  I think I would just lay out a --

21    lay it out how I would do that.  I would have the privilege

22    log there and say, Dr. Brittain, this is a privilege log of

23    documents that Elan has not produced in this litigation.

24    You understand that?  He would say yes.

25                I would say, the privilege log refers to
```

1    testing, test data prepared in conjunction with the Elan-

2    Abraxis litigation at the request of counsel.  Do you see

3    that, Dr. Brittain?

4              Yes, I see that.

5              So this testing was about issues in this

6    litigation, wasn't it, Dr. Brittain?

7              Yes.

8              And I would say, You are an expert in x-ray

9    powder diffraction, aren't you, Dr. Brittain?

10             And that's all the information we have about

11   this, isn't it, Dr. Brittain?  What we know is you are an

12   expert in x-ray powder diffraction, you did testing, and

13   it's not produced.  Isn't that right, Dr. Brittain?

14             Yes.

15             Now, if Mr. Scheve wants to try to rehabilitate

16   him by saying, was it about x-ray powder diffraction, we can

17   see what happens next.  I would be relying exclusively on

18   what is in front of us by way of his testimony and the

19   privilege log that they have produced.

20             THE COURT:  And reassert, if you would, for us,

21   you claim the right to do this again why?

22             MR. JACOBS:  I claim the right to do this

23   because once having declared Dr. Harry Brittain as a

24   testifying expert on issues of infringement, crystallinity,

25   testing of Abraxane, x-ray powder tests, diffraction testing

1    of Abraxane -- parenthetically, you can see I am building a

2    hierarchy of generality to granularity, because we have to

3    pick our subject matter here -- infringement, crystallinity,

4    testing, x-ray powder diffraction testing, once they

5    designated him on those subjects, they should have produced

6    anything that related in the largest sense, because that's

7    what we do with experts.  Anything that related to those

8    subjects, testing, crystallinity, infringement, if that's

9    what he did before Sipio or not, that's what they should

10   have produced, and they didn't.

11            THE COURT:  You maintain him being labeled,

12   Sipio, a consultant expert, once he is re-labeled as a

13   testifying expert, that strips that protection.  You are

14   saying that work product goes out the window.

15            MR. JACOBS:  Precisely.  Very well-understood.

16   Of course, we read closely the Court's Dyson decision where

17   you were dealing with kind of a species of this.

18            THE COURT:  Write the order.  Let me see it.  If

19   necessary, I will get back on the phone, if I feel that I

20   want to hear further from you.

21            That will give me some additional time.

22            I have to say, Mr. Scheve, in all candor, that

23   at this point I am tilting towards the Abraxis position.

24            We will leave it there for now.

25            All right.  Next.

1              We are going to break at 12:30 and have lunch.

2              MR. JACOBS:  Having not produced x-ray powder

3    diffraction, Elan relies on Dr. Munson for ssNMR testing.

4    SsNMR is a, it's generally regarded as a supplemental

5    technique for assessing crystallinity.

6              We got Munson's report.  We got other reports

7    from Elan about this ssNMR testing.

8              THE COURT:  Is this the motion wherein there is,

9    at least in part, a contention that there has been a

10   destruction?

11             MR. JACOBS:  Yes.  Absolutely.  I think we have

12   admissions of destruction, Your Honor.

13             Again, the theme, follow the bouncing ball.  We

14   get a couple of expert reports.  They refer in the first

15   person or sometimes obliquely to who actually did the work.

16   We pry out of Elan the evidence of what actually occurred in

17   connection with Munson's expert testimony and all of the

18   supporting work that went into Munson's expert testimony.

19             Among other things, when we noticed the

20   depositions of people who we learned had provided Munson

21   with inputs, Elan went out and filed motions for protective

22   orders in local district courts.

23             It's just an example of the kinds of problems we

24   ran into in trying to penetrate to the truth of this ssNMR

25   testing.  And that's detailed in the Evans declaration.  In

1     all candor, Your Honor, we submitted that declaration

2     defensively.  We are not actually moving for relief based on

3     all that obstruction, because ultimately through persistence

4     we think we got to the truth.

5                And the truth is that when it came to the

6     preparation of the samples of both controls and of Abraxane,

7     no one could tell us exactly what was done, because there

8     are no -- records were not maintained or were tossed.  The

9     samples were not maintained.  People don't remember.

10               The basic defense that Elan offers is, this was

11    all routine ssNMR testing.  Don't you guys get it?  This was

12    routine ssNMR testing.

13               But when we asked the people who did this work

14    what did you do, they couldn't remember what they had done.

15    It couldn't have been that routine or it would have been

16    easy for them to tell us.

17               We lay this out in the motion.  I don't want

18    to -- I think the briefing on this is pretty good.  I don't

19    want to go through it step by step.  I want to in a general

20    sense say on the front end, all the work that went into the

21    ultimate ssNMR testing, there are just huge evidentiary

22    holes which make it unreliable.

23               There is one that is just astounding.  The

24    Winkler declaration says, I prepared these samples, and we

25    take Winkler's declaration, it is not "I" any longer, it is

1    other people prepared the sample.  Follow the bouncing ball.

2    We stopped at that point.  We didn't take those yet other

3    people's depositions.  We got, we think, enough admissions

4    from Winkler about the inadequacy of his work.

5                  So this is all on the front end that goes into

6    the stuff that's in the ssNMR machine.

7                  Then there is the back end.  And we have already

8    discussed this briefly.  There is the deconvolution

9    analysis.  There is the third peak that sort of magically

10   appears.  There is the conclusion that this is a crystalline

11   form even though there is no, as Munson admits right in his

12   expert report, I didn't see a second peak that I would have

13   expected to see if it was a crystalline form.

14                 There is an assessment of the quantity of

15   crystallinity, an assessment of 4.5 percent, with no

16   explanation whatsoever for where the 4.5 percent comes from.

17   There is a doubling of it based on the second peak that he

18   didn't see but he says has to be there.

19                 And then -- this is the part that is just, it's

20   one of these brain-twisters.  He says there is a 50-percent

21   error rate.  I have got it to about eight percent.  Now

22   there is about a 50-percent error rate.  In all probability,

23   he says, it's greater than ten percent.

24                 The reason I say it's a brain-twister is, first

25   of all, the estimate itself, he says, of error rate is a,

1    quote, best guesstimate of the error rate.  So even the

2    error rate is subject to error.

3           But then we are in this odd world in which, if

4    his technique were really accurate and it came out at eight

5    percent, they wouldn't be able to say we are over ten

6    percent.  But because it's inaccurate, he gets to speculate

7    that all the error falls on the upper side of the equation,

8    that we are going to bias the error, if you will, in the

9    over-ten-percent direction, when there is no testimony that

10   it is more likely to be erroneous in that direction as

11   opposed to the other direction.  Otherwise, it wouldn't be a

12   50-percent error rate.  It would be something else.

13          Interestingly, in the articles that have been

14   attached, Munson does know how to get to a one- or

15   two-percent error rate.  That is what he did in this article

16   about neotane (phonetic) that he relies on so heavily, did

17   extensive analysis, none of which was done here.

18          Where are we?

19          We penetrate this wall that has been developed

20   to get to the actual people who did various components of

21   this.  It turns out Munson had a very small role.  Then we

22   are finally done.  And we submit the supplemental Atwood

23   report and where we submit an Atwood declaration in our

24   motion in limine.  The Atwood declaration details all of

25   this.  It lays out exactly what our methodological challenge

1    to Munson is.

2             This is not a disagreement among experts about

3    how to interpret some reliable data.  This is a

4    methodological challenge to Munson.  We get back virtually

5    nothing.  There is no scientific rebuttal to Atwood.

6             There is a claim that Atwood -- we have already

7    been through this a little bit.  He is not an ssNMR

8    specialist.  And the fact we had all this trouble running

9    the software merely proves that Atwood is not an ssNMR

10   specialist.  I would agree that Atwood is not an IT, a

11   computer specialist.  But you can see in the Atwood

12   declaration the efforts we went through to try to get their

13   software to run so we could replicate what they did.  That

14   has nothing to do with the reliability of his critique.

15            If there was something wrong with Atwood's

16   declaration about Munson, we would have seen a Munson

17   declaration in response or we would have seen a declaration

18   from somebody saying, no, no, no, I have looked at the

19   Atwood declaration and what Munson did, that's the way ssNMR

20   is done.  We don't take care of where the samples came from.

21   We make up stuff when we deconvolute.

22            I am being a little facetious.  We would have

23   seen a declaration in response.  We did not.

24            I appreciate what Your Honor said about Daubert

25   and how to apply it.  This falls on the keeping that stuff

1    out of this courtroom.

2                Just one thing.  I was thinking about this on

3    the way.  I have been seeing the kind of cases you have been

4    dealing with these days, these ANDA cases.  You are getting

5    a lot of science cases.  Delaware is becoming a science

6    courtroom in the Federal District Court.  It is a science

7    center.  We have DuPont right down the way.  There are

8    scientists around here, precisely because we are seeing so

9    many of these cases.

10                We ask that you strike Munson's proposed

11    testimony.

12                MR. SCHEVE:  First I want to address the

13    accusations that somehow there has been some wall put up.

14                They asked, unilaterally subpoenaed the

15    depositions of two Ph.D.'s who worked under Dr. Munson and

16    Dr. Berkland.  Those individuals were not consulted about

17    available dates.  They both had conflicts.  They are both

18    gainfully employed.  And we filed a motion just to protect

19    their interests so that we could negotiate additional dates.

20    They have had the deposition of every one of those people.

21    They have got Dr. Munson's deposition.  They have had Dr.

22    Berkland's deposition.  Dr. Berkland prepared the samples

23    that went into the machine that was used for the ssNMR.

24    They have had the deposition of both of them.  And we agreed

25    to produce those individuals for deposition at dates

1    convenient after the cutoff of discovery.

2            The notion that we somehow stonewalled or hid

3    from that is, it's just not factual.

4            They have had that opportunity to inquire.

5            The notion that we have somehow, that Elan has

6    somehow hid or that Dr. Munson destroyed something -- when

7    you do ssNMR there is software in the equipment.  All your

8    data is stored in that software.  It's all right there.  All

9    of it was downloaded to a disk and sent to them.  Every

10   single run.  33, I think, 34 runs.

11           Now, the fact that Dr. Atwood doesn't himself

12   have an ssNMR machine in his department, the one he has

13   access to is over in the engineering department, he has to

14   go across campus and ask to borrow time, the fact that they

15   have got a different model over there and different

16   software, and we told them the software, because this

17   gentleman right here who works with me is able to put it in

18   the machine and immediately download it and make it work

19   with the most simple of programs, doesn't mean we have

20   hidden or destroyed anything.

21           Everything they talk about, their criticisms of

22   Dr. Munson, and the characterization that it's only sort of

23   a secondary step, we will hear the testimony at trial, ssNMR

24   is the cutting edge.  Just as x-ray was sort of the

25   technology 30 years ago if you went to your doctor, now you

1   go get an MRI.  NMR and MRI are the same thing, big magnets

2   where you are changing the nucleus in those atoms and taking

3   some very sensitive readings.  That is cutting-edge stuff

4   for which Dr. Munson is an absolute world expert, someone

5   whom Dr. Atwood wrote a letter for recommending him for

6   tenure.

7           Their criticism that they didn't write down

8   "Inject water into vial" in the lab notebook goes to the

9   weight.

10          But if there is any accusation, and I resent it,

11  that somehow something has been destroyed, or that somehow

12  some piece of document or data has been withheld from them,

13  that is absolutely false.  And it gets down to a question of

14  Dr. Atwood -- I listened with interest here, where, quote,

15  according to Mr. Jacobs, it's a methodologic challenge to

16  Dr. Munson, when Mr. Jacobs stood before you barely two

17  hours ago and told you, we are not offering any testimony to

18  challenge the methods used in NMR, when I argued that Dr.

19  Atwood isn't qualified.  How can he give a methodologic

20  challenge to what Munson did if he has never in his life sat

21  in front of an NMR machine or console?

22          It gets down to the notion where they are

23  seeking the application of rules different than are applied

24  to us, Your Honor.

25          So we would suggest this goes to the weight.  It

1    clearly is technology that if they want to do their

2    cross-examination, they should be allowed to.  But it

3    clearly goes to the weight.  It doesn't go to the

4    reliability of the technology.

5                THE COURT:  In the main, I don't disagree with

6    you.  I want to think about this.  I will get back to you in

7    the form of some written order on this.

8                Next one, Mr. Jacobs.

9                MR. JACOBS:  Eric Walters will do this one.

10               MR. WALTERS:  Your Honor, the motion I would

11   like to address is Motion in Limine No. 3.

12               I don't think there is any dispute that one of

13   the things Elan would like to do at trial is introduce

14   evidence that Abraxis went to the FDA to try to get some

15   clarification on the label and so far the FDA has not made

16   the changes that we requested.

17               As we set forth in the brief, and I think it is

18   confirmed by Elan's opposition, there is no probative value

19   for what the FDA may have done at this point.  We cited a

20   half-dozen cases in a variety of contexts that say, what the

21   FDA does is not determinative of an issue in the case.

22               Here the issue is whether Abraxane is

23   crystalline or amorphous.

24               THE COURT:  You know, it's Mr. Scheve who is

25   swimming upstream on this.

1               Let me hear from you on this, Mr. Scheve.

2               MR. SCHEVE:  Your Honor, they submitted to the

3    Food & Drug Administration a proposed labeling change.

4               THE COURT:  I am aware of it.

5               MR. SCHEVE:  They said we want to characterize

6    our product as amorphous.  The role of the FDA, in addition

7    to evaluating safety and efficacy, is to determine how do

8    you characterize your product.  That is why you have to do

9    all these characterization studies and submit them in the

10   CMC portion of an ANDA.

11              Contrary to what Mr. Walters just suggested,

12   that they have not yet ruled, they specifically declined to

13   allow them.

14              Your Honor, the only test that gives you a

15   footprint for whether or not something is amorphous is

16   called glass transition, thermal glass transition

17   temperature, a test that Abraxis has never performed.  And

18   they rely on their FDA submissions.  They are going to go

19   in, and they are going to rely on the submissions that they

20   made to the FDA to show that their product is amorphous,

21   including these various tests about SDS -- excuse me, that

22   it's not crosslinked, including the SDS and all these other

23   test results.

24              Now, if they can rely on materials submitted to

25   the FDA to suggest that their product is either amorphous or

1    not crosslinked, and they specifically ask the FDA, can we

2    characterize our product as amorphous, and the agency

3    charged with looking --

4            THE COURT:  I know what the agency is charged

5    with, Mr. Scheve --

6            MR. SCHEVE:  -- said no.

7            THE COURT:  Said no.  But we don't know why they

8    said no.  We just don't.  Unless you can tell me.

9            MR. SCHEVE:  What I can say, there is a case in

10   the United States Supreme Court dealing with the 2006

11   labeling rule, about whether or not pronouncements by the

12   agency on labels preempt state rules.  Contrary to what

13   counsel suggested, that issue is front and center.  And the

14   position of the FDA is, the contents of a label -- and it's

15   stated in the preamble to the 2006 labeling rule -- state

16   specifically their view that it preempts anyone from coming

17   in and saying anything to the contrary.

18           If the FDA itself and the Supreme Court of the

19   United States itself has got that preemptive effect of the

20   FDA's view of it controls what's in there, it decides what

21   can be said about its product, then I would argue the notion

22   that it's just de minimis, it is a minimal standard, it

23   doesn't have any effect, that is old law under old product

24   liabilities case.

25           THE COURT:  I suggest both of you have invoked

1    Supreme Court cases for rather dubious propositions in this

2    litigation, KSR, I think it is, and now this.

3             I am going to grant the motion.

4             Let's move onto the next one.

5             4 is disposed, or will be.

6             MR. JACOBS:  So 5, Your Honor -- and I will do

7    this with Ms. Norman from Young Conaway, because what is

8    really going on here, Your Honor, what is really going on is

9    we are heading into trial over the next two weeks.  We have

10   orders, we have agreements, we really want them to be

11   adhered to in the main.

12            What happened here, we are not complaining about

13   a few exhibits coming in here and there.  Let me show Your

14   Honor.  Both sides have done this.  I provided this to

15   counsel last night.

16            This is a timeline, Your Honor.  You can see

17   what happened in the first few weeks of our pretrial

18   preparation period, with Elan's exhibits coming in large,

19   large quantities, well after the deadlines.  We had to

20   scramble, Your Honor.  Thanks to the Court's schedule, I

21   think mostly we were able to scramble.  We were able to deal

22   with this.  And you got a pretrial order that has our

23   objections.  I think we are mostly okay.

24            But it really was a very, very painful period

25   for us, and a period in which, coupled with other things

```
1    going on in the case, we felt it important to bring it to

2    the Court's attention.  We felt it important to ask the

3    Court to remind the parties -- and this is definitely sauce

4    for the goose is sauce for the gander here -- to remind the

5    parties of the importance of the Court's orders, the

6    importance of respect for the Court's processes, and to hold

7    us both accountable for reasonable compliance.

8               THE COURT:  Okay.  Did you want to react?

9               MR. SCHEVE:  As long as it is applied both ways,

10   Your Honor.  We are getting documents just this week that

11   have never before been produced.

12              THE COURT:  You have already in a previous

13   discussion heard me say that I am reluctant to charge one or

14   the other party with misbehavior at this point.  This has

15   been a vigorously contested action.  I understand that the

16   stakes are high.  And I am going to leave it there.  I think

17   both of you are a group of officers of the Court.  I expect

18   you to act that way.  You are in the United States District

19   Court.  Treat the office, my office, and your roles, your

20   vital and important roles, with the respect they deserve.

