1                IN THE UNITED STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF DELAWARE

3                          -   -   -

4    ELAN PHARMA INTERNATIONAL    :      Civil Action
     LIMITED,                     :
5                                 :
                Plaintiff,        :
6                                 :
          v.                      :
7                                 :
     ABRAXIS BIOSCIENCE INC.,     :
8                                 :
                Defendant.        :      No. 06-438-GMS
9
                          -   -   -
10                     Wilmington, Delaware
                     Thursday, May 29, 2008
11                        11:30 a.m.
                      Telephone Conference
12                        -   -   -

13   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

14   APPEARANCES:

15           JOHN G. DAY, ESQ.
             Ashby & Geddes
16                  -and-
             PAUL FEHLNER, ESQ.,
17           STEPHEN SCHEVE, ESQ. (Houston, Texas), and
             JEFFREY SULLIVAN, ESQ.
18           Baker Botts LLP
             (New York, New York)
19                  -and-
             GREGORY BOKAR, ESQ.
20           Counsel - Elan Drug Delivery

21                          Counsel for Plaintiff

22

23

24

25

```
 1    APPEARANCES CONTINUED:

 2            MICHELLE BUDICAK, ESQ.
              Young Conaway Stargatt & Taylor, LLP
 3                    -and-
              MICHAEL A. JACOBS, ESQ., and
 4            EMILY EVANS, ESQ.
              Morrison & Foerster
 5            (San Francisco, California)

 6                            Counsel for Defendant

 7

 8            THE COURT:  Good morning, counsel.  Counsel, who

 9    is on the line for Elan this morning?

10            MR. SCHEVE:  Good morning, Your Honor.  From

11    Elan this morning you have John Day at Ashby & Geddes

12    locally, Steve Scheve, Jeff Sullivan, and Paul Fehlner from

13    Baker & Botts, and also Greg Bokar, Elan's vice president

14    for intellectual property and litigation.

15            THE COURT:  Good morning.  For Abraxis.

16            MS. BUDICAK:  Good morning, Your Honor.

17    Michelle Budicak at Young Conaway, Delaware counsel for

18    Abraxis.  With me on the line is Michael Jacobs of Morrison

19    & Foerster, as well as Emily Evans from Morrison & Foerster.

20            THE COURT:  Good morning.  Counsel, is it the

21    case that both sides asked for the call or one or the other?

22            MR. JACOBS:  This is our initiation, Your Honor.

23            THE COURT:  Mr. Jacobs, go ahead.

24            MR. JACOBS:  Your Honor, I am on a speaker.  I

25    will try and make sure we don't over-speak the Court.  We
```

1    are set up over here.  The trial site isn't perfect yet.

2              The Court may have seen the filings that have

3    been coming in, the notice of service.  We have gotten six

4    additional expert reports from Elan since the pretrial

5    conference.  It's rather extraordinary.  They range from a

6    damages report to a new theory of infringement to an expert

7    report by an expert, Berkland, on critiquing x-ray powder

8    diffraction.  The Court's order on our Motions in Limine 1

9    and 4 ordered that only Brittain could critique our x-ray

10   powder diffraction.

11             We think that the standard for supplemental or

12   additional expert reports in the week before trial should be

13   really, really, really good cause.  And Elan can't possibly

14   meet that standard.

15             We would ask that the Court strike these expert

16   reports.

17             THE COURT:  Go ahead.

18             MR. JACOBS:  If the Court would like, I could

19   detail a little bit more our concerns with these reports.

20             THE COURT:  Let's get a general reaction.  I

21   will take that as a general opening comment.  Let's see if

22   we can short-circuit this.  Maybe we won't be able to.

23             Mr. Scheve.

24             MR. SCHEVE:  I will do my best, Judge.  Thank

25   you for taking time from what I know is a very busy

1    schedule.

2              Judge, I need to give you a little background.

3              You will recall at the pretrial conference an

4    issue arose about a witness named Katherine Melody, who is

5    with a company called Micron Laboratories.  Since the

6    initial Rule 26 conference in this case, Abraxis has taken

7    the position, both with Elan and with the Court, that the

8    product is amorphous.  It was not until February 1, 2008,

9    five and a half months after the close of discovery, and

10   without ever identifying Ms. Melody in responses to

11   discovery, that Abraxis listed her as a witness for them in

12   the case and produced four discrete, edited or cropped pages

13   from some lab notebooks which purport to support their x-ray

14   powder diffraction evidence in this case.

15             We moved to exclude her, Your Honor.  Your Honor

16   said that she would be allowed to testify, but you said that

17   she must be produced for deposition.

