## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELAN PHARMA                    )
INTERNATIONAL LIMITED,         )
                               )
    Plaintiff,                 )
                               )        Case No. 06-438-GMS
    v.                         )
                               )        **REDACTED**
ABRAXIS BIOSCIENCE, INC.,      )        **PUBLIC VERSION**
                               )
    Defendant.                 )
                               )

## DECLARATION OF LISA A. CHIARINI IN SUPPORT OF
## PLAINTIFF ELAN PHARMA INTERNATIONAL LIMITED'S
## MOTION FOR RECONSIDERATION

I, Lisa A. Chiarini, hereby declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 as follows:

1.    I am a member in good standing of the New York State Bar, am admitted to this Court *pro hac vice* in this matter, and am an associate with the law firm of Baker Botts, L.L.P., counsel of record for Elan Pharma International Limited in the above captioned action. I submit this Declaration based upon personal knowledge. If called upon as a witness, I could, and would, competently testify to the truth of each statement herein.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the documents filed with the United States Patent and Trademark Office and associated with the file history of U.S. Patent No. 5,399,363.

3.    Attached hereto as Exhibit 2 is a true and correct copy of an excerpt from Webster's Ninth New Collegiate Dictionary.

4.      Attached hereto as Exhibit 3 is a true and correct copy of "Micronization of Pharmaceutical Powders For Use in Inhalation" article and Scientific Abstract for "Influence of mechanical activation on the physical stability of salbutamol sulphate."

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the Rebuttal Expert Report of Jerry L. Atwood.

6.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the deposition transcript of Dr. Selvaraj and excerpts from the Expert Report of Dr. Harry Brittain.

I declare and affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**FURTHER DECLARANT SAYETH NOT.**

Executed this 21st day of May, 2008 at New York, New York.

_Lisa A Chiarini_
Lisa A. Chiarini

# EXHIBIT 1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

re Application of                    :

iversidge et al                      :      Group Art Unit:  1502
                                     :
Title:  SURFACE MODIFIED             :      Examiner:  W. Benston, Jr.
ANTICANCER NANOPARTICLES             :
                                     :
Serial No.:  07/908,125              :      Malvern, Pa   19355
                                     :
Filed:  July 1, 1992                 :

Honorable Commissioner of Patents and Trademarks
Washington, DC   20231

RECEIVED
SEP 1 5 1993
GROUP 1500

AMENDMENT

Sir:

      In response to the Office Action mailed March 11,
1993, the period for response having been extended by 3 months
to expire on September 11, 1993, by the petition and fee
authorization enclosed herewith, please amend this application,
without prejudice, as follows:

In the Claims

      Please rewrite claim 1 as follows:

     1.   (Amended)  Particles consisting essentially of
99.9-10% by weight of a crystalline anticancer agent having a
solubility in water of less than 10 mg/ml, said anticancer agent
having a non-crosslinked surface modifier adsorbed on the
surface thereof in an amount of 0.1-90% by weight and sufficient
to maintain an average effective particle size of less than
about 1000 nm.

P 30171 10/06/93  07908125    9-4325  030 103    132.00CH

      Please add claims 28-33 as follows:

- 2 -

28. The particles of claim 1 wherein said surface modifier is a surfactant.

29. The particles of claim 1 wherein said surface modifier is a nonionic surfactant.

30. The particles of claim 1 wherein said surface modifier is an anionic surfactant.

31. The particles of claim 1 wherein said surface modifier is selected from the group consisting of gelatin, casein, gum acacia, cholesterol, tragacanth, stearic acid, benzalkonium chloride, calcium stearate, glyceryl monostearate, cetostearyl alcohol, cetomacrogol emulsifying wax, sorbitan esters, polyoxyethylene alkyl ethers, polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters, polyethylene glycols, polyoxyethylene stearates, colloidol silicon dioxide, phosphates, sodium dodecylsulfate, carboxymethylcellulose calcium, carboxymethylcellulose sodium, methylcellulose, hydroxyethylcellulose, hydroxypropylcellulose, hydroxypropylmethylcellulose phthalate, noncrystalline cellulose, magnesium aluminum silicate, triethanolamine, polyvinyl alcohol, polyvinylpyrrolidone, poloxomers, tyloxapol, poloxamines, dextran, a dioctyl ester of sodium sulfosuccinic acid, sodium lauryl sulfate, an alkyl aryl polyether sulfonate, a mixture of sucrose stearate and sucrose distearate, hexyldecyl trimethyl ammonium chloride, bovine serum albumin and $C_{18}H_{37}CH_2(CON(CH_3)CH_2(CHOH)_4CH_2OH)_2$.

32. The particles of claim 1 wherein said surface modifier is present in an amount of 10 to 60% by weight based on the total weight of the dry particle.

- 3 -

33.  The particles of claim 1 wherein said surface modifier is present in an amount of 10 to 30% by weight based on the total weight of the dry particle.

## REMARKS

Claims 1-27 are pending in this application.  Claims 7-15 and 17-23 have been withdrawn from consideration.  Claims 28-33 have been added by this amendment.  The present application is a continuation-in-part of U.S. Patent Application Ser. No. 647,105 filed January 25, 1991, now U.S. Patent No. 5,145,684.  Favorable reconsideration of this application is respectfully requested in view of this amendment and the accompanying remarks.

Applicants' claims are directed to particles consisting essentially of a crystalline anticancer agent having a non-crosslinked surface modifier adsorbed on the surface thereof in an amount sufficient to maintain an effective average particle size of less than about 1000 nm.  Applicants' claims are further directed to anticancer compositions comprising such particles and to methods of treating mammals comprising administering the particles, whereby the efficacy of the anticancer agent is enhanced and/or the toxicity of the agent is reduced.  The particles are prepared by wet grinding coarse crystals of the anticancer agent in the presence of fine grinding media and in conjunction with a surface modifier.

The rejection of claims 1-6, 16 and 24-27 under 35 U.S.C. § 103 as being unpatentable over King (U.S. Patent No. 5,124,338) in view of Devissaguet et al (U.S. Patent No. 5,049,322) is respectfully traversed.  It is respectfully submitted that applicants' claims are patentable over these references taken individually or in combination.

King describes potentiating agents, i.e., specific acrivatine esters, which enhance the efficacy of antineoplastic agents.  However, the pharmaceutical formulations of King are conventional, i.e., they are prepared by methods known in the

ABRX 0000201

- 4 -

art (column 5, lines 55-58). Consequently, as noted in the Office Action, King does not suggest a particulate anticancer agent having an average effective particle size of less than 1000 nm.

