IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELAN PHARMA INTERNATIONAL
LIMITED,

            Plaintiff,

     v.

ABRAXIS BIOSCIENCE, INC.,

            Defendant.

§
§
§
§
§
§
§
§
§
§
§
§
§

C.A. No. 06-438-GMS

**PLAINTIFF ELAN PHARMA INTERNATIONAL LIMITED'S OPENING BRIEF
IN SUPPORT OF ITS CONDITIONAL MOTION FOR NEW TRIAL
ON ITS CLAIMS OF INDUCED AND CONTRIBUTORY INFRINGEMENT**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Elan Pharma International Limited*

*Of Counsel:*

Stephen E. Scheve
Linda M. Glover
Robert Riddle
BAKER BOTTS LLP
One Shell Plaza
910 Louisiana Street
Houston, TX 77042-4995
(713) 229-1659

Paul F. Fehlner
Jeffrey D. Sullivan
Lisa A. Chiarini
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112-4498
(212) 408-2527

Dated: June 30, 2008

# Table of Contents

I.    NATURE AND STAGE OF PROCEEDINGS ................................................1

II.   SUMMARY OF ARGUMENT ..................................................................2

      Judgment As A Matter Of Law On Elan's Indirect Infringement Claims
      Constitutes Prejudicial Error. ...........................................................2

III.  FACTUAL BACKGROUND ....................................................................3

      A.    Elan Asserted Claims 3, 5, 10 And 11 Of The '363 Patent In This Lawsuit. ..........3

      B.    Abraxis Disputes Only Whether The Particles In Abraxane® Or
            Reconstituted Abraxane® Contain A Crystalline Medicament And Non-
            Crosslinked Surface Modifier. ...................................................3

      C.    Abraxis Was Fully Aware Of The '363 Patent And Its Claims Directed To
            Particles Prior To The First Sale Of Abraxane®. ..............................4

      D.    The Evidence Demonstrates That Physicians Directly Infringe The '363
            Patent. ..........................................................................4

      E.    Abraxis Encourages Others To Administer Reconstituted Abraxane® ..............5
      F.    Abraxis Knew Or Should Have Known That Abraxane® Contains
            Particles That Infringe The '363 Patent. ......................................6

IV.   ARGUMENT ..................................................................................7

      A.    Prejudicial Error Warrants A New Trial. ........................................7

      B.    Elan Is Entitled To A New Trial On Its Indirect Infringement Claims
            Should The Jury Verdict And Judgment On Direct Infringement Be
            Vacated Or Modified. ............................................................8

            1.    Granting Judgment As A Matter Of Law On Elan's Induced
                  Infringement Claim Constituted Prejudicial Error. ....................9

                  (a.)    Governing law .................................................9

                  (b.)    Elan Presented Legally Sufficient Evidence To Establish
                          Direct Infringement By Physicians And/Or Health Care
                          Providers. ....................................................10

                  (c.)    Elan presented substantial evidence concerning Abraxis's
                          specific intent to induce infringement ........................11

            2.    It Was Error To Grant Abraxis's Motion For Judgment As A
                  Matter Of Law On Elan's Claim Of Contributory Infringement. .........14

                  (a.)    Governing Law ................................................14

(b.)   Abraxis knew that the combination for which its components were especially made was both patented and infringing and that lyophilized Abraxane® has no substantial non-infringing use.......................................................15

V.   CONCLUSION.............................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.,
424 F.3d 1293 (Fed. Cir. 2005)........................................................................................13

DSU Med. Corp. v. JMS Co., Ltd.,
471 F.3d 1293 (Fed. Cir. 2006) (en banc) ........................................................................9

Elan Pharma International Limited v. Abraxis BioScience, Inc.,
Civ. Action No. 06-438 (D. Del. dated June 13, 2008) ......................................................3

Elan Pharma International Limited v. Abraxis BioScience, Inc.,
Civ. Action No. 06-438 (D. Del. June 12, 2008) ...............................................................3

Eximco, Inv. v. Trane Co.,
737 F.2d 505 (5th Cir. 1984) .............................................................................................7

Gasoline Prods. v. Champlin Refining Co.,
283 U.S. 494 (1931)...........................................................................................................7

MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,
420 F.3d 1369 (Fed. Cir. 2005).................................................................................10, 11

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,
545 U.S. 913 (2005)...................................................................................................14, 15

Michalic v. Cleveland Tankers, Inc.,
364 U.S. 325 (1960)...........................................................................................................9

Minn. Mining & Mfg. Co. v. Chemque, Inc.,
303 F.3d 1294 (Fed. Cir. 2002)..........................................................................................8

Moleuculon Research Corp. v. CBS, Inc.,
793 F.2d 1261 (Fed. Cir. 1986)..........................................................................................9

Oxford Gene Tech. Ltd. v. Mergen Ltd.,
345 F. Supp. 2d 444 (D. Del. 2004) (Jordan, J.).................................................................9

Reeves v. Sanderson Plumbing Prods.,
530 U.S. 133 (2000)...........................................................................................................8

Rice v. Community Health Ass'n,
203 F.3d 283 (4th Cir. 2000) .............................................................................................7

*Smith v. Transworld Drilling Co.*,
   773 F.2d 610 (5th Cir. 1985) ....................................................................................7


**STATUTES**

35 U.S.C. 271(b) ...........................................................................................................8

35 U.S.C. § 271 (2000) .................................................................................................13

35 U.S.C. § 271(c) .........................................................................................................13


**OTHER AUTHORITIES**

Fed. R. Civ. P. 50 ...........................................................................................................7

Fed. R. Civ. P. 59(a) ......................................................................................................7

## I.   NATURE AND STAGE OF PROCEEDINGS

On June 11, 2008, the Court granted Abraxis BioScience, Inc.'s ("Abraxis") motion for judgment as a matter of law as to Elan's claims of induced and contributory infringement of U. S. Patent 5,399,363 ("the '363 Patent"). (Tr. 1633:1-4). The Joint Statement of Uncontested Facts and testimony from Herbert Lee, Dr. Michael Hawkins, Dr. Gary Liversidge, Dr. Neil Desai, Dr. Soon-Shiong, Leslie Louie, and Elan's experts, however, create a legally sufficient evidentiary basis for a reasonable jury to conclude that Abraxis indirectly infringes the '363 Patent.

The jury returned a verdict against Abraxis on June 13, 2008, finding that claims 3 and 5 of the '363 Patent were directly infringed, and that the patent was valid, and enforceable. (D.I. 613). Judgment on the verdict was entered on June 16. (D.I. 614). Should the Court or the appellate court (upon application by Abraxis) nonetheless vacate or modify the jury verdict and judgment (which Elan submits is not justified), Elan hereby conditionally moves for a new trial on its indirect infringement claims.[1]

---

[1] Abraxis sought, and the Court granted, a ruling barring Elan from showing direct infringement under the doctrine of equivalents ("DOE"). The Court similarly rejected Elan's jury instructions and verdict question as to a DEO theory of direct infringement. Although the jury found that Abraxis directly infringed claims 3 and 5 of the '363 Patent, it was nonetheless error to grant judgment as a matter of law on Elan's claim of direct infringement under DOE.

Elan presented legally sufficient evidence that Abraxis infringes claims 3, 5, 10 and 11 of the '363 Patent under a DOE theory. Elan's world-renowned expert, Dr. Samuel Danishefsky, opined that: (1) the molecular weight, chemical formula, chemical structure, and purity of the paclitaxel in Abraxane® is equivalent to the medicament claimed in the '363 Patent; (2) tumors recognize the paclitaxel in Abraxane® in the same manner in which the medicament in the '363 Patent is recognized; and (3) the paclitaxel in Abraxane® and the claimed medicament in the '363 Patent have the same solubility in blood. (Tr. 732:11-736:2). Dr. Taft, Elan's expert in pharmacokinetics, opined that the paclitaxel in Abraxane® and the claimed medicament in the '363 Patent achieve the same results in terms of enhanced efficacy and reduced toxicity as compared to pre-existing formulations of taxol. (Tr. 743:18-745:12, 749:9-776:8, 776:25-777:11).

## II.     SUMMARY OF ARGUMENT

### Judgment As A Matter Of Law On Elan's Indirect Infringement Claims Constitutes Prejudicial Error.[2]

Judgment as a matter of law on Elan's asserted claims of induced and contributory infringement constitutes prejudicial error that warrants a new trial should the jury's verdict and judgment of direct infringement be vacated or modified.

