IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELAN PHARMA INTERNATIONAL LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 06-438-GMS |
| ABRAXIS BIOSCIENCE, INC., | ) ) | **REDACTED –** |
| Defendant. | ) ) ) | <u>**PUBLIC VERSION**</u> |

**APPENDIX OF EXHIBITS TO**
**DEFENDANT ABRAXIS BIOSCIENCE, INC.'S ANSWERING BRIEF**
**IN OPPOSITION TO ELAN'S MOTION FOR**
**(1) AN AWARD OF PREJUDGMENT INTEREST AND (2) AN**
<u>**ACCOUNTING OF ABRAXIS'S INFRINGING SALES SINCE JUNE 12, 2008**</u>

OF COUNSEL:
Michael A. Jacobs
MORRISON & FOERSTER, LLP
425 Market Street
San Francisco, CA 94105-2482
(415) 268-7000

Emily A. Evans
Eric S. Walters
Erik J. Olson
Paul F. Coyne
Diana B. Kruze
MORRISON & FOERSTER, LLP
755 Page Mill Road
Palo Alto, CA 94304-1018
(650) 813-5600

Anders T. Aannestad
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130
(858) 720-5100

Dated: July 18, 2008

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Josy W. Ingersoll (#1088)
Elena C. Norman (#4780)
Karen E. Keller (#4489)
Michele Sheretta Budicak (#4651)
Jeffrey T. Castellano (#4837)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
jingersoll@ycst.com
enorman@ycst.com
kkeller@ycst.com
mbudicak@ycst.com
jcastellano@ycst.com

Attorneys for Defendant
ABRAXIS BIOSCIENCE, INC.

**TABLE OF CONTENTS**

| Exhibit No. | Description | Date | Page Nos. |
|---|---|---|---|
| PX046 | Contract - License Agreement between Elan Pharma International Limited and Aventis Pharma SA | 12/19/2003 | B 1-46 |
| PX050 | Contract - License Agreement between Elan Pharma International Limited and F. Hoffman-La Roche Ltd and Hoffman-La Roche Inc. | 04/16/2004 | B 47-89 |
| PX063 | Contract - License Agreement between Elan Pharma International Limited, Elan Drug Delivery, Inc. and Bristol-Myers Squibb Company | 08/29/2003 | B 90-141 |
| PX064 | Contract - License Agreement between Elan Pharma International Limited and Janssen Pharmaceutica N.V. | 07/31/2003 | B 142-202 |
|  | Excerpts of Trial Transcripts | 06/05-11/2008 | B 203-218 |

DB02:6988222.1

065496.1001

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, Esquire, hereby certify that on July 23, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on July 23, 2008, I caused a true and correct copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

> **<u>BY E-MAIL</u>**
>
> Stephen Scheve, Esquire
> BAKER BOTTS L.L.P.
> One Shell Plaza
> 910 Louisiana Street
> Houston, TX  77002-4995
> steve.scheve@bakerbotts.com
>
> Paul F. Fehlner, Esquire
> BAKER BOTTS L.L.P.
> 30 Rockefeller Plaza
> New York, NY  10112-4498
> paul.fehlner@bakerbotts.com

YOUNG CONAWAY STARGATT
 &  TAYLOR, LLP


/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
jingersoll@ycst.com
Elena C. Norman (No. 4780)
enorman@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
Michele Sherretta Budicak (No. 4651)
mbudicak@ycst.com
Jeffrey T. Castellano (No. 4837)
jcastellano@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899
(302) 571-6600

*Attorneys for Defendant*
*ABRAXIS BIOSCIENCE, INC.*

2

# PAGES B 1 – B 202

## REDACTED IN THEIR ENTIRETY

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ELAN PHARMA INTERNATIONAL    :    Civil Action
LIMITED,                     :
                             :
          Plaintiff,         :
                             :
     v.                      :
                             :
ABRAXIS BIOSCIENCE INC.,     :
                             :
          Defendant.         :    No. 06-438-GMS

- - -

Wilmington, Delaware
Thursday, June 5, 2008
9:30 a.m.
FOURTH DAY OF TRIAL
- - -

BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                  and a Jury

APPEARANCES:

          JOHN G. DAY, ESQ.
          Ashby & Geddes
               -and-
          STEPHEN SCHEVE, ESQ.,
          LINDA M. GLOVER, ESQ.,
          JEFFREY SULLIVAN, ESQ.,
          ROBERT RIDDLE, ESQ., and
          PAUL FEHLNER, ESQ.
          Baker Botts LLP
          (Houston, TX)
               -and-
          GREGORY BOKAR, ESQ.
          Counsel - Elan Drug Delivery

                    Counsel for Plaintiff

J Jarosz - direct

<table>
<tr><td>

**Page 799**

1  the quantitative analysis that you performed, sir.
2       In the first chart, you made reference to
3  something called the market approach. Could you explain
4  that to the jury?
5  A.   The market approach involves looking at other
6  transactions involving similar technology, similar parties,
7  as close to February '05 as one can get, using as close to
8  the same economic underlying facts as one can get.
9       It's similar to a real estate transaction.
10      When I go to sell my home, one of the very first
11  things that a real estate agent will do is see if there have
12  been other homes in my neighborhood or close in neighborhood
13  that have sold as well. What should be charged for my house
14  is importantly impacted by what other homes have sold for in
15  my neighborhood or in my town or in the broader geographic
16  area.
17      So if all the homes in my neighborhood have
18  sold, for instance, for $150,000, just by way of example,
19  then that's pretty strong evidence that I should probably
20  attempt to sell my home for about $150,000.
21      What I do is look at other homes in the
22  neighborhood, I look at other transfers and sharing of
23  patent rights that are similar to what we have today.
24  Q.   Okay. Are there any types of agreements or sets of
25  agreements that you reviewed, then, in applying this market

</td><td>

**Page 801**

1  terms to each Elan group agreement covering NanoCrystal
2  technology. But most of them have the features that are
3  reported here. That is, there are running royalty rates,
4  which means five percent or four percent or eight percent.
5  The percentage that I referred to before, when the user of
6  the technology makes sales, it pays associated with its
7  sales level, so five percent of sales, for instance.
8       So they are running royalties.
9       The vast bulk of the agreements also have up
10  front or milestone payments, some as high as $35 million.
11  In other words, there is a transfer of money up front just
12  for the right to practice the patented inventions.
13      Each of the agreements covered Elan's
14  NanoCrystal technology, or what's written here, the
15  nanotechnology patent portfolio, so a set of rights, patents
16  and patent applications, U.S. patents and foreign patents.
17  A whole host of rights were given to each one of the users,
18  which are called licensees.
19      Most of the licenses were related to a specific
20  compound. So they didn't state, You can use our technology
21  for any number of applications, but they said, for instance,
22  that you can use our technology in anticancer applications,
23  for instance, or in other types of very specific
24  applications.
25      The last -- many of the agreements involved more

</td></tr>
<tr><td>

**Page 800**

1  approach to your analysis?
2  A.   Yes. There are three sets of agreements. The first
3  are Elan group agreements, agreements entered covering
4  NanoCrystal technology to users of that technology.
5       The second is Abraxis licenses. The third is
6  third-party licenses in the general industry that we are
7  talking about but involving other parties.
8  Q.   I bored the jury to death reading into the record
9  various agreements. Have you reviewed all of those Elan
10  agreements as part of your exercise, sir?
11  A.   I have. There have been about 25 agreements that have
12  been produced as part of this discovery. And we have
13  reviewed all of those and summarized those in the report
14  that, or in the reports that I have submitted in this
15  matter.
16  Q.   In addition to the Elan agreements, did you review any
17  other sets of agreements?
18  A.   Yes. I reviewed the Abraxis agreements. There were
19  four agreements. I referred to three of them a few moments
20  ago. Then I reviewed about 175 third-party agreements and
21  surveys about licensing rates in a variety of industries.
22  Q.   Let's go to the next slide then, sir, in terms of the
23  Elan group agreements. Could you explain this slide,
24  please?
25  A.   Yes. Each agreement is quite lengthy. There are many

</td><td>

**Page 802**

1  than just what's called a naked patent license. It usually
2  involved some kind of collaboration with Elan, the owner of
3  the patent rights, and each one of its licensees. Sometimes
4  it was to develop a drug, sometimes to help sell the drug,
5  sometimes to make the drug. So, these are kind of the basic
6  provisions that one sees in those agreements.
7  Q.   With regard, then, to the Elan group agreements, did
8  you perform an analysis where you looked at them in
9  different points of time?
10  A.   I did.
11  Q.   What was your purpose for doing that, sir?
12  A.   Well, I saw, there is kind of a line of demarcation in
13  about the year 2000. There are quite a number of licenses
14  before, which you see summarized on the screen, and quite a
15  number of licenses afterwards, but in about an 18-month
16  period, there wasn't much activity. So that looked like a
17  clear line of demarcation.
18      More importantly, Elan didn't start receiving
19  its first revenues associated with the licenses until the
20  year 2002. So, at that point, it became clear to Elan and
21  clear to the marketplace that this technology really was
22  pretty strong and useful. So there were things that
23  happened after 2002 in the marketplace that said, the nature
24  of the licensing changed some.
25      What I did is I drew a line of demarcation at