21   That's all.  All of us.  I think we will be fine.

22              All right.

23              So I have reserved on No. 4.  You have combined

24   No. 4 with No. 1, I think.

25              MR. JACOBS:  On 1 and 4 we will be submitting
```

1    you a proposed order.  On 2 -- I am sorry, on Abraxis's

2    motions.

3              THE COURT:  On Abraxis's motion, I am waiting

4    for the order on 1 and 4.

5              MR. JACOBS:  Right.

6              THE COURT:  And I have reserved on No. 2.

7              MR. JACOBS:  Correct.

8              THE COURT:  The question was appropriately put:

9    Did I just deny the last one?

10             I will deny the last one with the words that I

11   have suggested or just stated.

12             Okay.  Let's take lunch, and then we will come

13   back.  Is 45 minutes enough time?

14             MR. JACOBS:  Sure.

15             (Luncheon recess taken.)

16             THE COURT:  Please, take your seats.

17             Let's go through Volume I of the proposed order.

18   I have tabbed a number of items.  As we go through the

19   pages, if there is something that counsel wants to call to

20   my attention that you think I missed, let's just do it that

21   way.

22             So the first item I have tabbed at Page 3 of 10.

23   It's in Paragraph 2a. and b.  The parties have a difference

24   as to the exchange of demonstratives.  Have you agreed on

25   that?

1          MR. JACOBS:  We have, Your Honor.  We met

2     yesterday and we reached agreement on several elements.  And

3     there is one issue we left open and didn't have a chance to

4     circle back to.  Maybe we can put it out and settle it now.

5          We will exchange the identities of witnesses,

6     the identification of proposed exhibits to be introduced,

7     and proposed demonstratives the day before they are going to

8     be used at 8:30 in the morning.  Objections to any of those

9     will be provided to the other side at 8:00 p.m. that

10    evening.  So that we will know to come at 8:30 in the

11    morning to resolve those issues with the Court.

12         The issue we left outstanding is how to handle

13    exhibits that would be used during cross-examination,

14    because we won't know until 8:30 in the morning the day

15    before what witnesses are going to appear the next day.

16         So I sent an e-mail last night.  We haven't

17    heard back.  I don't know if you have something that has

18    worked.

19         THE COURT:  No.

20         Do you have a response, Mr. Scheve?

21         MR. SCHEVE:  I don't plan to exchange what I am

22    going to use to impeach witnesses with the next day, Your

23    Honor.

24         MR. JACOBS:  The issue is how we will deal with

25    admissibility of exhibits during cross-examination, how we

1    will tee up admissibility issues, so that we can discuss

2    them in the 8:30 slot that the Court likes to use for that

3    purpose.

4                THE COURT:  I will make this order right now.  I

5    am going to overrule without prejudice all objections to

6    exhibits.  We can't possibly -- I am sure counsel

7    understands the reason for this ruling.  What Mr. Jacobs is

8    alluding to is my practice of getting together with counsel

9    the morning before the jury resumes the box or the evening

10   at the end of the day, and maybe that's when we will have to

11   do it, when the jury leaves at 4:30.

12               I say without prejudice.  That means the parties

13   can renew objections, and those two time slots are available

14   to discuss those objections.

15               It is typically the case in complex civil

16   litigation, it is interesting, there are generally not a lot

17   of really substantive objections, real, meaty.  Hearsay,

18   it's other stuff that comes up as to admissibility issues

19   that arise.

20               We should try to come up with something for that

21   category of exhibits that are going to be used on cross to

22   which one party or the other might have an objection.  I am

23   willing to be guided by the parties.

24               MR. JACOBS:  Maybe we can try and work on this

25   some more.

1          THE COURT:  That is fine with me.  Mr. Scheve?

2          MR. SCHEVE:  We will certainly work, Your Honor.

3     We are working to further limit the number of objections

4     that we have.

5          On the demonstratives, clearly, we have reached

6     an agreement, I think, that the exhibits we will use with a

7     witness that we are sponsoring will be exchanged the day

8     before, 24 hours, at 8 or 8:30 in the morning.

9          With regard to demonstratives, I am happy to do

10    that 24 hours before, as long as there is sort of a

11    good-faith rule, because there are going to be instances

12    where, based on the testimony that occurred within that 24

13    hours, we need to be able to work so we don't face a

14    circumstance, Ah, you didn't get that demonstrative to us

15    until last night.

16         THE COURT:  There has to be a rule.  I am not

17    going to apply the time parameters that you come up with

18    rigidly.  I just hope I don't have to hear about it at all,

19    quite frankly.  If I have to, be assured, I am not going to

20    be rigid.  If somebody misses a deadline, and there is a

21    good explanation for it, as they say, stuff happens.

22         Let's go to Page 5 --

23         MR. JACOBS:  Can I rewind a step?

24         THE COURT:  Yes.

25         MR. JACOBS:  I don't want to over-infer from

```
 1    what the Court said.  I believe the Court would, in fact,

 2    like us to work out a way to know in advance about

 3    cross-examination exhibits so that admissibility issues can

 4    be dealt with in advance or at the close of business, rather

 5    than in front of the jury.

 6              THE COURT:  Absolutely.  The default is not in

 7    front of the jury unless we just have to.  It shouldn't have

 8    to happen with regard to exhibits.  It's definitely going to

 9    happen with regard to objections to testimony, but not with

10    regard to exhibits.  We really shouldn't waste the jury's

11    time that way.

12              MR. SCHEVE:  So I am clear, Your Honor, stuff

13    that is being used clearly or simply for impeachment, I

14    don't have to exchange that in advance.  Correct?

15              THE COURT:  No -- well, perhaps.  You are

16    talking about deposition testimony?

17              MR. SCHEVE:  Where someone has testified

18    inconsistently with what they now tried --

19              THE COURT:  Prior statement?

20              MR. SCHEVE:  Yes.

21              MR. JACOBS:  I wasn't thinking about

22    depositions.  I was thinking about -- there is a category

23    that came up between the parties called impeachment and

24    there is a category called rebuttal that we are going to be

25    hearing about, I think, as we march through this.
```

```
 1                  I may be wrong about this.  I think the Court

 2      has a view that there really isn't impeachment as such.

 3      There are exhibits.  And if the exhibits are going to be

 4      used, then they are going to be ruled on.

 5                  I think it's good we circled to this, so we can

 6      have the Court's direction.

 7                  MR. SCHEVE:  Impeaching evidence, Your Honor, is

 8      not evidence that is admitted to prove the merits.  It goes

 9      to testing the credibility of the witness if they have taken

10      prior inconsistent statements.

11                  THE COURT:  I don't think we will have a

12      problem --

13                  MR. SCHEVE:  Those wouldn't be offered into

14      evidence.  I don't think we have to disclose them the day

15      before, which shows my thought processes and strategy.

16                  THE COURT:  Do you anticipate a problem with

17      prior inconsistent statements?

18                  MR. JACOBS:  No.  I was thinking of exhibits.

19                  THE COURT:  He was thinking about something

20      else.

21                  MR. JACOBS:  I think Mr. Scheve may have a large

22      view of prior inconsistent statements.  If, for example,

23      there is an article, a published article, or an e-mail, or

24      an internal document, maybe the witness doesn't even know

25      about that document.  Maybe it came from somebody else.
```

```
 1              THE COURT:  These do surface from time to time.
 2    We will deal with those in realtime.
 3              Page 5 of 10, that is fine.  Qualify your own
 4    experts.  That's fine.  That's the way it's normally done
 5    around these parts.
 6              MR. SCHEVE:  We have agreed to language for each
 7    of the witnesses, Your Honor, essentially limiting it to a
 8    paragraph.  But there have been certain events that have
 9    occurred even since these have been tendered.  While I will
10    not go over again what's in those, there will be some, I
11    would hope I would have the freedom to do a little bit more
12    qualifying on some of the specific issues, because we tried
13    to come to an agreement between one another as to what would
14    be acceptable from each party's side.  In other words, we
15    wouldn't agree that there is just this much -- there are
16    some experts where it is a lot more than ten lines to
17    qualify them.
18              THE COURT:  Absolutely.
19              MR. JACOBS:  Your Honor, I think there is some
20    confusion.  We did not agree on the statements to be read to
21    the jury about witness qualifications.  We hear Your Honor
22    saying qualify your own experts as you wish.
23              MR. SCHEVE:  I misunderstood.  I apologize.
24              THE COURT:  Part of the fun of this for me is
25    listening to these resumes.
```

1               Qualify your own experts.

2               I have these random thoughts.  I want to

3     encourage counsel in this case to get together and work on

4     transition statements, from subject matter to subject

5     matter, witness to witness.  I think it would be helpful for

6     this jury.  You are going to have to work those out so we

7     don't have objections happening.

8               Counsel, I am not going to get involved in

9     arguments or disagreements about deposition designations and

10    counter-designations.  You are going to have to work those

11    out.  You really are.  I don't have the time to manage those

12    disputes.  I suspect they are numerous, I believe they are.

13              There is this '025 issue that is, I guess this

14    is just as good a time as any to talk about whether the '025

15    patent and issues surrounding the '025 patent are still

16    alive.  Elan says no.  Abraxis says yes.

17              MR. SCHEVE:  Your Honor, we filed a motion for

18    clarification of your claim construction order.  As soon as

19    Your Honor denied that motion for reconsideration, or

20    clarification, within three days thereof, we advised counsel

21    for Abraxis that we would withdraw our claim and put them on

22    notice, don't go out and spend any money because we are not

23    going to prosecute that, and we offered a stipulated

24    judgment.

25              And I don't want to misstate this.  I think we

1    have heard nothing back or they declined.

2              They declined to agree to the stipulated

3    judgment.

4              From our perspective, the patent is now a new

5    issue.  We are not asserting it against them.  But they have

6    declined to move their invalidity part of the lawsuit.  So

7    in that sense, as we sit here, the '025 is still in the

8    lawsuit.

9              THE COURT:  The patent is, as I recall, is

10   still -- it's back at the PTO.

11             MR. SCHEVE:  Yes, sir.

12             THE COURT:  For reexamination?

13             MR. SCHEVE:  Reissue.  Not reexamination.

14             MR. JACOBS:  Your Honor, no stipulated judgment

15   was offered.  The procedural history is that in the summary

16   judgment letter briefing, they said, we would like summary

17   judgment, if you will, that this patent is out of the case.

18   We said, there is a proper motion to file.  It's a Rule 54

19   motion.  We will oppose that motion, but it will be teed up

20   properly.

21             We still don't have a Rule 54 motion for entry

22   of judgment.  So no stipulated judgment was ever proposed.

23   No Rule 54 motion has ever been filed, even though we, maybe

24   presumptuously, said to Elan we think that's the right

25   vehicle.

1          Here we are with the '025 still in the case

2     because we have a declaratory judgment counterclaim, we seek

3     a finding of inequitable conduct on the prosecution of the

4     '025.  It's got a lot of legs.  It's got the same inventors

5     as the inventors on the '363.

6          We floated an idea about how we could get the

7     '025 out of the case if certain conditions were met on our

8     end.  Principally, we don't ever want to hear about it again

9     in any way anymore, and we don't want Abraxane or the nab

10    platform to ever hear about it in any other way.

11         Otherwise, we are here now.  We are all

12    prepared.  We might as well litigate the inequitable conduct

13    issue on the '025.  It's some more evidence but not a whole

14    lot of evidence.  And I guess we will be getting to length

15    of trial in a minute, which relates to this, also.

16         MR. SCHEVE:  Your Honor, may I show the e-mail

17    from Mr. Jacobs?

18         I am confronted with they said this, he said

19    that, and I feel like there have been a number of issues

20    presented today where I haven't been able to show you.

21         This is an e-mail from Mr. Jacobs where he

22    responded to our offer of judgment on the '025 where he

23    wrote back, quote, "Abraxis is not prepared to stipulate to

24    judgment on the '025."

25         He just told you it wasn't offered.  I have had

```
 1        to tell you certain things.  But I have got the e-mail.

 2                THE COURT:  Does that refresh your recollection,

 3        Mr. Jacobs?

 4                MR. JACOBS:  I am sorry.  He is partially

 5        correct and I am partially wrong, and I apologize to the

 6        Court.  It says, "...without prejudice to Elan's right to

 7        seek appellate review of the current claim construction and

 8        to seek remand and resumption of the litigation in the

 9        District Court if successful."

10                So, I am sorry, Your Honor.  I forgot that,

11        frankly, because I have in mind the summary judgment motion.

12                MR. SCHEVE:  Mr. Balick sent an e-mail that

13        said, we stand ready at your earliest convenience to discuss

14        the prompt entry of judgment in Elan's favor on the '025

15        patent claims.

16                Here is the e-mail exchange and the response by

17        Mr. Jacobs.

18                THE COURT:  I think he has acknowledged he made

19        an error in his representation and apologized for that.  The

20        Court accepts the apology.  The apology is extended to

21        counsel, I assume, as well.

22                MR. JACOBS:  It is.

23                MR. SCHEVE:  Your Honor, our position is the

24        '025 they are not alleged now to be infringing.  We have

25        withdrawn our claim.  We are going to have to surrender that
```

1    patent when the reissuance occurs.  And so all this is going

2    to do is create a side-circus for the jury again.  We would

3    ask Your Honor that judgment be entered so that we can

4    proceed through the appropriate processes.  Otherwise, we

5    are stuck with this case on invalidity claims, and it will

6    be very confusing for the jury, when they are not being

7    accused.

8         And again, in terms of a declaratory judgment

9    action, in light of the Metimmune v. Genentech case, where

10   for declaratory judgment there has to be -- I am not going

11   to get the right words -- but a sense of immediacy in terms

12   of need for declaratory judgment.  Your Honor, our view is

13   there is no immediacy here now that we are not prosecuting

14   the patent -- excuse me, for purposes of seeking relief for

15   infringement.

16             THE COURT:  At least at the moment.

17             MR. SCHEVE:  Yes, sir.

18             THE COURT:  I think that is part of the basis

19   for the opposition.  But, Mr. Jacobs, the patent is in

20   reissue.  Technically, what will happen, what may become,

21   assuming it comes out to Elan's benefit?

22             MR. JACOBS:  If it comes out to Elan's benefit

23   and they actually accept, the way I understand it works, if

24   you accept the reissue and surrender, then they have new

25   claims that they could assert against Abraxis.  If, on the

```
 1    other hand, if we got a finding of inequitable conduct in
 2    this trial, our understanding, our argument would be that
 3    would infect any decision that would come out of the reissue
 4    proceeding.
 5              THE COURT:  That is a whole other body of
 6    litigation, isn't it?
 7              MR. JACOBS:  Yes.  Maybe I can try and move this
 8    along so you can see exactly what our concerns are.
 9              We don't want to see the '025 again in its
10    reissue form or otherwise.  We don't want to see it against
11    Abraxis.  We don't want to see it against Abraxane or any
12    nab platform, this HSA platform that Abraxane is based on.
13              And we don't want -- we are aggressively seeking
14    attorneys' fees in this case.  And we don't want Elan to
15    argue that by virtue of our stipulating that the '025 is out
16    of the case, that somehow we have in any way diminished our
17    claim to attorneys' fees for the whole case.
18              Those are our two concerns.  If those can be
19    addressed, we don't need to try the '025.
20              THE COURT:  Mr. Scheve.
21              MR. SCHEVE:  He made that as a settlement offer,
22    which would have us relinquish our rights to use the reissue
23    patent against any new drug they come out with, no matter
24    what the particulars, the level of crystallinity,
25    crosslinking, et cetera.  Certainly, I am not prepared to
```

```
1      accept that here today.  Certainly, as he acknowledged, or

2      has failed to acknowledge or address is the immediacy for

3      purposes of proceeding with a declaratory judgment action.

4              They can't meet that burden.

5              So we would again ask the Court that we should

6      go forward with the infringement case.  We are not pursuing

7      the '025 infringement case.  I say the infringement on the

8      '363 patent, and that they just don't meet the standards for

9      proceeding with a declaratory judgment action at this point.

10     There is no immediacy.  They are not threatened -- I

11     certainly understand why Mr. Jacobs would want to extract

12     from us:  We will never sue you in the future no matter how

13     many drugs we come out with even after the reissuance.

14             Your Honor, they have to meet the immediacy

15     standard, and they don't meet that.

16             THE COURT:  This comes up mainly within the

17     context of jury instructions, doesn't it?  Or it comes up

18     there as well, the issue of the '025 patent?

19             MR. SCHEVE:  If I may, Judge.  One of the issues

20     is whether the inequitable conduct is to be decided with a

21     bifurcated trial, because the law seems to be that it is a

22     question of law for Your Honor to decide.  And there is a

23     separate issue here.

24             Our position is, how can there be inequitable

25     conduct if the whole issue, including all of the material
```

```
 1    submitted to the PTO, is before them and they are

 2    considering that, again going to the issue?

 3              But I am not sure that it gets into the issue of

 4    instructions for the jury, because as I understand it, we

 5    will be asking Your Honor for a bifurcated trial on those

 6    equitable issues, inequitable meaning an equity claim which

 7    is to be decided by the Court.

 8              THE COURT:  The Federal Circuit has not spoken

 9    definitively on that.  As you probably know, I have done it

10    all three ways:  advisory verdict, advisory jury, where the

11    parties have agreed that, let the jury decide, and done it

12    myself, as you suggest is an appropriate way to do that.