18             Her deposition was taken last Wednesday, May the

19   21st.  It was a bombshell, and undercuts everything that

20   Abraxis has been telling Your Honor and the world since the

21   start of this case.

22             She testified that Micron Labs routinely advises

23   its clients that in order to have interpretable data one

24   needs to have two things:  particle size standards and

25   limits of detection.  She says that they are advised of that

1    because these are spelled out in the United States

2    Pharmacopeia.

3             Abraxis did not do the control testing to allow

4    anyone to determine crystallinity in Abraxane.  They did no

5    particle size standards.  They did not establish limits of

6    detection.  All Abraxis did was to provide them powder and

7    ask that x-ray powder diffraction be performed.

8             Ms. Melody then testified, and she used the word

9    surprised, she would be advised to hear that her testing

10   would be the basis for claiming amorphousness, because in

11   order to make such a conclusion one would need to test to

12   determine the limits of detection, which was never done.

13   She further testified that when dealing with nanoparticles,

14   x-ray powder diffraction is less conclusive, and as a result

15   it's important to have a control, for a control, a

16   nano-sized standard, which was not done.

17            She said, I still don't know if it's amorphous

18   or crystalline.

19            Importantly, we learned at the deposition that

20   Abraxis had submitted samples for further testing in 2007,

21   after this lawsuit was filed, none of which had ever been

22   produced to my client.  It was produced the evening before

23   the deposition that Your Honor ordered and which took place

24   last Tuesday.

25            What they produced were various lab notebooks

1    and various reports.  But we learned during the course of

2    the deposition that there was a whole wealth of other

3    laboratory notebook information that had never been

4    produced.  And it was only produced to us yesterday.

5            Against that backdrop, Your Honor, we received

6    from Your Honor last week the clarification order.  We know

7    the Court is extremely busy and overloaded due to

8    circumstances that the Senate of the United States has not

9    deemed appropriate to deal with, which creates a tremendous

10   amount of work for Your Honor.

11           We further assumed that if Your Honor took the

12   time to issue a clarification order, it was important that

13   we submit it to our experts.

14           What we did is this.

15           After the deposition of Katherine Melody, we

16   submitted that information to Dr. Berkland and said, please

17   consider this.  In addition, after Your Honor's

18   clarification order of last week, we submitted that to two

19   of our experts, Dr. Byrn and Dr. Munson.  Dr. Byrn is our

20   state of the art expert.  Dr. Munson is the one who has

21   performed solid state nuclear magnetic resonance testing to

22   determine crystallinity within Abraxane.

23           We asked him three questions.  Number one:  Does

24   this change your opinion?  If so, how so?  That is the

25   second question.  Number three:  If your opinions are not

1   changed, are you able to supplement your reports to track

2   the language of the Court's clarification order?  Knowing,

3   Your Honor, that it is important that they be in tune with

4   how Your Honor has construed the terms, and that if they

5   don't articulate their opinions in a manner which is

6   consistent with Your Honor's construction, all we will hear

7   from Abraxis is, the opinions shouldn't be offered.  They

8   should be excluded.

9            What has become very, very clear here, Your

10  Honor, is this is part of an overall plan to tie Elan's

11  hands, not identify the people who did this Micron testing,

12  not tell us that they had done x-ray powder diffraction

13  testing, until last Tuesday, the day before Ms. Melody's

14  deposition, that there was testing in 2007.

15           They still produce documents to us just

16  yesterday.  And now they want to exclude these supplemental

17  reports that were brought about by Melody's deposition and

18  by Your Honor's clarification order, so that they can,

19  number one, prevent those reports from being amended or

20  supplemented, and then stand up before Your Honor on Monday

21  and say, Your Honor, they shouldn't be allowed to offer this

22  testimony.

23           The other thing, Your Honor, relates to our

24  damages expert.  This is Mr. Jarosz.  There is an

25  interrogatory that asked them to supplement or to provide

1    information about sales of Abraxane going straight to

2    damages.  The Federal Rules, of course, require that they

3    supplement their discovery seasonally.  They didn't do that

4    for us.  So Mr. Jarosz, when he got access to quarterly

5    sales information for the first quarter of 2008, in order to

6    come up with a number against which to multiply a royalty

7    rate, supplemented his report to reflect that new

8    information.

9            Secondly, there was a document called the Korean

10   Green Cross Agreement, where Abraxis licensed its product

11   Abraxane to a company in Korea.  We asked for a copy of it

12   at the deposition of their economist.  It was not

13   forthcoming.  And it wasn't until sometime in the last six

14   weeks that we had to write Abraxis back and say, please

15   produce it.  That information was recently produced.  My

16   notes suggest it was produced on April 7th of '08.