Devissaguet et al describe a process for preparing nanocapsules. However, the nanocapsules described by Devissaguet et al are radically different than applicants' particles. The Devissaguet et al nanocapsules feature a wall of film-forming polymer (substance A) and a core (substance B), which can be a medicinal. On the other hand, applicants' claimed particles consist essentially of a crystalline anticancer agent and a non-crosslinked surface modifier adsorbed on the surface thereof. Moreover, the only medicinal containing nanocapsules described by Devissaguet et al are prepared by a precipitation technique, i.e., substance B is first dissolved in a solvent. For example, as illustrated in Example 2 therein, indomethecin is dissolved in acetone. Such solvent precipitation techniques provide non-crystalline, e.g., amorphous, cores which are contaminated with solvent. Such solvents are often toxic and can be very difficult, if not impossible, to adequately remove to pharmaceutically acceptable levels to be practical. On the other hand, applicants' crystalline particles, prepared by wet grinding, a technique entirely different than the technique of Devissaguet et al, are essentially free of solvent contamination.

Thus, it is urged that the references individually do not suggest applicants' claimed particles. Furthermore, applicants' respectfully submit that the combined teachings of the references in no way suggest the claimed invention. Nothing in the cited references or the prior art as a whole offers any suggestion that the teachings could be so modified and combined to yield anything resembling applicants' claimed particles of a crystalline anticancer agent. Devissaguet et al disclose nanocapsules, radically different than applicants' crystalline particles, of a size embraced by the range specified in applicants' claims. However, there is no reason for one skilled

ABRX 0000202

- 5 -

in the art to expect that the claimed crystalline particles could be prepared according to the teaching of Devissaguet et al. Nor does King, teaching conventional pharmaceutical formulation preparation techniques, remedy the deficiency in the teaching of Devissaguet et al. Even if the teaching of Devissaguet et al were applied to the anticancer agents listed by King, the resulting nanocapsules, as discussed above, would be radically different than the claimed crystalline particles.

Further, applicants' crystalline nanoparticles are obtained by a specific wet grinding technique which is not disclosed or suggested in the prior art. As stated in EPO 411,629 (cited in applicants' disclosure statement) "preparation of submicron particles of less than 1 μm in diameter is almost impossible". The reason for this is the inherent tendency of such particles to agglomerate, aggregate, solidify and/or adhere to the particle size decreases. Additionally, as discussed in the instant specification, applicants' attempts to reproduce the closest prior art wet grinding technique described by Motoyama et al in U.S. Patent No. 4,540,602 resulted in particles having an average particle size of much greater than 1 micron. Thus, the prior art as a whole does not disclose or suggest, and cannot be construed to disclose or suggest, applicants' claimed crystalline particles having an average effective particle size of less than 1000 nm.

Furthermore, there is no suggestion in the cited references or in the art as a whole of the unexpected advantageous properties associated with the claimed crystalline anticancer particles. The particles of this invention have been formulated into anticancer compositions which demonstrate enhanced efficacy and/or reduced toxicity and which can be administered by IV bolus injection. These advantages are illustrated in the working examples set forth on pages 13-22 of the instant specification.

To further evidence the nonobviousness of the claimed particles, applicants' proffer herewith the attached Rule 132 Declaration of Gary G. Liversidge, Ph.D., pointing out that the

ABRX 0000203

- 6 -

above-noted differences between the particles of the claimed invention and particles prepared by prior art techniques, such as solvent precipitation techniques, are commercially significant.

For all the reasons set forth above, it is respectfully urged that all of the applicants' claims are patentable over the prior art. It is therefore requested that the rejection under § 103 be withdrawn.

Claim 1 has been amended consonant with the amendment to the claims in parent U.S. Patent No. 5,145,684 for reasons discussed fully in the parent relating to the § 112 rejection and prior art cited therein. More specifically, claim 1 has been amended to recite minimal and maximal amounts of the crystalline anticancer agent and surface modifier present, that the surface modifier is non-crosslinked, and that the anticancer agent has a specific, i.e., low, solubility in water. Ample support for such amendments can be found, e.g., on page 9, lines 1-5; page 7, lines 19-21; and page 3, lines 23-29 of the instant specification.

New claims 28-33 added by this amendment are directed to various embodiments of the surface modifier component of the particles of this invention. Ample support for such claims can be found, e.g., on page 5, line 32 - page 7, line 5 of the instant specification. The new claims are dependent from claim 1 and thus are patentable over the prior art for the reasons discussed above.

In conclusion, applicants' claimed invention is nonobvious over the prior art because the art does not suggest the invention or its unexpected, advantageous properties. In view of the foregoing amendment, remarks and the attached Rule 132 Declaration, it is respectfully asserted that the Examiner's rejection cannot be sustained and should be withdrawn. It is respectfully urged that claims 1-6, 16 and 24-33 are patentable and in condition for allowance. Notice of Allowance or early action to that end is earnestly solicited.

ABRX 0000204

- 7 -

   In the event that the Examiner believes that a telephone and/or personal interview would be helpful in resolving any remaining issues, it is requested that the Examiner telephone applicants' undersigned attorney.

                                     Respectfully submitted,


                                     _William J. Davis_
                                     William J. Davis
Sterling Winthrop Inc.               Attorney for Applicants
9 Great Valley Parkway               Reg. No. 30,744
Malvern, PA 19355
Tele: (215) 889-8802


CERTIFICATE UNDER 37 CFR 1.8 (a)

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to Commissioner of Patents and Trademarks Washington, D.C. 20231, on _September 10, 1993_
                                                   (Date of Deposit)
   _William J Davis_        30,744
                           (Reg. No.)
        _September 9, 1993_
   (Date/  Signature)

ABRX 0000205

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of                    :
Liversidge et al                        :        Group Art Unit: 1502
                                        :
Title: Surface Modified                 :        Examiner: W. Benston, Jr.
Anticancer Nanoparticles                :
                                        :
Serial No.: 07/908,125                  :        Malvern, PA    19355
                                        :
Filed: July 1, 1992                     :
.. .. .. .. .. .. .. :. .. .. .. ..

Honorable Commissioner of Patents and Trademarks
Washington, DC  .20231

Sir:

                        RULE 132 DECLARATION

        I, Gary G. Liversidge, hereby say and declare that:

        1)  I am currently employed by Sterling Winthrop Inc. as
Director of Oral Products.  My primary responsibilities include
managing research and development work associated with
pharmaceutical sciences including drug delivery.  I received a B.
Pharm. degree in Pharmacy from the University of Bradford in 1978,
and a Ph.D. degree in Pharmaceutical Chemistry from the University
of Nottingham in 1981.

        2)  I am a coinventor of the subject matter disclosed and
claimed in U.S. Patent Application Serial No. 908,125.

        3)  I have read and understood and I am quite familiar
with the teaching and subject matter of U.S. Patent No. 5,049,322
of Devissaguet et al.