Most of the proof required for indirect infringement was established by the parties' Joint Statement Of Uncontested Facts, with additional evidence at trial providing a more than sufficient basis for a reasonable jury to find that Abraxis intended to cause others to directly infringe the '363 Patent. Elan asserted claims 3 and 5 of the '363 Patent against Abraxis's practice of selling Abraxane® in the form of a lyophilized powder—a product without substantial noninfringing use—to its customers with instructions to reconstitute and intravenously administer that product. Elan also asserted claims 10 and 11 against Abraxis's practice of selling Abraxane® to its customers for the treatment of metastatic breast cancer pursuant to FDA approval. By providing a material component of Elan's claimed methods, Abraxis contributes to the infringement of claims 10 and 11 of the '363 Patent.

---

As DOE serves as an alternate grounds for affirming the jury's direct infringement verdict, Elan reserves the right to argue on appeal that it was error for the Court to grant Abraxis's motion for judgment as a matter of law, and reject Elan's jury instructions and verdict question on direct infringement under a DOE theory.

[2] Elan's claims of indirect infringement are based upon Abraxis's inducement of and/or contribution to the direct infringement by others through the preparation and administration of reconstituted Abraxane®. Such claims present an alternate theory to the direct infringement found by the jury.

## III.    FACTUAL BACKGROUND

### A.    Elan Asserted Claims 3, 5, 10 And 11 Of The '363 Patent In This Lawsuit.

At issue during trial of this matter were claims 3, 5, 10 and 11 of the '363 Patent. (D.I. 507-08, Pre-Trial Order). Claims 3 and 5 are directed to "particles." (JX 081; Tr. 235:15-24). Claim 3 is directed to particles consisting essentially of a crystalline medicament useful in treating cancer selected from eight classes of compounds and a non-crosslinked surface modifier. (*Id.*). The particles of claim 3 have an average effective particle size of less than 300 nanometers ("nm"). (*Id.*). Claim 5 is similarly directed to "particles." (*Id.*). In claim 5, however, the crystalline medicament is limited to eight specific anti-cancer agents. (*Id.*). The particles of claim 5 have an average effective particle size of less than 1000 nm. (*Id.*).

Claims 10 and 11 are each directed to a method of treating a mammal by administration of the particles of the '363 Patent. (*Id.*). Claim 10 recites enhanced efficacy, while claim 11 recites reduced toxicity over pre-existing formulations of anticancer agents containing residual toxic solvents. (*Id.*).

### B.    Abraxis Disputes Only Whether The Particles In Abraxane® Or Reconstituted Abraxane® Contain A Crystalline Medicament And Non-Crosslinked Surface Modifier.

"In this lawsuit, Abraxis disputes only whether the particles in Abraxane®, or in reconstituted Abraxane®, consist essentially of (1) 99.9-10% by weight of a crystalline medicament [useful for treating cancer] and (2) 0.1-90% by weight of a non-crosslinked surface modifier. Abraxis does not dispute that Abraxane® meets any other '363 Patent claim limitation for purposes of determining whether there is infringement in this suit." (*See* Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶ 32.). Notably, Abraxis does not dispute that Abraxane® exhibits enhanced efficacy and reduced toxicity as compared to pre-existing formulations of taxol, requirements of claims 10 and 11 of the '363 Patent.

C.    **Abraxis Was Fully Aware Of The '363 Patent And Its Claims Directed To Particles Prior To The First Sale Of Abraxane®.**

It is undisputed that Abraxis had full knowledge of the '363 Patent and its claims directed to particles in 1996, well before the first sale of Abraxane® in 2005. (Tr. 279:11-280:3, 609:16-610:7, 1224:15-23, 1225:3-8, 1322:13-17, 1323:3-5; General Jury Instructions, *Elan Pharma International Limited v. Abraxis BioScience, Inc.*, Civ. Action No. 06-438 (D. Del. June 12, 2008), D.I. 608 at p 58; Verdict Form at Question 5, *Elan Pharma International Limited v. Abraxis BioScience, Inc.*, Civ. Action No. 06-438 (D. Del. dated June 13, 2008), D.I. 614). Despite this knowledge, Abraxis failed to obtain an opinion of qualified patent counsel as to whether making, offering to sell and/or selling Abraxane® would infringe the '363 Patent, or whether the '363 Patent was valid and enforceable. (Tr. 1547:21-1548:5). Moreover, Abraxis failed to separate and test the particles in Abraxane® to determine whether the anticancer drug, paclitaxel, exists in its crystalline form within the particles contained in the accused product. (Tr. 608:17-612:13, 874:15-878:2, 879:8-880:18).

D.    **The Evidence Demonstrates That Physicians Directly Infringe The '363 Patent.**

The accused product, Abraxane®, is sold by Abraxis in the United States as a lyophilized powder. (*See* Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶ 21; Tr. 973:24-974:1, 1229:6-1231:24). The FDA-approved physician package insert, which accompanies the sale of every vial of Abraxane®, instructs physicians and/or health care providers to reconstitute the lyophilized powder with an injection of Sodium Chloride, USP. (*See* Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶ 25; PX 125, Tr. 973:24-974:1). Sodium Chloride Injection, USP, is a saline solution. (Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶ 26). The package insert further instructs that

reconstituted Abraxane® be administered intravenously to cancer patients. (PX125).[3]  Abraxis admits that reconstituted Abraxane® has been administered to over 30,000 patients. (Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶ 27).  There was also sufficient evidence presented by Elan's experts that would permit a reasonable jury to conclude that the particles in reconstituted Abraxane® meet the disputed claim limitations of the '363 Patent. (*See e.g.*, Tr.  550:11-551:23, 552:19-570:16, 578:13-583:9, 660:18-661:4, 662:19-25, 663:10-25, 665:11-666:7, 667:25-668:17, 669:22-670:25, 672:1-14, 943:17-951:17).

### E.    Abraxis Encourages Others To Administer Reconstituted Abraxane®.

In addition to the package insert instructing physicians to reconstitute and intravenously administer Abraxane®, Abraxis provides encouragement and support for its post-sale administration.  During trial, Elan offered into evidence the deposition testimony of Dr. Michael Hawkins, Abraxis's former Chief Medical Officer, and Mr. Herbert Lee, a principal in MedComm Solutions, to establish that Abraxis actively encourages physicians and other health care providers to directly infringe the '363 Patent.  Dr. Hawkins testified that he responds to physician inquiries about the appropriate dose of reconstituted Abraxane® to administer, and makes recommendations as to the dosing regimen that will be well-tolerated by the patient (i.e., weekly or every three weeks).  (Tr. 908:20-909:24).

Mr. Lee testified that MedComm Solutions operates a toll-free call center on behalf of Abraxis Oncology, a division of Abraxis BioScience, to "take calls from customers of Abraxis who call us and ask for information" and to "respond to their questions and provide them with information."  (Tr. 1022:5-1024:15; 1034:5-12).

---

[3] PX125 is attached as Exhibit 1 for the Court's convenience.

Mr. Lee further testified that MedComm Solutions typically has four to five employees at a minimum answering questions about Abraxane® on any given day.  (Tr. 1024:19-23).  These employees respond to physician and other health care provider inquiries about Abraxane® by "work[ing] off of the package insert, which is the product labeling, and also a list of approved standard response letters for the particular topics."  (Tr. 1025:13-22).  The standard response letters are documents providing information about Abraxane® that have been approved for dissemination by Abraxis.  (Tr. 1026:4-1027:10).  For example, in response to an inquiry from Dr. Tom Spillane in San Luis Obispo, California, MedComm Solutions sent him an Abraxis-approved standard response letter titled "Clinical Experience with Abraxane Weekly Regimen," which provides information about administering Abraxane at a dose of $100mg/m^2$ on a weekly basis.  (Tr. 1032:1-1033:14).  Notably, there is no way to administer Abraxane® other than to reconstitute the lyophilized powder so that it forms a liquid for intravenous administration.  (PX 125).

**F.    Abraxis Knew Or Should Have Known That Abraxane® Contains Particles That Infringe The '363 Patent.**

Abraxis studiously avoided doing any testing on separated particles in Abraxane® to determine whether they contain a crystalline medicament.  (Tr. 608:17-612:13, 874:15-878:2, 879:8-880:18).  The lack of such testing, despite repeated notations in laboratory notebooks that crystals were seen, suggests a conscious disregard as to whether Abraxis infringes the '363 Patent.[4]  (*See e.g.*, Tr. 899:10-900:5, PX 19, 397, 400)  This is particularly true as Abraxis's

---

[4] Dr. Desai contended that the crystals noted by Abraxis's laboratory assistants were seen in samples of a batch of Abraxane® prepared on July 2, 1997 that contained too much solvent.  The jury apparently did not find this contention credible perhaps because it seems odd that Abraxis would continue to test as late as 2000 a 1997 batch of Abraxane® that did not meet its formulation requirements, or that too much solvent would actually result in the formation, rather than dissolution, of crystals.

employee, Leslie Louie, remarked in her laboratory notebook about the existence of crystals in ABI-007[5] as late as 2000, some two years after Abraxis filed its Investigational New Drug Application with the Food and Drug Administration ("FDA"). (*See* Tr. 899:10-900:5, 901:9-21, 1517:8-13).