</td></tr>
</table>

21 (Pages 799 to 802)

Page 803

1  2002, looked at the licenses before, in this chart, and
2  looked at the licenses after, in another chart.
3  Q.  Let's explain this.  I see, let's take the very first
4  line, there is a company called Janssen.  Can you tell the
5  jury what that is?
6  A.  Janssen is a pharmaceutical company, who was the first
7  company to take a license to NanoCrystal technology.  They
8  entered a license with Elan in 1995.  There were a number of
9  provisions.  But among the provisions was that Janssen would
10 pay a ten-percent royalty.  In other words, for every
11 hundred dollars in revenues that it received off a drug it
12 ultimately commercialized, it would pay $10 in a royalty
13 rate.
14 Q.  What I would like you to explain, sir, you have got
15 these bars, some of which are pretty thin and others of
16 which, like me, are pretty fat.
17     Can you explain the difference between the
18 length of the bar and what you are trying to communicate?
19 A.  Sure.  You see the ones that are skinny, they
20 represent a single point, that is, in the license, for
21 instance, with Mimetex, the royalty rate was four percent.
22 That's what that skinny little bar looks like.  The fatter,
23 or Scheve bar, represents that, or Jarosz bar, represents
24 the -- that that license has a range of rates, that is, for
25 instance, in the Muro license, depending on sales levels and

Page 804

1  depending on other milestones, the rate could be anywhere
2  from eight to 12 percent.
3     So a wider line means there is a range of rates
4  within that license.
5  Q.  Okay.  Then did you do a separate review of
6  agreements, sir, for 2002 and after?
7  A.  I did.
8  Q.  What does this next chart communicate to the jury?
9  A.  That reflects the running royalties associated with
10 those later agreements.  Remember, all I have charted in
11 these two is just a running royalty rate.  There are lots of
12 up-front payments and milestone payments, other forms of
13 compensation.  But I wanted to only focus on the running
14 royalties.  And what I have mapped here is the running
15 royalties associated with these later agreements, with
16 particular focus on the kind of orange colored bars, I found
17 those agreements to be particularly useful.
18 Q.  Let's go, then, to our next slide.  Would you then, in
19 addition to looking at the license agreements involving
20 Elan's NanoCrystal technology, look at license agreements
21 that Abraxis has entered into?
22 A.  Yes, I did.
23 Q.  What is communicated in this slide?
24 A.  This is a summary of one of the three licenses that I
25 spoke of a little bit earlier, and, that is, Abraxis entered

Page 805

1  into an agreement with AstraZeneca in early 2006 in which
2  AstraZeneca agreed to pay $200 million to have access to the
3  ability to sell Abraxane.  It also agreed over time, when
4  certain events were satisfied, that it would pay $108
5  million, again, from AstraZeneca to Abraxis.  AstraZeneca
6  also agreed that it would share the costs with Abraxis of
7  advertising and promoting the drug in the United States.
8     In other words, AstraZeneca kind of has taken
9  over the marketing role associated with this drug because
10 AstraZeneca, as we all know, is a well-known company.  It is
11 a very successful company.  It has been around a long time
12 and it knows how to market.  So it's kind of taken over the
13 marketing of the drug but it has paid quite a bit of money
14 for those rights.
15     Abraxis has agreed, in this return, through this
16 strategic alliance, to supply Abraxane, that is making the
17 product and handing it to AstraZeneca, in essence, to sell,
18 it also has agreed to pay for its activities, to pay
19 AstraZeneca 22 percent of the money Abraxis takes in.  So
20 there is money going both ways.  It's an alliance whereby
21 AstraZeneca is helping ensure the success of Abraxane in the
22 marketplace.
23 Q.  This up front money, has that money been paid to
24 Abraxis?
25 A.  Yes.  It was paid in 2006, all 200 million of it has

Page 806

1  been received and put to use by Abraxis.
2  Q.  Okay.  And you made mention of two other agreements.
3  Let's provide information both for the jury and Judge Sleet
4  here about both the Taiho and Green Cross agreements?
5  A.  Yes.  I think I made a little bit of a mistake.  I
6  apologize.  The line that is drawn is not quite drawn in the
7  right place.
8     I meant the line to be drawn after the second
9  big bullet.  So the top half is the Taiho agreement and the
10 bottom half is the Green Cross agreement.  I just drew the
11 dotted line imprecisely, I apologize.
12     Without getting into excruciating detail, as
13 tempting as that might be, the Taiho agreement again covers
14 that company taking charge of selling in Japan, Green Cross
15 allows that company to sell Abraxane in South Korea.  Both
16 those companies paid a fair amount of money up front for the
17 rights, whether there are any sales, there may not be a
18 single sale in Japan or South Korea, but still, $20 million
19 is owed by Taiho and $2 million is owed by Green Cross.
20     Then there are some milestone payments
21 associated with certain things that are accomplished by
22 Abraxis, and payments can be higher, as you see in those
23 notes, and both Taiho and Green Cross have agreed, by
24 supplying us with Abraxane, Taiho and Green Cross have
25 agreed to pay a fair amount in a royalty fee.  Taiho has

J Jarosz - direct

<table>
<tr><td>

Page 811

1  Q.  What was the next part of your quantitative analysis
2  to come up with a reasonable royalty rate?
3  A.  I undertook an income approach, and that entailed
4  looking at what the benefits and expected benefits to
5  Abraxis have been and will be through selling Abraxane. One
6  looks at the income, the money that Abraxis can expect to
7  make, and apportions that associated with the contributions
8  associated with the '363 patent.
9      In other words, you look at a profit pie and
10  divvy that up, that's what the income approach is.
11  Q.  Now, have you, yourself, published in the area, or
12  published on the topic of this so-called profit split rule?
13  A.  Yes.  In fact, there are two forms of income
14  approaches.  One is a profit split rule and one is an
15  incremental income approach, which I think is on the next
16  slide.
17      On the profit split rule, I have published
18  papers in that area, one a few years back that is used by
19  quite a number of people in the area, and then I have given
20  quite a number of presentations associated with the profit
21  split rule.  So I have done a lot of research on that topic.
22  Q.  With regard to this particular slide, sir, what should
23  one take away from it?
24  A.  Without going again into all the gory tails, the
25  expected operating profits for Abraxane are about 32 percent

</td><td>

Page 813

1  percent.
2      So the difference is, this Abraxane was going to
3  allow Abraxis to bump up to a new level of margins and
4  returns.
5      It would make a 34.4 percent excess return by
6  selling this product versus the other activities that it
7  engaged in historically.
8  Q.  What significance, then, sir, does that have in terms
9  of your income approach to analyzing a reasonable royalty
10  rate?
11  A.  Well, if this were the only evidence, if we just go
12  back one slide, if this were the only evidence, and the
13  comments would say, Abraxis would say up to 34 and
14  still get its normal margin, that is quite a substantial
15  excess, I did not think it would be fair to do, that it
16  would not give away all its excess, but I used this
17  observation in figuring out a range of reasonableness?
18  Q.  Did you create a summary of the income approach for
19  analysis of the reasonable royalty rate?
20  A.  Yes, I did.
21  Q.  Is it reflected here on this next slide?
22  A.  Yes, it is.
23  Q.  What is the results that came out of your income
24  approach to analyzing a reasonable royalty rate?
25  A.  The profit split rule that I employed said 8.1 to 10.8

</td></tr>
<tr><td>

Page 812

1  over a long-term period.  Divvying that up, one-quarter or
2  one-third to the owner of the patent says that Elan, by this
3  particular tool, would be entitled to a royalty fee of 8.1
4  to 10.8 percent.
5  Q.  Is that the range utilizing that profit split rule
6  that you have come up with as a reasonable royalty rate?
7  A.  Yes, using that profit split rule, using industry data
8  with regard to expectations as to profit margins.
9  Q.  Okay.  Now, did you end your analysis at that point?
10  A.  No, I did not.
11  Q.  Let's go to the next slide, again, with regard to the
12  income approach, to try and conclude or determine what would
13  be a reasonable royalty rate.
14  A.  I also sought to compare Abraxane gross profits and
15  expectations as to gross profits in the February of '05
16  period versus Abraxis' other business.
17      Gross profits is revenues minus cost of goods
18  sold.  It doesn't account for selling costs and general and
19  administrative costs.  It's just how much it takes to make a
20  product.
21      Its gross profit experience is shown in the
22  darker blue bar.  That's about 84 percent.
23      For its other business, which is largely related
24  to hospital work and generic work, in particular, providing
25  generic drugs, its margin is much lower.  It's about 50