13              MR. JACOBS:  In this case, Your Honor, the

14    overlap in issues is quite large, because our --

15              THE COURT:  That was a concern of mine.

16              MR. JACOBS:  Yes.  The defenses on validity that

17    we will pursue most assertively at trial, enablement,

18    written description, are closely related to the inequitable

19    conduct, the same documents that show that the patent

20    doesn't work, our documents during the prosecution period we

21    will argue --

22              THE COURT:  My inclination on that, Mr. Scheve,

23    is to let the matter go to the jury.  Nothing prevents me

24    from rejecting their finding on this issue.  So that's my

25    ruling on that.
```

1          But I am not sure that it really addresses your

2     concern, Mr. Jacobs.  Perhaps you can talk about Mr.

3     Scheve's assertions regarding the immediacy issue as it

4     relates to the DJ.

5          MR. JACOBS:  I think the law is that if there is

6     a pending declaratory judgment counterclaim, they can't

7     moot, Elan can't moot that unless they moot all the issues

8     arising out of it.  There is this recent Federal Circuit

9     case where the Federal Circuit reversed a finding that

10    Rambus had destroyed documents because Rambus had, before

11    that finding was entered, stipulated to judgment on the

12    merits, not just a judgment for getting it up on appeal, and

13    stipulated to attorneys' fees.  And then all the issues that

14    turned on the liability finding, such as attorneys' fees

15    relating to inequitable conduct, were mooted.

16         In part, that informed my proposition about how

17    we might deal with the '025.  If they will truly accept a

18    dismissal with prejudice of the '025, which I tried to

19    capture in my first leg of my proposal, and they will

20    stipulate that there is no attorneys' fees impact by virtue

21    of getting the '025 out of the case, then I think those

22    issues will have been mooted within the meaning of that

23    decision and as well address our concerns.

24         That's where I was going.  If attorneys' fees,

25    for example, are still in play, then because attorneys' fees

1    often turn on an inequitable conduct finding, then we need

2    to litigate inequitable conduct and seek that finding as

3    part of our proof of an exceptional case.

4              THE COURT:  Did you want to go ahead and file a

5    motion, Rule 54 motion on this, Mr. Scheve, tee it up?

6              MR. SCHEVE:  This would be for entry of

7    judgment, Your Honor?

8              THE COURT:  Yes.

9              MR. SCHEVE:  We would be happy to do that.

10   That's what we offered to do.

11             THE COURT:  My clerk is asking if there is

12   enough time before trial.  I don't know.  It's an astute

13   observation.  I don't want to press you and your team more

14   than necessary.

15             I am trying to figure out a way for you ladies

16   and gentlemen to tee this up for me so that I can look at

17   some submissions, some authority, some argument.

18             I don't think either of you wrote on this issue,

19   did you?

20             MR. JACOBS:  Our position is it's still in play

21   until it is out of play.

22             THE COURT:  I don't know if I need a lot of

23   writing.

24             MR. SCHEVE:  If Your Honor gives us a time

25   frame, we will meet it.

1          THE COURT:  Let me get back to you.

2          I have moved on to Page 9.  Counsel, what we are

3    going to do is empanel eight jurors.  All will deliberate.

4    I don't select alternates.

5          MR. JACOBS:  Your Honor, I think you want us to

6    flag for you if we pass over something.

7          THE COURT:  Yes.

8          MR. JACOBS:  I think we can do this in less than

9    ten days.

10          THE COURT:  That's music to my ears.

11          MR. JACOBS:  I anticipated that.  Partly because

12    the '025 infringement issues are indeed out of the case.

13    And backing up to how we got two weeks of the Court's time,

14    it's because there were two patents that were sort of fully

15    in the case when you scheduled, when the Court scheduled ten

16    days.

17          So we think we could try it in seven days.  And

18    I think we are both in agreement that whatever the Court

19    decides on trial length, and I think this would be the

20    Court's direction anyway, we should get time limits.  The

21    time limits should apply to openings and closings, the whole

22    trial.  We think with seven days, including jury selection

23    on the Monday, on our side, we think we could get it done.

24          MR. SCHEVE:  Your Honor, we need ten days.  The

25    '025 is still in the case.  As he said, there is substantial

1    overlap.

2              THE COURT:  It's in the case right now.

3              MR. SCHEVE:  I mean, I am going to whoop up, as

4    we say in Texas, on some cross-examination of their experts.

5    The only purpose of this is to limit my ability to do what I

6    need to do in cross-examination of their witnesses.

7              I am going to be narrowing my case.  That is my

8    goal, is to cut this thing down.  But the reality is cutting

9    it to seven days with jury selection taking a half-day --

10             THE COURT:  Jury selection will not take a

11   half-day.  I guarantee you that.

12             What about the fact that, at least the

13   infringement question of the '025 patent is out of the case?

14             MR. SCHEVE:  The same evidence on inducement

15   under the '363 would go straight to the infringement action

16   of the '025.  There is not going to be any diminution in the

17   evidence that is going to be presented.

18             THE COURT:  But it essentially comes down to a

19   one-patent case, with how many claims being asserted?

20             MR. SCHEVE:  We have narrowed our claims, Your

21   Honor, to four.

22             THE COURT:  I am going to let you whoop up on

23   some Texas-style cross-examination for eight days.  I will

24   split the baby a little bit and make it eight days.  The

25   math is you have to divide equally five and a half hours of

```
 1    the length of jury time.  The multiplier is five and a half

 2    per day.  That time will be apportioned equally.

 3                MR. SCHEVE:  If I may ask Your Honor, will Your

 4    Honor keep time or will someone be assigned to that?

 5                THE COURT:  You will both keep one another's

 6    time.  Ms. Walker will back you up.

 7                MR. SCHEVE:  The time that is allocated against

 8    each party will be time devoted to both direct and cross.

 9                THE COURT:  Yes.  Let me say this.  There is the

10    potential for penalty time assessed against one side or the

11    other, if I feel that, in some way -- and I will give you

12    notice, for instance, if I think your cross is unduly long

13    or excessive.  And I call you over -- "Counsel, the clock is

14    running, I am not going to assess any penalty now, but you

15    need to move it along.," Something like that.  That is just

16    by way of example.  I didn't mean to pick on you and your

17    preview of your anticipated cross-examination.

18                I think I am being clear.

19                MR. SCHEVE:  My comments, Your Honor, were not

20    on the time.  It's just I have some pretty pointed cross

21    that I just want Your Honor to understand, really, this is

22    my chance to put on my case.

23                THE COURT:  I would love to see some pointed

24    cross in a patent case.  I am looking forward to that.

25                I won't unduly hamstring you, Mr. Scheve.
```

1    Cross-examination is cross-examination.  I was a trial

2    lawyer.  I understand.

3            Anything else that I missed there, up to that

4    point?

5            I am ready to go on to Addendum B.  We have two

6    addenda, B and C, where numerous issues are raised.

7            I am looking for some guidance from counsel as

8    to, Abraxis's Additional Issues is the first one.  What is

9    still alive in this situation?

10           MR. JACOBS:  Your Honor, we have taken care of

11   the first one.  The next one is really just a flag for Your

12   Honor that this remains outstanding.  This is the question

13   that was reserved at the October 2nd hearing.

14           THE COURT:  That is still outstanding?

15           MR. JACOBS:  Sorry.  It is the question of

16   whether, for privilege purposes, the fact that the

17   Nanosystems business moved from company to company means

18   that as to the previous companies the privilege no longer

19   exists.

20           THE COURT:  How will this play itself out in the

21   trial?

22           MR. JACOBS:  It would play itself out, if we are

23   lucky, and the documents confirm, reinforce some of the

24   things that we believe about nondisclosure of information to

25   the Patent Office, then we will have our inequitable conduct

1    claims strongly reinforced.

2              THE COURT:  Did you want to say something about

3    that, Mr. Scheve?

4              MR. SCHEVE:  Only that you struck that motion to

5    compel, Your Honor, some eight months ago.  So this is an

6    effort, I guess, to resurrect it.  The record here is that

7    their claim is that this was a naked sale of a transfer of

8    assets.

9              THE COURT:  I might have reinstated it.

10             MR. SCHEVE:  We checked the file.  We couldn't

11   find evidence of it, Your Honor.

12             THE COURT:  My law clerk still has it on her

13   desk.  She reports to me that I did, in fact, at the

14   hearing -- there were two that were reinstated.

15             MR. SCHEVE:  We didn't see that in the records.

16             THE COURT:  It's probably in the transcript.  It

17   may not have made its way to the docket.  I apologize.

18             MR. SCHEVE:  We had heard Your Honor say --

19             THE COURT:  If I said something else in there,

20   you have got the transcript --

21             MR. SCHEVE:  You said that they were stricken,

22   you would consider reinstating them.  So we have been

23   monitoring the Court's docket and we had seen no evidence.

24             Getting to the merits of it, Your Honor, their

25   claim is that, without any supporting affidavits, that this

1  was a pure transfer of assets.  You have the affidavit of

2  David Czekai, who was involved and came over and is in a

3  position to attest, everything came over from the employees.

4  They assumed all liabilities.  They assumed pension plans.

5  They assumed everything.

6           That affidavit is uncontroverted.  So that is

7  the record that is now before you on that motion.

8           THE COURT:  Let's hear from you, Mr. Jacobs.

9           MR. JACOBS:  Your Honor, I did go back and check

10  the transcript on this.  What happened was, there were

11  written motions that were submitted and the Court struck

12  those motions.  Then it became apparent, as evidenced in the

13  transcript from the Court, on the argument of that hearing,

14  that there were actually some legal issues here, and the

15  Court said I will look at the briefs on this motion.  And

16  that's where it was left.  I don't think there was, quote,

17  consideration given to looking at it.  The Court took it

18  under advisement.

19           It is a legal issue here.  It is not a record

20  evidence issue.  As we understand the case law, if it's not

21  a sale of stock but it's a sale of assets --

22           THE COURT:  We will take a look at it.

23           MR. JACOBS:  If you have a chance, that would be

24  great.

25           So that was Page 2, Abraxis's pending motion for

```
 1    production of Sterling Winthrop documents.  The next topic

 2    is Elan's almost universal objections to Abraxis's proposed

 3    trial exhibits.

 4              We have talked about objections.  We, of course,

 5    understand the Court's practice, overruling subject to

 6    renewal.  There is kind of a related issue that is lurking

 7    right now that we haven't quite gotten closure on, which is,

 8    as a backup, we would like to subpoena a custodian of

 9    records from Elan in case we are unable to work out

10    authenticity/hearsay objections.  We have a lot of them that

11    are still part of our record.

12              We have been trying to hand those to Mr. Scheve.

13    There was an attempt at service at Elan Pharma a week or two

14    ago.  It was not accepted.

15              We thought we had agreement.  We agreed, we will

16    produce a custodian of records.  If there are outstanding

17    evidentiary objections on our end, then we would like

18    Elan's --

19              THE COURT:  That would be a waste of time,

20    wouldn't it?

21              MR. SCHEVE:  Your Honor, again, the

22    characterization of what just happened, they served a

23    subpoena to a company called Elan Drug Delivery, Inc.  It is

24    not a party to this case.  They served Elan Pharma, which is

25    an Irish company that doesn't have an office there.  We
```

1     advised them, your service is inappropriate, just as they

2     advised me yesterday that service of one of our trial

3     subpoenas wasn't appropriate.

4               So I said, look, I will work with you.  I got to

5     find out who the right custodian is.  Indeed, Ms. Norman has

6     come to me twice and I said, could we address it just after

7     the hearing?  I will be happy to talk to you about it.

8               She brought me three subpoenas.  I said, I know

9     this isn't the right one.  I need to think about which is

10    the right one.

11              I am not trying to hide any balls.  I am not

12    trying to waste your or anybody's time.  I think, again,

13    this has been mischaracterized.

14              THE COURT:  Am I hearing in spite of this

15    counsel will likely be able to work this out?

16              MR. SCHEVE:  Yes.  We are trying to narrow down

17    our objections as much as possible.  We understand the

18    pressure this Court is under.  We are not here to burden

19    you.  We are re-reviewing it.  We are hoping to remove a

20    bunch of these.  If there are, in fact, any left, we will

21    find somebody.  It's just that, you know, they didn't serve

22    correctly, and I exercised my client's right to say, look,

23    you haven't been serving the right party, let's work

24    together that.  And that's what we will do.

25              THE COURT:  Next.

```
 1              MR. JACOBS:  I needed to hear that on the

 2   record.

 3              Your Honor, this may be one of the harder ones,

 4   Protection of Secret Abraxane Manufacturing Information.

 5   This may be a little harder.

 6              THE COURT:  I think I may have even been a

 7   little testy with you earlier in the litigation.  I

 8   understand the theme.  Go ahead.

 9              MR. JACOBS:  Let me explain where we have been

10   able to come to try and work this out on our end.  We

11   haven't reached agreement with Elan on this.

12              Number one, we think we can all work together so

13   that when non-SAMI secret Abraxane manufacturing

14   information, non-SAMI restricted confidential information of

15   Abraxis is the subject of testimony in the courtroom, that

16   we will not need to close the courtroom.

17              We understand that the exhibits would still be

18   filed under seal, so the exhibits themselves will be

19   protected.  We may try and do something with the screen, if

20   an exhibit is flashed on the screen that has restricted

21   confidential information.  But we know how painful it can be

22   to close the courtroom.  We really don't want to do that.

23              With respect to secret Abraxane manufacturing

24   information, we believe there is no reason, given the

25   contours of Elan's case, for SAMI to be used in the
```

1    courtroom.   There are a couple of reasons for that.

2              Number one, as the Court may recall, the way

3    Elan argued for the production of SAMI was saying

4    intermediates were allegedly infringed.   And there is now no

5    claim that intermediates are infringed.   When we discussed

6    this with Elan yesterday, Elan said, no, we have got a new

7    reason for this.   We can show from the Secret Abraxane

8    Manufacturing Information that there was copying from the

9    documents that Elan sent to Abraxis in 1996.

10             There are a couple of reasons why we can only

11   argue to you at this stage that that doesn't make any sense.

12             Number one, this goes to willfulness, but we

13   have their willfulness interrogatory.   We have their final

14   willfulness interrogatory.   We have their final willfulness

15   interrogatory after the Court admonished the parties that

16   this is the final interrogatory.   And it doesn't mention

17   anything about manufacturing details as a theory of

18   willfulness.

19             The second is that their manufacturing process

20   is grinding.   We don't grind at all.   There is no grinding

21   on our side.   That has never been part of the case.   We have

22   a whole different manufacturing process.

23             How could we conceivably have copied

24   manufacturing details from a process of grinding crystals

25   down into nanoparticles when what we do is dissolve to

1      create the amorphous form?

2              We think this is an attempt to make us agitated

3      about SAMI in the courtroom.  We don't think there is a

4      legitimate basis for using SAMI at the trial.

5              There are some documents, however, that had so

6      much SAMI in them that we only produced SAMI versions on the

7      restricted website that we have for dealing with SAMI with

8      Elan.  And we have undertaken as to every SAMI document they

9      have put on their exhibit list to create a restricted

10     confidential version of that.  So there is no reason for

11     SAMI to be used in the courtroom.

12             If at the end of the day the Court decides that

13     I am wrong about this and they are right and they should be

14     able to put SAMI in front of a witness or in the courtroom,

15     then we will have to ask the Court to protect our client's

16     really valuable trade secrets and seal the courtroom, and

17     reduce the number of people in the courtroom to the bare

18     minimum in terms of the parties and the like so that those

19     trade secrets can best be protected.  But we really don't

20     want to have to asks the Court to do that.

21             MR. SCHEVE:  Your Honor, this brings into

22     question all sorts of the focus on when we even got the SAMI

23     documents, et cetera.

24             I am telling Your Honor, I have got a

25     willfulness case.  And I need access, I need to be able to

1    show certain of those SAMI documents to the jury.

2            To give you a sense of what they are talking

3    about, they have designated 43,300 pages of SAMI documents.

4    In fact, documents that were produced to us months ago, just

5    this week they came back and tried to redesignate them as

6    restricted confidential to SAMI.  And then the position they

7    have taken all along is that they don't believe they are

8    admissible.  There is a federal rule of SAMI evidence.

9            This information is relevant on willfulness.  I

10   have -- I haven't, poor Mr. Riddle here has gone through

11   those 43,000-plus pages.  We are down to less than a box.  I

12   will be down to less than that in terms of what I am going

13   to use.  But the effort to try to tie my hands on how I try

14   my case, just because they think it's confidential, there is

15   a presumption of openness, I am not here to hurt anybody's

16   business, but the idea that opposing counsel can tell me how

17   I try my willfulness case, how I can convince this jury that

18   they were picking information, putting it in their

19   manufacturing process, and, Mr. Scheve, we don't want you to

20   show this to the jury, goes to the very heart of my ability

21   to prosecute a claim.

22            THE COURT:  Is it the jury or members of the

23   public?

24            MR. SCHEVE:  Their position up until yesterday

25   was that SAMI, you know, this young lady would have to leave

```
 1    and this young lady would have to leave, this gentleman

 2    (indicating).

 3                   MR. DAY:  I would have to leave.

 4                   MR. SCHEVE:  That's the position.

 5                   THE COURT:  I see Mr. Jacobs shaking his head

 6    negatively.

 7                   MR. JACOBS:  I don't think we ever got into the

 8    topic.

 9                   MR. SCHEVE:  That discussion has been had.  And

10    that would be the outcome.

11                   THE COURT:  That is not going to happen, at

12    least as to my staff.

13                   MR. SCHEVE:  We recognize getting up, taking

14    people out, et cetera, is a real burden.  But the reality of

15    this is that -- I am not trying to broadcast -- I have tried

16    cases.  I know how to get it down simple.  But there are

17    specific things in there that I need to use in my

18    case-in-chief.  And they are trying to avoid the patent by

19    arguing that our patent excludes amorphous product that's

20    created by solvent precipitation.  That is the precise

21    language.