17           And Mr. Jarosz, the economist, is addressing the

18   updated financial information that we never got from

19   Abraxis.  We had to go out and search for it, once the first

20   quarter data was submitted.

21           And secondly, the Korean agreement, which wasn't

22   provided to us until April the 7th.  Of course, we couldn't

23   forward it on until April the 8th.

24           But, Your Honor, I will shut up.  This is an

25   effort to do nothing but hand-tie our case.  These were very

1    discrete supplements.  The suggestion that we put in some

2    new infringement theory is absolutely without basis.  We

3    went to Dr. Munson and said, look at Your Honor's

4    clarification order.  Look at the language.  It appears to

5    us, there was a "Whereas" clause, Your Honor, that we said

6    you need to look at this.  It says, whereas something would

7    reject an argument that a purely amorphous product could

8    infringe the '363.  We said look at that and then look at

9    the later language about the medicament within the

10   particles.  And he addressed only those in his supplemental

11   report.

12         He says his opinion doesn't change.  He says, in

13   a manner that is absolutely consistent with his prior

14   report, that there are particles wherein the crystalline

15   medicament is entirely crystalline, utilizing that word

16   "entirely," which, Your Honor, had not appeared back in your

17   August of 2007 Markman order.

18         That is what we did.  These reports are, I think

19   the longest is ten pages, but most of them are in the five-

20   to six-page-in-length area, with, of course, the caption

21   taking up the entire first page.

22         We have attempted to follow the rules.  We

23   understand the importance of the Court's language.  We

24   understand the Court's role in construing terms.  We went

25   back to our experts immediately and said, please look at

1    this order.  Do your reports need to be supplemented in

2    light thereof?

3                    That is what we did.

4                    THE COURT:  Okay.  Bear with me just a second

5    before you respond, Mr. Jacobs.

6                    (Pause.)

7                    THE COURT:  Mr. Jacobs, I am sorry.

8                    MR. JACOBS:  Your Honor, let's set Melody aside

9    for a minute.  We can come back to that, because Mr. Scheve

10   has vastly overstated what happened at her deposition.

11                   Setting Melody aside, marching through them,

12   let's start with Munson, who has turned into their lead

13   infringement expert.

14                   In Munson's original report, he had one

15   fragmentary reference to the possibility that individual

16   particles might be more crystalline than Abraxane as a

17   whole.  The sentence was this:  Samples that are on average

18   from 3.5 percent to 12 percent crystalline such as those

19   discussed above include individual particles that are mostly

20   crystalline.

21                   That was the entirety of the expert report last

22   fall.

23                   Munson was asked about that sentence at his

24   expert deposition.  He really did not want to answer the

25   question.  He asked how long was on the videotape.  He had

1    to be instructed twice by Mr. Sullivan that he needed to

2    answer the question.  Then he went on, went on a lengthy

3    exegesis on really an unrelated topic, and gave no

4    foreshadowing of what he was about to say in the

5    supplemental report we received yesterday.

6              In that report, he notes his original sentence,

7    individual particles that are mostly crystalline, and then

8    he attempts to quantify the number of particles in Abraxane

9    that are entirely crystalline.  And he says, well, there are

10   two trillion -- there are probably two trillion particles in

11   which there is a portion of the paclitaxel that is

12   crystalline.  Of these two trillion particles, it is my

13   opinion that most of them contain paclitaxel that is

14   entirely crystalline.

15             So we have gone from individual particles that

16   are mostly crystalline, a half-expressed thought, to a

17   quantification of particles that are entirely crystalline.

18   That, in turn, is based on an entirely new theory that we

19   haven't had advanced before to us.  It is called the theory

20   of nucleation, the nucleation theory of crystallization,

21   which is, as stated by Munson here, when one crystallizes a

22   substance, it usually becomes completely or essentially

23   completely crystalline.

24             I think I can prove the newness of this in

25   several different ways.  One is just by way of the

1    comparison with the earlier report and the early sentence --

2    and the fragmentary sentence about mostly crystalline

3    particles there.

4          But as the Court will recall, as recently as a

5    week ago, Elan submitted a motion for reconsideration in

6    which all of the evidence advanced in that motion was that

7    particles are not entirely crystalline or entirely

8    amorphous.  They are within some sort of gradient or

9    variable quantities.