ABRX 0000206

- 2 -

4)  U.S. Patent No. 5,049,322 discloses a solvent precipitation technique for preparing nanocapsules. Solvent precipitation techniques ordinarily result in the formation of non-crystalline or amorphous particles. Particles prepared by solvent precipitation techniques provide particles which are contaminated with solvent. Such solvents are often pharmaceutically unacceptable and can be difficult, if not impossible, to adequately remove to pharmaceutically acceptable levels to be practical. This problem is noted in U.K. Patent Application 2,200,048 of record which suggest that it is not possible to completely remove solvent by conventional techniques.

5)  The crystalline particles described in U.S. Patent Application Serial No. 908,125 are essentially free of solvent contamination. Such essentially solvent free particles prepared according to the method described in U.S. Patent Application Serial No. 908,125 and parent U.S. Patent No. 5,145,684 provide a significant commercial advantage compared to the solvent contaminated particles prepared according to the teaching of Devissaguet et al and other prior art solvent precipitation techniques such as those described in U.S. Patent No. 4,826,689 of record.

6)  Example 7 in U.S. Patent No. 5,049,322 describes nanocapsules of a polymer containing an inorganic mineral solid, i.e., particulate silicon carbide. However, there is no exemplification of a particulate organic medicine. Moreover, I believe that the prior art does not teach one skilled in the art how to prepare crystalline particles of organic medicines, e.g., anticancer agents, in the size range specified in U.S. Patent No. 5,049,322.

7)  Furthermore, laboratory work has demonstrated that particles prepared according to the teaching of U.S. Patent Application Serial No. 908,125 have exhibited unexpected

ABRX 0000207

- 3 -

advantageous properties, e.g., with respect to toxicity and/or efficacy.

8)  All statements made herein of my own knowledge are true and that all statements made herein on information and belief are believed to be true; and

9)  These statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of this application or any patent issuing thereon.

_____9/8/93_____
Date

_____
Gary G. Liversidge, Ph.D.

CERTIFICATE UNDER 37 CFR 1.8 (a)

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to Commissioner of Patents and Trademarks Washington, D.C 20231, on _September 10 1993_
(Date of Deposit)

_William J Davis_   _30-744_
(Reg. No.)

_September 9 1993_
(Date   Signature)

ABRX 0000208

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of
Elaine Liversidge et al

RECEIVED

NOV 12 1992

GROUP 1500

Serial No. : 07/908,125 : Group Art Unit:

Filed:  July 1, 1992 :

: Malvern, Pennsylvania 19355

Title: Surface Modifier :
Anticancer Nanoparticles :

CERTIFICATE UNDER 37 CFR 1.8 (a)
I hereby certify that this correspondence is being
with the United States Postal Service as first class
envelope addressed to Commissioner of Patents and
Trademarks Washington, D.C. 20231; on  26 Oct. 1992
(Date of Deposit)
William Davis
30744
(Reg. No.)
William Davis   26 Oct 1992
(Date of Signature)

Hon. Commissioner of Patents and Trademarks
Washington, D.C.  20231

Sir:

## INFORMATION DISCLOSURE STATEMENT
## PURSUANT TO 37 CFR 1.97 - 1.99

For the convenience of the Patent Office, record is
made below to published art for consideration by the Office
in connection with the above-identified application.  No
representation is made or intended that a search has been
made, or, if made, was complete, or that no more pertinent
art than that listed is available.  It is expected that the
Patent Office will conduct independently a complete search
for relevant prior art.

In compliance with MPEP Sec. 609 and 37 CFR 1.97
through 1.99, accompanying each citation is a discussion
indicating and including reference to specifically identified
portions (e.g., page and line) of the above-identified
application, where appropriate.  Unless otherwise indicated,
a full text copy of the entire item of published art and, in
the case of references not in English, a translation thereof
is attached.  Where specifically indicated, an equivalent

PRF-328/91

English language patent or publication is attached in lieu of a translation.

In accordance with the Patent Office Notice (998 OG 9) dated August 15, 1980, also enclosed is a completed form PTO-1449.

## CITED ART

AA     U.S. Patent 2,671,750 relates to an aqueous suspension of cortisone acetate and a method for the preparation thereof which comprises milling an aqueous vehicle and cortisone acetate. However, the aqueous vehicle contains a surface active agent, which functions to prevent individual particles from coalescing (column 4, lines 25-28), a suspending agent and a bacteriological preservative. Moreover, suspensions reported contain a substantial percentage of particles greater than 5 microns (5,000 nm) in size.

AB     U.S. Patent 4,107,288 describes particles in the size range from 10 to 1,000 nm containing a biologically or pharmacodynamically active material. However, the particles comprise a cross-linked matrix of macromolecules having the active material supported on or incorporated into the matrix.

AC     U.S. Patent No. 4,540,602 discloses that a solid drug can be pulverized in an aqueous solution of a water-soluble high

- 2 -

ABRX 0000184

PRF-328/91

molecular substance, and that as a result of such wet grinding, the drug is formed into finely divided particles ranging from 0.5 μm or less to 5 μm in diameter. However, there is no suggestion that particles having an average particle size of less than about 400 nm can be obtained. Indeed, attempts on behalf of the applicants to reproduce the wet grinding procedures described in U.S. Patent No. 4,540,602 resulted in particles having an average particle size of much greater than 1 μm.

AD    U.S. Patent No. 4,826,689 discloses a method of making uniformly sized non-crystalline amorphous particles from water-insoluble organic compounds wherein the organic compound is dissolved in an organic solvent. However, solvent precipitation techniques such as described in U.S. Patent No. 4,826,689 for preparing particles tend to provide solvent contaminated particles. Such solvents are often toxic and can be very difficult, if not impossible, to adequately remove to pharmaceutically acceptable levels for diagnostic imaging. Additionally, amorphous materials and formulations tend to exhibit unacceptably poor stability and/or short shelf-lives.

AE    U.S. Patent No. 4,851,421 describes an agricultural suspension containing a

- 3 -

ABRX 0000185

PRF-328/91

biocidal fine powder and a specific
adjuvant, but does not suggest
applicants' surface modified anticancer
nanoparticles.

AL        EPO 411,629 (indicating a publication
date of February 6, 1991, after the
applicants' priority date) discloses a
process for micronizing slightly soluble
drugs by subjecting a mixture of the drug
and a sugar or sugar alcohol to high
speed stirring comminution or impact
comminution.  There is no suggestion of
the applicants' claimed particles or
method.

AM        Japanese Patent Application 2,282,330
relates to a danazol composition
containing danazol microcrystals prepared
by solvent precipitation, a surfactant
and optionally a carrier.  There is no
suggestion of applicants' claimed
particles or method.

AN        U.K. Patent Application 2,185,397
discloses a drug delivery system wherein
particles of drug are directed away from
the reticuloendothelial system by the use
of a surface coating which prevents the
take up of the composite particles.