Abraxis also knew that the particles in reconstituted Abraxane® contain a non-crosslinked albumin surface modifier. Abraxis concedes that monomeric albumin is by definition non-crosslinked. (Tr. 606:19-607:24). Abraxis further concedes that the starting albumin material in Abraxane® is 90 to 95% monomeric. (Tr. 606:12-20). In its FDA filings, Abraxis represented that the manufacturing process does not alter the albumin component in Abraxane®. (Tr. 605:11-606:11). Indeed, Abraxis expressly stated to the FDA that "if you start cross-linking the albumin with chemicals and things, I think you might run into problems. But we don't do that." (Tr. 604:8-605:19). Viewing the evidence in its entirety, a reasonable jury could conclude that Abraxis knew or should have known that reconstituted Abraxane® contains particles that infringe the '363 Patent.

## IV.   ARGUMENT

### A.   Prejudicial Error Warrants A New Trial.

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which new trials have heretofore been granted in actions at law in courts of the United States." (Fed. R. Civ. P. 59(a)). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." (*Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13

---

[5] ABI-007 was the name that Abraxis applied to Abraxane® during development.

(5th Cir. 1985)). Furthermore, the court may grant a partial new trial limited only to certain issues, provided the error justifying the new trial did not affect the determination of the remaining issues, *see Eximco, Inv. v. Trane Co.*, 737 F.2d 505 (5th Cir. 1984), and provided that the singular issue for retrial is so clearly distinct and separate from all other issues that a retrial of it alone will not be unjust. (*See Gasoline Prods. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)). Partial new trials can be granted as to any "separable matter." (*See Rice v. Community Health Ass'n*, 203 F.3d 283, 290 (4th Cir. 2000)).

**B.     Elan Is Entitled To A New Trial On Its Indirect Infringement Claims Should The Jury Verdict And Judgment On Direct Infringement Be Vacated Or Modified.**

After the close of evidence and before submission to the jury, Abraxis moved for judgment as a matter of law on Elan's claims of induced and contributory infringement, which the Court granted. (Tr. at 1633:1-4). Judgment as a matter of law should be granted only if, after a party has been fully heard on an issue during a jury trial, a court finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." (Fed. R. Civ. P. 50). The Supreme Court has held that in entertaining a motion for judgment as a matter of law, a court must draw all inferences in favor of the non-moving party and disregard all evidence favorable to the moving party that the jury is not required to believe:

> [I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

(*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-151 (2000)).

In arguing that it was entitled to judgment as a matter of law, Abraxis contended that Elan had failed to show direct infringement, which is a required element for proof of indirect infringement claims. (D.I. 605 at 7). Abraxis further maintained that Elan had failed to demonstrate that Abraxis acted with specific intent to induce infringement. (*Id.*). To the contrary, Elan presented substantial evidence that physicians directly infringe the '363 Patent and that Abraxis acted with the requisite intent to induce and/or contribute to that infringement. Because granting Abraxis's motion for judgment as a matter of law was error, Elan seeks a new trial on its claims of indirect infringement should the jury verdict and judgment be disturbed.

1.    **Granting Judgment As A Matter Of Law On Elan's Induced Infringement Claim Constituted Prejudicial Error.**

(a.)    **Governing law**

Under 35 U.S.C. 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." (35 U.S.C. 271(b) (2000)). "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement." (*Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002) (citations omitted)). Second, the patentee must show that "the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." (*DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (*en banc*) (resolving conflicting precedent as to the required intent to induce infringement) (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990))). "The requirement that the alleged infringer knew or should have know his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent." (*Id.* (citing *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1364 n. 4 (Fed. Cir. 2006) (citing *Manville* and explaining that the inducing infringement standard was satisfied "because it is

undisputed that [the alleged infringer] had notice of the patent."))). A patentee may prove intent through circumstantial evidence. (*Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 444, 464 (D. Del. 2004) (Jordan, J.) (citing *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004)).

### (b.) Elan Presented Legally Sufficient Evidence To Establish Direct Infringement By Physicians And/Or Health Care Providers.

"A patentee may prove direct infringement or inducement of infringement by either direct or circumstantial evidence." (*Liquid Dynamics Corp.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006) (citation omitted)). "It is hornbook law that direct evidence of a fact is not necessary." (*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)). "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." (*Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960)).

Here, the Joint Statement Of Uncontested Facts and trial testimony reveal that Abraxis sells Abraxane® in a lyophilized form in the United States. (*See* Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at 21, Tr. 1229:6-1231:24). Accompanying every vial of Abraxane® is the FDA-approved package insert, which instructs physicians and other health care providers to reconstitute the lyophilized form of Abraxane® with an injection of Sodium Chloride (a saline solution). (*See* Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶¶ 25-26; PX 125). The package insert further instructs physicians and other health care providers to administer the reconstituted product intravenously. (PX125). It is undisputed that reconstituted Abraxane® has been intravenously administered to over 30,000 patients. (*See* Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶ 27). Further, Elan's experts testified that particles in Abraxane® meet the disputed claim limitations

of the '363 Patent. (Tr. 550:11-551:23. 552:19-570:17; 578:13-583:9, 602:20-607:24, 866:5-8, 899:10-900:5, 901:9-21, 943:17-951:17, 1517:8-13). This testimony also encompassed reconstituted Abraxane®. (*See id.*) Drawing all inferences in favor of Elan, as the Court was required to do, counseled against granting Abraxis's motion for judgment as a matter of law on Elan's indirect infringement claims.

### (c.) Elan presented substantial evidence concerning Abraxis's specific intent to induce infringement.

Elan indisputably established at trial that Abraxis (1) had notice of the '363 Patent, and (2) induced infringing acts and knew or should have known that its actions would induce actual infringements.

"Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." (*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1379 (Fed. Cir. 2005) (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913, 932 (2005); *see also Metabolite*, 370 F.3d at 1365 (finding active inducement of infringement based upon defendant's publications describing and promoting use of patented method)).

Abraxis includes a physician package insert with each vial that instructs physicians how to reconstitute and in what manner to administer Abraxane®. (*See* Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶¶ 25-26; PX 125). Dr. Hawkins, Abraxis's Chief Medical Officer, testified that he responds to physician inquiries by making recommendations about the appropriate dose of Abraxane® to be administered to physicians' patients. (Tr. 908:20-909:24). Mr. Lee testified that MedComm Solutions responds on behalf of Abraxis to inquiries from physicians and other health care providers about the administration of

Abraxane®. (Tr. 1022:5-1024:15, 1034:5-12). Mr. Lee further testified that MedComm Solutions employees discuss the Abraxane® physician package insert with callers and disseminate information that has been pre-approved by Abraxis. (Tr. 1025:13-22).

In its motion for judgment as a matter of law, Abraxis pointed to testimony of Dr. Desai for the proposition that Abraxis lacked the necessary specific intent to induce infringement. (See D.I. 605 at 7). The entire record, however, must be consulted. In the record as a whole, there is ample evidence of Abraxis's culpable conduct directed toward encouraging others to infringe the '363 Patent.

As noted above, Abraxis packages Abraxane® with instructions for its use, and advises and disseminates information to physicians and other health care providers about the appropriate dose for its administration. Moreover, testimony from Dr. Gary Liversidge and Dr. Desai undeniably establishes that Abraxis engaged in these inducing activities with full knowledge of the '363 Patent. (See Tr. 284:5-18, 609:16-610:7, 1322:3-17; see also MEMC, 420 F.3d at 1380 (finding evidence that a party's knowledge of the infringed patent relevant for supporting proof of intent for inducement) (citing Fuji Photo Film Co., Ltd. v. Jazz Photo Corp., 394 F.3d 1368, 1378 (Fed. Cir. 2005); Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365, 1379 (Fed. Cir. 2001))).