</td><td>

Page 814

1  percent.  There were other confirmations of that in Abraxis
2  documents.  The Grand plan and the Green Cross agreements
3  confirmed the profit rates that I was using.  That says 8.1
4  to 10.8.  The incremental income approach says as high as
5  34.4 percent.  I thought that number was too high.  I
6  thought that wouldn't be reasonable for Abraxis to pay that
7  or Elan to demand that.
8      So I pretty much eliminated what is that high
9  end, and said, The range from the income approach is 8.1 to
10  10.8 percent.
11  Q.  We have covered the market approach.  We have covered
12  the income approach.  What was the third approach under your
13  quantitative analysis?
14  A.  It's called the cost approach.  That entails looking
15  at what other alternatives were available to Abraxis that
16  would allow it to achieve the same ends through a different
17  means.  Could it have rolled out Abraxane using some other
18  patented invention?  An example to think about is if I could
19  buy a Trek bicycle for $300 from Wal-Mart and Sears was
20  offering it for $250, I never would pay $300 to Wal-Mart.  I
21  would buy the bike from Sears.  I would go to the next best
22  alternative.
23      So I sought to determine if there was a next
24  best alternative available to Abraxis and I didn't see any
25  evidence of it.  In other words, I didn't see that it

</td></tr>
</table>

24  (Pages 811 to 814)

J Jarosz - direct

## Page 835

1  have simply superimposed on that where Mr. Musika believes
2  the royalty rate should be and my six to eight percent, in
3  the green and Mr. Musika is in the red.
4  Q.  I will go to my last slide here, sir.  What is, based
5  upon your review, sir, applying all the standards that an
6  economist would apply to the analysis that you have done,
7  what do you conclude to be a reasonable number for
8  calculating damages from February of 2005 through the
9  present in terms of the infringing revenue?
10  A.  I believe that range is $55.2 to $75.9 million, with,
11  I believe, the high end being the appropriate number, it's
12  based on eight percent and based on fully considering
13  AstraZeneca, Taiho, Green Cross, and the product sales.
14  Q.  I may not have spoken very clearly, sir.  I wanted to
15  focus first on the first column, which is the total revenue.
16      Do you, sir, believe, to a reasonable degree of
17  economic probability, that that is the appropriate number to
18  use for purposes of calculating the appropriate damage
19  number from February of 2005 up through the second quarter
20  of 2008?
21  A.  Yes, I do.  I apologize, I may have misheard you
22  before.
23  Q.  I probably didn't speak very clearly.
24  A.  Thank you.
25      That number, again, includes the product sales

## Page 836

1  of Abraxane.  It includes the AstraZeneca payments.  It
2  includes the Taiho and it includes Green Cross.
3  Q.  If the jury were to conclude that the reasonable rate
4  of royalty to be applied to that is eight percent, which of
5  these numbers would be the appropriate damage number?
6  A.  The $75.9 million number.
7  Q.  If the jury concluded that the lower number, the six
8  percent, would be the more appropriate royalty rate, what
9  would be the appropriate damage number?
10  A.  Assuming as well that the jury would exclude Green
11  Cross and Taiho reimbursements, that number would be $55.2
12  million.
13  Q.  If they applied Mr. Musika's one percent, what would
14  be the damage number?
15  A.  $8.1 million.
16  Q.  Do you have an opinion, sir, as an economist, to a
17  reasonable degree of economic probability, as to whether or
18  not that $8.1 million figure for damages from February of
19  2005 through the second quarter of 2008, whether that's a
20  reasonable figure?
21  A.  Considering the company has generated revenues of
22  almost a billion dollars, that $8.1 million appears to be
23  too low.
24  Q.  In terms of going forward, in terms of a reasonable
25  royalty rate, for the jury to decide --

## Page 837

1      THE COURT:  Yes, sir.
2      MR. OLSON:  Objection, Your Honor.  The jury
3  does not determine forward-going royalties legally as a
4  matter in this case.
5      THE COURT:  Let me see counsel.
6      (The following took place at sidebar.)
7      THE COURT:  Mr. Olson, I know Judge Garth was --
8  you clerked for him.  It is bad form to tell a judge what a
9  jury does or does not determine, especially to do it in
10  front of the jury.  Just ask for a sidebar.  I will gladly
11  grant it.
12      MR. OLSON:  I apologize, Your Honor.
13      THE COURT:  Go ahead.
14      MR. OLSON:  Your Honor, in terms of the royalty,
15  under the law of the Federal Circuit, you determine
16  reasonable royalty up to the date of trial.  What happens
17  thereafter is really a matter not yet fully addressed by the
18  Federal Circuit, but there are a number of cases that it is
19  not appropriate to leave to the jury the question of
20  forward-going royalties, and that, rather, the determination
21  could be made, in part, it goes again to the special verdict
22  form at issue, it needs to be made by the Court in light of
23  the decision of the plaintiff not to seek an injunction in
24  this case.
25      I again --

## Page 838

1      THE COURT:  That's okay.  Mr. Scheve, your
2  reaction?
3      MR. SCHEVE:  My response to that, Your Honor, is
4  that the evidence should come in, and then depending upon
5  the instruction, they will either be asked to come up with
6  that number or not.  And there are a number of areas, as I
7  have come to learn, as I have come to love patent law over
8  the last few months, that maybe the Federal Circuit is
9  unclear whether that's for Your Honor to decide or the jury.
10  But I wanted to get that number in so whoever decides it
11  will have that benefit.
12      THE COURT:  I think this is one of those
13  situations we may be able to repair later on or address
14  later on, as we discussed earlier.
15      So we have got the jury here.  Let's go ahead
16  and let them hear the evidence.  I might benefit from
17  further submissions on this.  I think you are probably
18  right.  But rather than having me make that call from the
19  hip, as we often do to the disadvantage of the process and
20  everyone here by not letting them hear the evidence, let's
21  let them hear it and we can take it care of it later on if
22  necessary.
23      (End of sidebar conference.)
24  BY MR. SCHEVE:
25  Q.  Mr. Jarosz, in terms of a going-forward reasonable

30  (Pages 835 to 838)

J Jarosz - cross

Page 847

1  A.  No.  Again, I am not a scientist.  I am an economist.
2  I don't have training in the physical sciences.  So I am not
3  able to interpret it from that perspective.
4        But I saw some of the representations as to what
5  would impact an economic analysis.  And I reported on that.
6  Q.  Is it correct, sir, that on this question, which you
7  didn't have a basis from your own knowledge --
8  A.  I am sorry, I missed the first part of your question.
9  I apologize.  If you could start over.
10  Q.  Sure.  Is it correct that on this subject matter for
11  which you did not have any expertise, that you did not seek
12  out the assistance of any outside or independent technical
13  experts?
14  A.  I did not seek out any separate expertise.  I did have
15  a conversation or more with Dr. Liversidge.  To me, he is an
16  outsider.  But I understand he is employed by Elan.  I got
17  some technical understanding through him.  But I don't
18  recall talking with anybody beyond the people we have
19  identified on this topic.
20  Q.  You didn't speak to any of the experts that have
21  presented technical evidence in this case on behalf of Elan.
22  Correct?
23  A.  I don't believe I did.
24  Q.  You don't have any understanding as to whether or not
25  Abraxane contains any crystalline medicament.  Is that

Page 848

1  correct?
2  A.  I don't know for sure.  Again, I am not a scientist.
3  Q.  You are seeking a royalty on all the sales of
4  Abraxane.  Correct?
5  A.  I am not seeking a royalty.  I believe Elan is hoping
6  that it gets a royalty.  I am providing my expertise on what
7  the royalty base and appropriate royalty rate should be.
8  But it's for the jury to decide whether that was done
9  correctly or not.
10  Q.  So may I rephrase to say, you are recommending a
11  royalty be paid on all the sales of Abraxane.  Correct?
12  A.  Yes.
13  Q.  Every --
14  A.  From February 2005 through my estimate of June 2008.
15  Q.  Every vial from 2005 through the present.  Correct?
16  A.  Yes.
17  Q.  And all the nanoparticles in those vials?
18  A.  Yes.
19  Q.  Isn't it correct -- withdrawn.
20        I would like to turn to another subject matter,
21  the subject matter of the license agreements or the market
22  approach that you discussed.  That is in part derived from
23  the Georgia-Pacific analysis as well.  Correct?
24  A.  Well, I am not exactly sure what you are asking.  But
25  at least two Georgia-Pacific factors ask one to consider

Page 849

1  other licensing.
2  Q.  If I could have Slide F11.
3        Isn't it the case that this is a statement of
4  the Georgia-Pacific Factor No. 2 as it relates to this case,
5  so with the insertion of Elan and Abraxis or others, and
6  that one of the factors is the rates paid by a licensee of
7  Elan, Abraxis, or others for the use of other patents
8  comparable to the '363 patent?  Correct?
9  A.  Not exactly.  I think it's the rates paid by the
10  licensee -- I forget the exact words.  But putting Elan and
11  Abraxis together, that's not the focus of Georgia-Pacific
12  Factor 2.  Georgia-Pacific Factor 2 looks at the licensee,
13  and maybe you could show me the exact case because I don't
14  think this is quite right, and of course it doesn't
15  specifically talk about the '363 patent but it talks about
16  other comparable licenses.
17        So I don't know if this is quite a fair
18  representation.
19  Q.  Is it your understanding that the intent is to try to
20  identify comparable licenses?  Correct?
21  A.  In Georgia-Pacific 2, it is comparable licenses
22  entered into by the licensee, as my memory goes.
23  Q.  This was something you referred to as using other
24  data, similar to what you referred to as the real estate
25  circumstance.  Correct?