22                   They are going to try to claim that their

23    product is amorphous and generated through solvent

24    precipitation, but in fact they use a different process.  I

25    need to be able to impeach.  I need to be able to show that
```

1    to the jury.  Otherwise, they will come up and claim that

2    they don't come within it, but Mr. Scheve can't rely on this

3    information.

4                    In the first instance I represent to Your Honor,

5    I am going to cut it down, but I need reference to some

6    specific documents that they have given to the FDA and which

7    are in other forms.

8                    They have clearly over-designated.  I have

9    460,000 pages of documents that they claim are restricted

10   confidential.

11                   I am very pleased to hear Mr. Jacobs saying he

12   thinks there is a way that I can try my case without my

13   having to empty the courtroom for those.  But my case is in

14   those documents.

15                   The purpose of the protective order was to

16   provide access during discovery so that counsel could make

17   its case.  It's not so that we shield stuff now from the

18   trier of fact in our system.

19                   Our request, Your Honor, is there is a problem

20   with SAMI.  But the problem isn't with Elan.  It's the

21   restrictive nature of how they are trying to tell me how to

22   try my case and how we can use these documents in the

23   courtroom.

24                   THE COURT:  Mr. Jacobs.

25                   MR. JACOBS:  Your Honor, I don't think you want

1    us to rebut every little aspect of this.  The number of

2    documents, we have done things to try to facilitate review

3    of SAMI that are now being used against us on the numerosity

4    front.  I don't think you want us to go there.

5               There are two things that might help this come

6    alive for the Court.

7               We have an example of a, from our NDA, our drug

8    application, of how we redacted for SAMI, so you can see

9    what is going on here with these actual redactions.  What

10   the Court will see, what we have is Joint Exhibit 6, which

11   is the restricted confidential version of significant

12   portions of our drug application, then Plaintiff's Exhibit

13   23, of course, on their exhibit list, the SAMI version.

14               THE COURT:  This is the SAMI version.

15               MR. JACOBS:  That is the SAMI version.

16               THE COURT:  Mr. Scheve.

17               MR. SCHEVE:  It is a SAMI version of one

18   document out of 43,000 pages of SAMI documents.

19               MR. JACOBS:  The first thing to observe is, of

20   course, in that 43,000 pages, we produced the entirety of

21   documents that we had redacted for restricted confidential.

22               If you go to the orange tab, and flip it over to

23   the next page, you will see, I think if you are looking at

24   the redacted version -- you are looking at the SAMI version.

25   Now you are looking at the redacted version.  You can see

1    how we have redacted values, and specific numerical amounts

2    from this amount, because we wanted to leave in, as we

3    discussed with the Court at the very beginning, the contours

4    of the manufacturing process while protecting the identity

5    of equipment and the like.

6              If you go to the second tab, that's the

7    characterization section of the NDA.  And in that it goes to

8    what is Abraxane in its final form, including some of the

9    issues on infringement.

10             You will note, there is no redaction there,

11   because it has nothing to do with the manufacturing process.

12   It's the final form of the product.  And we left that

13   largely intact.  In some cases there may be, as we went

14   through it, we might have seen manufacturing details.

15             So I don't know, I think the point we are

16   driving at, Your Honor, is --

17             THE COURT:  There is some small redactions, Mr.

18   Jacobs, I think.  I say small, there are some redactions.

19   Go ahead.

20             MR. JACOBS:  The Court can't decide this, I

21   don't think, on the fly right now based on what each side is

22   saying.  I would ask the Court to urge the parties to work

23   together to try to reduce the need for actual SAMI in the

24   courtroom, so that Abraxis is not put in the position of

25   having to ask the Court to seal the courtroom when SAMI is

1    going to be used.

2              THE COURT:  But, Mr. Jacobs, you would agree

3    with me that I should not -- it would be inappropriate,

4    improper, and unfair for me to hamstring Mr. Scheve in his

5    ability to prosecute his claims and to defend against any

6    counterclaims that might remain.  Right?

7              MR. JACOBS:  Of course.

8              THE COURT:  You correctly point out that this is

9    supposed to be an open process.  That is the default

10   position.  If it should come to pass that you can't work it

11   out, and that any of your proposals with regard to

12   preserving from view SAMI information may somehow prejudice

13   the ability of Mr. Scheve to protect his client's interest,

14   I will default to clearing the courtroom.

15             I hope that counsel will be able to work these

16   issues out, so there will only be a minimum of

17   interruptions, because there is a logistical issue there.

18   And you both want to be mindful of the jury's time and the

19   jury's level of potential frustration.

20             I say that generally, because, again, I go back

21   to the fact that this case is closely contested.  So counsel

22   will need to use common sense in the interposition of

23   objections and excessively arguing legal points while the

24   jury is here, excessive sidebars.  Keep in mind, they will

25   penalize one or both of you.  It is entirely possible for

```
 1    them to penalize both of you in their final judgment at the

 2    end of the day.  Keep that in mind.

 3              I will try to keep my temperature down,

 4    understanding, as I have tried to do today, it's not going

 5    to be helpful for me to become explosive.  Let me let you

 6    guys burn up.  I will try to put out the fires, is how I see

 7    my job, particularly in this case.

 8              I appreciate what's going on.  It's okay.

 9              MR. SCHEVE:  Your Honor, in order to limit or

10    reduce the amount of time for distraction, et cetera, we

11    really need to be able for this group of lawyers here to

12    work with these documents.  Because right now --

13              THE COURT:  I am not going to restrict your

14    ability to work with those documents.

15              MR. SCHEVE:  Under the current order, the only

16    people who can deal with this are Mr. Riddle and I.  We

17    can't even go to a vendor to create a blowup.  It's got to

18    be Mr. Riddle because of the way they have interpreted it.

19    We have gotten castigated umpteen times, accused of having

20    done this or that wrong.  And it has served no purpose.

21    Nothing has been disseminated to anybody.  It has served no

22    purpose other than to hinder and hamper.  We are ready to go

23    and try our case, but within this courtroom we need to be

24    able to deal with vendors who can make photocopies and help

25    us with blowups and demonstratives.  If I need to ask Mr.
```

1    Day to be able to look through this real quick, I can't say

2    you need to leave the courtroom.

3              THE COURT:  I appreciate your point, Mr. Scheve.

4    The examples that Mr. Jacobs just shared with both of us,

5    showing, I forget the number, where there were redactions,

6    principally, as I understood it, to be numerical, redactions

7    of factors and whatever you call it, mathematicians and

8    scientists call those things, are those problematic?

9              MR. SCHEVE:  I would have to answer that two

10   ways, not inconsistent ways.  Number one, what they

11   attempted to do there that you saw was, Abraxane is a

12   mixture of nine parts albumin/one part paclitaxel.  And yet

13   they did testing.  And part of our case will be about how

14   many different versions they had, and they never got to a

15   final formulation until they got our packet in 1996, until

16   after that.  But Abraxane is nine to one.  Why are they

17   redacting information about 12-to-one ratios and

18   eight-to-one ratios and six-to-one ratios?  That has nothing

19   to do with the manufacturing process for the drug that is at

20   issue or the product that is at issue here.

21             Now, I don't want to fight battles to fight

22   battles.  I am going to try to narrow it down, where I am

23   saying, I need this document in.  I am going to use this

24   document.  If I got ten documents that prove the same point,

25   I am going to give one of them there.  My view and our view

1    all along, Mr. Riddle and I, there has been way too much

2    characterization of what's truly manufacturing.  How can lab

3    notebooks during the development be called SAMI, meaning

4    secret Abraxane manufacturing information?

5            Thousands of pages of lab notebooks in the '94,

6    '95, '96 time period -- again, I am not here to fight every

7    battle, because now I am just focusing on what I want at

8    trial, and we understand Your Honor to say work together,

9    and we will do that.  But I can't be hand-tied.  If there is

10   a document in SAMI that I need to prove my case, we are

11   going to ask Your Honor to let me use that document.  I am

12   not here to blow up and show the world their manufacturing

13   process.  They have over-designated.

14           The example they showed you is perfect.  Why is

15   data about an 18-to-one or six-to-one ratio relevant when

16   that product isn't the marketed product?  It's therefore not

17   the product that is accused in this litigation.  How can

18   that be claimed to be manufacturing information?

19           MR. JACOBS:  What would be most helpful to the

20   Court at this stage?

21           THE COURT:  I don't want to get into a tit for

22   tat.  But Mr. Scheve uses the documents just handed up to me

23   as an example of over-designation and questions the

24   rationale for certain of the redactions.  So what I would

25   ask of both parties is to go back, Abraxis, to see if, out

```
 1    of an abundance of caution, you haven't over-designated and

 2    redact real SAMI to the extent you feel it just has to be

 3    redacted.

 4              Then we will have to clear the courtroom in

 5    those situations.

 6              Any other suggestions, I am open to.

 7              MR. SCHEVE:  When you say redact, do you mean in

 8    terms of coming to an agreement on what is redacted for

 9    purposes of the jury?

10              THE COURT:  Yes.

11              MR. SCHEVE:  We still have a right, do we not,

12    to see the SAMI documents?

13              THE COURT:  Yes.  I don't think that is an

14    issue.  Is that an issue?

15              MR. JACOBS:  Well, Your Honor, we have a

16    protective order that we heavily negotiated that limits

17    access to SAMI to five attorneys, and they plan on

18    substitute attorneys, so it's been multiplied.  There have

19    been issues of failure to protect SAMI, and we get into a

20    back-and-forth about whether it is really SAMI or not.  We

21    haven't brought that to the Court's attention.  We have come

22    very close to putting forward a motion on it, but we thought

23    we would work it out and focus on trial.  But they say this

24    is sensitive information.  They can't develop Abraxane.

25    That is their failure.  That fact makes this information all
```

1    the more critical.

2              THE COURT:  But is that information being

3    revealed to someone over at Kinko's going to be problematic

4    for Abraxis?

5              MR. JACOBS:  Exactly for purposes of preparing

6    an exhibit?  We will have to work out the specifics of this.

7    I undertake in good faith to work, for us to work with

8    opposing counsel to manage the mechanics of how we get from

9    here to trial, understanding that if I were in their shoes

10   and I had SAMI, I would have to do the same thing.  So we

11   will try and work that out.

12             Please don't blanket-order anybody on the Elan

13   trial team can see SAMI, because that would eviscerate all

14   we worked so hard to put in place for the protection of that

15   information.

16             THE COURT:  Was not the protective order

17   negotiated with the long view, that is, protecting the

18   information through the discovery process right on up

19   through the trial?

20             MR. SCHEVE:  It is an interim protective order,

21   Your Honor.  All we want is, we have got our trial team

22   here.  To give you an example, Judge, again, I am not here

23   to fight, but I feel --

24             THE COURT:  Sure you are, Mr. Scheve.  That's

25   your job.

```
 1            MR. SCHEVE:  There are accusations made that are
 2    just not factual.  Ms. Chiarini here was one of the five
 3    attorneys.  She got called off on an emergency for another
 4    client, so she was not available to us for a period of time.
 5    We then substituted another lawyer.  Then when Ms. Chiarini
 6    came back about eight or nine months ago -- I am not saying
 7    we asked them nine months ago, but within the last six
 8    months we have gone back and said, can Ms. Chiarini, who was
 9    on the original order, be allowed to look at this, they have
10    refused to let her do it.
11            THE COURT:  Isn't there language -- I don't have
12    the order -- isn't there language in the order that
13    addresses that substitution issue?  Because certainly that
14    is something that could be envisioned over the long course
15    of the leadup to a trial.
16            MR. SCHEVE:  I would not be the person to
17    address that specific issue, Your Honor.  But we thought we
18    followed the letter of the rule.
19            THE COURT:  I am talking about the spirit of the
20    thing.
21            MR. SCHEVE:  Yes.  We wrote and said, Ms.
22    Chiarini was back.  She was on it originally.  Now it's
23    being used strategically to impede my ability to try the
24    case.  I am saying, here is the trial team.  This trial team
25    needs to be able to work effectively, to look at documents
```

```
 1    for cross-examination.  And they would like to say, no, Mr.

 2    Scheve, while you are standing up at the podium we also want

 3    you to be scouring documents at the same time.

 4              THE COURT:  To what extent are the members of

 5    your trial team involved in areas of the practice of patent

 6    law that might be problematic for Mr. Jacobs, his client and

 7    his team prosecuting patents?

 8              MR. SCHEVE:  None.

 9              MR. RIDDLE:  I have been involved with

10    prosecuting patents before.  But I don't believe the SAMI

11    issues poses an issue in that regard.

12              THE COURT:  In this area of technology?

13              MR. RIDDLE:  I am already approved to view SAMI

14    documents.

15              MS. CHIARINI:  I, also, prosecute patents.  But

16    not for Elan and not on this technology.  It's usually

17    medical device work.

18              THE COURT:  Mr. Jacobs, your thoughts?  Do you

19    have anything you want to add?

20              MR. JACOBS:  I appreciate what they are saying

21    about the trial team needing to work with the documents.  I

22    think we -- I specifically did not advert to that issue when

23    I was talking about the issue of our concerns about the use

24    of SAMI.  That is the substituting of lawyers was not what I

25    had raised.  The Court directed us on that point.
```

1          THE COURT:  You brought it up.  But go ahead.

2          MR. JACOBS:  I would like to have a chance to

3    try and work this out with Elan.  We will somehow get on the

4    phone with the Court or something if we are unable to do

5    that.

6          THE COURT:  Let's leave it there.

7          MR. SCHEVE:  We proposed to them a written final

8    proposed protective order to deal with this going forward.

9    We have gotten, I think, no response back.

10         So if this is being used as an effort to make my

11   life more difficult so I can stay up until 4 in the morning

12   trying to prepare my examination, I need the help of this

13   team.

14         THE COURT:  That is not going to be an

15   acceptable result, Mr. Scheve.  If that submission could be

16   the basis for further discussion, that's fine.

17         MR. SCHEVE:  We will take it up with Mr. Jacobs.

18         THE COURT:  Okay.  Mr. Jacobs.

19         MR. JACOBS:  Preventing inappropriate

20   examination of Abraxis's witnesses at trial before it

21   happens.  Mr. Scheve and I have had an exchange on this

22   topic.  There were deposition questions that were asked of

23   our witnesses that went beyond, Your Honor, anything I have

24   ever seen in a patent case before.  Our damages expert was

25   asked about whether he understood that he could be subject

1   to criminal prosecution.

2           One of our experts -- I am not going to say his

3   name on the record because I don't want to be repeating this

4   on the record.  But one of our experts was asked about

5   statements that were made about him in divorce papers as to

6   whether that -- it is a way, we believe, of intimidating our

7   expert witnesses.

8           I have the examples assembled here, Your Honor.

9   Mr. Scheve and I had an exchange on this.  Mr. Scheve said,

10  you are trying to control what I do at trial.  You can't

11  control what I do at trial.

12          I am afraid here we are.  Frankly, Your Honor,

13  what I would really like to do is reassure our experts that

14  Judge Sleet patrols this courtroom for inappropriate

15  questioning and inappropriate cross-examination on topics

16  that are tangential to the subject matter.  I think I can

17  tell them that.  But I would like to be able to have it from

18  you so I can report it back.

19          THE COURT:  Mr. Scheve.

20          MR. SCHEVE:  Your Honor, there was an exchange.

21  Every -- not every.  Multiple of their experts are folks

22  that on their resume provided to us, it provides information

23  about where they were born, where they were educated, where

24  they were employed, where they were reared, et cetera.  In

25  that instance, multiple of them happen to be born in foreign

1    countries, happen to be educated in foreign countries,

2    happen to be reared in foreign countries.

3              The only questions I asked them are, did you

4    become a U.S. citizen?  When did you become a U.S. citizen?

5    As part of discovery.  This discussion about -- this isn't

6    my first rodeo.  I know I am not going to be stupid in terms

7    of the questions I ask.  But I have a right, I think, during

8    discovery to inquire about the things that are on their CV.

9    I didn't think it was appropriate for Mr. Jacobs to be able

10   to tell me you can't ask them about anything that relates to

11   sort of, as they characterize it, my asking about

12   nationality.  That's what happened.

13             MR. JACOBS:  Your Honor, I really would ask we

14   not put this statement on about one of our experts.  I would

15   like the court reporter to expunge the name.

16             I can show Your Honor the testimony.  You can

17   judge for yourself whether this was appropriate or not.  I

18   don't want it --

19             THE COURT:  We will excise as appropriate.

20             Can you make your point?

21             MR. SCHEVE:  Yes.  Dr. "Blank," I did a

22   background search on him.  I find in a motion to protect

23   against bodily harm, in a family dispute, what we call a

24   motion for restraining order by his wife filed against him,

25   that she made an allegation that was never denied by him

```
 1    that, quote, I do this, in brackets, testifying, quote, in

 2    court, close brackets, for an F-blank-blank-blank-ing

 3    living, end quote.  He went on to say, I will have that

 4    judge in the palm of my hand, end quote.

 5              They just happened to be --

 6              THE COURT:  Which judge was he talking about?

 7              MR. SCHEVE:  I don't know.

 8              THE COURT:  I am kidding.  I don't want to make

 9    light of anybody's marital difficulties.

10              MR. SCHEVE:  Nor am I, Your Honor.  It happened

11    to be in pleadings.  I asked him, did you ever say that?

12    And he said, well, I might have.  Instead, it's, Mr. Scheve

13    is going into their divorce --

14              THE COURT:  Here is the thing:  I expect that

15    you know that I wouldn't tolerate inquiry in that area.