10          There are two paragraphs in which that is

11   elaborated at great length as a way of saying that the

12   Court's clarification of the claim construction is wrong.

13          Now we have a supplemental report for Munson

14   which goes the other direction, and says, no, no, no.  They

15   are entirely crystalline and I can tell you how many of them

16   there are.

17          By the way, the quantifications are not

18   detailed.  He doesn't explain how he gets to two trillion.

19   We can guess.  But it's not explained.  Of course, all of

20   the work we had done in analyzing Munson's 50-percent error

21   rate to get above ten percent, the doubling from four

22   percent to get to eight percent, all of that is now out the

23   window because it appears he is not relying on that argument

24   at all.

25          Munson nowhere mentioning Melody.  So Melody has

1    nothing to do with this theory.  This was a theory that

2    Munson and Elan could have articulated along the way.  There

3    should be no surprise, based on the Court's original claim

4    construction, that the particles' medicament had to be

5    entirely crystalline.  There should be no surprise

6    whatsoever.

7              Of course, he had this half-fragment that

8    individual particles could be mostly crystalline.

9              If we had this report back in September, our

10   approach to challenging Munson's expert testimony would have

11   gone off on a very different path.  We now would have been

12   looking for not particles that are in some sense sort of,

13   this whole crystalline phase issue that they were

14   articulating, we would have been attacking a report that

15   says, I know that there are some billions or trillions of

16   particles in Abraxane that are entirely crystalline.

17             If we had the nucleation theory in September, we

18   would have gone off and embarked on attacking the nucleation

19   theory.

20             So that's Munson.  Munson, you don't need to

21   hear about from Melody, because Munson doesn't mention

22   Melody.

23             Let me turn to Berkland.  Berkland is directly

24   in violation of the Court's order on 1 and 4.  Yes, Berkland

25   references Melody.  But much of his report is not based on

1    Melody's testimony at all.  It is based on things that have

2    long been available to them, including all the reports from

3    a year ago that had Melody's name on them and Micron's name

4    on them, and had the USP referenced.

5            So the newness argument for Berkland is very

6    powerful as well.

7            But the killer here is that Your Honor issued an

8    order that said Brittain is the only one who is going to

9    criticize Abraxis's x-ray powder diffraction -- I'm sorry,

10   that Brittain is the only one.  Now they are submitting an

11   additional report from Berkland.

12           Maybe if we focus on those two, we can make some

13   focused progress, Your Honor.

14           THE COURT:  Mr. Scheve, let's do that.  Let's

15   focus our attention for now on Munson and Berkland.

16           MR. SCHEVE:  All right.  I will start with

17   Berkland, because I think that's the shortest, Your Honor.

18           As Your Honor knows, a motion in limine doesn't

19   preserve anything for appeal.  So in order for me to

20   preserve for appellate review Your Honor's decision that I

21   am limited, in other words, I am not free to pick between

22   Dr. Berkland and Dr. Brittain, we felt it necessary to

23   supplement his report.

24           We expected to go before Your Honor outside the

25   presence of the jury, offer that testimony.  I frankly, Your

1    Honor, expected that Your Honor would again, at the time of

2    trial, rule in the way consistent with your in limine

3    notion.  But the suggestion that I have done something

4    wrong -- and Mr. Jacobs knows it, the only way I can

5    preserve this issue for appeal is to supplement his report,

6    because I understand Your Honor has said if it is not in the

7    report it can't be offered, and then make an offer of proof,

8    if Your Honor said it can't be heard by the jury.

9               That is why I did what I did, to protect my

10   rights.

11              And the notion that it should be stricken, when

12   Mr. Jacobs knows I have to do that in order to preserve

13   rights, is simply again another desperate position to try to

14   make sure that the truth -- and I think that is what this

15   process is about, is to get the truth to come out.  And Dr.

16   Berkland attended the deposition of Melody, Ms. Melody last

17   week.  And that's the first time that he had heard anything

18   about how they had customarily told their customers,

19   including Abraxis, you have to do these standards, you have

20   to do the particle size standards, you have to create the

21   appropriate standards against USP, and that Abraxis chose

22   not to do it.  That's the first time that any of that came

23   out and the first time that he had heard testimony that to

24   this day she doesn't know if it is either crystalline or

25   amorphous based on that x-ray powder diffraction because

1    those standards were not done.

2              THE COURT:  Before you go on to Munson, I do

3    have a question, Mr. Scheve.

4              Why not supplement Brittain's report instead?

5    Why did you make that election?  Was it because of your

6    assessment of how one goes about preserving the appellate

7    rights?