AO        U. K. Patent Application 2,200,048
discloses pharmaceutical colloidal
hydrosols for injection.  The hydrosols
are formed by a solvent precipitation

- 4 -

ABRX 0000186

PRF-328/91

technique (page 11, lines 8-14), and thus
exhibit the problems, e.g., solvent
contamination, associated with particles
prepared by solvent precipitation
techniques such as described in U.S.
Patent 4,826,689.  U.K. Patent
Application 2,200,048 suggests that it is
not possible to completely remove the
solvent, noting that the suspension
contains residual organic solvent after
solvent removal in a rotary evaporator
(page 11, lines 11-14).  There is no
suggestion of applicants' claimed
particles or method.

AP    EPO 275,796 describes the production of
colloidally dispersible systems
comprising a substance in the form of
spherical particles smaller than 500 nm.
However, the method involves a
precipitation effected by mixing a
solution of the substance and a miscible
non-solvent for the substance and results
in the formation of non-crystalline
nanoparticle.  Furthermore, precipitation
techniques for preparing particles tend
to provide particles contaminated with
solvents.  Such solvents are often toxic
and can be very difficult, if not
impossible, to adequately remove to
pharmaceutically acceptable levels to be
practical.

- 5 -

ABRX 0000187

PRF-328/91

AR          These publications provide a background
AS          on industrial milling and colloidal
            dispersions but do not suggest
            applicants' surface modified anticancer
            nanoparticles.

AT          See applications page 1.


                         Respectfully submitted,

Date:  26 October 1992    William J. Davis
                          Registration No. 30,744
                          Attorney for Applicants
                          (215) 889-8802


Address:
Patent Department
Sterling Winthrop Inc.
81 Columbia Turnpike
Rensselaer, NY  12144

WJD:mmm

- 6 -

ABRX 0000188

# EXHIBIT 2

Case 1:11-cr-00630-DAB   Document 57   Filed 06/20/18   Page 1 of 35



Webster's
Ninth New
Collegiate
Dictionary

A Merriam-Webster®



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1989 by Merriam-Webster Inc.

Philippines Copyright 1989 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

Includes index.
I. English language—Dictionaries. I. Merriam-Webster Inc.
PE1628.W5638     1989     423     88-8335
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

32333435RMcN89

existing in appearance only **3** : a representation of something abstract, ideal, or incorporeal (she was a ~ of delight —William Wordsworth) — **phan·tom·like** \-,līk\ *adj or adj*

**phan·tom** *adj* (15c) **1** : of the nature of, suggesting, or being a phantom : ILLUSORY **2** : FICTITIOUS, DUMMY (~ voters)

**phar·aoh** \'fe(ə)r-(,)ō, 'fā(ə)r-(,)ō, 'fā–(,)rō\ *n, often cap* [ME pharao, fr. OE, fr. LL pharaon-, pharao, fr. Gk pharaō, fr. Heb par'ōh, fr. Egypt pr-'] (bef. 12c) **1** : a ruler of ancient Egypt **2** : TYRANT — **phar·a·on·ic** \,fer-ā-'än-ik, ,far-\ *adj, often cap*

**pharaoh ant** *n* (ca. 1947) : a little red ant (*Monomorium pharaonis*) that is a common household pest

**phar·i·sa·ic** \,far-ə-'sā-ik\ *adj* [LL pharisaicus, fr. LGk pharisaikos, fr. Gk pharisaios Pharisee] (1618) **1** : PHARISAICAL **2** *cap* : of or relating to the Pharisees

**phar·i·sa·i·cal** \-'sā-ə-kəl\ *adj* (1531) : marked by hypocritical censorious self-righteousness — **phar·i·sa·i·cal·ly** \-ik-(ə-)lē\ *adv* — **phar·i·sa·i·cal·ness** \-kəl-nəs\ *n*

**phar·i·sa·ism** \'far-ə-,sā-,iz-əm\ *n* [NL pharisaismus, fr. Gk pharisaios] (1610) **1** *cap* : the doctrines or practices of the Pharisees **2** *often cap* : pharisaical character, spirit, or attitude : HYPOCRISY

**Phar·i·see** \'far-ə-,sē\ *n* [ME *pharise,* fr. OE *farise,* fr. LL *pharisaeus,* fr. Gk *pharisaios,* fr. Aram *pĕrīshayā,* pl. of *pĕrīshā,* lit., separated] (bef. 12c) **1** *cap* : a member of a Jewish sect of the intertestamental period noted for strict observance of rites and ceremonies of the written law and for insistence on the validity of their own oral traditions concerning the law **2** : a pharisaical person

**phar·ma·ceu·ti·cal** \,fär-mə-'süt-i-kəl\ *adj* [LL *pharmaceuticus,* fr. Gk *pharmakeutikos,* fr. *pharmakeuein* to administer drugs — more at PHARMACY] (1648) : of, relating to, or engaged in pharmacy or the manufacture and sale of pharmaceuticals (a ~ company) — **pharma·ceu·ti·cal·ly** \-i-k(ə-)lē\ *adv*

**pharmaceutical** *n* (1881) : a medicinal drug

**phar·ma·cist** \'fär-mə-səst\ *n* (1834) : one engaged in pharmacy

**phar·ma·co-** *comb form* [Gk *pharmako-,* fr. *pharmakon*] : medicine : drug (*pharmacology*)

**phar·ma·co·dy·nam·ics** \,fär-mə-kō-dī-'nam-iks, -dō-\ *n pl but sing in constr* (ca. 1842) : a branch of pharmacology dealing with the reactions between drugs and living systems — **phar·ma·co·dy·nam·ic** \-ik\ *adj* — **phar·ma·co·dy·nam·i·cal·ly** \-i-k(ə-)lē\ *adv*

**phar·ma·cog·no·sy** \,fär-mə-'käg-nə-sē\ *n* [ISV fr. Gk *pharmakon* + *-gnōsis* knowledge, fr. *gnōtis* — more at GNOSIS] (ca. 1883) : descriptive pharmacology dealing with crude drugs and simples — **phar·ma·cog·nos·tic** \-,käg-'näs-tik\ *or* **phar·ma·cog·nos·ti·cal** \-ti-kəl\ *adj*

**phar·ma·co·ki·net·ics** \-kō-kə-'net-iks, -kō-kī-\ *n pl but sing in constr* (1960) **1** : the study of the bodily absorption, distribution, metabolism, and excretion of drugs **2** : the characteristic interactions of a drug and the body in terms of its absorption, distribution, metabolism, and excretion — **phar·ma·co·ki·net·ic** \-ik\ *adj*