The evidentiary record is replete with evidence from which a reasonable jury could conclude that Abraxis intended others administer reconstituted Abraxane® so as to infringe the '363 Patent. For example, Leslie Louie's 2000 laboratory notebook entry confirms that Abraxis was aware of the existence of crystals in Abraxane® well after it had submitted its Investigational New Drug application to FDA. (Tr. 899:10-900:5, 901:9-21). Despite this, Abraxis never conducted or commissioned tests on the particles in Abraxane® to determine

whether they met the crystalline claim limitations of the '363 Patent. (Tr. 608:17-612:13, 874:15-878:2, 879:8-880:18). Abraxis's own expert, Dr. Atwood, recommended during litigation that Abraxis avoid any testing on the separated nanoparticles in Abraxane and urged, instead, reliance on Abraxis's XRPD testing in which the crystalline paclitaxel was masked by an overwhelming amount of amorphous albumin. (Tr. 1063:10-18). Abraxis's intransigence in performing a determinative test even during litigation could lead a reasonable jury to conclude that Abraxis was well aware that the outcome of such testing would not be favorable.

Moreover, not until this litigation commenced did Abraxis "reanalyze" data in an attempt to show that the albumin surface modifier adsorbed onto the particles in Abraxane® is cross-linked. (Tr. 1477:15-1478:23). This "reanalysis," is particularly suspect as it was never provided to the Federal Drug Administration ("FDA") and all of Abraxis's pre-litigation representations to the FDA were consistent with a conclusion that the albumin is non-crosslinked. (*Id.*; Tr. 602:20-606:23).

Abraxis should not be permitted to avoid liability for intentional infringement by consciously disregarding evidence contrary to its self-interest and by repudiating its pre-litigation statements to FDA. Indeed, a jury could reasonably conclude that Abraxis was indifferent to the infringement by its customers based upon its failure to obtain an opinion of qualified patent counsel as to whether Abraxane® would infringe the '363 Patent or whether the patent was valid and enforceable before offering the chemotherapeutic product for sale. (*See* Tr. 1547:21-1548:5). Accordingly, Elan presented legally sufficient evidence of induced infringement on claims 3 and 5 of the '363 Patent to raise an issue of material fact and preclude the entry of judgment as a matter of law.

Similarly, Elan established that Abraxis actively encourages physicians to treat patients who have metastatic breast cancer with Abraxane®, which has enhanced efficacy and reduced toxicity over pre-existing anti-cancer agents. (Tr. 921:1-9, 1505:7-22. 1511:24-1513:1. 1517:6-21; *see also* Part III B, *supra*). By its actions, Abraxis induces others to infringe claims 10 and 11 of the '363 Patent, which warrants granting Elan a new trial on these claims should the jury's verdict and judgment be vacated.

2. **It Was Error To Grant Abraxis's Motion For Judgment As A Matter Of Law On Elan's Claim Of Contributory Infringement.**

(a.) **Governing Law**

35 U.S.C. § 271(c) provides that

> Whoever offers to sell or sells . . . a component of a patented machine, manufacture, combination or composition . . . constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

(35 U.S.C. § 271 (2000)). To succeed on a claim of contributory infringement, in addition to proving an act of direct infringement, a patentee must show that the defendant "knew that the combination for which its components were especially made was both patented and infringing" and that defendant's components have "no substantial non-infringing uses." (*Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005) (quoting *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004))). As discussed above, there is ample evidence to conclude that physicians and other health care providers directly infringe the '363 Patent, that Abraxis was aware of the '363 Patent, and that Abraxis knew or should have known that reconstituted Abraxane® infringes the '363 Patent. (*See* Part IV.B.1(b), (c) *supra*).

> **(b.) Abraxis knew that the combination for which its components were especially made was both patented and infringing and that lyophilized Abraxane® has no substantial non-infringing use.**

In *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, the Supreme Court held that the required intent to establish contributory infringement is met if an article can be adapted only for use in an infringing combination: "One who makes and sells articles which are only adapted to be used in a patented combination are presumed to intend the natural consequences of his acts; he will be presumed to intend that they shall be used in the combination of the patent." (*Grokster*, 545 U.S. at 932). It is undisputed that Abraxis sells Abraxane® in a lyophilized, or freeze-dried form. (Tr. 1229:6-1231:24; Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶ 21). It is also undisputed that Abraxis instructs physicians to reconstitute Abraxane®, as it cannot be intravenously administered without first being mixed in an aqueous suspension. (Tr. 732:11-733:2, 1544:12-14, PX 125). Thus, the lyophilized form of Abraxane® has no substantial non-infringing use; rather, its *only* use is in reconstituted Abraxane®. (*See* PX 125). Elan, therefore, established that Abraxis contributes to the infringement of claims 3 and 5 of the '363 Patent. Abraxane® lyophilized powder is also a material component of a method of treating patients suffering from metastatic breast cancer, which has enhanced efficacy and reduced toxicity as compared to pre-existing methods of cancer treatment. (Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶¶ 21, 22, 25, 27; Tr. 921:1-9, 1505:7-22, 1511:24-1513:1, 1517:6-21; PX 125)). As mentioned above, there is no substantial non-infringing use of the lyophilized form of Abraxane as it must be reconstituted prior to intravenous administration. (Pre-Trial Order, Exhibit 1 (Joint Statement of Uncontested Facts) at ¶¶ 22, 25, 27; PX 125). Accordingly, Abraxis contributes to the infringement by others of claims 10 and 11 of the '363 Patent.

Under *Grokster*, Elan raised an issue of material fact as to whether Abraxis had the requisite intent to be liable for contributory infringement. In fact, even beyond the minimal intent requirement for contributory infringement, Abraxis acted specific and long-standing knowledge of the '363 Patent. (*See* Tr. 284:5-18, 609:16-610:7, 1322:3-17). Elan is therefore entitled to a new trial on its claim of contributory infringement should the jury verdict and judgment of direct infringement be vacated.

## V.    CONCLUSION

Elan raised issues of material fact sufficient to withstand judgment as a matter of law as to whether Abraxis is liable for indirect infringement of claims 3 and 5 of the '363 Patent. The record reflects uncontested evidence that Abraxis offers for sale and sells Abraxane® in its lyophilized form for reconstitution by physicians for subsequent administration to cancer patients. The record also reflects considerable evidence that Abraxis actively induced infringement by instructing physicians to reconstitute and administer to cancer patients previously-lyophilized Abraxane® in a way covered by the '363 Patent claims, and that Abraxis provided that help with the knowledge and intent that its actions would induce actual infringement.

The evidentiary record further reflects that Abraxis contributed to infringement of the '363 Patent by making, selling, and offering for sale a component (lyophilized Abraxane®) of an independently directly infringing product (reconstituted Abraxane®) when that component was not a staple article of commerce and when it provided functionality that was a material part of Elan's claimed invention. Moreover, as Abraxis's own package insert demonstrates, Abraxis did so with knowledge that that component was especially made or adapted for use in infringing the '363 Patent, and that it had no substantial non-infringing use.

Elan was prejudiced by the Court granting Abraxis's motion for judgment as a matter of law on Elan's indirect infringement claims. Elan, therefore, requests that in the event that the jury verdict and judgment of direct infringement is vacated or otherwise modified, that Elan be granted a new trial on its indirect infringement claims.

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Elan Pharma International Limited*

*Of Counsel:*

Stephen E. Scheve
Linda M. Glover
Robert Riddle
BAKER BOTTS LLP
One Shell Plaza
910 Louisiana Street
Houston, TX 77042-4995
(713) 229-1659

Paul F. Fehlner
Jeffrey D. Sullivan
Lisa A. Chiarini
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112-4498
(212) 408-2527

Dated: June 30, 2008

# EXHIBIT 1



**ABRAXIS**
ONCOLOGY

451031/Issued: January 2005

Abraxane
for Injectable Suspension
Rx only

(paclitaxel protein-bound particles for injectable suspension)
(albumin-bound)
**(Patient Information Enclosed)**

## WARNING

**ABRAXANE for Injectable Suspension (paclitaxel protein-bound particles for injectable suspension) should be administered under the supervision of a physician experienced in the use of cancer chemotherapeutic agents. Appropriate management of complications is possible only when adequate diagnostic and treatment facilities are readily available.**

**ABRAXANE therapy should not be administered to patients with metastatic breast cancer who have baseline neutrophil counts of less than 1,500 cells/mm³. In order to monitor the occurrence of bone marrow suppression, primarily neutropenia, which may be severe and result in infection, it is recommended that frequent peripheral blood cell counts be performed on all patients receiving ABRAXANE.**

**Note: An albumin form of paclitaxel may substantially affect a drug's functional properties relative to those of drug in solution. DO NOT SUBSTITUTE FOR OR WITH OTHER PACLITAXEL FORMULATIONS.**

## DESCRIPTION:

ABRAXANE for Injectable Suspension (paclitaxel protein-bound particles for injectable suspension) is an albumin-bound form of paclitaxel with a mean particle size of approximately 130 nanometers. ABRAXANE is supplied as a white to yellow, sterile, lyophilized powder for reconstitution with 20 mL of 0.9% Sodium Chloride Injection, USP prior to intravenous infusion. Each single-use vial contains 100 mg of paclitaxel and approximately 900 mg of human albumin. Each milliliter (mL) of reconstituted suspension contains 5 mg paclitaxel. ABRAXANE is free of solvents.