Page 850

1  A.  I did this analysis as part of my market approach,
2  which was part of my quantitative analysis.
3  Q.  Would you agree with me, if we were doing a market
4  approach with respect to real estate, that you wouldn't want
5  to use the price for a mansion to determine the price for a
6  fixer-upper?
7  A.  Probably not, although one might consider that.  But
8  it probably would be discarded if there was a huge disparity
9  between those two pieces of property.
10  Q.  And you agree that the hypothetical license in this
11  case would involve only the '363 patent.  Right?
12  A.  Yes.
13  Q.  It doesn't include any other patents?
14  A.  Correct.
15  Q.  It wouldn't include any know-how?
16  A.  Correct.
17  Q.  And know-how is unpatented technology that's
18  nonetheless valuable to another party?
19  A.  Yes, it can be.
20  Q.  And it wouldn't include any manufacturing assistance?
21  A.  That's correct.
22  Q.  Wouldn't include any other services from Elan.
23  Correct?
24  A.  That's correct.  These are all things that I spoke
25  about on direct.  I agree with that.

33 (Pages 847 to 850)

J Jarosz - cross

| Page 851 |
|---|
| 1  Q.   You agree that all things being equal, the transfer of |
| 2  a larger bundle of intellectual property rights would |
| 3  command a higher price than the transfer of a smaller bundle |
| 4  of intellectual property rights.  Correct? |
| 5  A.   Yes.  That's why I have one of the factors as a |
| 6  downward arrow, favoring Abraxis. |
| 7  Q.   And the Elan portfolio includes a complete, the |
| 8  complete Elan nano-technology portfolio.  Correct? |
| 9  A.   I think it's technically called the NanoCrystal |
| 10  technology.  But most of the licenses, if not all, include |
| 11  the entire portfolio, patents and patent applications. |
| 12  Q.   That is more patents than just the '363 patent.  And |
| 13  foreign patents -- can I have the answer? |
| 14  A.   I am sorry.  I was just waiting for your question.  I |
| 15  had heard you make a statement. |
| 16  Q.   Let me ask it again.  That's more patents than just |
| 17  the '363 patent.  Correct? |
| 18  A.   Yes. |
| 19  Q.   And continuations in part, or other children patents. |
| 20  Correct? |
| 21  A.   Yes.  Although I am not sure I have heard the term |
| 22  children patents, I think I know what you are referring to. |
| 23  Q.   It would include the know-how that is transferred. |
| 24  Correct? |
| 25  A.   Yes.  Many of the licenses do. |

| Page 852 |
|---|
| 1  Q.   The licenses often include manufacturing assistance. |
| 2  Correct? |
| 3  A.   Certainly some of them do.  I don't recall if it is a |
| 4  majority. |
| 5  Q.   And certainly formulation assistance.  Correct? |
| 6  A.   Some of them do, yes. |
| 7  Q.   You didn't limit yourself to licenses that involved |
| 8  the '363 patent.  Correct? |
| 9  A.   Correct, there were no licenses that involved just the |
| 10  '363 patent. |
| 11  Q.   You didn't limit yourself to those licenses which |
| 12  specifically identified the '363 patent in those terms. |
| 13  Correct? |
| 14  A.   That's correct.  I looked broader. |
| 15  Q.   If I could have Slide F008.  I put up on the board a |
| 16  series of licenses between Elan and others that specifically |
| 17  identify the '363 patent.  Do you recognize these as |
| 18  licenses that you reviewed? |
| 19  A.   I have not seen this chart before.  It's something |
| 20  that I created.  The licensee names all appear to be |
| 21  licensees of Elan.  I don't know for sure whether the dates |
| 22  are correct and the other information.  But based on my very |
| 23  brief look, which is in the last 60 seconds, it appears to |
| 24  be correct in the first column. |
| 25  Q.   It's correct is that these licenses include patents |

| Page 853 |
|---|
| 1  other than the '363 patent? |
| 2  A.   The licenses that Elan has entered include patents |
| 3  beyond the '363, yes. |
| 4  Q.   And they include this other technology or know-how. |
| 5  Correct? |
| 6  A.   They often do.  And these, I don't have reason to |
| 7  dispute your representation is correct that these all do. |
| 8  Q.   Isn't it correct that none of these licenses that I |
| 9  have listed here have resulted in a commercial product? |
| 10  A.   I think that's right.  I believe that's right, yes. |
| 11  Q.   And I have listed -- |
| 12  A.   Although you will see all of them were entered 2003 or |
| 13  later.  So I am not sure that it will always be the case |
| 14  that there was no commercial product.  I believe probably |
| 15  work is being done as we speak at a number of these |
| 16  licensees.  These are not old licenses.  These are |
| 17  relatively new or modern licenses. |
| 18  Q.   Certainly none of those have resulted in a commercial |
| 19  product to date.  Correct? |
| 20  A.   I believe that's correct, yes, not yet. |
| 21  Q.   Do you have any reason to disagree with the fact that |
| 22  the median of those license agreements is three percent? |
| 23  A.   I am not quite sure how you are computing the median. |
| 24  Let me just ask so I can answer your question. |
| 25       For the EntreMed, are you considering that two |

| Page 854 |
|---|
| 1  separate observations, the six and the eight percent for |
| 2  Sanofi patents, is that separate, or are you averaging or |
| 3  median-ing thing those?  I don't know how you have done this |
| 4  calculation precisely. |
| 5  Q.   If you look at every observation on the right-hand |
| 6  column, is it correct that if you count every observation, |
| 7  the median royalty rate is three percent? |
| 8  A.   You will have to give me a minute if you want me to do |
| 9  the calculation, because I haven't seen this before.  Just |
| 10  give me one minute to do it. |
| 11       (Pause.) |
| 12       So we are in agreement, I think there are 22 |
| 13  observations.  Is that right? |
| 14  Q.   I didn't do a count right now, sir, but that seems |
| 15  about right. |
| 16  A.   How should I handle the five to seven percent?  Should |
| 17  I handle that as five, or seven or something else? |
| 18  Q.   Why don't you handle them as two observations? |
| 19  A.   So that is 23 observations then, is that what you are |
| 20  asking? |
| 21  Q.   That's right. |
| 22  A.   Okay. |
| 23       (Pause.) |
| 24       Yes, that appears to be the case. |
| 25  Q.   You put some significance when you did your analysis |

34  (Pages 851 to 854)

Page 855

1  on whether or not a license agreement included a
2  commercialized product, didn't you?
3  A.   Yes.
4  Q.   So I would like to show you Slide F10, please. Elan
5  has five licenses that have resulted in currently FDA
6  approved products. Isn't that right?
7  A.   Ignores that's right, although it's four separate
8  products. TriCor is with Fournier and Abbott. It's four
9  products, five licensees.
10 Q.   And each of these licenses with these companies
11 includes other patents and technology beyond the '363
12 patent. Correct?
13 A.   I believe that's correct, yes.
14 Q.   They include other know-how. Correct?
15 A.   I believe that's correct, yes.
16 Q.   And I have again listed the running royalty rate at
17 the right-hand side for these patents, or these license
18 agreements. Do you see that?
19 A.   Yes, I see that column.
20 Q.   Do you agree with me that the median of those
21 observations, if you take each one, is 3.5 percent?
22 A.   You will have to give me a minute if you want me to
23 compute that.
24        (Pause.)
25        Again, the 2 to 2.35, am I treating that as two

Page 856

1  observations?
2  Q.   Why don't you.
3  A.   Okay.
4        (Pause.)
5        I think so, but I am a little less confident
6  because I have done it a little more quickly. Just give me
7  one moment.
8        Yes, I believe 3.5 is correct. Remember,
9  however, all the previous pages and this page, these were
10 all in a world in which there was uncertainty associated
11 with the strength of the patent rights, and remember the
12 academic study says you should consider a rate to be twice
13 as high as what one sees in real licenses.
14 Q.   Mr. Jarosz, you had an opportunity to talk to people
15 at Elan about their licenses before you formed your opinion.
16 Correct?
17 A.   Yes.
18 Q.   And isn't it correct that at the time you formed your
19 opinion, you did not understand Megace to be an anticancer
20 drug? Is that right?
21 A.   You are saying before I came to my opinion? Is that
22 what you are asking?
23 Q.   At the time you came to your opinion in the fall of
24 last year. Is that correct?
25 A.   I just don't remember. I don't have reason to dispute