16              MR. SCHEVE:  About their marital discord?  I

17    have no interest in their marital discord.  But I do believe

18    when it gets down to impeaching him as a professional

19    witness, when he has made the statement about his wife, who

20    he's still married to, it got dismissed, unless he was

21    lying, he made the statement, "I do this testifying for a

22    living."  I think that would be proper.

23              THE COURT:  Within the super-heated context of a

24    marital dispute, you might say anything, quite frankly,

25    counsel.  I am not going to permit that type of inquiry.
```

```
 1                    MR. SCHEVE:  For purposes of discovery, Your

 2      Honor, I had a right --

 3                    THE COURT:  That is fine.  We are beyond that.

 4                    MR. SCHEVE:  Everything I did was in the context

 5      of discovery.

 6                    THE COURT:  This is another motion in limine.

 7      That is okay.  I am not deaf, dumb and blind.  Go ahead.

 8      Not yours.  Both of you.  I understand.

 9                    MR. SCHEVE:  They accuse me of harassing him.

10      Under the Missouri Freedom of Information Act -- first off,

11      as an employee of the University of Missouri, he has to

12      limit his number of hours.  And I used the Missouri Freedom

13      of Information Act to simply send a request to them asking,

14      do you have his report for how many hours he spent

15      consulting?

16                    What I get back is that I am doing this to

17      threaten him.  I mean, if he didn't comply, and he didn't,

18      with his obligations to the university, that's his problem.

19      But how am I harassing anybody by doing what any citizen of

20      the United States can do, by making a written request to the

21      university, saying can you give me these documents under

22      Freedom of Information?  And I am accused of harassing.

23      That is the kind and nature of what has happened in this

24      lawsuit.

25                    I am a professional.  I am an officer of this
```

```
 1    Court.  I am going to conduct myself appropriately at trial,

 2    Your Honor.  But I am constantly accused and my team is

 3    constantly accused of things that are baseless.

 4              THE COURT:  Mr. Jacobs.

 5              MR. JACOBS:  This is pretty important.

 6              THE COURT:  Counsel, I am trying to give you a

 7    chance to air this out, because I think there may be some

 8    benefit, hopefully, to this.

 9              MR. JACOBS:  I am handing you some deposition

10    excerpts.

11              THE COURT:  Please focus on discovery/trial.

12              Mr. Scheve seemingly, to me, at least, has

13    acknowledged his obligations at trial may change, in terms

14    of this issue.  Go ahead.

15              MR. JACOBS:  Mr. Scheve argued to the Court that

16    in cross-examining this witness at trial he could impeach

17    him as a professional expert.

18              THE COURT:  I have just dealt with that.

19              MR. JACOBS:  You have dealt with that.  But

20    there are other examples that exceed even that, Your Honor.

21              THE COURT:  Well, if that's the baseline, then

22    he knows now, Mr. Scheve knows now beyond which he cannot

23    go.  If he does, you are going to be up I am sure in a

24    flash:  "Your Honor, may we see you at sidebar?"  White

25    noise machine goes on.  We go to sidebar.  Okay?
```

```
 1                    MR. JACOBS:  Okay.

 2                    THE COURT:  I don't think we need to spend a lot

 3     more time on this.

 4                    MR. JACOBS:  I needed to have this out and get

 5     your direction.

 6                    THE COURT:  Next.

 7                    MR. JACOBS:  Elan's new damages claim I think we

 8     will pass on, Your Honor.

 9                    Elan's attempts to preclude testimony without

10     filing motions --

11                    THE COURT:  I think we should pass on that.

12                    MR. JACOBS:  The '025 we have discussed.

13                    So I think we are done with ours.

14                    THE COURT:  Mr. Scheve, your addendum.

15                    MR. SCHEVE:  Your Honor, Dr. Atwood has tendered

16     a new report some ten months after --

17                    THE COURT:  You made reference to this earlier.

18                    MR. SCHEVE:  Right.  It does tie in with the

19     fact that if you go to the next one, Abraxis, when I first

20     took Dr. Atwood's deposition, I pointed to some documents

21     and said, were you aware of this?  And he said, no, I didn't

22     know anything about that, in terms of how their x-ray

23     diffraction work was done.  So without having identified in

24     answers to interrogatories this Katherine Melody or Dr. Tim

25     Wozniak ever, they have named them now as witnesses in their
```

1    pretrial order.

2         And they went out and got in some new documents

3    from this Katherine Melody, who is at a company called

4    Micron Laboratories up in Chicago.  They were never produced

5    in discovery.  And showed up ten weeks later in Dr. Atwood's

6    report.  And, you know, Your Honor, I heard about Dr. Byrn

7    earlier today that new materials, new people -- they

8    provided it on February 1st, I am advised by my co-counsel,

9    even though expert discovery stopped on December the 14th.

10        And so if Atwood is going to be allowed to talk

11   about brand-new stuff, the same reason that you said I can't

12   produce Dr. Byrn, can't use him, then at a minimum we should

13   get a deposition.  It's just not fair we be treated

14   differently than them in terms of new materials, new stuff

15   produced for the first time.  The close of discovery was in

16   August.  Here we are on February 1st.  We see for the first

17   time these documents.  And we got a new witness we see in

18   the pretrial order without any reference to answers to

19   interrogatories.

20        THE COURT:  These individuals are on a witness

21   list?

22        MR. SCHEVE:  Yes, sir.

23        MS. EVANS:  I am just getting my binder, Your

24   Honor.

25        I thought, when Mr. Scheve had selected his

1           motions in limine, that he was not going to be attacking --

2                    THE COURT:  Well, no.  Both of you have run

3           afoul of that parameter.  So we are not going to go there.

4                    MS. EVANS:  All right, sir.

5                    Let me first talk about the report.

6                    THE COURT:  It is a clever way of doing it, I

7           have to admit.  It gives me something else to put in my form

8           of order.

9                    Go ahead.

10                   MS. EVANS:  It all turns on the facts, Your

11          Honor.  That's the issue here.  That's the rub.

12                   The Atwood supplemental report does fall

13          squarely within Rule 26(e).  As you know from the

14          declaration that I submitted in support of our first motions

15          in limine and that Dr. Atwood submitted, the whole history

16          of the obstruction of our ability and Dr. Atwood's ability

17          to get the data that he needed to fully analyze, you know,

18          the evidence that Elan is relying on for solid-state NMR.

19          And he said in his report, when I get this electronic data,

20          I am going to -- this is in his first rebuttal report -- I

21          am going to supplement, I am going to analyze it and I am

22          going to supplement.  And he did.

23                   When he got it up and running, he did that.

24                   There is nothing -- everything in his

25          supplemental report was based on information that was

1    available because of Elan's conduct, or misconduct, after

2    the rebuttal report was due.  So there is no way that this

3    could have been done before, during the deadline.  That is

4    why there was a later rebuttal report.

5            The other issue here is that the subject matter

6    is the same.  Dr. Atwood's rebuttal report that was served

7    at the deadline talked at length about Dr. Munson's ssNMR

8    experiments.

9            THE COURT:  There is no new matter.

10           MR. EVANS:  No.  It is the same thing.  It's

11   crystallinity.  His whole first report was about

12   crystallinity and about paclitaxel and Abraxane was

13   amorphous.  That is the subject matter of his opinion.  That

14   is still the subject matter of his opinion in the rebuttal

15   report.  It is just more elaboration on that based on the

16   newly acquired information.  But it's the exact same subject

17   matter.  It's crystallinity and Munson's ssNMR testing.

18   It's the same subject matter.

19           THE COURT:  Do you intend to use Melody and

20   Wozniak?

21           MS. EVANS:  Yes, sir.  Let me tell you the

22   issues with respect to those.

23           So starting with Melody, Elan challenged the

24   methods used to prepare Abraxane's samples for XRPD for the

25   first time during expert discovery, actually, at the

1    deposition of Elan's Dr. Berkland.  He just volunteered it,

2    first time we heard it in the case, that there was something

3    wrong with the way the outside testing laboratory Micron had

4    prepared the samples for XRPD.

5            We never heard that before.  Not in any Elan

6    expert report.  Not in any Elan interrogatory response.  Not

7    a peep of this, Your Honor.  Not a peep.

8            Then all of a sudden it pops out at Dr.

9    Berkland's deposition, who was obviously prepped to say it.

10   And they asked Dr. Atwood about it at his deposition shortly

11   thereafter.

12           Well, they are going to challenge the

13   preparation?  We thought, okay.  This is now an issue.  We

14   didn't know this was an issue.  Now it's an issue.

15           So we went to Micron and we said, does the

16   person who does these XRPD analysis of Abraxane samples,

17   does that person still work here?  They said, yes, Katherine

18   Melody.  We talked to Katherine Melody:  Do you have your

19   lab notebooks?  Of course, I have lab notebooks.

20           And in fact, the issue that Elan raises, saying,

21   you know, Ms. Melody did this or did that, not the case.

22   Not the case.

23           And so we asked her for her lab notebooks or

24   Micron for the lab notebooks, and they gave it to us.  Our

25   expert, Dr. Atwood talked to Melody, and we are planning on

1    calling her as a rebuttal fact witness.  She is right

2    here -- I don't know where Chicago came from.  She is right

3    here in Wilmington, Delaware.  Micron is right here.

4            In fact, interestingly enough, this is really

5    ironic, Elan itself uses Micron to do its XRPD of its

6    nanoparticles.  I mean, it's a very reputable company and

7    well-known for doing XRPD work, and certainly has a lot of

8    experience in nanoparticle XRPD.  But we have the person who

9    actually did the work.  We have her lab notebook pages,

10   which shows that the concern that Elan raised for the first

11   time during expert depositions is just not an issue.

12           And one really ironic thing, Your Honor, is that

13   Elan has objected to those laboratories notebook pages as

14   being hearsay, and not authentic, and is also objecting to

15   Ms. Melody testifying so that she can authenticate those

16   pages and get them into evidence as a business record.

17           So it kind of puts us between a rock and a hard

18   place on that, Your Honor.

19           Mr. Jacobs reminded me, when we disclosed Ms.

20   Melody, we supplemented in initial disclosures February 1st.

21   And we produced the notebook pages.  We immediately offered

22   her up for deposition.  And I didn't hear back.  I think I

23   sent a total of at least three e-mails offering her up for

24   deposition and was told, no, we don't want to take her

25   deposition.

```
 1              THE COURT:  This is an easy one.  You have

 2      offered to take her deposition.

 3              MR. SCHEVE:  Your Honor, they didn't produce her

 4      underlying data, or identify her, until eight -- six months

 5      after the close of discovery.  And she just now confided to

 6      you, Dr. Atwood has called her and talked to her.  And

 7      again, my request as to Atwood is -- I don't know what this

 8      obstruction stuff is.  We gave them a CD with all the

 9      downloaded data.  We provided them a list of software

10      packages that we know worked because we did them and they

11      worked and you can download that data.  Not to argue whether

12      Dr. Atwood knows what he is doing, but it can be downloaded.

13      It can be dealt with.

14              It's characterized by them as somehow

15      obstructing the data.  If he is going to be allowed to

16      manipulate the data six weeks after the close of discovery,

17      seven weeks after the end of his deposition, then at a

18      minimum with regard to Dr. Atwood we should be allowed to

19      re-depose him.

20              THE COURT:  I was asking you about Melody.  You

21      reject the assertion by Ms. Evans that Dr. Atwood's

22      supplemental contains no new matter.

23              MR. SCHEVE:  She just told you that he talked to

24      Melody --

25              THE COURT:  So you want to talk to him about
```

```
 1    talking to Melody?

 2              MR. SCHEVE:  Why would they be able --

 3              THE COURT:  I don't need an argument.  Is that

 4    what you want to talk about?

 5              MR. SCHEVE:  I don't want them to present

 6    evidence on Melody when she should have been disclosed a

 7    long time ago.  She wasn't disclosed in the answers to

 8    interrogatories, et cetera.  Now what we have got, Your

 9    Honor, is a very self-serving -- I don't have full pages of

10    the lab notebooks they are relying upon.  Do you remember

11    the document --

12              THE COURT:  I suppose, though, that you would,

13    if I permit, am going to permit her use, you would want to

14    depose her.

15              MR. SCHEVE:  Yes, sir.

16              THE COURT:  That's what you are going to need to

17    do.  Let's cut it off.

18              I didn't have give her a chance to finish as to

19    Wozniak.

20              MR. SCHEVE:  I at some point need some further

21    guidance upon the deposition of her, Your Honor.

22              THE COURT:  Sure.  In terms of logistics, you

23    mean?

24              MR. SCHEVE:  The document I showed you a little

25    bit ago showed these various formulations.  I would sure
```

```
 1    like to see from her the x-ray powder diffraction of these

 2    various formulations, because all I have got are very

 3    selective documents.  This is the totality of it.  If I'm

 4    going to get to depose her, I want to see what other tests

 5    they had done with this individual, because they are

 6    offering her to talk about tests she did.

 7                THE COURT:  Ms. Evans.

 8                MS. EVANS:  Yes, sir.  What Mr. Scheve has is

 9    what Elan has is what we have.

10                We talked to Micron and said we would like the

11    underlying -- we gave them the reports that had been

12    produced in the litigation to Elan so that they would have

13    the reference numbers.  We said, we would like all the

14    underlying laboratory notebook pages for that work, for the

15    x-ray crystallography work that you have done for Abraxis on

16    Abraxane.  We received the pages that we produced as

17    received.

18                What we were told was that the things that had

19    been taken out was work for other clients.

20                Ms. Melody is a technician.  She does XRPDs day

21    in and day out for many, many years, so one notebook page

22    might have entries for a number of different clients.  They

23    weren't going to give us that.  They gave us what they said

24    were the relevant portions that concerned the work that they

25    had done for us.
```

1              That's what I know, Your Honor.  I spoke to them

2      myself.  So I know what I asked for and I know what they

3      told me they were giving us.

4              MR. SCHEVE:  Your Honor, the only pattern, x-ray

5      pattern they have given us is for the final formulation.

6      That's the only one.  This is it.  So for eight, nine years

7      of development, beginning in 1992, up until this one deal, I

8      don't have a single x-ray powder diffraction image.  If we

9      are going to take her deposition, this notion of just her

10     notebook, just to support these images, it's I want it both

11     ways.  I want to be able to limit what I can inquire about.

12     I want to see all the x-ray powder diffraction images that

13     they ran on various versions of their products.

14             I am going to be like Mr. Jacobs.  It is hard

15     for me to believe that you wouldn't have done a single x-ray

16     on any of the other up to 20 formulations, that you would

17     have only done it on the so-called one that became final.

18             MR. JACOBS:  I think we are mixing issues.

19     There is a body of x-ray powder diffraction that we produced

20     in the course of the litigation.  We produced the x-ray

21     powder diffraction of Abraxane.  I don't think there is

22     anything we didn't produce.  Then we went to Micron and

23     said, there is a backup question about preparation for that

24     XRPD.  Can you document your backup?  That's what Melody is

25     all about.  So let's -- he is good.  He is trying to

1    distract us a little bit, and I would like to stay focused.

2              THE COURT:  I think that I ruled.  Counsel are

3    directed to arrange the deposition of Dr. Melody.  If there

4    are more documents, they should be produced.

5              MS. EVANS:  Yes, sir.  To my knowledge, they

6    have all been produced.  But I will inquire again, sir.

7              THE COURT:  You heard that representation, Mr.

8    Scheve.

9              MR. SCHEVE:  Yes, sir.  But I still am going to

10   serve a notice that says please bring me any of your lab

11   notebooks for any other x-ray powder diffraction.  Will this

12   be at their expense, at our convenience, in terms of time

13   and location?

14             THE COURT:  Well, she is here in Wilmington.

15   The deposition will take place here in Wilmington.

16             When you say serve a subpoena with a request for

17   any other XRPD --

18             MR. SCHEVE:  Abraxis had submitted other

19   samples --

20             THE COURT:  As it relates to Abraxis.  Not other

21   clients.

22             MR. SCHEVE:  I am not using anybody else.  It's

23   just as it relates to tests on these formulations that they

24   were working on.

25             THE COURT:  That's fine.

1              Ms. Evans, Dr. Wozniak.

2              MS. EVANS:  Yes, sir.  Dr. Wozniak is an

3      oncologist here in Delaware who treats breast cancer using,

4      among other things, Abraxane.  And we disclosed Dr. Wozniak

5      in our second supplemental disclosures late in February

6      2008.

7              The way we came to Dr. Wozniak is this, sir.

8              In preparing for trial, we realized that we have

9      a lot of very technical, very detailed, very complicated

10     testimony, and that the jury, we thought, would really

11     benefit from putting a human face on this, someone who has

12     actually used Abraxane, can talk about its effect on, you

13     know, in his practice, how it compares to the previous Taxol

14     and its effect on his patients.  We thought that that would

15     be something that the jury would really benefit from and

16     would probably be a welcome relief from all the very

17     technical testimony from the experts.

18             He would not be on the stand long.  It would be

19     very, very short testimony.  We again have offered him for

20     deposition multiple times.  And we will be guided by Your

21     Honor's judgment in this regard.

22             MR. SCHEVE:  Not disclosed until February 29,

23     2008.  This is a disguised expert.  They woke up one day and

24     decided they thought this would help their case.  The

25     Court's ruling is I can't bring in Dr. Byrn.  But their

```
 1    proposal is they should be able to bring in their people,

 2    never disclosed, named to come in and talk about oncology

 3    issues?

 4              Again, as Mr. Jacobs's rationalized on the Byrn

 5    thing, they want me to go, instead of spending my time on

 6    trial preparation, running around and take his deposition.