8              MR. SCHEVE:  Yes, sir.  That was my primary

9    purpose.  And Dr. Brittain has already expressed all of his

10   criticisms in depositions about the x-ray powder diffraction

11   that was done.

12             THE COURT:  Why don't you go on to Munson then.

13             MR. SCHEVE:  Yes, sir.

14             Here is what is happening, Your Honor, and what

15   Mr. Jacobs -- as they say, here is the rest of the story.

16             The particles that are contained -- let me back

17   up.

18             Abraxane is nine parts amorphous albumin and one

19   part paclitaxel.  In their documents, which we will

20   demonstrate at trial, they did some separation of this free

21   albumin, meaning this unbound albumin, and did some

22   calculations of how much paclitaxel and how much albumin is

23   in the particles.  And their own conclusion is that 95

24   percent of that albumin is free.

25             We have got these particles, which according to

1    their own documents submitted to the FDA are 88-percent

2    paclitaxel and 12-percent amorphous albumin.

3              What Dr. Munson testified to in light of what

4    Your Honor's claim construction was -- I said testified.

5    What he put in his report, which tracked again Your Honor's

6    claim construction of August of 2007, which construed the

7    phrase consisting essentially of crystalline medicament,

8    surface modifier and other ingredients that do not affect

9    the basic and novel properties of the invention, by

10   definition, those particles, 18 percent of them are

11   amorphous, of the particles.

12             When Your Honor issued the clarification, and

13   that's why he said in his report that, of his opinion in

14   August of last year, that there are particles contained in

15   that product that are mostly crystalline, because by

16   definition, if we are talking about it as a particle, it is

17   going to be 82-percent paclitaxel and 18-percent amorphous

18   albumin.

19             When Your Honor clarified last week, and there

20   is the "Whereas" clause, and I actually looked up the word

21   whereas, and the phrase has the meaning, it is taken as

22   fact, whereas it is taken as fact that an amorphous product,

23   a largely amorphous product could not infringe the '363, we

24   asked him, what would your opinion be if that is the Court's

25   construction.  And his report says --

1              THE COURT:  That is not the Court's

2     construction.  I fear that I have created controversy where

3     I was making an effort to give the parties clarity, which,

4     with the benefit of hindsight, I had given in the issuance

5     of the first order and the infamous footnote in question.  I

6     reject that notion, Mr. Scheve.  But go ahead.

7              MR. SCHEVE:  But if I can just explain, Your

8     Honor.  I asked him first, I said, if this were the

9     construction, what would your opinion be.  And his report

10    says, if that's the construction, then it doesn't infringe.

11    Then I said, assume that what we are talking about here is

12    that the word product meant medicament, that we are talking

13    about the medicament within the particles.  Does that change

14    your opinion?  And he said no.  And I said, in what way?

15    And he said, well, it would serve to reduce the number of

16    infringing particles.  But, you know, we are talking 60

17    trillion particles within Abraxane, and if you take the most

18    conservative number, my three and a half percent, and

19    multiply it by 60 trillion, he said there are around two

20    trillion particles that contain crystallinity.

21             Then he did further calculations and said,

22    conservatively, the most conservative assumption I have is

23    that the number of infringing particles is in the billions.

24    And I said, can you articulate that then in a way that's

25    consistent with the Court's construction.

1           And so all he did was to say, there are

2    particles wherein the medicament is entirely crystalline and

3    those numbers would be in the billions.

4           All I have tried to do, Your Honor, is give him

5    your clarification order and say it's important that we

6    track the Court's construction language.  Can you still

7    offer an opinion that meets this?  Because, Your Honor, if

8    he had said, no, I can't, then I as an officer of the Court

9    would be faced with the issue of can we proceed or not.

10          THE COURT:  I think he should have been able to

11   do that based on the original order.

12          Go ahead, Mr. Jacobs.  Let's hear a response.

13          MR. JACOBS:  First on Berkland.  You know, there

14   is a way to make an offer of proof or to say I am making an

15   offer of proof.  You say this is an offer of proof.  That's

16   not what we got.  We got a supplemental expert report.

17          So if what he is saying is he doesn't plan to

18   offer that testimony at trial, it's just an offer of proof,

19   fine, he can make whatever offers of proof he wishes.

20          On Munson, I think Your Honor has it exactly

21   right.  The point of the clarification of the claim

22   construction was this was always in the claim construction.

23   Footnote 4 rejected "a portion of."  We are seeing another

24   variation on the "a portion of" theory.  We are seeing a

25   variation on the "a portion of" theory that not only should

1    and could have been forecast from the original claim

2    construction, but really represents kind of the just before

3    trial version of hiding the ball.