**phar·ma·col·o·gy** \,fär-mə-'käl-ə-jē\ *n* (ca. 1771) **1** : the science of drugs including materia medica, toxicology, and therapeutics **2** : the properties and reactions of drugs esp. with relation to their therapeutic value — **phar·ma·co·log·i·cal** \-kō-'läj-i-kəl\ *also* **phar·ma·co·log·ic** \-ik\ *adj* — **phar·ma·co·log·i·cal·ly** \-i-k(ə-)lē\ *adv* — **phar·ma·col·o·gist** \-'käl-ə-jəst\ *n*

**phar·ma·co·poe·ia** *also* **phar·ma·co·pe·ia** \,ks-pē-(y)ə\ *n* [NL, fr. LGk *pharmakopoiia* preparation of drugs, fr. Gk *pharmako-* + *poiein* to make — more at POET] (1621) **1** : a book describing drugs, chemicals, and medicinal preparations; *esp* : one issued by an officially recognized authority and serving as a standard **2** : a collection or stock of drugs — **phar·ma·co·poe·ial** *also* **phar·ma·co·pe·ial** \-(y)əl\ *adj*

**phar·ma·co·ther·a·py** \,fär-mə-kō-'ther-ə-pē\ *n* (ca. 1909) : the treatment of disease and esp. mental illness with drugs

**phar·ma·cy** \'far-mə-sē\ *n, pl* **-cies** [LL *pharmacia* administration of drugs, fr. Gk *pharmakeia,* fr. *pharmakeuein* to administer drugs, fr. *pharmakon* magic charm, poison, drug] (1651) **1** : the art or practice of preparing, preserving, compounding, and dispensing drugs **2** a : a place where medicines are compounded or dispensed **b** : DRUGSTORE **3** : PHARMACOPOEIA **2**

**Pha·ros** \'fa(ə)r-,äs, 'fe(ə)r-\ *n* [Gk, fr. *Pharos,* island in the bay of Alexandria, Egypt, famous for its lighthouse] (1552) : a lighthouse or beacon to guide seamen

**pha·ryng-** *or* **pha·ryngo-** *comb form* [Gk, fr. *pharyng-, pharynx*] (*pharyngitis*) (*pharyngology*)

**pha·ryn·geal** \,far-ən-'jē-əl, fə-'rin-j(ē-)əl\ *adj* [NL *pharyngeus,* fr. *pharyng-, pharynx*] (1828) : relating to or located or produced in the region of the pharynx

**pha·ryn·gi·tis** \,far-ən-'jīt-əs\ *n, pl* **-git·i·des** \-'jit-ə-,dēz\ (ca. 1844) : inflammation of the pharynx

**phar·ynx** \'far-iŋ(k)s\ *n, pl* **pha·ryn·ges** \fə-'rin-(,)jēz\ *also* **phar·ynx·es** [NL *pharyng-, pharynx,* fr. Gk, throat; akin to ON *barki* throat, L *forare* to bore — more at BORE] (ca. 1693) **1** : the part of the vertebrate alimentary canal between the cavity of the mouth and the esophagus **2** : a differentiated part of the alimentary canal in some invertebrates that may be thickened and muscular, eversible and toothed, or adapted as a suctorial organ

**phase** \'fāz\ *n* [NL *phasis,* fr. Gk, appearance of a star, phase of the moon, fr. *phainein* to show (middle voice, to appear) — more at FANCY] (1812) **1** : a particular appearance or state in a regularly recurring cycle of changes (~s of the moon) **2** a : a distinguishable part in a course, development, or cycle (the early ~s of his career) **b** : an aspect or part (as of a problem) under consideration **3** : the point or stage in a period of uniform circular motion, harmonic motion, or the periodic changes of any magnitude varying according to a simple harmonic law to which the rotation, oscillations, or variation has advanced considered in its relation to a standard position or assumed instant of starting **4** : a homogeneous, physically distinct, and mechanically separable portion of matter present in a nonhomogeneous physicochemical system **5** : an individual or subgroup distinguishable different in appearance or behavior from the norm of the group to which it belongs; *also* : the distinguishing peculiarity — **pha·sic** \'fā-zik\ *adj* — **in phase** : in a synchronized or correlated manner — **out of phase** : in an unsynchronized manner : not in correlation

**phase** *vt* **phased; phas·ing** (1904) **1** : to adjust so as to be in a synchronized condition **2** : to conduct or carry out by planned phases **3** : to introduce in stages — often used with *in* (~ in new models)

**phase–contrast** *adj* (1934) : of or employing the phase-contrast microscope

**phase–contrast microscope** *n* (1947) : a microscope that translates differences in phase of the light transmitted through or reflected by the object into differences of intensity in the image — called also *phase microscope*

**phase·down** \'fāz-,daūn\ *n* (1964) : a gradual reduction (as in operations)

**phase modulation** *n* (1930) : modulation of the phase of a radio carrier wave by voice or other signal

**phase·out** \'fā-,zaūt\ *n* (1958) : a gradual stopping of operations or production : a closing down by phases

**phase out** \'fā-'zaūt\ *vt* (ca. 1940) **1** : to discontinue the practice, production, or use of by phases (*phase out* the old machinery) ~ *vi* **1** : to stop production or operation by phases

**pha·sia** \'fā-zh(ē-)ə\ *n comb form* [NL, fr. Gk, speech, fr. *phasis* utterance, fr. *phanai* to speak, say — more at BAN] : speech disorder of a (specified) type (dysphasia)

**Phas·mid** \'faz-məd\ *n* [NL *Phasmida,* group name, fr. *Phasma,* type genus, fr. Gk, apparition, fr. *phainein* to show — more at FANCY] (1872) : any of an order or suborder (Phasmatodea) of large cylindrical or sometimes flattened chiefly tropical insects (as a walking stick) with long strong legs, strictly phytophagous habits, and slight metamorphosis

**pha·sic** \'fat-ik\ *adj* [Gk *phatos,* verbal of *phanai* to speak] (1923) : revealing or sharing feelings or establishing an atmosphere of sociability rather than communicating ideas — **pha·ti·cal·ly** \-i-k(ə-)lē\ *adv*

**pheas·ant** \'fez-'nt\ *n, pl* **pheasant** *or* **pheasants** [ME *fesaunt,* fr. AF, fr. OF *fesan,* fr. L *phasianus,* fr. Gk *phasianos,* fr. *phasianos* of the Phasis river, fr. *Phasis,* river in Colchis] (13c) **1** : any of numerous large often long-tailed and brightly colored Old World gallinaceous birds (*Phasianus* and related genera of the family Phasianidae) many of which are raised as ornamental or game birds **2** : any of various birds resembling a pheasant

**phel·lem** \'fel-,em\ *n* [Gk *phellos* cork + E *-em* (as in *phloem*)] (1887) : a layer of usu. suberized cells produced outwardly by a phellogen