The active agent in ABRAXANE is paclitaxel, a natural product with antitumor activity. Paclitaxel is obtained from *Taxus media*. The chemical name for paclitaxel is $5\beta,20$-Epoxy-$1,2\alpha,4,7\beta,10\beta,13\alpha$-hexahydroxytax-$11$-en-$9$-one-$4,10$-diacetate $2$-benzoate $13$-ester with $(2R,3S)$-$N$-benzoyl-$3$-phenylisoserine.

Paclitaxel has the following structural formula:



Paclitaxel is a white to off-white crystalline powder with the empirical formula $C_{47}H_{51}NO_{14}$ and a molecular weight of 853.91. It is highly lipophilic, insoluble in water, and melts at approximately $216°C$ to $217°C$.

## CLINICAL PHARMACOLOGY:
### Mechanism of Action

ABRAXANE for Injectable Suspension (paclitaxel protein-bound particles for injectable suspension) is an antimicrotubule agent that promotes the assembly of microtubules from tubulin dimers and stabilizes microtubules by preventing depolymerization. This stability results in the inhibition of the normal dynamic reorganization of the microtubule network that is essential for vital interphase and mitotic cellular functions. Paclitaxel induces abnormal arrays or "bundles" of microtubules throughout the cell cycle and multiple asters of microtubules during mitosis.

### Human Pharmacokinetics

The pharmacokinetics of total paclitaxel following 30- and 180-minute infusions of ABRAXANE at dose levels of 80 to 375 mg/m² were determined in clinical studies. Following intravenous administration of ABRAXANE, paclitaxel plasma concentrations declined in a biphasic manner, the initial rapid decline representing distribution to the peripheral compartment and the slower second phase representing drug elimination. The terminal half-life was about 27 hours.

The drug exposure (AUCs) was dose proportional over 80 to 375 mg/m² and the pharmacokinetics of paclitaxel for ABRAXANE were independent of the duration of administration. At the recommended ABRAXANE clinical dose, 260 mg/m², the maximum maximum concentration of paclitaxel, which occurred at the end of the infusion, was 18,741 ng/mL. The mean total clearance was 15 L/hr/m². The mean volume of distribution was 632 L/m²; the large volume of distribution indicates extensive extravascular distribution and/or tissue binding of paclitaxel.

The pharmacokinetic data of 260 mg/m² ABRAXANE administered over 30 minutes was compared to the pharmacokinetics of 175 mg/m² paclitaxel injection over 3 hours. The clearance of ABRAXANE was larger (43%) than for the clearance of paclitaxel injection and the volume of distribution of ABRAXANE was also higher (53%). Differences in $C_{max}$ and $C_{max}$ corrected for dose reflected differences in total dose and rate of infusion. There were no differences in terminal half-lives.

*In vitro* studies of binding to human serum proteins, using paclitaxel concentrations ranging from 0.1 to 50 µg/mL, indicate that between 89% to 98% of drug is bound; the presence of cimetidine, ranitidine, dexamethasone, or diphenhydramine did not affect protein binding of paclitaxel.

After a 30-minute infusion of 260 mg/m² doses of ABRAXANE, the mean values for cumulative urinary recovery of unchanged drug (4%) indicated extensive non-renal clearance. Less than 1% of the total administered dose was excreted in urine as the metabolites $6\alpha$-hydroxy-paclitaxel and $3'$-$p$-hydroxypaclitaxel. Fecal excretion was approximately 20% of the total dose administered.

*In vitro* studies with human liver microsomes and tissue slices showed that paclitaxel was metabolized primarily to $6\alpha$-hydroxypaclitaxel by CYP2C8, and to two minor metabolites, $3'$-$p$-hydroxypaclitaxel and $6\alpha$, $3'$-$p$-dihydroxypaclitaxel, by CYP3A4. *In vitro*, the metabolism of paclitaxel to $6\alpha$-hydroxypaclitaxel was inhibited by a number of agents (ketoconazole, verapamil, diazepam, quinidine, dexamethasone, cyclosporin, teniposide, etoposide, and vincristine), but the concentrations used exceeded those found *in vivo* following normal therapeutic doses. Testosterone, $17\alpha$-ethinyl estradiol, retinoic acid, and quercetin, a specific inhibitor of CYP2C8, also inhibited the formation of $6\alpha$-hydroxypaclitaxel *in vitro*. The pharmacokinetics of paclitaxel may also be altered *in vivo* as a result of interactions with compounds that are substrates, inducers, or inhibitors of CYP2C8 and/or CYP3A4 (see **PRECAUTIONS: Drug Interactions**). The effect of renal or hepatic dysfunction on the disposition of ABRAXANE has not been investigated.

Possible interactions of paclitaxel with concomitantly administered medications have not been formally investigated.

## CLINICAL STUDIES:
### Metastatic Breast Carcinoma

Data from 106 patients accrued in two single arm open label studies and from 460 patients enrolled in a randomized comparative study were available to support the use of ABRAXANE in metastatic breast cancer.

#### Single Arm Open Label Studies

In one study, ABRAXANE was administered as a 30-minute infusion at a dose of 175 mg/m² to 43 patients with metastatic breast cancer. The second trial utilized a dose of 300 mg/m² as a 30 minute infusion in 63 patients with metastatic breast cancer. Cycles were administered at 3 week intervals. Objective responses were observed in both studies.

#### Randomized Comparative Study

This multicenter trial was conducted in 460 patients with metastatic breast cancer. Patients were randomized to receive ABRAXANE at a dose of 260 mg/m² given as a 30-minute infusion, or paclitaxel injection at 175 mg/m² given as a 3-hour infusion. Sixty-four percent of patients had impaired performance status (ECOG 1 or 2) at study entry; 79% had visceral metastases; and 76% had > 3 sites of metastases. Fourteen percent of the patients had not received prior chemotherapy; 27% had received chemotherapy in the adjuvant setting, 40% in the metastatic setting and 19% in both metastatic and adjuvant settings. Fifty-nine percent received study drug as second or greater than second-line therapy. Seventy-seven percent of the patients had been previously exposed to anthracyclines.

In this trial, patients in the ABRAXANE treatment arm had a statistically significantly higher reconciled target lesion response rate (the trial primary endpoint) of 21.5% (95% CI: 16.2% to 26.7%), compared to 11.1% (95% CI: 6.9% to 15.1%) for patients in the paclitaxel injection treatment arm. See Table 1.

**Table 1: Efficacy Results from Randomized Trial**

| | | ABRAXANE 260 mg/m² | Paclitaxel Injection 175 mg/m² |
|---|---|---|---|
| **Reconciled Target Lesion Response Rate (primary endpoint)[a]** | | | |
| All randomized patients | Response Rate (95% CI) | 50/223 (21.5%) (16.19% to 25.73%) | 25/227 (11.1%) (6.94% to 15.09%) |
| | P-value[b] | | 0.003 |
| Patients who had failed combination chemotherapy or relapsed within 6 months of adjuvant chemotherapy[c] | Response Rate (95% CI) | 20/129 (15.5%) (9.29% to 21.75%) | 12/143 (8.4%) (3.85% to 12.94%) |

[a] Reconciled Target Lesion Response Rate (TLRR) was the prospectively defined protocol specific endpoint, based on independent radiologic assessment of tumor responses reconciled with investigator responses (which also included clinical information) for the first 6 cycles of therapy. The reconciled TLRR was lower than the Investigator Reported Response Rates, which are based on allcycles of therapy.

[b] From Cochran-Mantel-Haenszel test stratified by 1st line vs. > 1st line therapy

[c] Prior therapy should have included an anthracycline unless clinically contraindicated.

## INDICATION:

ABRAXANE™ for Injectable Suspension (paclitaxel protein-bound particles for injectable suspension) is indicated for the treatment of breast cancer after failure of combination chemotherapy for metastatic disease or relapse within 6 months of adjuvant chemotherapy. Prior therapy should have included an anthracycline unless clinically contraindicated.