Page 857

1  it, but I don't remember sitting here right now.
2  Q.   Do you agree that the Green Cross license deals solely
3  with sales of Abraxane in Korea?
4  A.   Actually, technically it's South Korea.
5  Q.   Otherwise, you agree with the statement?
6  A.   Yes, I think I spoke of that earlier, an exclusive
7  license to cell in South Korea.
8  Q.   You agree that the Taiho agreement is exclusively or
9  solely about sales in Japan. Correct?
10 A.   I believe that's correct, yes.
11 Q.   And is it your understanding, under the AstraZeneca
12 agreement between AstraZeneca and Abraxis, that Abraxis owes
13 certain responsibilities to AstraZeneca going forward?
14 A.   In order to earn the 108-million-dollar milestone
15 payments, yes. But not with regard to the
16 200-million-dollar up-front payment.
17 Q.   Do you understand whether the contract provides
18 certain obligations from Abraxis to AstraZeneca that are
19 ongoing?
20 A.   Yes.
21 Q.   I would like to turn to the income approach. Isn't it
22 correct that you previously evaluated Abraxis's
23 profitability, at least in part, based on their actual
24 financial results?
25 A.   Yes. That's why you saw on the summary chart I had

Page 858

1  before, I had three observations under the income approach,
2  the lowest one was associated with the actual financial
3  performance.
4  Q.   When you looked at the actual financial performance of
5  Abraxane, you identified a royalty rate of between 1.7 and
6  2.3 percent.
7  A.   That sounds right, although I will look at my report
8  to confirm that if you would like me to.
9  Q.   That's okay. I don't think I need you to.
10        You have identified a hypothetical profitability
11 rate of 32 percent. Correct?
12 A.   That's my projection as to what the long-term
13 operating profits will be for Abraxane, 32.3 percent.
14 Q.   That is not anywhere near what Abraxis's actual
15 profitability has been from February of 2005 to March of
16 2008. Correct?
17 A.   I don't know that I have the data to say for sure what
18 the profits have been. But as I spoke of before, there has
19 been negative profit performance. So 32.3 percent is
20 certainly higher than negative profit performance.
21 Q.   Isn't it the case that you have the certified
22 financial reports of the company?
23 A.   I have the 10-K's from the company.
24 Q.   Which are certified by the officers. Correct?
25 A.   As I understand it, yes.

35 (Pages 855 to 858)

J Jarosz - cross

Page 859

1   Q.   And audited by the independent auditors. Correct?
2   A.   Yes, although I don't think they report Abraxane
3   profits.
4   Q.   And isn't -- well, they report the profits of Abraxis.
5   Corrects?
6   A.   They reports the profits of the company but not of
7   that product.
8   Q.   Isn't it correct that Abraxane is currently the only
9   product being sold by Abraxis?
10  A.   It certainly is the bulk, it's at least 85 percent.
11  Q.   And isn't it the case, sir, that Abraxis's losses
12  during the period from January 2005 to March 2008 have been
13  over 208 million dollars?
14  A.   I don't recall the exact number. But there certainly
15  have been losses, many of those associated with
16  merger-related activities, some of those associated with
17  operating activities.
18  Q.   Isn't it the case in a supplemental report, March 23rd
19  in this case, you provided a calculation that for that
20  period Abraxis had lost 208 million dollars?
21  A.   If you want I will turn to it. I don't think it was
22  March I submitted a report. I think it was May.
23  Q.   I meant to say May, if I said March.
24  A.   You may have. If I misheard you, I apologize.
25       Do you want me to look at that report?

Page 860

1   Q.   Why don't we bring it up on the screen. Supplemental
2   Tab 4. If you will look in the total there, where there is
3   income from operations here at the left, do you see that?
4   A.   Yes, I do.
5   Q.   It's for the period 2005 through March 31st, 2008.
6   Correct?
7   A.   Yes, for the company, not for the product, and it
8   includes merger-related costs. I think you covered them up.
9   I don't know if that was accidentally or not. But you see
10  the merger-related costs that are about 180 million dollars
11  of that.
12  Q.   But the amount of the loss that you calculated from
13  the SEC reports is 208 million dollars. Correct?
14  A.   Yes. That's the amount. But again, about 170, 180
15  million of that is associated with merger-related activity.
16  Q.   And your calculation of the loss as a percentage is 28
17  percent, correct, of revenue?
18  A.   Yes. That's right. Again, including the
19  merger-related costs.
20  Q.   Compared to your 32-percent profit number. Correct?
21  A.   I don't know what you mean by "compared with." I have
22  an estimate over a long run of 32.3 percent operating profit
23  for Abraxane.
24       MR. OLSON: No more questions, Your Honor.
25       THE COURT: All right. Do you have any

Page 861

1   questions?
2        MR. SCHEVE: None, Your Honor.
3        THE COURT: Thank you, Mr. Jarosz. You are
4   excused.
5        (Witness excused.)
6        THE COURT: That's pretty good timing, ladies
7   and gentlemen. Let's take our lunch break.
8        (Jury leaves courtroom at 12:58 p.m.)
9        THE COURT: We will take care of the exhibit
10  issue. Get together with Ms. Walker.
11       (Luncheon recess taken.)
12       THE COURT: All right. Ms. Walker.
13       (Jury enters courtroom 2:04 p.m.)
14       THE COURT: All right, ladies and gentlemen. If
15  you would take your seats.
16       Mr. Scheve.
17       MR. SCHEVE: With some regret, I would request
18  the ability to show the deposition of Dr. Raj Selvaraj to
19  the jury, Your Honor.
20       THE COURT: How long? Hopefully you will give a
21  better estimate than you did last time.
22       MR. SCHEVE: The technician says 30:08 seconds.
23       MR. JACOBS: To complete the story, we have like
24  two or three minutes of counter-designations.
25       "Question: And how would you like me to address

Page 862

1   you today?
2        "Answer: Ulagaraj Selvaraj, Ph.D.
3        "Question: And are you still a senior manager
4   in the biopharmaceutical technology group at Abraxis?
5        "Answer: Yes, sir.
6        "Question: Where did you go to school?
7        "Answer: I went to school in Indiana.
8        "Question: Did you get what we call an
9   undergraduate degree in Indiana?
10       "Answer: Undergraduate, Master's, and Ph.D. in
11  India.
12       "Question: What was your undergraduate degree
13  in?
14       "Answer: Chemistry.
15       "Question: Any particular discipline of
16  chemistry?
17       "Answer: It was like general chemistry,
18  physics, mathematics.
19       "Question: When was the first time that you
20  began research with the application of nanotechnology to
21  paclitaxel?
22       "Answer: That is in Abraxis Bioscience.
23       "Question: Have you reviewed the patents that
24  are at issue in this lawsuit?
25       "Answer: Can you tell me what the patents?

36  (Pages 859 to 862)

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| ELAN PHARMA INTERNATIONAL LIMITED, | : | Civil Action |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ABRAXIS BIOSCIENCE INC., | : | |
| | : | |
| Defendant. | : | No. 06-438-GMS |

- - -

Wilmington, Delaware
Wednesday, June 11, 2008
9:40 a.m.
EIGHTH DAY OF TRIAL

- - -

BEFORE: HONORABLE GREGORY M. SLEET, Chief Judge,
and a Jury

APPEARANCES:

        JOHN G. DAY, ESQ.
        Ashby & Geddes
           -and-
        STEPHEN SCHEVE, ESQ.,
        LINDA M. GLOVER, ESQ.,
        JEFFREY SULLIVAN, ESQ.,
        LISA A. CHIARINI, ESQ.,
        ROBERT RIDDLE, ESQ., and
        PAUL FEHLNER, ESQ.
        Baker Botts LLP
        (Houston, TX)
           -and-
        GREGORY BOKAR, ESQ.
        Counsel - Elan Drug Delivery

                    Counsel for Plaintiff

Page 1631

```
 1
 2  APPEARANCES CONTINUED:
 3     ELENA C. NORMAN, ESQ., and
        MICHELLE SHERETTA BUDICAK, ESQ.
        Young Conaway Stargatt & Taylor, LLP
 4        -and-
        MICHAEL A. JACOBS, ESQ.,
 5      EMILY A. EVANS, ESQ.,
        ERIC S. WALTERS, ESQ.,
 6      DIANA KRUZE, and
        ERIK J. OLSON, ESQ.
 7    Morrison & Foerster
      (San Francisco, CA)
 8
              Counsel for Defendant
 9
10              - - -
11        THE COURT: Good morning. Please take your
12  seats.
13        We will take the JMOLs first. Other than to --
14  I will indicate that I have had a chance to, albeit an
15  abbreviated opportunity to review your various positions, I
16  have considered them. Contrary to what I announced
17  yesterday, I will act on at least a couple of things on each
18  side.
19        Largely, for the reasons articulated in various
20  submissions, I'm not going to have time to prepare a more
21  articulate analysis than that. I will tell you that I am
22  going to do the following.
23        As to plaintiff's various JMOLs -- and I gather
24  counsel will recognize that I am not interested in hearing
25  argument. This is, I think, a housekeeping matter more than
```