 7              There is no justifiable excuse --

 8              THE COURT:  I am going to rule Dr. Wozniak out.

 9              Let's talk for a moment about, you were

10    responding to Ms. Evans's comments about Dr. Atwood.

11    Specifically, the assertion that the reason for the

12    supplemental, late supplemental, was Elan's failure in

13    discovery.  I think I am summarizing your assertion.  Am I

14    mischaracterizing?

15              MR. JACOBS:  Your Honor, I think this really was

16    in the motions in limine.  And it's not been raised here.

17              THE COURT:  Have we dealt with this?

18              MR. SCHEVE:  No.

19              MR. JACOBS:  You dealt with it when you said

20    they get five, not ten.  This isn't really here right now.

21    If there is something more they are asking for in this

22    section of the pretrial order --

23              THE COURT:  I think what they are asking is to

24    re-depose Dr. Atwood.  Is that what you are asking for?

25              MR. SCHEVE:  Sure, Your Honor.
```

1              THE COURT:  In a very limited area.

2              MR. SCHEVE:  Well, on the areas that he hadn't

3       previously dealt with, correct.  I am not going to rehash

4       anything.  He has talked now with Katherine Melody, who --

5              THE COURT:  Where is Dr. Atwood?

6              MR. JACOBS:  He is in Missouri.  Ordinarily, I

7       would say, absolutely, they should get a right to depose.

8       But the history here of why his supplemental report was late

9       really is fairly charged against Elan.  Had Dr. Munson and

10      Dr. Berkland's initial reports been complete, had all the

11      data been there, had it been accessible, Dr. Atwood's

12      rebuttal report would have been timely and complete.  That

13      is the only reason we are resisting a deposition.

14             MR. SCHEVE:  He had a CD that was readily

15      downloadable.  He didn't have the equipment.  He had to go

16      to his IT department because he doesn't do this for a

17      living.  And that's my client's fault, Your Honor?  When he

18      had a CD, when Dr. Atwood -- when Dr. Munson testified they

19      got a CD, it was downloaded straight off the software.  They

20      were advised of the software.  They were told of the

21      software that would allow them to download and, quote,

22      manipulate the data, manipulate meaning move it around, play

23      with it however they want.

24             Their inability to do that isn't my fault.  We

25      didn't manipulate a thing.  It came straight out of the

1    computer.

2              THE COURT:  You are saying that the subject

3    matter that was discussed in the supplemental report, that

4    information upon which that supplemental report was based

5    was provided timely.

6              MR. SCHEVE:  As to that, yes.  Katherine Melody,

7    no.

8              THE COURT:  We have dealt with Melody.

9              MR. SCHEVE:  As to the ssNMR, he finally got it

10   open six weeks later.  He had to buy a new computer or

11   something because he didn't have it.  That's supposed to be

12   my fault?

13             THE COURT:  Mr. Jacobs, he says it's not his

14   fault.

15             MR. JACOBS:  Your Honor, look at the

16   supplemental Atwood reports.  There is a list of exactly

17   what Atwood got and when he got it.  Among the things that

18   weren't disclosed were all these, hide the ball, other

19   people who did the work.  It took us weeks and weeks to get

20   their depositions, because -- for example, motions to

21   preserve orders being filed in district courts.  There is a

22   whole panoply laid out in the Evans declaration of just what

23   we had to do to pry that information from them.

24             There is the issue with the software that was a

25   very real issue.  They are using antique stuff.

```
 1              You don't even need to decide who is right about

 2    the software, Your Honor, because of the deposition, the

 3    documents, the lack of documentation, all of that gets

 4    revealed well after the official close of expert discovery,

 5    when Elan finally agrees, they are going to have to produce

 6    these people for depositions.  And it's right there on the

 7    face of the supplemental.

 8              THE COURT:  Mr. Scheve, he says put the CD

 9    aside, there were other discovery abuses.

10              MR. SCHEVE:  I think he acknowledges they had

11    the CD.  They had it immediately.

12              MR. JACOBS:  Your Honor, I am just trying to

13    avoid a dispute that you can't possibly resolve between us

14    counsel about whether the software was accessible or not.

15    But the Court does need to know that if they had a guy doing

16    work on their expert testimony, they should have disclosed

17    him in the expert reports.  They should have made him

18    available for depositions.  And the fact that we had to

19    spend hundreds of thousands of dollars and eons of

20    attorneys' time to get this discovery of what underlay

21    Munson's report was appalling.

22              All we are dealing with now is whether they get

23    yet more deposition time with Atwood -- I won't say it.

24    More deposition time with Atwood two weeks before trial.

25    And we resist.
```

```
 1              THE COURT:  I am going to accept the resistance,

 2   largely based upon the representation made by Ms. Evans that

 3   there is really nothing new in the supplemental report.  If

 4   it should come to pass that that is not correct, then you

 5   can bring that to my attention.  I am willing to look at

 6   highlighted versions of the supplemental report.  Make it

 7   easy for me.  If you convince me otherwise, Mr. Scheve, I

 8   may revisit this ruling.

 9              MR. JACOBS:  Can I be clear about what Ms. Evans

10   was saying?

11              THE COURT:  Ms. Evans has basically, in sum,

12   said that the supplemental report doesn't contain new

13   information.

14              MR. JACOBS:  I don't want you to rely on a

15   misunderstanding.  Of course, it supplements.  Otherwise,

16   there wouldn't be a supplemental report.

17              THE COURT:  Essentially, here is what I

18   understood.  And I don't want to misinterpret what Ms. Evans

19   said:  that Dr. Atwood has already been deposed on the

20   subject matter.  That's what I understand the case to be.

21              Mr. Scheve.

22              MR. SCHEVE:  His manipulation of the data when

23   he finally got himself a computer, a new computer, and got

24   it open, I haven't been able to ask him anything about that.

25   He has created charts.
```

1          MS. EVANS:  Two things, Your Honor.  One is, in

2     the original report, first of all, the electronic data that

3     Elan has talked about was not produced until middle of

4     November.  That is after Atwood's expert report.  In the

5     middle of November, in the middle of expert depositions,

6     after expert reports, that's when we got the disk.  That's

7     when the whole odyssey began of trying to get the operating

8     system, trying to get the computer.  It is Elan's misconduct

9     that is the reason why that was not in the opening report.

10         THE COURT:  Without accepting that assertion, or

11    that characterization, the ruling stands.

12         I think that completes the addenda, B and C, the

13    issues raised in those two addenda.  I have dealt with the

14    parties' combined witness exhibit list -- not witness list,

15    exhibit list.

16         There are a number of issues that are raised at

17    Tab 5.  I don't know if they are real or not, quite frankly.

18    If counsel want to guide the Court, if there are any real

19    issues, let's talk about them now.

20         MR. JACOBS:  We talked about this last night to

21    try to figure out what the nugget of our real dispute is,

22    because, obviously, we have to agree that the expert report

23    sets the boundaries of expert testimony -- let's focus on

24    that issue, the expert testimony issue.

25         We all have to agree that the expert reports set

```
 1    the boundaries of expert testimony.  Then there is a
 2    question about, well, what if we did ask in a deposition
 3    questions that went beyond the expert report.  Does that
 4    mean all of a sudden the expert can fully testify on that
 5    subject even if it wasn't in his expert report?  We have a
 6    disagreement about that.  We think it would be unfair if you
 7    are not given a roadmap to the testimony that all of a
 8    sudden because there are questions about the topic at a
 9    deposition that opens the door and vitiates the rule that if
10    it is not in the expert report it doesn't come in.
11                 That is one disagreement, is, okay, what happens
12    if the expert talked about this at deposition?
13                 I am sorry, Your Honor.  We could either talk
14    about this now or do it on the fly at trial.
15                 The second issue is this rebuttal issue.
16                 THE COURT:  I would rather do it on the fly at
17    trial.
18                 MR. JACOBS:  Can I flag the second one?
19                 THE COURT:  Yes.
20                 MR. JACOBS:  It's rebuttal.  Again, we disagree.
21    We think there were rebuttal reports and the word, quote,
22    "rebuttal" doesn't allow an expert to all of a sudden come
23    in with all sorts of new testimony that wasn't in his
24    reports.  We have a disagreement about that.
25                 THE COURT:  Mr. Scheve, is there a disagreement?
```

1    The meaning of rebuttal report?

2              MR. SCHEVE:  If I put on my case-in-chief, they

3    put on their case-in-chief in defense, and then I have to

4    rebut something that their expert came up with, that I can't

5    predict what their experts are going to say or be allowed to

6    say --

7              THE COURT:  Sure, you can predict what their

8    experts are going to say and be allowed to say.  That is the

9    whole purpose of that section of Rule 26.

10             MR. SCHEVE:  Your Honor, you just told me I

11   couldn't take Dr. Atwood's deposition.  He has all kinds of

12   manipulations of ssNMR.

13             THE COURT:  We can take Dr. Atwood as an

14   exception, perhaps.  But the rules are the rules.  They are

15   pretty well-known, I should think, to all of us.

16             MR. SCHEVE:  All I am saying is, to the extent

17   we have got witnesses who have submitted supplemental

18   reports, and I can't now go depose them, then we have -- the

19   issue is how can I say that my people are limited to what

20   was in their reports when I didn't know Dr. Atwood was going

21   to talk to Ms. Melody.  We didn't have his re-analysis and

22   his charts --

23             THE COURT:  You are going to get a chance to

24   talk to Ms. Melody.  Thereby, you will have an opportunity

25   to formulate what you want or don't want to ask Dr. Atwood

```
 1    about.  There may be nothing.

 2              MR. SCHEVE:  What I will confront, Your Honor,

 3    if I may, is that I will -- let's say I take Melody's

 4    deposition and we come up with some new information and I

 5    have got to have somebody rebut that now.  I will face the

 6    argument, that is not in your report.  Do I have to

 7    supplement my report?  I am simply saying --

 8              THE COURT:  I think we can cross that bridge if

 9    and when we come to it.  All we can do in a pretrial

10    conference is to the best of our abilities anticipate

11    issues.  We can't anticipate every issue that is going to

12    arise.  Naturally, some of the rulings I have made are going

13    to create other issues.  We understand that.  A trial is a

14    living, breathing thing and we will live and breathe and

15    deal with it as we need to.

16              MR. SCHEVE:  My position simply is you can't

17    make those rulings --

18              THE COURT:  You can't make every one, I agree.

19              MR. SCHEVE:  That is what I see Mr. Jacobs

20    wanting.  He wants you to rule if it is not in the report,

21    even though Melody and others are going to be deposed

22    later --

23              THE COURT:  I have just accepted your assertion

24    that Atwood may be an exception to Rule 26 in this regard,

25    and there may be others.  But as a general rule, sure, you
```

```
 1          know what an expert is going to say.

 2                     Any other of these issues?

 3                     MR. JACOBS:  There are a couple of things we

 4          have agreed to, Your Honor, that I would like to report to

 5          you.

 6                     THE COURT:  Let's take a short facilities break.

 7                     (Recess taken.)

 8                     THE COURT:  All right.

 9                     MR. JACOBS:  A few things we agreed on, Your

10          Honor.  We agreed on the order of proof, that Elan will go

11          first on infringement.  We would go first on invalidity.

12          Rebut on infringement, et cetera.

13                     And that means we go last on invalidity because

14          we rebut on invalidity.

15                     What we didn't agree on was the order of closing

16          argument.

17                     THE COURT:  It's going to be plaintiff, you,

18          plaintiff.  I am fine with your agreement as to the order of

19          proof.  That's going to be it.

20                     MR. JACOBS:  Understood, Your Honor.

21                     We had a discussion about multiplicity of

22          experts on the same subject.  The Court has a standing order

23          on this:  one expert per subject.  We both understand that

24          is the rule in place.  I understand that Elan is going to

25          look at its experts and pick the ones on the particular
```

1    topics.

2              THE COURT:  Yes.  I am sure both of you

3    understand, you have limited time.

4              MR. JACOBS:  We agreed when we present Patrick

5    Soon-Shiong and Neil Desai, who are two Abraxis witnesses in

6    our case, that Elan can examine them as if they were in

7    Elan's case so that they only have to appear once.

8              THE COURT:  That's fine.

9              MR. JACOBS:  There is a similar agreement on

10   Gary Liversidge and Elaine Liversidge, the two inventors.  I

11   sent an e-mail last night.  Haven't had a response yet to

12   the question of whether Elan will, in fact, be calling both

13   Gary and Elaine Liversidge in their case.  We just need to

14   know, so that we know whether we are going to have to make

15   sure they appear pursuant to our trial subpoena in our case.

16             THE COURT:  Okay.  You have asked.  Mr. Scheve,

17   you have heard the question.

18             MR. SCHEVE:  I, frankly, didn't understand

19   exactly what he was asking.

20             THE COURT:  Do you want to repeat that.

21             MR. JACOBS:  Is Elan going to be calling Elaine

22   and Gary Liversidge in Elan's case-in-chief so we can

23   examine them at that time as if they are in our

24   case-in-chief without having to recall them, or,

25   alternatively, if Elan is not, will we have to call one or

1    the other or both in our case-in-chief?

2            MR. SCHEVE:  I am not trying to be quaint, Your

3    Honor, but I can't answer that question.

4            Elaine would only go to the invalidity issue.

5    It would seem strange for me to call her in my case on the

6    invalidity issue.  I haven't made that decision.  Certainly,

7    if I do call them in my case-in-chief, there will be no need

8    to bring them back and they can consider that evidence in

9    their case-in-chief.  But I can't say -- my goal is to

10   shorten my case, not make it longer.

11           Along those lines, since we have got another

12   witness in Melody, Your Honor, do we get more time than

13   eight days?

14           THE COURT:  No.

15           MR. SCHEVE:  We have added to the witness list.

16           THE COURT:  No.  We are not going to get more

17   time that eight days.  No.

18           Nice try, Mr. Scheve.

19           MR. SCHEVE:  I tried, Judge.

20           THE COURT:  Anything else?

21           MR. JACOBS:  A few other topics, Your Honor.

22           Elan has issued a trial subpoena to what we

23   regard as a lower-level Abraxis employee.  It turns out that

24   it was, as Mr. Scheve alluded to before, issued out of the

25   wrong district.  So it's defective for that reason.  We

1    believe it's defective because he is not, in the words of

2    the rule, a managing agent, officer, et cetera.  He is about

3    four levels down in the organization.

4              And we really just need to know what the Court's

5    preference is on procedure here.  We would prefer not to

6    have to move to quash that subpoena in the trial court in

7    which it has been issued out of.

8              We have advised Elan that we do not -- that we

9    are -- we have advised Elan similarly, that we are not sure

10   whether we are going to call Liversidge live in the trial.

11   We don't know how that is all going to play out yet.

12             The question is:  What do we do about this

13   little dispute about whether he is going to appear?

14             The rule is they can't subpoena him, we think.

15   Therefore, we would for the moment stand on the rule.  We

16   don't want to have to file a motion to quash.  That is

17   really the issue.

18             MR. SCHEVE:  The case law he alluded to, Your

19   Honor, is anyone, managing agent.  His title is senior

20   manager, Nanotechnology Product Development Group.  He was

21   the one who was brought into the company specifically to

22   reach the final formulation.  He was produced by them as one

23   of their 30(b)(6) witnesses to speak on behalf of the

24   company.  And we have subpoenaed him as the senior manager,

25   Nanotechnology Product Development Group, who was the one

1    responsible for settling on the final formulation.  It

2    clearly falls within the case law.

3            We are not going to rank-and-file people.  He is

4    the head formulation guy in the company.

5            MR. JACOBS:  Not a managing agent, officer,

6    within the meaning of the rule, Your Honor.  He is a manager

7    of a product, number one.  Number two, they had two days of

8    deposition.  So there is plenty of testimony from this

9    witness that they can put on through video or otherwise.

10   The fact that he is a supervisor of product development

11   doesn't change his status under the rule.  We may ultimately

12   bring him and this may be moot.  But for the moment we got

13   the subpoena out there that's wrong.

14           MR. SCHEVE:  We are going to correct that.  I

15   acknowledge, apparently, we had the wrong caption on it.  We

16   will correct that.  For them to say he is now not a managing

17   agent, when he is the lead formulation scientist in the

18   company responsible for reaching the final formulation and

19   all of these tests that are done in the case and say, we

20   don't think that you can gain access to him, that is again

21   trying to hide behind a procedural niche to avoid producing

22   someone.

23           We only issued three subpoenas.  They in

24   contrast have issued sevens subpoenas, including issuing

25   subpoenas to our experts that are within a hundred miles, et

```
1    cetera.  They have got four of our company employees, a

2    custodian of records.

3              It's really sort of, they want to be treated

4    differently than we do.

5              MR. JACOBS:  I have the deposition testimony on

6    his place in the company hierarchy.  In his deposition, at

7    Page 18, this is the deposition of Ulgarat Selvaraj, Friday,

8    June 22, 2007, basically in this passage, at Page 18, he

9    points out that the supervisor of the formulation

10   development of Abraxane is his boss, Kang Yang (phonetic).

11   He is the head of the department.

12             I could read the whole stream.  But I tried to

13   summarize it, Your Honor.  That is his testimony.

14             THE COURT:  Mr. Scheve, do you think --

15             MR. SCHEVE:  He is a managing agent.  His title

16   is, he testified to, is not manager.  Senior manager.  Not

17   just Abraxane.  Nanotechnology Product Development Group.