4         It's really quite extraordinary that when the

5    issue has always been whether there is crystallinity in

6    Abraxane from the very first case management conference, now

7    we are getting a quantification of the supposed number of

8    crystalline particles in Abraxane.

9         To say that Munson did calculations, where are

10   the calculations?  Are we once again going to hear more at

11   trial that we haven't had a chance to develop pretrial?

12   There are no calculations set forth here.

13        So I think this is all, this really is, as I

14   started to get worked up to say, Your Honor, this is hiding

15   the ball at its most extreme, in its most extreme form.

16             THE COURT:  Okay.

17             MR. SCHEVE:  May I respond, Your Honor?

18             THE COURT:  Well, I think I have made -- you had

19   already anticipated the Court's ruling, Mr. Scheve.  Please

20   respond briefly.

21             MR. SCHEVE:  Your Honor, the position we are in

22   is, if it was so clear, why was the Court issuing a

23   clarification?  And we took that very seriously.

24             THE COURT:  And I think I have already addressed

25   that issue.  Perhaps I muddied the waters.  If that is the

1    case, and it does appear to be, indeed, the case, my

2    apologies to both sides.  It seems, with the benefit of

3    hindsight and listening to this argument, that I should have

4    left stand the original order and let the parties have at it

5    based upon my original claim construction order.

6              And you correctly anticipate my ruling as to

7    Berkland and Munson, Mr. Scheve.

8              I am going to reject the offers of proof, and

9    order that the supplemental reports be removed or struck

10   from the record.

11             Let's talk about, I guess Melody is a discrete

12   issue.  Is Melody a separate issue?

13             MR. JACOBS:  Your Honor, I think Melody was --

14   the Berkland report was about Melody.  So as we look at the

15   other reports, frankly, Your Honor, I think on the other

16   reports we are okay dealing with them closer in -- well,

17   Manning.

18             Emily Evans is here with me, Your Honor.  Let's

19   just talk briefly about Manning.

20             MR. SCHEVE:  Your Honor, can I get some

21   clarification on Dr. Munson?

22             THE COURT:  I am afraid to clarify anything, Mr.

23   Scheve.  Go ahead.

24             MR. SCHEVE:  Your Honor, I have a witness who

25   put in his report that those particles were mostly

1    crystalline because he was focusing at that time on the

2    August order.  Do I understand, Your Honor, that I would not

3    be allowed to ask him at trial do you have an opinion

4    whether it contains particles that infringe under the

5    Court's construction order?

6            THE COURT:  Under the Court's original

7    construction order?  He has opined on that.  Right?  He has

8    opined with the Court's original order in mind, in other

9    words.

10           MR. SCHEVE:  Yes, sir.

11           THE COURT:  Well, I see no reason that you can't

12   have him discuss that with the jury.

13           MR. SCHEVE:  Okay.

14           THE COURT:  Mr. Jacobs, any difficulties with

15   that?

16           MR. JACOBS:  Your Honor, I think what Mr. Scheve

17   is indirectly exposing is a slightly different variation on

18   a theme.  Recall that what Munson says in his original

19   report is individual particles that are mostly crystalline.

20   Then Elan reads the Court's clarification and writes to the

21   Court, we don't have an infringement theory anymore.  And we

22   agree with that.  We agree, we thought they didn't have an

23   infringement theory last August.  But they kept the case

24   alive.  But they told, they wrote to the Court and said

25   three times in the request for clarification, we don't have

1    an infringement theory anymore.

2            Now they have told the Court that they gave the

3    Court's order to Munson and said, can you come up with an

4    infringement theory?  And Munson is saying, yes, I can.  But

5    that report has now been stricken.  So the question is, how

6    can they have it both ways?  How can they represent to the

7    Court that they don't have an infringement theory, have

8    Munson's report be stricken, and still have an infringement

9    theory?

10           THE COURT:  Mr. Scheve.

11           MR. SCHEVE:  Your Honor, the statements made in

12   our motions in limine last week went to the "Whereas"

13   clause, whereas, again, taken from Webster's Dictionary

14   says --

15           THE COURT:  Counsel, given the fact that,

16   indeed, I do have limited time, I am going to stick by what

17   I said originally, in my original ruling.  Should we need to

18   address this further in realtime, I will do that.  Okay?

19           But as to your request for clarification, I

20   think I have been as clear as I possibly can be at this

21   point.  But I will not get exorcised if you want to, feel it

22   appropriate to, I will say renew, for lack of a better word,

23   at least your request for clarification.