**phel·lo·derm** \'fel-ə-,dərm\ *n* [Gk *phellos* + ISV *-derm*] (1875) : a layer of parenchyma produced inwardly by a phellogen

**phel·lo·gen** \'fel-ə-jən\ *n* [Gk *phellos* + ISV *-gen*] (1875) : a secondary meristem that initiates phellem and phelloderm in the periderm of a stem

**phen-** *or* **pheno-** *comb form* [obs. *phene* Benzene, fr. F *phène,* fr. Gk *phainein* to show; fr. its occurrence in illuminating gas — more at FANCY] : related to or derived from benzene (*phenol*) : containing phenyl (*phenobarbital*)

**phe·na·caine** \'fē-nə-,kān, 'fen-ə-\ *n* [prob. fr. phenetidine + acet- + -caine] (1907) : a crystalline base $C_{18}H_{22}N_2O_2$ or its hydrochloride used as a local anesthetic

**phen·ac·e·tin** \fi-'nas-ət-ən\ *n* [ISV] (ca. 1887) : a white crystalline compound $C_{10}H_{13}NO_2$ that is used to ease pain or fever — called also *aceto-phenetidin*

**phen·a·kite** \'fen-ə-,kīt, 'fēn-\ *or* **phen·a·cite** \-,sīt\ *n* [G *phenakit,* fr. Gk *phenak-, phenax* deceiver; fr. its being easily mistaken for quartz] (ca. 1834) : a glassy mineral $Be_2SiO_4$ that consists of a beryllium silicate and occurs in rhombohedral crystals

**phen·an·threne** \fə-'nan-,thrēn\ *n* [ISV *phen-* + *anthracene*] (1882) : a crystalline aromatic hydrocarbon $C_{14}H_{10}$ of coal tar isomeric with anthracene

**phen·a·zine** \'fen-ə-,zēn\ *n* [ISV] (ca. 1900) : a yellowish crystalline base $C_{12}H_8N_2$ that is the parent compound of many azine dyes and a few antibiotics

**phen·cy·cli·dine** \()fen-'sik-lə-,dēn, -'sī-klə-, -dən\ *n* [*phen-* + *cycl-* + *-idin*] (1959) : a piperidine derivative $C_{17}H_{25}N$ used medicinally as an anesthetic and sometimes illicitly as a psychedelic drug to induce vivid mental imagery — called also *PCP*

**phe·net·ic** \fi-'net-ik\ *adj* [*phenotype* + *-etic* (as in *genetic*)] (1960) : of, relating to, or being classificatory systems and procedures that are based on overall similarity usu. of many characters without regard to the evolutionary history of the organisms involved

**phe·net·ics** \-iks\ *n pl but sing in constr* (ca. 1960) : biological systematics based on phenetic relationships — **phe·net·i·cist** \-'net-ə-səst\ *n*

**phe·net·i·dine** \fə-'net-ə-,dēn\ *n* [*phenetole* + *-idine*] (ca. 1865) : any of three liquid basic amino derivatives $C_8H_{11}NO$ of phenetole used esp. in manufacturing dyestuffs

**phen·e·tole** \'fen-ə-,tōl\ *n* [ISV *phen-* + *ethyl* + *-ole*] (ca. 1850) : the aromatic liquid ethyl ether $C_8H_{10}O$ of phenol

**phen·met·ra·zine** \()fen-'me-trə-,zēn\ *n* [*phenyl* + *methyl* + *tetra-* + *oxazine*] (1956) : a sympathomimetic stimulant $C_{11}H_{15}NO$ used in the hydrochloride as an appetite suppressant

**phe·no·bar·bi·tal** \,fē-nō-'bär-bə-,tol\ *n* (1918) : a crystalline barbiturate $C_{12}H_{12}N_2O_3$ used as a hypnotic and sedative

**phe·no·bar·bi·tone** \-bə-,tōn\ *n, chiefly Brit* (ca. 1932) : PHENOBARBITAL

**phe·no·copy** \'fē-nə-,käp-ē\ *n* [*phenotype* + *copy*] (1937) : a phenotypic variation that is caused by unusual environmental conditions and resembles the normal expression of a genotype other than its own

**phe·no·cryst** \-,krist\ *n* [F *phénocryste,* fr. Gk *phainein* to show + *krystallos* crystal — more at FANCY] (ca. 1893) : one of the prominent embedded crystals of a porphyry — **phe·no·crys·tic** \,fē-nə-'kris-tik\ *adj*

**phe·nol** \'fē-,nōl, -,nöl, fi-'\ *n* [ISV *phen-* + *-ol*] (ca. 1852) **1** : a caustic poisonous crystalline acidic compound $C_6H_6O$ present in coal tar and wood tar that in dilute solution is used as a disinfectant **2** : any of various acidic compounds analogous to phenol and regarded as hydroxyl derivatives of aromatic hydrocarbons

**phe·no·late** \'fēn-ə-,lāt, -l-ət\ *n* (1885) : PHENOXIDE

\ə\ abut \ʰ\ kitten, F table \ər\ further \a\ ash \ā\ ace \ä\ cot, cart \aü\ out \ch\ chin \e\ bet \ē\ easy \g\ go \i\ hit \ī\ ice \j\ job \ŋ\ sing \ō\ go \o\ law \oi\ boy \th\ thin \t̷h\ the \ü\ loot \u̇\ foot \y\ yet \zh\ vision \ə, ḳ, ⁰, œ, ü, ᵫ, ꭧ, \ *see* Guide to Pronunciation



# EXHIBIT 3



# Micronisation of Pharmaceutical Powders for Use in Inhalation



## By Jean Martin Larran, General Manager Micron Technologies Ltd

Jean Martin Larran is currently General Manager at Micron Technologies Ltd, a company specialising in the contract micronisation of pharmaceutical powders. He has 15 years' experience in the pharmaceutical industry, dealing with active ingredients and excipients at Aventis and then at Colorcon group.

Due to the nature of the respiratory tract, depending on the indication for which the product is being developed, particle size of pharmaceutical powders for use in inhalation is critical. It will dictate which areas of the respiratory tract are targeted in order for the product to have the greatest efficacy. This article will cover different micronisation techniques used by the industry to achieve desired particle size, and will describe analytical techniques to test these particles and characterise the powders.

Due to the nature of pharmaceutical actives developed for the inhalation route of administration, and the conditions treated by them, both the particle size of the active and any excipients is critical to the success of the final formulated product. Regulatory agencies are requesting more and more that tight control on the size, and also on the distribution, along with a good understanding of the material itself, is obtained and is reproducible.

The final formulated product can take several forms, with the most common being the multidose pressurised inhaler (pMDI) and also the dry powder inhaler (DPI). Both are very common in the treatment of asthma, although there is considerable research that supports the delivery of other active drug substances by this route.