## CONTRAINDICATIONS:

ABRAXANE should not be used in patients who have baseline neutrophil counts of < 1,500 cells/mm³.

## WARNINGS:

Bone marrow suppression (primarily neutropenia) is dose dependent and a dose limiting toxicity. ABRAXANE should not be administered to patients with baseline neutrophil counts of < 1,500 cells/mm³. Frequent monitoring of blood counts should be instituted during ABRAXANE treatment. Patients should not be retreated with subsequent cycles of ABRAXANE until neutrophils recover to a level > 1,500 cells/mm³ and platelets recover to a level > 100,000 cells/mm³.

The use of ABRAXANE has not been studied in patients with hepatic or renal dysfunction. In the randomized controlled trial, patients were excluced for baseline serum bilirubin > 1.5 mg/dL or baseline serum creatinine > 2 mg/dL.

### Pregnancy — Teratogenic Effects: Pregnancy Category D

ABRAXANE can cause fetal harm when administered to a pregnant woman. Administration of paclitaxel protein-bound particles to rats on gestation days 7 to 17 at doses of 6 mg/m² (approximately 2% of the daily maximum recommended human dose on a mg/m² basis) caused embryo- and fetotoxicity, as indicated by intrauterine mortality, increased resorptions (up to 5-fold), reduced numbers of litters and live fetuses, reduction in fetal body weight and increase in fetal anomalies. Fetal anomalies included soft tissue and skeletal malformations, such as eye bulge, folded retina, microphthalmia, and dilation of brain ventricles. A lower incidence of soft tissue and skeletal malformations were also exhibited at 3 mg/m² (approximately 1% of the daily maximum recommended human dose on a mg/m² basis).

There are no adequate and well-controlled studies in pregnant women using ABRAXANE. If this drug is used during pregnancy, or if the patient becomes pregnant while receiving this drug, the patient should be apprised of the potential hazard to the fetus. Women of childbearing potential should be advised to avoid becoming pregnant while receiving treatment with ABRAXANE.

### Use in Males

Men should be advised to not father a child while receiving treatment with ABRAXANE (see PRECAUTIONS: Carcinogenesis, Mutagenesis, Impairment of Fertility for discussion of effects of ABRAXANE exposure on male fertility and embryonic viability).

### Albumin (Human)

ABRAXANE contains albumin (human), a derivative of human blood. Based on effective donor screening and product manufacturing processes, it carries an extremely remote risk for transmission of viral diseases. A theoretical risk for transmission of Creutzfeldt-Jakob Disease (CJD) also is considered extremely remote. No cases of transmission of viral diseases or CJD have ever been identified for albumin.

## PRECAUTIONS:

### Drug Interactions

No drug interaction studies have been conducted with ABRAXANE.

The metabolism of paclitaxel is catalyzed by CYP2C8 and CYP3A4. In the absence of formal clinical drug interaction studies, caution should be exercised when administering ABRAXANE (paclitaxel protein-bound particles for injectable suspension) concomitantly with known substrates or inhibitors of CYP2C8 and CYP3A4 (see CLINICAL PHARMACOLOGY).

Potential interactions between paclitaxel, a substrate of CYP3A4, and protease inhibitors (such as ritonavir, saquinavir, indinavir, and nelfinavir), which are substrates and/or inhibitors of CYP3A4, have not been evaluated in clinical trials.

### Hematology

ABRAXANE therapy should not be administered to patients with baseline neutrophil counts of less than 1,500 cells/mm³. In order to monitor the occurrence of myelotoxicity, it is recommended that frequent peripheral blood cell counts be performed on all patients receiving ABRAXANE. Patients should not be retreated with subsequent cycles of ABRAXANE until neutrophils recover to a level > 1,500 cells/mm³ and platelets recover to a level > 100,000 cells/mm³. In the case of severe neutropenia (< 500 cells/mm³ for seven days or more) during a course of ABRAXANE therapy, a dose reduction for subsequent courses of therapy is recommended (see DOSAGE AND ADMINISTRATION).

### Nervous System

Sensory neuropathy occurs frequently with ABRAXANE. The occurrence of grade 1 or 2 sensory neuropathy does not generally require dose modification. If grade 3 sensory neuropathy develops, treatment should be withheld until resolution to grade 1 or 2 followed by a dose reduction for all subsequent courses of ABRAXANE (see DOSAGE AND ADMINISTRATION).

### Injection Site Reaction

Injection site reactions occur infrequently with ABRAXANE and were mild in the randomized clinical trial. Given the possibility of extravasation, it is advisable to closely monitor the infusion site for possible infiltration during drug administration.

### Carcinogenesis, Mutagenesis, Impairment of Fertility

The carcinogenic potential of ABRAXANE has not been studied.

Paclitaxel has been shown to be clastogenic in vitro (chromosome aberrations in human lymphocytes) and in vivo (micronucleus test in mice). ABRAXANE was not mutagenic in the Ames test or the CHO/HGPRT gene mutation assay.

Administration of paclitaxel protein-bound particles to male rats at 42 mg/m² on a weekly basis (approximately 16% of the daily maximum recommended human exposure on a mg/m² basis) for 11 weeks prior to mating with untreated female rats resulted in significantly reduced fertility accompanied by decreased pregnancy rates and increased loss of embryos in mated females. A low incidence of skeletal and soft tissue fetal anomalies was also observed at doses of 3 and 12 mg/m²/week in this study (approximately 1 to 5% of the daily maximum recommended human exposure on a mg/m² basis). Testicular atrophy/degeneration has also been observed in single-dose toxicology studies in rodents administered paclitaxel protein-bound particles at 54 mg/m² and doses administered 175 mg/m² (see WARNINGS).

### Pregnancy — Teratogenic Effects: Pregnancy Category D

(see WARNINGS section)

### Nursing Mothers

It is not known whether paclitaxel is excreted in human milk. Following intravenous administration of carbon-14 labeled paclitaxel to rats on days 9 to 10 postpartum, concentrations of radioactivity in milk were higher than in plasma and declined in parallel with the plasma concentrations. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants, it is recommended that nursing be discontinued when receiving ABRAXANE therapy.

### Pediatric Use

The safety and effectiveness of ABRAXANE in pediatric patients have not been evaluated.

### Geriatric Use

Of the 229 patients in the randomized study who received ABRAXANE, 11% were at least 65 years of age and < 2% were 75 years or older. No toxicities occurred notably more frequently among elderly patients who received ABRAXANE.

### Information for Patients

(See Patient Information Leaflet).

## ADVERSE REACTIONS:

The following table shows the frequency of important adverse events in the randomized comparative trial for the patients who received either single-agent ABRAXANE or paclitaxel injection for the treatment of metastatic breast cancer.

**Table 2: Frequency[a] of Important Treatment Emergent Adverse Events in the Randomized Study on an Every-3-Weeks Schedule**

| | Percent of Patients | |
|---|---|---|
| | ABRAXANE 260/30min[b] (n=229) | Paclitaxel Injection 175/3[c] (n=225) |
| **Bone Marrow** | | |
| Neutropenia | | |
| < 2.0 x 10⁹/L | 80 | 82 |
| < 0.5 x 10⁹/L | 9 | 22 |
| Thrombocytopenia | | |
| < 100 x 10⁹/L | 2 | 3 |
| < 50 x 10⁹/L | <1 | 1 |
| Anemia | | |
| < 11 g/L | 33 | 25 |
| < 8 g/L | 1 | 1 |
| Infections | 24 | 20 |
| Febrile Neutropenia | 2 | 1 |
| Bleeding | 2 | 2 |
| **Hypersensitivity Reaction[d]** | | |
| All | 4 | 12 |
| Severe[e] | 0 | 2 |
| **Cardiovascular** | | |
| Vital Sign Changes[f] | | |
| Bradycardia | <1 | <1 |
| Hypotension | 5 | 5 |
| Severe Cardiovascular Events[e] | 3 | 4 |
| **Abnormal ECG** | | |
| All patients | 60 | 52 |
| Patients with Normal Baseline | 35 | 30 |
| **Respiratory** | | |
| Cough | 6 | 6 |
| Dyspnea | 12 | 9 |
| **Sensory Neuropathy** | | |
| Any Symptoms | 71 | 56 |
| Severe Symptoms[f] | 10 | 2 |
| **Myalgia/Arthralgia** | | |
| Any Symptoms | 44 | 49 |
| Severe Symptoms[f] | 8 | 4 |
| **Asthenia** | | |
| Any Symptoms | 47 | 38 |
| Severe Symptoms[f] | 8 | 3 |
| **Fluid Retention/Edema** | | |
| Any Symptoms | 10 | 8 |
| Severe Symptoms[f] | 0 | 1 |
| **Gastrointestinal** | | |
| Nausea | | |
| Any symptoms | 30 | 21 |
| Severe symptoms[f] | 3 | <1 |
| Vomiting | | |
| Any symptoms | 18 | 9 |
| Severe Symptoms[f] | 4 | 1 |
| Diarrhea | | |
| Any Symptoms | 26 | 15 |
| Severe Symptoms[f] | <1 | 1 |
| Mucositis | | |
| Any Symptoms | 7 | 7 |
| Severe Symptoms[f] | <1 | 0 |
| **Alopecia** | 90 | 94 |
| **Hepatic** (Patients with Normal Baseline) | | |
| Bilirubin Elevations | 7 | 7 |
| Alkaline Phosphatase Elevations | 36 | 31 |
| AST (SGOT) Elevations | 39 | 32 |
| **Injection Site Reaction** | 1 | 1 |