Page 1632

```
 1  anything, that Abraxis in one of its headings at Page 8 of
 2  its motion, points out that Abraxis has failed to put on
 3  certain evidence to support certain defenses. I don't think
 4  this is contested. If it is -- well, we'll see.
 5        Obviously, obvious type double patenting,
 6  indefiniteness, I think are the three. I think you would
 7  concede those, wouldn't you?
 8        MR. JACOBS: Yes, Your Honor.
 9        THE COURT: Okay. So those are out. In other
10  words, the motion is granted.
11        The Court agrees with Elan that the reverse
12  doctrine of equivalents is not supported by the law and the
13  facts of record in this case. The Court agrees with Elan
14  that Abraxis's defense of unclean hands is not properly
15  submitted to the jury in this case.
16        Unless you can tell me why I should not so find,
17  Mr. Jacobs, I don't see any other basis for this jury, any
18  other damage theory for this jury to consider other than
19  that which has been offered by Elan.
20        MR. JACOBS: On the theory, we agree, Your
21  Honor.
22        THE COURT: So that's granted. Those are all
23  granted.
24        The others are denied. Not reserved. Denied.
25  Of course, they can be raised again.
```

Page 1633

```
 1        I am going to agree, Mr. Scheve, with Mr. Jacobs
 2  that Abraxane does not infringe under the doctrine of
 3  equivalents, nor has Abraxis induced infringement or
 4  contributorily infringed. I have already decided on the
 5  reverse doctrine of equivalents issue in Elan's favor.
 6        The remaining motions are denied.
 7        That's JMOLs.
 8        Any questions about any of those rulings? Do we
 9  understand where we are?
10        MR. SCHEVE: I am putting that question to my
11  co-counsel, Your Honor, just to make sure that I caught it
12  correctly.
13        MR. SULLIVAN: Your Honor, I have advised
14  Mr. Scheve, and I hope correctly, that Elan will not be
15  permitted to put on a case of doctrine of equivalents
16  infringement.
17        THE COURT: That's right.
18        MR. SULLIVAN: Thank you, sir.
19        THE COURT: All right. All right. Let's take a
20  few moments and go through these remaining disputes on the
21  parties' proposed final general instructions.
22        So the first one I have is at Page 9. The
23  parties and their contentions. I see that Abraxis objects
24  to the bracketed language as unnecessary, argumentative,
25  redundant, confusing.
```

Page 1634

```
 1        MR. JACOBS: Your Honor, we resolved that, we
 2  think.
 3        THE COURT: Fine.
 4        MR. JACOBS: That is what I am told.
 5        THE COURT: That language is going to remain?
 6        MR. WALTERS: I apologize, Your Honor. This is
 7  an agreement reached just as we walked in the door. We have
 8  substitute language for that instruction that the parties
 9  have agreed on.
10        THE COURT: I would like to see it.
11        MR. WALTERS: It was in one of your packets. It
12  may not have made it up there. I apologize for that.
13        THE COURT: It's not in any of the packets I
14  have. I mean, I have got enough packets that it's an
15  amazing thing that I think I have come out with the right
16  materials. So if you want to give me the language, I will
17  look at it.
18        I think in the fourth line, there is a typo
19  issue to be referred to as paclitaxel or taxol, not "a."
20        As best I can tell, the change from the version
21  that I have is in the last sentence. The version I have
22  been provided just a moment ago reads, the last sentence,
23  the case also involves certain questions regarding the
24  validity and enforceability of Elan's '363 and '025 patents.
25        The version submitted this morning earlier
```

## Page 1647

1   it has windows.

2       (Recess taken.)

3       (The following took place at sidebar.)

4       THE COURT: Ms. Walker reports that it's going

5   to be about another hour. I don't understand that. But it

6   is what it is.

7       So I am going to have Ms. Walker advise the

8   jury, we have ordered their lunch, we have their orders, we

9   haven't placed it yet. We will have it delivered at 11:30.

10  I am going to tell the jury in the meantime they can go

11  about whatever they want to do and come back at around

12  11:30, and hopefully we will be ready to instruct them by

13  noon.

14      So you, ladies and gentlemen, should get some

15  food, because we are going to go straight through after

16  that.

17      MR. SCHEVE: Your Honor, just so I am perfectly

18  clear and don't inject any error into my closing, when you

19  said that contributory and inducing was out, is that out

20  both on the literal and DOE.

21      THE COURT: Yes. Let me also remind you my

22  preference, and I think the appellate courts prefer this as

23  well, I know that counsel are loathe to interrupt during

24  closing speeches. I prefer you do, so that we can correct

25  any error that you perceive to be injected into the case

## Page 1648

1   improper closing and if necessary I can give a curative

2   instruction at that time.

3       I don't know how you practice, Mr. Jacobs,

4   Mr. Scheve.

5       MR. SCHEVE: I am real loathe to do something

6   that the jury would get upset about.

7       THE COURT: I will leave it to you. Judges

8   don't want to micromanage these kinds of cases.

9       MR. SCHEVE: Would you prefer we ask for a

10  sidebar?

11      THE COURT: Yes; Judge, may we see you at

12  sidebar.

13      MR. JACOBS: If we can get a sense of ground

14  rules. Is it okay to put the instructions on the Elmo and

15  walk the jury through them?

16      THE COURT: I have no difficulty with that.

17      This is what I will have already told the jury.

18  This is one of the reasons I instruct first. There is no

19  issue about what the jury has been told is the law.

20      MR. JACOBS: Otherwise, of course, it's

21  argument, and we can argue from the evidence.

22      THE COURT: Absolutely. To the extent there is

23  some passing in the night, as we alluded to earlier, it may

24  happen. We will do the best we can. It is an imperfect

25  system, but for the most part, it works.

## Page 1649

1       (End of sidebar conference.)

2       (Recess taken.)

3       THE COURT: All right. Take your seats. I

4   understand there is one more issue. Mr. Scheve, what is it?

5       MR. SCHEVE: Your Honor, I raised with

6   Mr. Jacobs, Your Honor granted the motion on the damages

7   theory. I suggested to him that it seemed to me the only

8   question, then, for the jury, if there is a jury question,

9   is where between six and eight percent. Mr. Jacobs thought

10  that maybe the ruling was different than that and suggested

11  that we speak with you about that.

12      THE COURT: I think what I intended to convey in

13  my ruling was that there is evidence from only one side on

14  the issue of damages.

15      MR. JACOBS: Your Honor, when you came out and

16  said -- there are two things here, what did I agree to and,

17  two, what is your ruling.

18      When you came out and asked me if I agreed that

19  there is only one theory of damages, I said, yes, there is

20  only one theory.

21      THE COURT: There is only one set of numbers.

22      MR. JACOBS: Well, I think the jury doesn't have

23  to accept because, for example, he was cross-examined on

24  this, the jury doesn't have to accept the Elan

25  quantification of the reasonable royalty. For example, if

## Page 1650

1   the jury were to discredit Dr. Jarosz' testimony --

2       THE COURT: They would be free to do that.

3       MR. JACOBS: -- because he decided that a

4   hundred percent of the value was associated with the Elan

5   patents --

6       THE COURT: They could do that.

7       MR. JACOBS: Then they could go well below six

8   or eight percent. So that the jury still has a jury

9   question as to amount. I agree that there is only one

10  theory of damages.

11      THE COURT: Mr. Scheve?

12      MR. SCHEVE: I would only suggest, Your Honor,

13  if he is going to argue that there ought to be some

14  different combination of numbers or percentages, there has

15  been no affirmative evidence by Abraxis and, therefore, they

16  would be arguing from something that is not in the record.

17  So rather than disrupt his closing, I thought it would be

18  appropriate to raise that.

19      THE COURT: Well, I guess Mr. Jacobs is arguing

20  that he was able to achieve certain responses to questions

21  asked during cross, and that those answers, as evidence,

22  would support an argument of some type. I am just

23  hypothesizing.