18   And again, they put him up as a 30(b)(6) to speak on behalf

19   of the company.  I don't know how they can now say he is not

20   an agent for purposes of binding the company, both in his

21   professional capacity as the lead formulation guy, and he

22   was designated by them for 30(b)(6) to speak and bind the

23   company.

24             Now it's, well, we don't think you can compel

25   him to show up.  It is asking for different rules applied to
```

```
 1    the parties, Your Honor.  30(b)(6) has nothing to do with

 2    Rule 45.  He was designated to testify about people who were

 3    involved in the formulation of Abraxane.  That was his

 4    topic.  30(b)(6), you can designate anybody to testify on

 5    anything.  That doesn't make them a managing agent.

 6              MR. SCHEVE:  I will point out, Your Honor, he

 7    was deposed as 30(b)(6) and we later took his deposition.

 8    He is reading from the 30(b)(6) deposition.  His title

 9    changed in the interim.  What I have told you is his current

10    title, at least when I took it in July, it was senior

11    manager, Nanotechnology Product Development Group.

12              THE COURT:  Lot of words.  Refresh my

13    recollection as to why this is an issue at all.

14              MR. JACOBS:  Because Elan issued a trial

15    subpoena to him and would like to compel his attendance from

16    Los Angeles.

17              THE COURT:  He is in Los Angeles.

18              MR. JACOBS:  Chicago, sorry.

19              THE COURT:  He is on your witness list?

20              MR. SCHEVE:  Yes, Your Honor.

21              THE COURT:  The purpose of this witness?  Give

22    me a proffer.

23              MR. SCHEVE:  Well, I have got to establish, Your

24    Honor, how they assiduously avoided -- I believe -- I am

25    telling you many of my thought processes.
```

1                    THE COURT:  I don't want you to do that.

2                    MR. SCHEVE:  They went to a certain point and

3       stopped testing.  They never tested, they never applied an

4       x-ray --

5                    THE COURT:  You said that already.  That is not

6       a revelation.

7                    MR. SCHEVE:  He is the fellow to get those

8       admissions.  He wrote the CMC portion of the IND.  He is the

9       guy who made the decision to ship this stuff to Micron.  He

10      is right in the guts of this case.

11                   MR. JACOBS:  I think, if they have those

12      admissions, they have those admissions, they can play or

13      read those admissions from the deposition.  That is what

14      depositions are for.

15                   THE COURT:  Do you feel that inadequate?

16                   MR. SCHEVE:  Yes, Your Honor.  I want them to

17      see this person.  Dr. Desai has characterized this fellow as

18      not having any expertise in crystallography.  Yet they put

19      him in the position.  And I want the jury to judge the

20      credibility.

21                   Interestingly, they try to force us to bring our

22      people, they have objected to us reading depositions from

23      our people.  It is very clear they want different rules

24      applied to two companies.  I am asking for fairness.

25                   THE COURT:  Is there another witness that might

1    serve this purpose that the parties could agree fit the

2    designation?

3                MR. SCHEVE:  The three relevant people Dr.

4    Soon-Shiong, Dr. Neil Desai and Dr. Selvaraj.

5                There are a lot of what I would call

6    rank-and-file employees.  I would love to be able to do it,

7    but I haven't subpoenaed them because I don't believe they

8    hold the title of senior manager within a product

9    development group.

10               THE COURT:  What kind of burden does it place on

11   Abraxis to bring this gentleman, the three hours it will

12   take for him to fly?

13               MR. JACOBS:  Your Honor, he has his trial

14   strategies for bringing him.  We have a trial strategy

15   reason for not bringing him.  Rule 45 says managing agent.

16   He is not a managing agent.

17               I don't want to elevate this to -- try to make a

18   burden argument.  They did take his deposition.  We are sort

19   of standing on our trial rights, because I don't want them

20   to be able to have him live, Your Honor.  It's that simple.

21   Or I may not.  We may end up deciding to bring him.  For the

22   moment, I want to be able to hedge my bets and I don't want

23   to have to file a motion to quash.  But if we have to,

24   that's what we will do, when they issue the subpoena.

25               THE COURT:  Let's see what happens when they

```
 1   reissue.  If they want to move to quash, I will decide the

 2   motion.

 3              MR. JACOBS:  That was actually my technical

 4   question.  Technically, we would have to bring it in the

 5   court from which it issues.  But I believe you would have a

 6   strong desire that it come to you.

 7              MR. DAY:  We are going to reissue it from this

 8   Court.

 9              THE COURT:  Even if it is not, I could hear it.

10              MR. JACOBS:  Your Honor mentioned jury

11   instructions.

12              THE COURT:  I have the preliminary jury

13   instructions.  I want to discuss the areas of disagreement

14   with you.  These need to be put in shape by whoever on your

15   team has responsibility for this.  I know it's not you, Mr.

16   Scheve.

17              MR. SCHEVE:  Your Honor, I understand Your Honor

18   is going to want us to whittle this down.  I proposed to Mr.

19   Jacobs yesterday that we take a stab at each party

20   tendering, in addition to what I understand to be sort of a

21   standard set, each party tendering, we will tender five

22   questions, they will he tender five questions.  Come to some

23   agreement like that.

24              THE COURT:  You are talking about voir dire.  I

25   will handle the voir dire today.  The preliminary
```

```
 1    instructions.

 2              MR. SCHEVE:  Excuse me.  I am sorry.

 3              THE COURT:  There are some substantive

 4    disagreements, it seems to me, in the jury instructions.  I

 5    well-understand that counsel may not have paid a lot of

 6    attention to jury instructions at this point.

 7              You said you did.  Okay, Mr. Jacobs.  What I

 8    need to know is, is there any further room for agreement, or

 9    are you now at loggerheads?  Have you done what you can do?

10    I am just talking about the preliminary instructions.

11              MR. WALTERS:  Your Honor, I think, with the

12    preliminary instructions, we are probably closer than it

13    might appear from looking at this.  If you look at the

14    objections, many of them, there is basically three or four

15    categories that I think are fairly easily dealt with.  One

16    is, we think the '025 is in.  They think it should be out.

17    That covers a number of them.

18              We have objected throughout the instructions to

19    instructions on the presumption of validity and on the

20    instruction on clear and convincing evidence, because we

21    think that those instructions are legally unnecessary and

22    improper.  We understand Your Honor has ruled on that in

23    prior cases.  So we are making our objection.

24              THE COURT:  Okay.

25              In other words, you win on that.  That is his
```

1        point.

2                    MR. WALTERS:  There is a minor, well, it's minor

3        in size, easily fixed, in Instruction 1.6, there was a

4        change from your form instruction, one word.

5                    THE COURT:  "Should," "must."

6                    MR. WALTERS:  "Should," "must," we think if they

7        didn't prove their case, then the jury --

8                    THE COURT:  "Must."

9                    You think I should say "should."

10                   MR. SCHEVE:  That is a verdict director, Your

11       Honor.  There is case law on that.  We think it should say

12       "should."

13                   MR. WALTERS:  I believe they say if they

14       persuade the jury they must find for Elan and the opposite

15       for us.  If they didn't prove their case, the jury needs to

16       come to a verdict.

17                   MR. SCHEVE:  We will work with them on it.

18                   THE COURT:  I had a question.

19                   MR. WALTERS:  There are some other minor things

20       in terms of the order of how we present a clear and

21       convincing instruction for validity versus willful

22       infringement.  I would hope we could work that out.

23                   THE COURT:  Let me let you work on that.

24                   There is disagreement about the guidance, at 1.7

25       at Page 14, the general guidance regarding patents.  Have

1    you contemplated using the video instead of doing this?

2         MR. SCHEVE:  We suggested that Your Honor do

3    that, and I think we came to agreement last week.

4         THE COURT:  Do you want to show the video?  I

5    would suggest you display it to the jury before I give the

6    preliminary instructions.  But we can do it in any order you

7    want.

8         MR. SCHEVE:  That is fine with us.

9         MR. JACOBS:  Before would be great, please.

10        THE COURT:  Remember that, please.  I will leave

11   you to your own devices.

12        MR. WALTERS:  In terms of the substantive jury

13   instructions at the end of the case, there are much more

14   significant disagreements.  I think we can probably get

15   closer.

16        THE COURT:  That is good news.  Here is my

17   directive on that:  Make an effort to get closer, every

18   effort that you can.  Then we will have a conference to

19   discuss those issues.

20        MR. SCHEVE:  One issue in that regard, Your

21   Honor.  We have asked them repeatedly to acknowledge that

22   they didn't seek legal counsel advice before putting this

23   product on the market.  Your Honor has clearly ruled in the

24   Energy Transportation Group versus Demant Holding Company

25   case --

```
 1              THE COURT:  Can you believe it?  That case has

 2    been tried, and I got a teleconference waiting on that.

 3              MR. SCHEVE:  They still refuse to answer the

 4    question.  And it goes directly to the instructions, because

 5    we are going to ask for a negative inference.  We think they

 6    should answer the question.  They have not put a thing on

 7    their privilege log that relates to anything.

 8              I think the answer is, no.  But they have

 9    assiduously avoided telling us that, no, we didn't seek

10    legal advice.  We would ask that that question be answered.

11              MR. JACOBS:  We never said we are not relying on

12    advice of counsel for willfulness.  We think that is all we

13    really need to say on this score.  We know Your Honor's

14    ruling on what they can make of that.  I think we disagree

15    on that ruling.  It is what it is, as they say.

16              THE COURT:  For now, at least.

17              MR. JACOBS:  That is all we think we need to

18    report.

19              THE COURT:  Adequate to your needs?

20              MR. SCHEVE:  Again, I would really appreciate,

21    Your Honor, them answering the interrogatory.  All I have

22    got is objections to it.

23              THE COURT:  Are you prepared to answer the

24    interrogatory?

25              MR. JACOBS:  I think we just did, Your Honor.
```

1          MR. SCHEVE:  We don't have a single verified

2   interrogatory answer in this entire case, Your Honor.  They

3   have refused to verify, they haven't signed, their client

4   hasn't signed --

5          THE COURT:  It's late in the day, Mr. Scheve.

6          MR. SCHEVE:  I would just like an answer to that

7   interrogatory.  That's all I am asking for.  I don't know

8   why --

9          THE COURT:  Mr. Jacobs, answer his

10  interrogatory.  Okay?

11         MR. JACOBS:  We did.

12         THE COURT:  I think you did.

13         MR. JACOBS:  We think we answered it.  We are

14  not relying on advice of counsel.  But we are not telling

15  him whether there were lawyers involved at various stages,

16  for example, litigation counsel at various stages.  He gets

17  to say whatever he wants from --

18         THE COURT:  It's a factor.

19         MR. SCHEVE:  But the interrogatory goes, did you

20  rely on, get an opinion of counsel before you put the

21  product on the market?

22         THE COURT:  And the answer is no.

23         MR. SCHEVE:  That's what I needed.  Thank you,

24  Your Honor.

25         THE COURT:  You got it.

1          What you need to do, to the extent that there

2     remain issues that you cannot resolve with these preliminary

3     instructions, the minute you have arrived at the impasse,

4     just like with a discovery dispute, contact chambers.  Let's

5     get on the phone and let's get it resolved.

6          In terms of logistics, Ms. Walker can assist you

7     in how they should look.  One of the things absolutely that

8     has to be done is remove all references to sources and

9     footnotes.

10          But the face page is simply Preliminary

11     Instructions, no party's name or no law firm's name on it.

12     Again, Ms. Walker can assist you if necessary.

13          There is a set on the website, she reminds me.

14          Voir dire.  This order, because this is the way

15     it was given to me and I think the way it was filed at 5/12

16     and 5/13, Plaintiff's Proposed Voir Dire and Defendant's, it

17     is probably easier for me to tell you, Elan, what I am going

18     to permit than what I am not, because most of it I am not

19     going to permit.

20          We use the struck-juror method.  When the panel

21     comes in, I think it will consist of approximately -- I

22     think it's 32 veniremen and women.  You can get the list

23     from Ms. Walker, you should, you can get it as early as

24     three days before from Mr. Trickey, John Trickey.  Your

25     Delaware counsel can assist you in that regard.

1          I am advised, there might be a 50 draw, of the

2     jury venire.

3          You should check with Ms. Walker the morning of,

4     because we will get a copy which will be more recent than

5     the three-day copy you get and there may be some changes.

6     So she will come out and give those to you.

7          They will be seated.  I will ask the general

8     questions.

9          I will e-mail to you sometime during the time

10    between now and trial what your voir dire will look like and

11    give you an opportunity to feed back to me on things that

12    you feel passionate about, only those things that you really

13    feel passionate about.

14         I will give you a chance right here today to

15    talk to me about those questions that you feel strongly

16    about, that I have otherwise ruled out of order.

17         So as we go through Elan's proposals, you might

18    want to check, counsel:  Judge, would you go back to

19    Question No. 8?  I would really like to discuss that with

20    you.

21         We will ask the general questions.  Counsel will

22    be invited to sidebar with me.  We will bring each juror up.

23    You will get a chance to talk to the putative jurors at that

24    time.  I will limit the questioning as I see fit.  But I

25    will give you an opportunity to expand on their answers to

1    questions within reasonable parameters.

2              Then we will go through each of the jurors.  I

3    will receive challenges for cause at that time, not in front

4    of the juror, but after the juror goes back to the well of

5    the court.  And I will rule on them right then and there.

6    There will be occasions that I will sua sponte remove a

7    juror.  Example, child-care issues, something like that.

8              We will then recapitulate to make sure that we

9    are all in agreement as to who has been removed for cause

10   and who has not.  Then we will do the perempts.  Ms. Walker

11   will guide you through passing the pad back and forth.

12              Any questions about that?

13              MR. SCHEVE:  Is there an actual lottery, then,

14   Your Honor, to narrow down the 50 or 32 to a smaller group

15   when we get down to the peremptories?

16              THE COURT:  What do you mean when you say an

17   actual lottery?

18              MR. SCHEVE:  If you bring in a venire panel of

19   50 people, do I understand you to say that you are going to

20   take all 50 one at that time to go through the general?

21              THE COURT:  We will go through the general with

22   everyone.  Then we will take only those who have responded

23   affirmatively and bring them up with all of us.

24              MR. SCHEVE:  Is there a process, then, where

25   that 50 is cut down and it's a subset to which we make our

1    peremptories?

2            THE COURT:  Yes is the answer to your question.

3    You will be able to eyeball.

4            So let's go through Elan's.  The first question

5    that I am going to accede to -- you know, I have been doing

6    this long enough now that there have got to be versions of

7    patent voir dire that I have permitted in all the law firms

8    that do this work, and certainly in the law firms that are

9    represented here.  So you should have an idea already what I

10   am going to permit and what I am not going to permit.

11           So No. 10, yes.  With the exception that at the

12   end -- this language is not verbatim.  I am just telling you

13   generally that after the question mark or after -- "or any

14   medically related business that would make it impossible for

15   you to be a fair and impartial juror," or words to that

16   effect, I won't be asking those feelings, positive or

17   negative, how long have you held them.

18           No. 11, with this exception:  It will be

19   inquired up to the word trial, period.  Then the rest comes

20   out.

21           I will interpose anything regarding your

22   participation or anything regarding your participation that

23   would cause you to be unable to be a fair and impartial

24   juror.  This is the have you served as a juror before.

25           MR. JACOBS:  Your Honor, could I ask you to do

1      that one more time?

2                THE COURT:  No. 11, Have you served as a juror

3      before?  It will be actually broader than that.  I will

4      inquire as to whether you have been a member of a petit or

5      grand jury in federal or state court.

6                No. 12, I will inquire as to whether the

7      putative jurors have ever been a party to a lawsuit, not as

8      to whether they have used the services of an attorney.

9                And I will ask about the results, ask very

10     specific and detailed questions about their participation

11     relative to time, the type of case, and whether there was a

12     verdict, and for those who remember what the verdict was,

13     what it was.

14               I have never asked No. 15.  If Elan feels

15     strongly about that, that is, do you know of -- essentially,

16     do you know anybody else on the panel.

17               MR. SCHEVE:  I am led to believe, Your Honor,

18     that the jury panel would come from all over the state.

19               THE COURT:  They will.  The likelihood of one of

20     them knowing the other is slim, at best.

21               MR. SCHEVE:  This isn't something where I will

22     fall a sword on.

23               THE COURT:  Then as I will ask it.

24               Then we go down to 24.  Training in

25     pharmaceuticals.  During the general questions, I will not

1    ask them to describe that experience.  I will let counsel

2    follow up with that at sidebar, to a reasonable degree.

3          You will get some sense of the educational

4    background, you will know the section of the state that the

5    jurors come from -- I should say the educational level --

6    and the current employment on the jury forms, the sheets

7    that you get.

8          Drop down to No. 30, Have you ever heard of the

9    product Abraxane or the product Taxol, sure.  You will get

10   to follow up with them at sidebar on when, what have you

11   heard.

12         And then we drop down to II, I will inquire in

13   some way as to the following:  35, 36, 37, 39, 40, 41, 42,

14   43, 44, 45.  Then we will get down III, I will inquire in

15   some fashion as to 49, 59, 60 and 61, 70.  And that's it.

16         Of those questions I have excluded, counsel, are

17   there any that you would like to discuss?

18         You will have an additional opportunity.  Again,

19   I am going to send you an e-mail.  It will have the

20   questions as I contemplate them at the time of the delivery

21   of the e-mail.  You can feed back and say, Judge, we would

22   like you to tweak the wording here.  We would like you to

23   add this.  I will say yeah or nay.  And that's the way that

24   process will work.

25         You can look through that.  I am going to go on

1    through Abraxis's voir dire.

2            Again, easier for me to say what I am going to

3    allow.

4            Actually, not.  Some of this is going to

5    overlap, of course.  Again, I will use language that I have

6    either already come up with or will.

7            I am going to inquire into 1b., c., and d., 2,

8    3, 4, 5, 6, 11, 12, 13, 14, 15, 17, 19, 20, and 21.

9            MR. JACOBS:  Your Honor, as I prepared for this

10   discussion, the one I have been thinking the most about is

11   18.

12           THE COURT:  I looked at that.  Both of you have

13   some version of this.  I understand that both of you

14   suggest, appropriately, I think, that responses to these

15   questions -- let me ask you both to tell me first why.

16   Let's identify the question.  Again, Elan has a version of

17   this.  I don't remember which one it is.

18           But Abraxis proposes at 18 to have me inquire:

19   Have you, a family member, or close friend -- and it would

20   most likely be immediate family member.  I define immediate

21   family for the jury as sibling, spouse, parent, child --

22   ever received treatment for any type of cancer?

23           MR. JACOBS:  From our standpoint, we are the

24   company here with the actual anticancer drug.  And it could

25   be that somebody who has had experience with cancer reacts

```
 1    to our case presentation very favorably.  But it could also
 2    be that because they had some kind of adverse event in their
 3    cancer therapy that they have some kind of very deep-seated
 4    feeling that we would have a lot of trouble overcoming with
 5    our trial presentation.
 6              That is the concern.  I guess I should
 7    underline.  There is probably no more emotional topic for
 8    people to talk about in terms of health care than cancer.
 9    That is why we thought it was important to bring out the
10    emotional, I don't know whether this is the right word for
11    something so serious, baggage, the emotional frame of mind
12    that somebody would be coming to this trial with based on
13    their experience with cancer.
14              MR. SCHEVE:  We generally agree.  We think this
15    would be very helpful information, Your Honor.  These drugs
16    are used primarily for breast and other cancers.  Some
17    members of the jury might feel uncomfortable.  Our
18    suggestion, in our version, was that most of the followup
19    needs to be done at --
20              THE COURT:  I was trying to contemplate the
21    logistics.  These are general questions that I propound to
22    the jury.  Inevitably, unless I ask it of everyone, in some
23    way that is perhaps more innocuous than this, that which is
24    proposed by both of you, you are not going to get at the
25    entire panel.
```

```
 1                    I am willing to hear you on how we could do

 2      that.  These people are placed under oath.  We are proposing

 3      now to inquire into a very private matter.  I don't much

 4      cotton to the undue invasion of the putative juror's

 5      privacy.  Somebody might, frankly, not be truthful about

 6      this.  That concerns me.  I understand both parties'

 7      concerns in this regard.