24           MR. SCHEVE:  Thank you, Your Honor.

25           THE COURT:  So we were talking about Melody.

1              MR. JACOBS:  Your Honor, there are no -- to my

2    knowledge, there are no other Melody-related issues.  There

3    were some other supplemental reports.  But I think we could

4    deal with them in realtime.

5              The one I would flag for everybody, especially,

6    is Manning.  But as I say, I think we can deal with that in

7    realtime.

8              THE COURT:  All right, then.  So of those

9    witnesses teed up initially, we still have Byrn and I guess

10   Jarosz to talk about?

11             MR. JACOBS:  Jarosz is the damages theory.

12   Again, I think we can deal with that in realtime.  What Byrn

13   did was re-do his obviousness analysis.  It's a mix of re-do

14   based on the Court's claim construction and things he should

15   have done earlier.  Again, I think we can deal with that in

16   realtime.

17             THE COURT:  Do you agree with that, Mr. Scheve?

18             MR. SCHEVE:  Certainly, it can be dealt with in

19   realtime.  But I don't believe -- as you know my position,

20   Your Honor, there is no issues to be dealt with.

21             THE COURT:  I understand your position, yes.

22             Okay.  An issue of mine.  Have you filed -- let

23   me ask it this way.  Have you been able to agree on a set of

24   preliminary instructions?

25             MR. JACOBS:  Your Honor, we have been trying to

1    get some responses from Elan on this.  I am just checking my

2    e-mail.  It looks like something may have finally --

3              MR. SCHEVE:  It was filed a few minutes ago,

4    Your Honor.

5              THE COURT:  Is it an agreed-upon set?

6              MR. SULLIVAN:  Your Honor, it is an

7    almost-agreed-upon set.

8              THE COURT:  All right.

9              MR. SULLIVAN:  But it is a set that complies

10   with the Court's instructions to provide clean language with

11   objections set forth elsewhere.

12             THE COURT:  Okay.  In other words, what you have

13   filed is in an effort to preserve appellate issues.

14             MR. SULLIVAN:  Exactly.

15             THE COURT:  Would you please file --

16             MR. JACOBS:  It is not just appellate, Your

17   Honor.  I think there are some other things that we would

18   like the Court to take a look at.

19             THE COURT:  That is what I am interested in

20   knowing, whether there are things that we need to attend.

21   So can you just tell me -- I haven't pulled that yet,

22   because it was just filed -- if you have a set in front of

23   you, what pages, or at least what instructions are at issue,

24   if not the pages?

25             MR. SULLIVAN:  Your Honor, I think the

1    submission sets it forth pretty clearly.

2              THE COURT:  Here is the thing, Mr. Sullivan.  I

3    am just wanting to know that I will know when, and Ms.

4    Walker has just gone to try to retrieve this, the

5    distinction between issues that I need to address for Munson

6    and those that I don't, because they are merely highlighted

7    in the interests of the preservation of appellate rights.

8              MR. JACOBS:  Your Honor, I think it's really

9    actually a pretty small issue.  There is a word must and a

10   word shall.  And we don't need to give you a lot of

11   argumentation on all this.  You just need to call this one.

12   It is highlighted in the comments.

13              The other objections, they are serious

14   objections.  But I understand that the Court might not want

15   to -- I understand the Court's position on whether to decide

16   those in advance.

17              MR. SULLIVAN:  I will differ with that only to

18   the extent, sir, that Elan has objected on two grounds,

19   Abraxis has objected on five grounds.  Those are set forth

20   in a cover sheet.  Elan objects to issues of

21   unenforceability being submitted to the jury and the use of

22   the mandatory language must versus the word should.  Abraxis

23   objects to --

24              THE COURT:  Did I not already rule on the issue

25   of enforceability being submitted to the jury?

1            MR. SULLIVAN:  Yeah.  And I think, sir --

2            THE COURT:  "Yeah"?  You mean yes?

3            MR. SULLIVAN:  Sir, I think, yes, that's true.

4    And I think that potentially the word must versus the word

5    shall or should will be up to the Court's sound discretion.

6            THE COURT:  Here is the thing.  If they are

7    issues I have already ruled upon, and it sounds like this is

8    at least one, they have been ruled on.

9            MR. SULLIVAN:  Your Honor, we have tried very

10    assiduously, and certainly Elan has removed all of its

11    objections to instructions on the '025, because the Court

12    has made it clear that the '025 will be in issue, so we have

13    tried to facilitate things for the Court and the jury.

14            THE COURT:  Here is what we will do.  I will

15    take a look.  If I need to get you back on the phone, I

16    will.