The inhalation route has many advantages over other forms of delivery, as it provides a rapid drug uptake in the case of respiratory diseases, but also for some systemic deliveries. Particle size will dictate which areas of the respiratory tract are required to be targeted in order for the product to have the greatest efficacy.

Micronisation can reproducibly deliver product within the size range required for the development of inhalation products, from small 'look see' trials and quantities of new active ingredients, up to large scale manufacture for commercial volumes. Particles are required to be less than 10 microns, usually with the majority of the particles being between two and five microns, in order to be inhaled into the respiratory tract. Particles greater in size than this will impact on the back of the throat where there is no therapeutic benefit, especially when dealing with steroidal formulations. Equally, if there are too many 'fines' present in the micronised product, once formulated, these again offer little therapeutic value, as they are often exhaled with the patient's next breath. The method by which the micronised drug product is tested to confirm the particle size generated is as critical a process as the micronisation itself.

## CHOOSING THE RIGHT EQUIPMENT FOR MICRONISATION

Very few techniques are capable of supplying a powder in the size range discussed; micronisation is one of them and has proven over decades that it is a reliable method. There are essentially two ways in which this can be carried out; the method selected is usually driven by the material characteristics, that is particle size/shape, flowability, moisture/solvent content and hardness. This will determine the

way in which the powder responds to the chosen milling technique, and what the final outcome of the particle size distribution will be. The two most common designs of mills used for micronisation of powders for inhalation are spiral jet mills and opposed jet mills.

Spiral jet micronisers are commonly used in the pharmaceutical industry because they:

◆ Are easy to clean – the mill is designed for quick and simple cleaning, so it can be cleared for use again very quickly
◆ Are easy to use – simple operation allows quick adjustments to produce varying grades of material, from coarse to fine particle sizes
◆ Control operating temperature – heat sensitive powders can be milled as the microniser does not have any moving parts and, more importantly, due to the cooling effect of the compressed gases as they expand in the grinding chamber
◆ Produce one product stream



The spiral jet mill consists of a flat cylindrical grinding chamber; a venturi injector fluidises and pushes the powder into the circular grinding chamber. Here the particles are subjected to a combination of forces; the result is particle to particle collisions which leads to size reduction. A free vortex created by the nozzle angle and jet stream exerts a centrifugal force on the particles. This force keeps the larger particles towards the outside of the grinding chamber where the collisions are most effective, whilst the finer particles migrate towards the outlet and into the collection system.

Factors which affect the final particle size distribution are:

◆ Jet nozzle design and size
◆ Jet nozzle angle
◆ Jet nozzle pressure
◆ Feeding rate
◆ Particle size of the feed
◆ Grinding chamber design and size

Normally, in use, only the gas pressures and feeding rate are adjusted to alter the final product size. The other factors would have been decided when the mill was selected.

As with everything in life, most things have limitations, and as good as spiral jet mills are, they are not suitable for everything. Disadvantages are limitations to the size of feed material as the product injector is no bigger than 1.5-2mm. Any fluctuation

in the size of the feed during the micronisation run can cause the final product to vary in size. Also, other possible problems to overcome are product blockage, or limited control on the top end of the particle size distribution, if we target a D 50 value, for example.

Opposed jet mills with forced vortex classifiers are used when narrow particle size distributions are required; this gives a greater control of the top end of the size distribution curve. This type of mill achieves particle size reduction by the projection of particles directly against each other. The fine particles are carried upwards by an air stream, where they meet the vortex classifier. The rotation speed of the classifier governs the exit of particles through it into the collection system; particles that are too big are excluded by centrifugal forces and fall back into the grinding zone.

Factors which affect the final particle size distribution are:

◆ Jet nozzle size
◆ Jet nozzle pressure
◆ Air flow
◆ Speed of classifier



Pre-Micronization 30X



Post-Micronization 240X

The top end of the particle size distribution is usually controlled by adjusting the classifier speed. This type of mill has no limitation on feed size, does not generate heat and produces narrow particle size distributions. But on the other hand:

◆ It requires a minimum batch size larger than equivalent spiral jet mill
◆ Recycling of coarse material can cause powder to build-up in the grinding zone
◆ Sticky materials would block the classifier wheel and make the equipment not adequate for that product

This equipment is usually more complex to use than a spiral jet mill and it requires skilled operators; but on the other hand, the micronisation process could be easier to validate as the final size distribution is less dependent on the size of the feed.

New equipment is due to be released soon, combining the spiral jet technique with a classifier wheel. However, this equipment will need to demonstrate its efficiency and reproducibility.

## DEVELOPING A ROBUST PARTICLE SIZE METHOD

As we mentioned earlier, it is critical to have a robust validated method to analyse the particle size of a powder, and there are several very good laser diffraction instruments for conducting this analysis. Due to the nature and operation of these instruments, it will affect how the sample for analysis is presented to the instrument. The two forms of sample presentation are as the dry micronised powder and as a 'wet' suspension. Usually, analysts would prefer the dry option as it is quicker and requires less material; but only the physical properties of the drug substance should govern which method is to be chosen – for example, static and 'sticky' drug substances do not lend themselves very easily to dry analysis, as they do not possess very good flow characteristics for introduction into the laser beam for assessment. Therefore, these types of drug substance would lend themselves better to a 'wet' form of analysis, where the sample is mixed with a dispersing agent and then suspended in an appropriate solvent which the product is

not soluble in. On the other hand, if the micronised powder is free-flowing, it would lend itself very well to analysis by a dry dispersion method.

Both forms of sample introduction have their 'difficulties'. With dry dispersion methods, it is ensuring that the vacuum pressure used to introduce and de-agglomerate the sample is not higher than the pressure that has been used during micronisation to obtain the desired particle size. If it is higher, it will lead to further particle fracture and inconsistent and 'false' particle size results. Most of the time, for powders micronised for inhalation purposes, the pressure used during the micronisation process will be higher than the one required to de-agglomerate the sample. Therefore, this will not be a problem. In the case of a wet dispersion method, there are similar issues: primarily the length of time a sample is placed in an ultrasonic bath to ensure that the particles have been dispersed, and that there are no agglomerates present. Again, if the sample is placed in an ultrasonic bath for too long, it will initially cause the de-agglomeration of any agglomerates; but a second particle size decrease can be observed due to the fracture of the individual particles.

Once these issues have been resolved for a particular drug substance, it is then important to ensure that the optimum information is obtained from the technique used. In the case of drugs for inhalation, it is recognised that the fine particle fraction is of utmost importance, both for the drug substance and for the final dosage form. Given that specifications for micronisation of these products are typically 100 per cent less than 10 microns, and also a percentage of not more than a particular figure at the fine end of the distribution, it is important that the instrument used for the testing is very efficient in quantifying accurately the fine's fraction. Here, there can be some differences between different laser diffraction instruments.