[a] Based on worst grade

[b] ABRAXANE dose in mg/m²/duration in minutes

[c] paclitaxel injection dose in mg/m²/duration in hours

[d] paclitaxel injection patients received premedication

[e] Includes treatment-related events related to hypersensitivity (e.g., flushing, dyspnea, chest pain, hypotension) that began on a day of dosing.

[f] Severe events are defined as at least grade 3 toxicity

[g] During study drug dosing.

Myelosuppression and sensory neuropathy were dose related.

### Adverse Event Experiences by Body System

Unless otherwise noted, the following discussion refers to the primary safety database of 229 patients with metastatic breast cancer treated with single-agent ABRAXANE in the randomized

controlled trial. The frequency and severity of important adverse events for the study are presented above in tabular form. In some instances, rare severe events observed with paclitaxel injection may be expected to occur with ABRAXANE.

### Hematologic

Neutropenia, the most important hematologic toxicity, was dose dependent and reversible. Among patients with metastatic breast cancer in the randomized trial, neutrophil counts declined below 500 cells/mm³ (Grade 4) in 9% of the patients treated with a dose of 260 mg/m² compared to 22% in patients receiving paclitaxel injection at a dose of 175 mg/m².

In the randomized metastatic breast cancer study, infectious episodes were reported in 24% of the patients treated with a dose of 260 mg/m² given as a 30-minute infusion. Oral candidiasis, respiratory tract infections and pneumonia were the most frequently reported infectious complications. Febrile neutropenia was reported in 2% of patients in the ABRAXANE arm and 1% of patients in the paclitaxel injection arm.

Thrombocytopenia was uncommon. In the randomized metastatic breast cancer study, bleeding episodes were reported in 2% of the patients in each treatment arm.

Anemia (Hb <11 g/dL) was observed in 33% of patients treated with ABRAXANE in the randomized trial and was severe (Hb <8 g/dL) in 1% of the cases. Among all patients with normal baseline hemoglobin, 31% became anemic on study and 1% had severe anemia.

### Hypersensitivity Reactions (HSRs)

In the randomized controlled metastatic breast cancer study, Grade 1 or 2 HSRs occurred on the day of ABRAXANE administration and consisted of dyspnea (1%) and flushing, hypotension, chest pain, and arrhythmia (all <1%). The use of ABRAXANE in patients previously exhibiting hypersensitivity to paclitaxel injection or human albumin has not been studied.

### Cardiovascular

Hypotension, during the 30-minute infusion, occurred in 5% of patients in the randomized metastatic breast cancer trial. Bradycardia, during the 30-minute infusion, occurred in <1% of patients. These vital sign changes most often caused no symptoms and required neither specific therapy nor treatment discontinuation.

Severe cardiovascular events possibly related to single-agent ABRAXANE occurred in approximately 3% of patients in the randomized trial. These events included: chest pain, cardiac arrest, supraventricular tachycardia, edema, thrombosis, pulmonary thromboembolism, pulmonary emboli, and hypertension. Cases of cerebrovascular attacks (strokes) and transient ischemic attacks have been reported rarely.

Electrocardiogram (ECG) abnormalities were common among patients at baseline. ECG abnormalities on study did not usually result in symptoms, were not dose-limiting, and required no intervention. ECG abnormalities were noted in 60% of patients in the metastatic breast cancer randomized trial. Among patients with a normal ECG prior to study entry, 35% of all patients developed an abnormal tracing while on study. The most frequently reported ECG modifications were non-specific repolarization abnormalities, sinus bradycardia, and sinus tachycardia.

### Respiratory

Reports of dyspnea (12%) and cough (6%) were reported after treatment with ABRAXANE in the randomized trial. Rare reports (<1%) of pneumothorax were reported after treatment with ABRAXANE. Rare reports of interstitial pneumonia, lung fibrosis, and pulmonary embolism have been received as part of the continuing surveillance of paclitaxel injection safety and may occur following ABRAXANE treatment. Rare reports of radiation pneumonitis have been received in paclitaxel injection patients receiving concurrent radiotherapy. There is no experience with the use of ABRAXANE with concurrent radiotherapy.

### Neurologic

The frequency and severity of neurologic manifestations were influenced by prior and/or concomitant therapy with neurotoxic agents.

In general, the frequency and severity of neurologic manifestations were dose-dependent in patients receiving single-agent ABRAXANE. In the randomized trial, sensory neuropathy was observed in 71% of patients (10% severe) in the ABRAXANE arm and in 56% of patients (2% severe) in the paclitaxel injection arm. The frequency of sensory neuropathy increased with cumulative dose. Sensory neuropathy was the cause of ABRAXANE discontinuation in 7/229 (3%) patients in the randomized trial. In the

randomized comparative study, 24 patients (10%) treated with ABRAXANE developed Grade 3 peripheral neuropathy; of these patients, 14 had documented improvement after a median of 22 days; 10 patients resumed treatment at a reduced dose of ABRAXANE and 2 discontinued due to peripheral neuropathy. Of the 10 patients without documented improvement, 4 discontinued the study due to peripheral neuropathy.

No incidences of grade 4 sensory neuropathies were reported in the clinical trial. Only one incident of motor neuropathy (grade 1) was observed in either arm of the controlled trial.

Reports of autonomic neuropathy resulting in paralytic ileus have been received as part of the continuing surveillance of paclitaxel injection safety.

Ocular/visual disturbances occurred in 13% of all patients (n=366) treated with ABRAXANE in single arm and randomized trials and 1% were severe. The severe cases (keratitis and blurred vision) were reported in patients in a single arm study who received higher doses than those recommended (300 or 375 mg/m²). These effects generally have been reversible. However, rare reports in the literature of abnormal visual evoked potentials in patients treated with paclitaxel injection have suggested persistent optic nerve damage.

### Arthralgia/Myalgia

Forty-four percent of patients treated in the randomized trial experienced arthralgia/myalgia; 8% experienced severe symptoms. The symptoms were usually transient, occurred two or three days after ABRAXANE administration, and resolved within a few days.

### Hepatic

Among patients with normal baseline liver function treated with ABRAXANE in the randomized trial, 7%, 36%, and 39% had elevations in bilirubin, alkaline phosphatase, and AST (SGOT), respectively. Grade 3 or 4 elevations in GGT were reported for 14% of patients treated with ABRAXANE and 10% of patients treated with paclitaxel injection in the randomized trial.

Rare reports of hepatic necrosis and hepatic encephalopathy leading to death have been received as part of the continuing surveillance of paclitaxel injection safety and may occur following ABRAXANE treatment.

### Renal

Overall 11% of patients experienced creatinine elevation, 1% severe. No discontinuations, dose reductions, or dose delays were caused by renal toxicities.

### Gastrointestinal (GI)

Nausea/vomiting, diarrhea, and mucositis were reported by 33%, 27%, and 7% of ABRAXANE treated patients in the randomized trial.

Rare reports of intestinal obstruction, intestinal perforation, pancreatitis, and ischemic colitis have been received as part of the continuing surveillance of paclitaxel injection safety and may occur following ABRAXANE treatment. Rare reports of neutropenic enterocolitis (typhlitis), despite the coadministration of G-CSF, were observed in patients treated with paclitaxel injection alone and in combination with other chemotherapeutic agents.

### Injection Site Reaction

Injection site reactions have occurred infrequently with ABRAXANE and were mild in the randomized clinical trial. Recurrence of skin reactions at a site of previous extravasation following administration of paclitaxel injection at a different site, i.e., "recall", has been reported rarely.