24      Would you disagree that if a witness in response

25  to a question, albeit posed on cross, the question resulted

6  (Pages 1647 to 1650)

Page 1651

1 in the adducement of evidence, that that would not be
2 appropriate?
3        MR. SCHEVE: Certainly, the jury is free, Your
4 Honor, with any witness to disregard their testimony. But
5 if in any sort of alternative, you ought to come with three
6 percent for this reason and that reason, there is no
7 evidence in this record upon which to suggest a different
8 theory.
9        THE COURT: Let's talk about that then.
10 Mr. Jacobs.
11        MR. JACOBS: Two points. First, they put in
12 Mr. Musika's calculation of one percent. I think I can cut
13 through this, Your Honor. I don't intend to argue in my
14 closing for an alternative quantification of damages.
15        MR. SCHEVE: I think we have resolved the
16 dispute, Judge.
17        THE COURT: That's great.
18        Ms. Walker, you can bring the jury back.
19        Mr. Sullivan, compliments to you in getting
20 these in shape.
21        MR. SULLIVAN: Thank you, Your Honor. And.
22 Mrs. Walters as well.
23        (Jury enters courtroom at 12:27 p.m.)
24        THE COURT: Ladies and gentlemen, please take
25 your seats. The time has arrived, and the Court on behalf

Page 1652

1 of the parties wishes to extend its gratitude to you for
2 your patience.
3        These are best estimates sometimes we make with
4 regard to time. Please believe me, that was our best
5 estimate, 10:00. I apologize for any inconvenience, and
6 there has been a tremendous inconvenience. Jury service is
7 a, I guess, probably by some called an inconvenience. It is
8 a duty. We deeply appreciate your assiduous attention to
9 your duty and your indulgence.
10        You each have a copy of the instructions and the
11 verdict form.
12        Ladies and gentlemen, now it's time for me to
13 instruct you about the law that you must follow in deciding
14 this case.
15        If you read along, you are free to do that, but
16 it is probably just as easy for you to just watch me or to
17 listen. But feel free, if you are more comfortable reading
18 along. You may see from time to time a small deviation from
19 the literal language, as just now, of the instructions, but
20 hopefully I will not deviate in any material aspect.
21        I will start by reminding you about your duties
22 as jurors and instructions you heard at the beginning of the
23 case. I will then explain the positions of the parties and
24 the law that you will apply in this case.
25        Last, I will explain the rules that you must

Page 1653

1 follow during your deliberations in the jury room, and the
2 possible verdicts that you return.
3        I expect that both sides are going to talk about
4 the verdict form that you have been provided. I am
5 probably, therefore, not going to spend a lot of time on
6 that. I think it is pretty self-explanatory, in any event.
7        Please listen carefully to everything that I
8 have to say.
9        Ladies and gentlemen, remember your duties as
10 jurors, as I explained them to you at the beginning of the
11 case. You must decide what the facts are from the evidence
12 you saw and heard here in this courtroom. Nothing I have
13 said or will say should influence your determination of the
14 facts in any way. Do not guess or speculate and do not be
15 influenced in any way by any personal feeling of sympathy
16 for, or prejudice against, either side in this case. All
17 parties are entitled to the same fair and impartial
18 consideration.
19        You must take the principles of law that I will
20 now explain to you and apply them to the facts in reaching
21 your verdict, the facts that you find.
22        You are bound by the oath you took to follow my
23 instructions, even if you personally disagree with them.
24 All of my instructions are important, including the ones
25 that I from time to time gave you during the course of the

Page 1654

1 trial, and the preliminary instructions. You should
2 consider them together as a whole.
3        I will not repeat my earlier instructions about
4 evidence and how to weigh and consider it. You have copies
5 of these instructions. Again, you may feel free to
6 reference them as you need to.
7        Perform these duties fairly. Do not let any
8 bias, sympathy, or prejudice that you may feel toward one
9 side or the other influence your decision in any way.
10        As you know, this is a civil case in which the
11 plaintiff, Elan, is accusing the defendant, Abraxis, of
12 patent infringement. Elan alleges that Abraxis has
13 infringed the asserted claims of the '363 patent. Elan has
14 the burden of proving its allegations of patent infringement
15 and its alleged damages by what is known as a preponderance
16 of the evidence. That means Elan must produce evidence
17 that, when considered in light of all the facts, leads you
18 to believe that what Elan claims is more likely true than
19 not.
20        To put it differently, if you were to put Elan's
21 and Abraxis's evidence on opposite sides of a scale, the
22 evidence supporting Elan's claims would have to make the
23 scales tip somewhat to its side.
24        Elan also alleges that Abraxis's alleged
25 infringement was willful. Elan must prove its claim of

7  (Pages 1651 to 1654)

## Page 1691

1 the facts," and that offended you, please hold me
2 responsible. Don't hold my client responsible. If I
3 offended you in any way, I apologize for that.
4          This case can really be boiled down to two
5 issues. I am going to get to what the evidence is. At the
6 risk of going over territory you have already heard, let's
7 just go over a few of the slides that I showed you during
8 opening to sort of give us some bearing on what the evidence
9 shows in this case.
10          You have heard about this compound called Taxol.
11 It contains this drug that was originally derived from a yew
12 tree. When I sit down this weekend to talk with my friends,
13 among the things I am going to say is I met Sam Danishefsky.
14 If there wasn't Sam Danishefsky, there wouldn't be an
15 Abraxane. There wouldn't be the nanoparticulate
16 formulations of paclitaxel. And we all got to meet him in
17 this case.
18          He was the person who was able to synthesize
19 this so that they could make paclitaxel, not kill all those
20 yew trees up in the Northwest. And that allowed for the
21 development of different formulations. The original
22 formulation, called Taxol, which is made by Bristol Myers
23 Squibb, is toxic, as you have heard in this case, because it
24 contains solvents. Cremophor is a very, very toxic solvent.
25 It is made from castor beans. It is actually more toxic

## Page 1692

1 than Taxol itself. It requires premedication with
2 antihistamines, and it limits the maximum-tolerated dose.
3          Nanoparticles, you have heard testimony, why are
4 they beneficial when smaller means more exposed surface
5 area? More exposed surface area means better dissolution
6 rate. Better dissolution rate means we hope that you are
7 going to get more of the chemical or drug into your system
8 so that it can do what's hoped for.
9          What was Elan's solution? What was
10 Dr. Liversidge's and Dr. Liversidge's solution? Reduce
11 particle size, the stabilizer adsorbed onto the surface of
12 the particle, to prevent clumping. We showed you an
13 example, when we poured that stuff in the water and that
14 stuff clumped up, that's what poorly soluble molecules do.
15          The hope was here that they could separate these
16 particles in such a way that there wouldn't have to be these
17 terrible solvents which create all sorts of problems and
18 require premedication.
19          The proteins are adsorbed onto the surface of
20 the crystalline medicament, and they function in two
21 different ways. One is through electrical charges, and
22 others, as Dr. Liversidge described, is sort of failing arms
23 prevent these particles from coming together and clumping.
24          Adsorbed, what does it mean? It means physical
25 contact with the surface. No penetration of the surface and

## Page 1693

1 no chemical reaction.
2          Who were the people behind this? Dr. Gary
3 Liversidge, Dr. Elaine Liversidge, you have heard about
4 their accomplishments. Dr. Liversidge told you the thing
5 that means the most to him is every day 1.5 million people
6 take a compound that contains one of his inventions.
7          The invention claimed are particles. It's very
8 important, ladies and gentlemen, that when you go back to do
9 your deliberation you understand, we are not claiming that
10 Abraxane as a product infringes. We are claiming that
11 Abraxane contains particles and that those particles
12 infringe.
13          You heard testimony in this case that there are
14 61 trillion particles in a bottle of Abraxane. 61 trillion
15 is over 10,000 times the number of human beings living on
16 this earth. And the question is, among those 61 trillion,
17 are there more than one particle -- are there particles that
18 embody the invention of the '363 patent and therefore
19 infringe it?
20          So it's particles consisting essentially of
21 crystalline medicament and a surface modifier essentially
22 free of intermolecular cross-linkages. And as Judge Sleet
23 has instructed you, the first question is below 1,000
24 nanometers, and the other claim is below 300 nanometers in
25 size.

## Page 1694

1          Now, there is a problem with putting
2 nanoparticles in the human body, because bodies react to it.
3 It's called an anaphylactic reaction. It can be deadly, as
4 you heard testimony about.
5          My clients also patented the '025 patent, which
6 was a method of intravenous administration to a mammal
7 within a certain period of time, according to a certain
8 formula for administration. My client is not before you
9 claiming that Abraxis infringed that patent. Nonetheless,
10 Abraxis wants you to declare this patent to be invalid.
11          It's not unusual in patent cases, if you have
12 been accused of infringement, to have as an immediate
13 response, well, your patent is no good. Therefore, I
14 shouldn't be held liable.
15          When you checked in this building, you probably
16 were asked to check your cellphone. But you weren't asked
17 to check your common sense. As we go through and I go
18 through the evidence with you, I am going to ask you to draw
19 on your common sense, your common experiences in life, look
20 at this evidence. I am going to ask you to put up experts
21 side by side and witnesses side by side. Use your common
22 sense, draw inferences, and reach the conclusions that we
23 believe the evidence shows.
24          You will be happy to know that I am then going
25 to go to materials up on the screen and get rid of these

17 (Pages 1691 to 1694)

Page 1707

1 Berkland tells you, it's not outcome-determinative, it is
2 suggestive of crystallinity.
3     Let's go to the next studies.
4     Solid state NMR. This is the only picture of a
5 car I could find on the Internet last night. If I wanted to
6 find if there is something in that car, a nut or bolt, that
7 infringes -- again, we are not looking at Abraxane as a
8 product. We are saying, is there something in it that was
9 incorporated that infringes the '363 patent? I am not going
10 to be able to determine if those bolts infringe from just
11 looking at the exterior of this. I recognize that inside of
12 this there is an engine. If I look at the engine, pull it
13 out, I am still not going to be able to see all of the
14 parts. The only way to begin to see all of the parts is to
15 take it apart, get it down to every little nut, bolt, screw.
16 And if I want to find out if a couple of those pieces
17 infringe, I am going to have to get down to that level. And
18 that's what the solid state NMR testing was that you heard
19 testimony about at some length in this case.
20     You heard from Dr. Eric Munson, in Who's Who of
21 ssNMR on that list. He spent his entire career doing this.
22 He was recently invited to the FDA to consult on solid state
23 NMR. You heard Dr. Brittain's video say Professor Munson is
24 one of the most qualified scientists I know of to perform
25 solid state nuclear magnetic resonance spectrometry work.