 8                    Your concerns are reasonable.  I am open to a

 9      suggestion as to how we might get over this hurdle.

10                    I hadn't thought about it, I will be frank with

11      you.  I saw the question, I said, oh, no, we are not going

12      to do that.  That was my reaction.

13                    MR. JACOBS:  Could we reflect on this a little

14      further in light of your concerns?  We will do it as part of

15      the e-mail process.

16                    THE COURT:  Yes.

17                    Acceptable to you, Mr. Scheve?

18                    MR. SCHEVE:  Yes, Your Honor.  We would think

19      this would be helpful information.  As I understand it, you

20      want us to talk about how would we deal with it outside the

21      presence of the entire jury.

22                    THE COURT:  Yes.  How do we identify those

23      victims of this disease and then get a chance to get you in

24      a sequestered way to talk with them about those concerns

25      that might impact on their ability to be fair.
```

1            That's what we are trying to get at, is there

2    something within the treatment, the nature of the drug, that

3    will impact upon that ability.  It's a fair concern for the

4    parties.  I agree.  I am just not sure quite right now how

5    to get at the entire panel, because those who answer

6    affirmatively will be at sidebar.  You could ask them, in

7    the general course.  I could ask the question, then allow

8    you to follow up.

9            MR. JACOBS:  Then, if I can narrow exactly what

10   the concern is, it is whether this question gets read to the

11   jury venire and they raise their hands to it?

12           THE COURT:  Yes.  Or the other thought that

13   occurs to me is that, I guess we could somehow -- we will

14   know those who do not answer any of the general questions.

15   And we could call them up individually and ask that

16   question.  I guess we could do that.  It's going to take

17   some additional time, time that I didn't anticipate using in

18   the selection process.

19           Counsel, think about it.  You need to really

20   think about how important this is to you in terms of your

21   individual causes.

22           MR. JACOBS:  Thank you, Your Honor.

23           THE COURT:  All right.  You are going to need

24   to, I am sure you haven't spent much time, but you are going

25   to need to do what you can to again revisit the final jury

1    instructions and the verdict form.  The verdict form is a

2    big issue, I know, it always is.  Hotly contested.

3              Your turn -- no, not quite.

4              Jury notebooks.  I know you are going use

5    presentation equipment.  I urge you, in fact, I insist,

6    that, because I have seen it now happen in patent cases,

7    incredibly enough, where the jurors have not been provided

8    notebooks, and at some point during the course of trial said

9    to Ms. Walker, because she is with the jury, we can't follow

10   this.  You know, things are being flashed on the board, on

11   the screen, but -- you need to give them admitted -- and all

12   exhibits are admitted unless otherwise ruled out -- you need

13   to give them the things you want them to see.

14             So you have to use some common sense.  They

15   should be separate notebooks.  One for Elan, one for

16   Abraxis.  I don't think there is any way -- you can't agree

17   on anything else; you are not going to agree on a joint

18   notebook.

19             How many?

20             Twelve.  Eight, one for each juror, you will

21   need one for me, one for my clerk, you will need the

22   witness, just be prepared, have an extra, just in case.

23             My clerk reminds me of a different issue.  That

24   is your witness notebooks.  I think you are going to want to

25   have individual -- the jury notebook is a distinct issue

 1    from the witness notebook.

 2              Everybody does it differently.  I should think

 3    that you would anticipate having notebooks consisting of

 4    exhibits that you are going to cover with that individual

 5    witness.  I will need those as well.

 6              MR. SCHEVE:  Your Honor, I beg your pardon.  Do

 7    you envision that we provide not only a general but also a

 8    specific witness notebook for each?

 9              THE COURT:  Yes.

10              MR. SCHEVE:  Would we do that by giving them the

11    exhibits in advance of the testimony, so they can follow

12    along, or do we involve ourselves --

13              THE COURT:  When the witness gets called:  "Your

14    Honor, may I approach?"  And you give the witness the

15    notebook.

16              MR. SCHEVE:  Okay.  Are the jurors going to be

17    given a witness notebook?

18              THE COURT:  No.

19              MR. SCHEVE:  Just for the witness.

20              THE COURT:  Yes.

21              On approaching a witness, each witness, you ask

22    one time for leave to approach, then you have leave freely

23    to approach.  Please don't keep asking, "May I approach?"

24    It changes with each witness.

25              I am pretty rigid and, frankly, formal, when it

1    comes to this jury.  When they come in here, I sort of will

2    morph once that happens from the loosey-goosey guy you see

3    right now.

4             When you want to move about the courtroom, ask

5    for permission, and I will give it to you, because there are

6    going to be times when you need to move, to see something or

7    hear something, whatever the case may be.

8             I do not plant you to the podium.  It will be

9    back in the center.  I am not going to plant you to the

10   podium.  There is a mike on the podium.  It's useful.  The

11   acoustics in this room are awful.  We do have complaints

12   frequently about jurors not being able to hear.  I don't

13   think we are going to have that problem with either lead

14   counsel.  I have been able to hear you quite well.  But you

15   should keep in mind that the podium does have a mike and can

16   be useful.

17            You must keep a respectful distance from the

18   box.  The middle pedestal of that conference table that

19   plaintiff's counsel is situated at is probably close enough.

20   You can ask permission.

21            Jurors don't like to be hovered over.  You have

22   both been doing this long enough.  You know that.  They

23   really don't.  They like their space, and I like them to

24   have their space .

25            Stand up when you object.  Please, don't rattle

```
 1    off Rule 601(b)(2)3.  Just, "Hearsay," "Relevance,"

 2    whatever the real meat and substance of the objection is.

 3              I will rule on the objection usually rather

 4    quickly.

 5              If you think that I didn't understand you or I

 6    flat-out blew it -- and you are entitled to think that --

 7    ask for a sidebar.

 8              I encourage judicious use of sidebars.  Be

 9    thoughtful in your request for sidebars.  But you have got

10    to protect your record.  I may be in a bad mood and not want

11    to go to sidebar, but it's your job to get me there so you

12    can protect your record, so you can make your objection, so

13    I can correct perhaps an error that I am about to make.

14              Okay?

15              MR. SCHEVE:  Along those lines, Your Honor, on

16    offers of proof, is there a particular procedure you would

17    like us to follow?

18              THE COURT:  No.  I expect that you will have

19    discussed these issues in advance.  Right?

20              MR. SCHEVE:  Yes.  But if Your Honor were to

21    exclude certain opinions or questions --

22              THE COURT:  And you want to make an offer of

23    proof, just say, Judge, may we have a sidebar?  When we get

24    there:  Judge, I would like to make an offer of proof.

25              MR. SCHEVE:  If it is a document, we will do it
```

1    outside the jury's presence?

2              THE COURT:  Yes.

3              MR. SCHEVE:  Your Honor, this witness will

4    provide the following testimony if allowed..., would we

5    excuse the jury?  How do you propose dealing with that?

6              THE COURT:  We will go to sidebar.  If it is

7    going to be a lengthy conversation, I will excuse the jury.

8              MR. JACOBS:  Another mechanical question.  If we

9    do have a beyond-the-scope objection to expert testimony, in

10   a way that challenges to quickly share with you why it is

11   beyond the scope, is there anything you have found that

12   works well in being able to provide you with what you need

13   to make those rulings on the spot?

14             THE COURT:  Beyond the scope of an expert

15   report, you mean?

16             MR. SCHEVE:  Correct.

17             THE COURT:  Have the report.  Somebody other

18   than the questioner on your team should be designated to

19   deal with that.  It comes up more frequently than I would

20   imagine, but I have seen it a lot now over almost ten years

21   I have been doing this.  And it does happen.  It is most

22   helpful when I am able to look at the report and see it

23   myself.

24             MR. JACOBS:  I would imagine we would talk with

25   the Court staff about equipment.

```
1              THE COURT:  Ms. Walker.  She will take care of

2   that for you.  She will make sure that you have access to

3   the courtroom and how to manipulate the equipment.  There is

4   nothing more frustrating for lawyers, I know, than to have

5   things not work.  But I know that good lawyers, like you

6   are, will be able to soldier on, should a breakdown occur.

7              MR. JACOBS:  One other thing.  We would like to,

8   we think we would like to have a few people watching the

9   trial and giving us feedback as it occurs.  We would like to

10  have a direction from the Court that that would not be

11  alluded to in argument, would not be highlighted for the

12  jury, that we have done that.

13             THE COURT:  In what way?

14             MR. JACOBS:  In some kind of argument that, They

15  didn't trust you.  Look, they have these people in the back

16  of the room the whole time.

17             THE COURT:  I never had that before.  That's

18  fine.  I don't think that would be appropriate argument.

19             MR. SCHEVE:  I don't know what's going to

20  happen.  If they are going to put a shadow jury in here,

21  Your Honor, there has been some considerable case law on

22  that about impressions drawn.  And juries will know

23  immediately when there is the same faces showing up, there

24  is a shadow juror.

25             All I am saying is, I think that is something
```

 1    you have got to deal with as it comes up.  I don't

 2    anticipate making use of it.  But I don't know what's going

 3    to happen.  I would urge Your Honor to see what comes out of

 4    the use of a shadow jury.

 5              THE COURT:  Just do me this favor and courtesy.

 6    Let's go to sidebar, preview the issue, or the night before

 7    or the morning of, and we can talk about it.  I might, will

 8    likely let you give me some citations, look at some

 9    authority.  But if you see it, Mr. Scheve, you think it's

10    becoming a problem, you need to highlight it for me.

11              MR. SCHEVE:  Your Honor, if I may, I am old

12    school, I really like to use boards.  Does the Court provide

13    tripods or do I need to bring my own?

14              THE COURT:  Ours are pretty flimsy.

15              MR. SCHEVE:  Obviously, we will bring our own

16    flip charts and things of that sort and the actual tripods.

17              THE COURT:  I would do that.  There are plenty

18    of people around.  We have our own cottage industry we have

19    developed.  Us and the Eastern District of Texas,

20    apparently.  We have been at it a lot longer, by the way.

21              I can't think of much else.

22              MR. JACOBS:  On posttrial --

23              THE COURT:  Let me say a word about statements

24    of counsel.  Be real careful about making gratuitous

25    comments about editorializing with this jury.  It's

```
 1    inappropriate.  Opening statements are just that.  They are
 2    designed -- and I will tell the jury, and you have all
 3    agreed on the instruction, that they are designed to provide
 4    an outline of the case, to help guide the jury.  It is not
 5    an argument.  It is not an opening argument.  You will get a
 6    chance to argue.  Keep that in mind.
 7              MR. JACOBS:  In terms of previewing evidence,
 8    one of the things we have been wondering about, deposition
 9    clips in opening statements.
10              THE COURT:  Well, I have had people argue about
11    this of late, quite frankly.  What is your proposition?
12              MR. JACOBS:  Obviously, it is going to be
13    charged against us time-wise.  But if there is otherwise an
14    admission, for example, that would be admissible, I would
15    think we would be able to --
16              THE COURT:  Again, it is not an argument.  Your
17    view on this, Mr. Scheve?
18              MR. SCHEVE:  It would depend upon what's the
19    clip.  Is it in context?  Are they taking something out of
20    context?
21              THE COURT:  Is it your plan to use clips?
22              MR. SCHEVE:  I doubt that.  My experience has
23    been that it is very confusing to juries.  But I am going to
24    tell a story, and I plan to do that with boards and tell
25    them here is our plan, here is what we think the evidence
```

```
 1    will show.  If he is suggesting he wants to take out a

 2    little snippet for which we have fairness designations, et

 3    cetera, then it gets into argument.

 4              THE COURT:  I think we have to be real careful.

 5    This came up in ETG.  It was hotly contested.  And I

 6    ultimately ruled them out.

 7              MR. JACOBS:  Out of the opening statement?

 8              THE COURT:  Yes.  Out of the opening statement.

 9    That is my inclination.

10              MR. JACOBS:  Pre-verdict and post-verdict JMOLs.

11              THE COURT:  We will obviously excuse the jury

12    and give you an opportunity to -- you can submit these and

13    probably should, in some kind of outlined form, so you

14    preserve your appellate rights.  You don't have to submit a

15    brief.  I really don't think the Federal Circuit has gone

16    that far.  They have gone further than perhaps some of the

17    regional circuits on the issue of preservation.  But I think

18    you ought to be careful.

19              I will hear limited argument.  I may, I most

20    likely will not, but we will see what happens as to whether

21    I am going to grant or reserve or just what's going to

22    happen.  If you feel strongly enough about an issue, you

23    might want to submit a more extensive writing.  I will read

24    it.

25              MR. JACOBS:  We did have this discussion in the
```

1    context of their in limine motion and the topic of scope of

2    claims and determination of scope of claims by the Court,

3    this "consisting essentially of" issue.  We would like the

4    Court to rule on that as a matter of law.  Is there a

5    process that you would like us to follow on that score?

6              THE COURT:  You mean while you are in front of

7    the jury?

8              MR. JACOBS:  Well, in a perfect world, Your

9    Honor would decide you are right and you would decide we are

10   right before trial.  In the worst-case world, no, the worst

11   case, you decide, you are wrong.  In the intermediate cases,

12   you decide you are right but not until motions as a matter

13   of law after the jury renders a verdict, presumably in this

14   hypothetical against us.  In an intermediate case the Court

15   decides this in the middle of trial and issues a jury

16   instruction on the topic, but then we are spending a lot of

17   time trying what we think is an issue of law.  Hence, as we

18   worked our way through what made the most sense, it seemed

19   to make the most sense to us for the Court to decide this

20   question earlier rather than later.

21             MR. SCHEVE:  If this is an effort to re-do the

22   Markman hearing, Your Honor, which it is, we would

23   respectfully again urge that you decided this and let's

24   present our evidence, and if there are questions of law that

25   they think they are entitled to, it should come either at

1      the JMOL briefing, either at the end of the plaintiff's case

2      or at the close of all the evidence.

3                    THE COURT:  Okay.  We are not going to re-do

4      Markman.  That has come and gone.

5                    MR. SCHEVE:  Your Honor, have you given any

6      further thought on that Rule 54 motion on the entry of the

7      '025?  I didn't know if you were going to get back to us

8      today or some day after.

9                    THE COURT:  I think some day after today was my

10     thinking.

11                   MR. SCHEVE:  Okay.

12                   We will prepare the motion and just wait to hear

13     from you.

14                   THE COURT:  Okay.  Other issues?

15                   We should plan on -- oh, the jury panel won't be

16     here until 9:30 on the first day, the day of selection.

17     Expect that as a general rule, I am going to be here, so we

18     will come out to the courtroom, Ms. Walker or somebody will

19     come out to check and see if you have got 8:30 issues

20     during the eight days of trial.

21                   I think that's all I can think of at this point.

22                   All right, counsel.  I think you have some

23     issues to work on.  To the extent that -- Mr. Jacobs, that

24     order, can you get that over here tomorrow?

25                   MR. JACOBS:  You bet.

1              THE COURT:  Okay.

2              All right, counsel.  Thanks for your time.

3              (Conference concluded at 3:50 p.m.)

4

5                        -   -   -

6     Reporter:  Kevin Maurer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25