17            What's next, if anything?

18            MR. JACOBS:  That is all that really prompted

19    the call, Your Honor.  I hope we don't get any more

20    supplemental reports, because we are trying to get ready for

21    trial.  It would be helpful to know if this is the last one.

22            MR. SULLIVAN:  I will only note on Elan's

23    behalf, just for the record, that Dr. Berkland's report was

24    largely or entirely prompted by the very recent testimony of

25    Ms. Melody, which took place last week.

1          THE COURT:  Mr. Scheve made that amply clear.  I

2    really don't have time for a rehash, counsel.

3          MR. SULLIVAN:  I apologize, Your Honor.

4          THE COURT:  I have the preliminary instructions

5    in front of me.  Let me just page through them while I have

6    you all here to see if we can benefit from the fact that we

7    are all on the line.

8          You said there is a cover sheet.

9          MR. JACOBS:  There is a comment, is where the

10   objections are laid out.

11         THE COURT:  I see.

12         Did we agree or not that the video was going to

13   be used in this case?

14         MR. JACOBS:  We did, Your Honor.

15         THE COURT:  Mr. Scheve, we did have that

16   agreement.  Right?

17         MR. SCHEVE:  You are correct, Your Honor.

18         THE COURT:  Do, then, counsel, believe that we

19   need 1.7?

20         MR. JACOBS:  Let me jump ahead, Your Honor.

21   Sorry.

22         No, Your Honor, I do not think that we need -- I

23   think a summary of the patent issues is technically in 1.7.

24   Yes, it is.

25         THE COURT:  Yes, it is.  I think you can modify

1     this a little more, because the video covers at least the

2     first part, up to the heading Summary of Patent Issues.

3     Doesn't it?

4              MR. JACOBS:  Why don't we work on that some

5     more, Your Honor.

6              THE COURT:  So the comments say, in part, that

7     the parties maintain several outstanding objections to the

8     instructions.  We have Elan's objection to enforceability,

9     reference to unenforceability.  That's been dealt with.  We

10    have this "must" issue, I will look at that, in the fifth

11    sentence of the first paragraph of Instruction 1.6.

12             Then these Abraxis objections, these have been

13    previously raised?  There are five in number?

14             MR. JACOBS:  They have been raised in the sense

15    that they surfaced in the actual jury instructions.  And our

16    argument, if you will, on these issues is in the submission

17    to the Court of the actual jury instructions.

18             THE COURT:  But they are not in the preliminary

19    instructions?  They are not issues extant in the preliminary

20    instructions?

21             MR. JACOBS:  They are extant in the sense that

22    there are references, for example, to willful infringement

23    or the presumption of validity in the preliminary

24    instructions; hence, the objection here.

25             MR. SULLIVAN:  Sir, just to clarify.  In the

1    pretrial order, all of the objections of both parties should

2    be stated.

3                    THE COURT:  Okay.  I will take a look, and then

4    we will issue probably another oral order.

5                    But what I expect at this point is for 1.7 to be

6    edited in accordance with our earlier discussion and now

7    just recent discussion.

8                    I will take a look at the balance.

9                    Okay?  All right, counsel.  Thank you.

10                   MR. SCHEVE:  Your Honor, I apologize.  But I

11   have to raise this with you.

12                   You recall at the pretrial conference, we dealt

13   with the so-called Atwood exception.

14                   THE COURT:  The Atwood exception, okay.

15                   MR. SCHEVE:  Dr. Atwood two and a half months

16   after his deposition supplemented his report.  You allowed

17   it and didn't allow us to take his deposition.  And the

18   question was raised about rebuttal and what's in the

19   reports.  And Your Honor said on repeated occasions, and I

20   can find the quotes and the pages in the transcript for you

21   if necessary, but you said, well, we may have to have an

22   Atwood exception.  Among the things that Dr. Munson did was

23   to supplement to deal with the supplemental material

24   provided by Dr. Atwood.  Do I understand that that portion

25   of his supplemental report is going to be stricken, too?

1          MR. JACOBS:  Your Honor, that is the first

2   supplemental report we got for Munson.  That is something

3   again that I think we can deal with on the fly.

4          THE COURT:  All right.  Do you agree with that,

5   Mr. Scheve?

6          MR. SCHEVE:  We certainly can.

7          THE COURT:  Okay.  All right, counsel.  Thank

8   you.

9          (Conference concluded at 12:15 p.m.)

10                         -  -  -

11   Reporter:  Kevin Maurer

12

13

14

15

16

17

18

19

20

21

22

23

24

25