After the micronisation process, the formulated powder will also be tested by *in vitro* methods. For example, Anderson Cascade Impactor and 50 per cent plus of the product would need to form the fine particle fraction, which is usually between two and five microns.





## CHARACTERISING THE DRUG SUBSTANCE

It also has to be noted that during a given micronisation process – either spiral jet milling or opposed jet milling – it is possible that the forces required to produce material that is within the desired particle size range may also affect the amorphous content of the micronised drug substance and the surface energy. The whole topic of the amorphous content of a material is still an area where a lot of work needs to be done in order to understand: at what level amorphous particles affect the final product; where the amorphous material is – on the surface or in patches; and how evenly it is distributed in the powder. These changes in amorphous content can be assessed and approximate concentrations calculated by the use of other powder characterisation techniques, such as X-ray powder diffraction and differential scanning calorimetry. A complete material characterisation of the substance should be carried out at a very early stage to compare the crystalline form before and after micronisation. If a very low level of detection is required, techniques like modulated DSC, isothermal microcalorimetry, solution calorimetry, vapour sorption or inverse gas chromatography, or a combination of these would be required, along with a strong knowledge by the analyst of the capabilities of these equipments.

When such a situation occurs, a change in the equipment used (pancake mills versus loop mills – both of them are spiral air jet mills – or opposed jet mills) could resolve or reduce the problem; similar situations can also be resolved, for example by reducing the pressure used and increasing the number of passes, or eventually using a milling air with a certain amount of moisture in it; being aware that there are several patents around these subjects.

If all of these do not give successful results, the product could sometimes still be formulated as long as there is a good understanding of the amorphous stability of the drug substance.

## CONCLUSION

Micronisation technique is, and has been for a number of years, the preferred option to obtain a size reduction of a drug substance suitable for an inhalation formulation; it can provide consistent results and is a very cost effective way of achieving small particle sizes. Different equipments have their pros and cons, but experience is required to select the right one and get the best out of it. Material characterisation of the drug substance needs to be associated with the micronisation technique to have a clear picture of the size, shape and crystallinity of the powder. ◆

*The author can be contacted at*
*jlarran@microntech.com*

## Titre du document / Document title

Influence of mechanical activation on the physical stability of salbutamol sulphate

## Auteur(s) / Author(s)

BRODKA-PFEIFFER Katharina [1 2] ; LANGGUTH Peter [2] ; GRASS Peter [1] ; HÄUSLER Heribert [1] ;

## Affiliation(s) du ou des auteurs / Author(s) Affiliation(s)

[1] Boehringer Ingelheim Pharma KG, Ingelheim am Rhein, ALLEMAGNE
[2] Institute of Pharmacy, Biopharmacy and Pharmaceutical Technology, Johannes Gutenberg University, Mainz, ALLEMAGNE

## Résumé / Abstract

In order to obtain the optimal particle size distribution for pharmaceutical powders in dry powder inhalers the particles have to be micronised. In most cases the process of micronisation is connected with a high input of energy which induces disorder and defects on the surface of the drug particles and as a result changes in the crystallinity. Consequently, changes in the physical stability of the powders may occur. To investigate changes on the physical stability of the powder, different analytical methods are used in the present investigation: laser diffraction, Differential Scanning Calorimetry (DSC), isothermal microcalorimetry and DVS-method. Air-jet-milling is one of the most frequently used techniques in the pharmaceutical industry, in order to obtain particles of respirable size. In the treatise described here the influence of the critical parameters of the process, i.e. feed pressure, grind pressure and feed rate is assessed for salbutamol sulphate. The grind pressure is of utmost importance with respect to particle size distribution and the physical powder stability. For salbutamol sulphate, ground with a MC Jetmill 50, a grind pressure of 6 bar has been found optimal. Pressures below 6 bar are not sufficient to produce the required reduction in particle size. The feed pressure and rate have negligible influence on the powder quality. Furthermore, the micronisation process is optimised to achieve respirable particles while minimising the amorphous content. A correlation between mechanical activation and the amount of the amorphous regions is showed clearly. Air-jet-milling has been compared to ball milling in this investigation. In pilot tests ball milling was not suitable to achieve the needed particle size distribution, however, it generates a specific quantity of amorphous material. With the help of specific amorphous regions in the powder, the sensitivity of the used methods for salbutamol sulphate can be examined.

## Revue / Journal Title

European journal of pharmaceutics and biopharmaceutics  ISSN 0939-6411

## Source / Source

2003, vol. 56, n°3, pp. 393-400 [8 page(s) (article)] (19 ref.)

## Langue / Language

Anglais
Revue : Anglais

## Editeur / Publisher

Elsevier Science, Amsterdam, PAYS-BAS (1991) (Revue)

## Mots-clés anglais / English Keywords

Comparative study ; Jet mill ; Ball mill ; Mechanical activation ; Amorphous phase ; Air jet ; Micronization ; β2-Adrenergic receptor ; Agonist : β-Adrenergic receptor agonist ; Pharmaceutical industry ; Control method ; Particle size ; Stability ; Powder ; Salbutamol ;

## Mots-clés français / French Keywords

Etude comparative ; Broyeur jet ; Broyeur boulet ; Activation mécanique ; Phase amorphe ; Jet air ; Micronisation ; Récepteur β2-adrénergique ; Agoniste ; Stimulant β-adrénergique ; Industrie pharmaceutique ; Méthode contrôle ; Dimension particule ; Stabilité ; Poudre ; Salbutamol ;

## Mots-clés espagnols / Spanish Keywords

Estudio comparativo ; Triturador chorro ; Molino bolas ; Activación mecánica ; Fase amorfa ; Chorro aire ; Micronización ; Receptor β2-adrenérgico ; Agonista ; Estimulante β-adrenérgico ; Industria farmacéutica ; Método control ; Dimensión partícula ; Estabilidad ; Polvo ; Salbutamol ;

## Mots-clés d'auteur / Author Keywords

Micronisation ; Salbutamol sulphate ; Particle size ; Amorphous ; Mechanical activation ;

## Localisation / Location

INIST-CNRS, Cote INIST : 17483, 35400011445591.0110

**Copyright 2007 INIST-CNRS. All rights reserved**
Toute reproduction ou diffusion même partielle, par quelque procédé ou sur tout support que ce soit, ne pourra être faite sans l'accord préalable écrit de l'INIST-CNRS.
No part of these records may be reproduced of distributed, in any form or by any means, without the prior written permission of INIST-CNRS.

N° notice refdoc (ud4) : 15280806

# EXHIBIT 4

**REDACTED**

# EXHIBIT 5

# REDACTED