Rare reports of more severe events such as phlebitis, cellulitis, induration, skin exfoliation, necrosis, and fibrosis have been received as part of the continuing surveillance of paclitaxel injection safety. In some cases the onset of the injection site reaction in paclitaxel injection patients either occurred during a prolonged infusion or was delayed by a week to ten days.

Given the possibility of extravasation, it is advisable to closely monitor the infusion site for possible infiltration during drug administration.

### Asthenia

Asthenia was reported in 47% of patients (8% severe) treated with ABRAXANE in the randomized trial. Asthenia included reports of asthenia, fatigue, weakness, lethargy and malaise.

### Other Clinical Events

Rare cases of cardiac ischemia/infarction and thrombosis/embolism possibly related to ABRAXANE treatment have been reported. Alopecia was observed in almost all of the patients. Nail changes (changes in pigmentation or discoloration of nail bed) were uncommon. Edema (fluid retention) was infrequent (10% of randomized trial patients); no patients had severe edema.

The following rare adverse events have been reported as part of the continuing surveillance of paclitaxel injection safety and may occur following ABRAXANE treatment: skin abnormalities related to radiation recall as well as reports of macropapular rash, Stevens-Johnson syndrome, toxic epidermal necrolysis, conjunctivitis, and increased lacrimation.

### Accidental Exposure

No reports of accidental exposure to ABRAXANE have been received. However, upon inhalation of paclitaxel, dyspnea, chest pain, burning eyes, sore throat, and nausea have been reported. Following topical exposure, events have included tingling, burning, and redness.

### OVERDOSAGE:

There is no known antidote for ABRAXANE overdosage. The primary anticipated complications of overdosage would consist of bone marrow suppression, sensory neurotoxicity, and mucositis.

### DOSAGE AND ADMINISTRATION:

After failure of combination chemotherapy for metastatic breast cancer or relapse within 6 months of adjuvant chemotherapy, the recommended regimen for ABRAXANE for Injectable Suspension (paclitaxel protein-bound particles for injectable suspension) is 260 mg/m² administered intravenously over 30 minutes every 3 weeks.

### Hepatic impairment

The appropriate dose of ABRAXANE for patients with bilirubin greater than 1.5 mg/dL is not known.

### Dose Reduction

Patients who experience severe neutropenia (neutrophil <500 cells/mm³ for a week or longer) or severe sensory neuropathy during ABRAXANE therapy should have dosage reduced to 220 mg/m² for subsequent courses of ABRAXANE. For recurrence of severe neutropenia or severe sensory neuropathy, additional dose reduction should be made to 180 mg/m². For grade 3 sensory neuropathy hold treatment until resolution to grade 1 or 2, followed by a dose reduction for all subsequent courses of ABRAXANE.

### Preparation and Administration Precautions

ABRAXANE is a cytotoxic anticancer drug and, as with other potentially toxic paclitaxel compounds, caution should be exercised in handling ABRAXANE. The use of gloves is recommended. If ABRAXANE (lyophilized cake or reconstituted suspension) contacts the skin, wash the skin immediately and thoroughly with soap and water. Following topical exposure to paclitaxel, events may include tingling, burning and redness. If ABRAXANE contacts mucous membranes, the membranes should be flushed thoroughly with water.

Given the possibility of extravasation, it is advisable to closely monitor the infusion site for possible infiltration during drug administration. Limiting the infusion of ABRAXANE to 30 minutes, as directed, reduces the likelihood of infusion-related reactions (see PRECAUTIONS: Injection Site Reaction).

No premedication to prevent hypersensitivity reactions is required prior to administration of ABRAXANE.

### Preparation for Intravenous Administration

ABRAXANE is supplied as a sterile lyophilized powder for reconstitution before use. AVOID ERRORS, READ ENTIRE PREPARATION INSTRUCTIONS PRIOR TO RECONSTITUTION.

1. Aseptically, reconstitute each vial by injecting 20 mL of 0.9% Sodium Chloride Injection, USP.
2. Slowly inject the 20 mL of 0.9% Sodium Chloride Injection, USP, over a minimum of 1 minute, using the sterile syringe to direct the solution flow onto the INSIDE WALL OF THE VIAL.



3. DO NOT INJECT the 0.9% Sodium Chloride Injection, USP, directly onto the lyophilized cake as this will result in foaming.
4. Once the injection is complete, allow the vial to sit for a minimum of 5 minutes to ensure proper wetting of the lyophilized cake/powder.
5. Gently swirl and/or invert the vial slowly for at least 2 minutes until complete dissolution of any cake/powder occurs. Avoid generation of foam.
6. If foaming or clumping occurs, stand solution for at least 15 minutes until foam subsides.

ABRX 0000824

Each mL of the reconstituted formulation will contain 5 mg/mL paclitaxel.

Calculate the exact total dosing volume of 5 mg/mL suspension required for the patient: Dosing volume (mL) = Total dose (mg)/5 (mg/mL).

The reconstituted sample should be milky and homogenous without visible particulates. If particulates or settling are visible, the vial should be **gently** inverted again to ensure complete resuspension prior to use.

Inject the appropriate amount of reconstituted ABRAXANE into an empty, sterile, polyvinyl chloride (PVC) type IV bag. The use of specialized DEHP-free solution containers or administration sets is not necessary to prepare or administer ABRAXANE infusions. The use of an in-line filter is not recommended.

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit.

### Stability

Unopened vials of ABRAXANE are stable until the date indicated on the package when stored between 20°C to 25°C (68°F to 77°F), in the original package. Reconstituted ABRAXANE should be used immediately, but may be refrigerated at 2°C to 8°C (36°F to 46°F) for a maximum of 8 hours if necessary. If not used immediately, each vial of reconstituted suspension should be replaced in the original carton to protect it from bright light. Discard any unused portion. Neither freezing nor refrigeration adversely affects the stability of the product. Some settling of the reconstituted suspension may occur. Ensure complete resuspension by mild agitation before use. Discard the reconstituted suspension if precipitates are observed. The suspension for infusion prepared as recommended in an infusion bag is stable at ambient temperature (approximately 25°C) and lighting conditions for up to 8 hours.

### HOW SUPPLIED:

| Product No. | NDC No. | |
|---|---|---|
| 103450 | 68817-134-50 | 100 mg in a single use vial, individually packaged in a carton. |

### Storage

Store the vials in original cartons at 20°C to 25°C (68°F to 77°F). Retain in the original package to protect from bright light.

### Handling and Disposal

Procedures for proper handling and disposal of anticancer drugs should be considered. Several guidelines on this subject have been published.[1-8] There is no general agreement that all of the procedures recommended in the guidelines are necessary or appropriate.

U.S. Patent Numbers: 5,439,686; 5,498,421; 5,560,933; 5,665,382; 6,096,331; 6,506,405; 6,537,579; 6,749,868; 6,753,006

### REFERENCES:

1. Recommendations for the Safe Handling of Parenteral Antineoplastic Drugs. Publication No. 83-2621. For sale by the Superintendent of Documents, US Government NIH Printing Office, Washington, DC 20402.
2. AMA Council Report. Guidelines for Handling Parenteral Antineoplastics. *JAMA*, 1985; 253(11):1590-1592.
3. National Study Commission on Cytotoxic Exposure Recommendations for Handling Cytotoxic Agents. Available from Louis P. Jeffrey, ScD, Chairman, National Study Commission on Cytotoxic Exposure. Massachusetts College of Pharmacy and Allied Health Sciences. 179 Longwood Avenue, Boston, Massachusetts 02115.
4. Clinical Oncological Society of Australia. Guidelines and Recommendations for Safe Handling of Antineoplastic Agents. *Med J Australia*, 1983; 1:426-428.
5. Jones RB, et al: Safe Handling of Chemotherapeutic Agents: A Report from the Mount Sinai Medical Center. *CA-A Cancer Journal for Clinicians*, 1983: (Sept/Oct) 258-263.
6. American Society of Hospital Pharmacists Technical Assistance Bulletin on Handling Cytotoxic and Hazardous Drugs. *Am J Hosp Pharm*, 1990; 47:1033-1049.
7. Controlling Occupational Exposure to Hazardous Drugs. (OSHA WORK-PRACTICE GUIDELINES.) *Am J Health-Syst Pharm*, 1996; 53:1669-1686.
8. ONS Clinical Practice Committee. Cancer Chemotherapy Guidelines and Recommendations for Practice Pittsburgh, PA: Oncology Nursing Society; 1999:32-41.



A Division of American Pharmaceutical Partners, Inc.
Schaumburg, IL 60173

451031
Issued: January 2005