Page 1708

1 This is his research specialty.
2     And even the expert for Abraxis said, Dr. Munson
3 did that experiment. I am quite happy with his experiment.
4 I have found no fault with his experiment.
5     You will recall that Dr. Atwood actually wrote a
6 letter of recommendation when Dr. Munson was up for full
7 professorship at the Pharmaceutical Sciences School when he
8 was on the faculty. What did Dr. Munson teach us? He
9 taught us that this NMR machine -- this is his actual
10 machine in his laboratory in Lawrence, Kansas. It's a huge
11 magnet. And he likened it to the huge magnet that's in an
12 MRI machine. If you have ever been in an MRI machine, it is
13 not a pleasant experience, loud, pinging sounds. But it's a
14 huge magnet that is realigning atoms within your body, and
15 then there is some resonance that's put to it, and it
16 measures all of that. It is the same technology. And he
17 further described to you it's like the advance from the old
18 x-rays. When I was a kid, every time I went to the doctor,
19 I don't care if I had a sore toe, they would take an x-ray
20 of something on my body. This is a much more precise
21 technology, entirely different, where you are looking at the
22 atomic level, and using it to determine what are the
23 constituent parts. What is the makeup of the molecules or
24 the atoms within a certain substance?
25     Let's see here what's in the published

Page 1709

1 literature about it. As early as 1991, the ultimate
2 characterization of a pharmaceutical material concerns the
3 chemical environment of each atom in the compound. Again,
4 looking at it at an atomic level. Not just taking a picture
5 looking at the surface, but looking at the atomic level.
6     This information is best obtained through the
7 use of nuclear magnetic resonance spectroscopy. With recent
8 advances in instrumentation and computer pulse sequences,
9 these studies can now be carried out in the solid state.
10     This is what we have been talking about in this
11 case, is solid state chemistry, not liquid chemistry.
12     So as early as 1991 -- and you saw Dr. Munson,
13 fairly young man. If you line this up, he has been doing
14 this ever since this came to be recognized as the most
15 sensitive method for characterizing the chemistry of solid
16 materials, using it to determine if there is crystallinity.
17     So what happened?
18     You saw from the evidence that Abraxis itself
19 separated the nanoparticles with something called a
20 centrifuge, where you spin. What happens is the solids spin
21 out and the liquid stays in there. Abraxis did it itself in
22 its own experiments. They created what's called a pellet.
23 The liquid goes to the top and the nanoparticles settle to
24 the bottom.
25     What you also heard is, Abraxis has never tested

Page 1710

1 that pellet for its crystallinity. That's where the
2 nanoparticles are, is in that pellet. We know that Dr.
3 Berkland actually did the centrifuging for Dr. Munson's
4 study. He did it at ten times less the centrifugal force
5 that Abraxis uses to make sure they didn't mess up the
6 particles, they didn't hurt their integrity.
7     You heard, then, that they got two different
8 samples. They reconstituted. They spun them. Got the
9 nanoparticles, and then they had to dry them to make sure
10 they didn't have some result that would be criticized
11 because they dried it one way versus another, they dried it
12 two ways. One was air-dried, one was freeze-dried.
13     Now, actually, you heard testimony from both
14 sides about what happens when you get this data from ssNMR.
15 Well, you have to go use a very sophisticated computer
16 program. And it's called deconvolution. Because the
17 question is, you get all these humps on these lines, what
18 does it really mean? And we have created a little video
19 here to illustrate the testimony that you heard in this
20 case.
21     What has happened here is, these peaks could
22 reflect two or more pieces of data. And what Dr. Munson
23 found was that there was this third peak that was hidden in
24 the data using this very sophisticated technique. When he
25 subtracted out the other two, there was this unexplained

21 (Pages 1707 to 1710)

Page 1711

1  third, which the computer did analysis on, if I could go to
2  the next slide, please. Dr. Munson -- this was the
3  freeze-dried sample -- after he subtracted out these other
4  two human beings, there was a third one there. Eight
5  percent of the total paclitaxel within those vials of
6  Abraxane are crystalline. Eight percent of the total. Very
7  important number to remember. Eight percent of the total,
8  because the issue here isn't in this case is there a certain
9  percentage of the total. The question is are there
10 nanoparticles, more than two, amongst 61 trillion, that are,
11 as Judge Sleet has instructed you, that are themselves
12 entirely crystalline. We know that eight percent of the
13 total was crystalline, based on this definitive study. We
14 know that in the air-dried sample, it was seven percent.
15      Dr. Munson testified to you that gave him some
16 confidence that there wasn't any sort of artifacts or
17 artifactual data that was being seen.
18      Single bottle of Abraxane contains over 60
19 trillion particles. If eight percent of those particles
20 contain crystallinity, then over 4.8 trillion particles in a
21 vial have a crystalline content.
22      If only four percent, then 2.4 trillion
23 particles contain crystalline medicament.
24      The question that you have to decide, based on
25 the evidence that you have seen here is, of those 60-plus

Page 1712

1  trillion particles, are there two or more that are particles
2  wherein the paclitaxel is crystalline as has been construed
3  for you by the Judge in the instructions you have been
4  given?
5      Again, the law isn't, well, it doesn't infringe
6  if it's just a few. Personally, I don't think 2.4
7  transitional is just a few. If it contains particles and
8  they meet the claim limitation, then that's infringement.
9  That's what the law is. The law allows my client and
10 anybody else who has got a patent to seek to prevent others
11 from using that invention. And we seek a license for the
12 fact that, notwithstanding their best efforts, there are
13 crystalline particles therein.
14      Now, Dr. Munson then offered the following
15 opinions. Abraxane contains particles consisting
16 essentially of 99 to 10 percent by weight of a crystalline
17 medicament useful in treating cancer. Abraxane contains
18 particles that meet the crystallinity claim limitation as
19 defined by Judge Sleet.
20      What else do we know on this crystallinity
21 issue?
22      We know that the starting material, starting
23 paclitaxel is a white to off-white crystalline material.
24 They start with crystals.
25      What else did we know? You heard Dr. Atwood,

Page 1713

1  their expert, comment on this. In the published literature
2  since 1955, one of the most remarkable facts revealed by
3  x-ray science is the extreme rarity of a truly amorphous
4  state. The extreme rarity of a truly amorphous state.
5      You begin to add the evidence up. DSC, this is
6  not a hundred-percent amorphous. It is the fingerprint.
7  That testimony is not contradicted by anybody. Dr. Berkland
8  looks at the cryo-TEM. He sees some angles and some edges.
9  He says it's suggestive of crystallinity. We go to the
10 definitive test, ssNMR. We know that eight percent of the
11 total paclitaxel contained is crystalline. And Dr. Munson
12 gave you his opinion, there are particles in there that meet
13 the claim limitation.
14      Now, you heard evidence in this case about,
15 well, wait a minute, there is this test called x-ray powder
16 diffraction, and it shows that it is amorphous.
17      You saw this chart. When you go back to
18 deliberate, I am going to ask you please to look at this
19 real close, because the evidence really didn't focus on --
20 or I should say the testimony. These lines all look about
21 the same. What's important is that you look at this scale.
22 You remember during the testimony that this bottom line is
23 crystalline paclitaxel, particles up to 500 microns. That
24 is 3500 times bigger than the nanoparticles within Abraxane.
25 3500 times bigger.

Page 1714

1      The reason I say look at this scale, because the
2  largest peak goes up to 7,000, just under 7,000.
3      You will also recall this lineup here. This is
4  what their expert pointed to, Dr. Atwood, which was a
5  physical mixture. They just took that raw paclitaxel,
6  somewhere between 50 and 500 microns, up to 3500 times
7  larger than the particles in Abraxane. And they just added
8  albumin to it. That's all they did. They didn't reduce it
9  in size. They just added albumin to it.
10      Look at the difference in the shape by just
11 adding albumin to particles that big.
12      What we provide to you now is, if you chart
13 these, no reduction in size, all you do is add albumin to
14 these large particles. And look what happens to the line.
15 Look at the difference in the scale. The highest peak here,
16 when you look at it, is about 600. You remember, this one
17 that went up to close to 6800. Look where the peak is here.
18 Why? Why? What's the effect of albumin? What things
19 affect x-ray powder diffraction?
20      Again, I am going to ask you to consider the
21 testimony of the woman that I asked the Texas phrase to -- I
22 shouldn't say that because I grew up someplace other than
23 Texas. This was Katherine Melody. I said, Ms. Melody, you
24 don't have a dog in this hunt, do you? She didn't know
25 quite what I meant. I was trying to ask her, you are not

22 (Pages 1711 to 1714)