IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELAN PHARMA INTERNATIONAL LIMITED, )
)
)
Plaintiff, )
)
v. )
)
ABRAXIS BIOSCIENCE, INC., )
)
Defendant. )
)

**REDACTED**
**PUBLIC VERSION**

C.A. No. 06-438-GMS

**PLAINTIFF ELAN PHARMA INTERNATIONAL LIMITED'S**
**ANSWERING BRIEF IN OPPOSITION TO ABRAXIS BIOSCIENCE, INC.'S**
**MOTIONS FOR JUDGMENT AS A MATTER OF LAW OF NONINFRINGEMENT,**
**INVALIDITY, INEQUITABLE CONDUCT, AND ITS MOTION FOR NEW TRIAL**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. # 4261)
500 Delaware Avenue, 8th Floor
Wilmington, Delaware 19899-1150
(302) 654-1888 Telephone
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Elan Pharma International Limited*

*Of Counsel:*

Stephen E. Scheve
Robert Riddle
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77042-4995
(713) 229-1659 Telephone

Paul F. Fehlner
Jeffrey D. Sullivan
Lisa A. Chiarini
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112-4498
(212) 408-2527 Telephone

Dated: August 4, 2008

**TABLE OF CONTENTS**

I.    NATURE AND STAGE OF THE PROCEEDING.................................................................. 1

II.   SUMMARY OF ARGUMENT ......................................................................................... 1

III.  STATEMENT OF FACTS ............................................................................................... 1

IV.   ARGUMENT ................................................................................................................... 1

    A.   The Court should not disturb the jury's infringement verdict. ........................... 2

        1.   Claims 3 and 5 require particular particles, not particular formulations. ...................... 3

        2.   The jury reasonably concluded that Abraxane® contains the claimed particles. ............ 4

    B.   The jury had substantial evidence that the inventors properly described the inventions claimed in the '363 patent. .......................................................................................... 8

    C.   The inventors disclosed the invention in the '363 patent so that an ordinarily skilled artisan could practice the claims. ....................................................................... 9

    D.   The '025 patent enables an ordinarily skilled artisan to practice the claimed inventions and adequately describes those inventions. ................................................... 13

    E.   The Court should not disturb the jury's rejection of Abraxis's inequitable conduct claims. ...................................................................................................... 13

    F.   The jury awarded Elan a reasonable amount of damages that is grounded on the evidence before it and a theory agreed to by Abraxis. ......................................... 14

    G.   The Court should not reward Abraxis for its willful blindness by granting it a new trial. 17

        1.   Abraxis knew about Elan's infringement argument at least a year before trial and cannot properly claim otherwise. ....................................................................... 17

        2.   Abraxis was not prejudiced. ................................................................................ 19

    H.   Abraxis is not entitled to a new trial as a result of Dr. Munson's testimony. ................ 19

V.    CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
   334 F.3d 1343, 1356 (Fed. Cir. 2003) ................................................................. 8

*CFMT, Inc. v. YieldUP Int'l Corp.*,
   349 F.3d 1333, 1338 (Fed. Cir. 2003) ................................................................ 12

*Eisai Co. v. Dr. Reddy's Lab., Ltd.*,
   Case Nos. 2007-1397, 2007-1398, slip op. at (Fed. Cir. July 21, 2008) ................... 14

*Greenleaf v. Garlock, Inc.*,
   174 F.3d 352, 365 (3d Cir. 1999) .................................................................... 9, 20

*In re Wands*,
   858 F.2d 731, 737 (Fed. Cir. 1988) .................................................................... 10

*Innova/Pure Water, inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111, 1115 (Fed. Cir. 2004) ................................................................. 3

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387, 1394 (Fed. Cir. 2003) ................................................................ 16

*Northview Motors, Inc. v. Chrysler Motors Corp.*,
   227 F.3d 78 (3d Cir. 2000) .............................................................................. 9

*Union Oil Co. of California v. Atlantic Richfield Co.*,
   208 F.3d 989, 997 (Fed. Cir. 2000) .................................................................... 8

*United States v. Reilly*,
   33 F.3d 1396, 1423 (3d Cir. 1994) .................................................................... 20

## STATUTES

35 U.S.C. § 284 ............................................................................................ 16

## I.    NATURE AND STAGE OF THE PROCEEDING

After an eight day trial, the jury returned a verdict of infringement against Abraxis under Elan's U.S. Pat. No. 5,399,363 (the "'363 patent"). The jury further found claims 1, 3, 5, 10, and 11 of the '363 patent and claims 1-3 and 13-15 of Elan's U.S. Pat. No. 5,834,025 (the "'025 patent") not invalid and the '363 and '025 patents not unenforceable. The jury awarded Elan $55,230,000. The Court entered judgment accordingly on June 16, 2008. (D.I. 613, 614.)

## II.    SUMMARY OF ARGUMENT

After careful deliberations concerning the credibility and testimony of the trial witnesses and the documentary evidence, the jury correctly determined that Abraxis directly infringes claims 3 and 5 of the '363 patent and properly rejected Abraxis's invalidity and unenforceability assertions. The jury also properly rebuffed Abraxis's validity and enforceability challenges to the '025 patent. The evidence of record supports the jury's decisions on both patents, as well as its determination of a proper damages award. Elan submits that the Court should not disturb the jury's findings and should deny Abraxis's motions for judgment as a matter of law or a new trial. Finally, Elan submits that the Court should deny Abraxis's motion for a new trial based on its claim that it was unaware of Elan's infringement arguments and its objections to Dr. Eric Munson's testimony. Long before trial, Abraxis should have known—and did know—that sale of the claimed particles as part of a product infringes the '363 patent. Moreover, Dr. Munson testified only upon subject matter contained within his initial expert report.

## III.    STATEMENT OF FACTS

Elan has addressed pertinent facts in the Argument sections, *infra*, as appropriate.

## IV.    ARGUMENT

After an eight-day trial involving hours of testimony about the scientific testing of physical properties of nanoparticles, the jury resolved the intensely factual disputes before it in

Elan's favor. The jury reached this verdict after a trial in which Abraxis seemingly started with a leg up: Abraxis presented its inequitable conduct case to the jury, Abraxis sought and obtained an adverse-inference instruction, and Abraxis sent its closing slides to the jury.

In the end, however, Abraxis failed to put forth a convincing defense. For example, it presented the testimony of Dr. Jerry Atwood, who has "never put [his] hands on," much less tested, Abraxane®,[1] and who ultimately testified that he was "happy with" and had "not found fault with"[2] the testing performed by Elan's expert, Dr. Eric Munson. The jury also heard from Dr. Mansoor Amiji, who Abraxis presented to rebut Dr. Manning's testimony despite his comparatively lacking educational and experiential qualifications. Dr. Amiji relied on unpublished data, rather than the materials Abraxis submitted to FDA that Dr. Manning used. Given that Abraxis relied on testimony from these two witnesses to rebut Elan's claims—one who endorsed Elan's expert and the other who chose to rely on less trustworthy data—the jury was entitled to assess credibility determinations in favor of Elan's technical experts. The jury's decision to apply Elan's damages evidence is an even more clear-cut example: Abraxis offered no testimony on damages of its own. Rather, it agreed to *Elan's* damages theory.

The jury weighed the credibility of the witnesses whose testimony it heard, weighed the documentary evidence it saw, and ultimately found in favor of Elan. Abraxis now asks the Court to substitute Abraxis's view of the facts for the jury's. The Court should deny this request.

**A.    The Court should not disturb the jury's infringement verdict.**

After considering the total picture drawn by the parties, the jury reasonably and correctly concluded that Abraxis directly infringes claims 3 and 5 of the '363 patent. Asserted claims 3 and 5 require a specific type of particles, not a specific formulation, and analyzing the testimony

---

[1] Tr. 1125:13-1127:8, 1168:22-1169:4.
[2] Tr. 1159:24-1160:15.

and documents before it, the jury correctly concluded that Abraxane® includes these particles. Rather than disturb the jury's verdict, the Court should deny Abraxis's motion for judgment as a matter of law or a new trial on infringement.

### 1. Claims 3 and 5 require particular particles, not particular formulations.

Claims 3 and 5 of the '363 patent cover *particles*; they do not cover formulations that contain particles. This fact is most evident from the words of the claims themselves: asserted claims 3 and 5, and the claim from which they both depend, recite "particles." (JX081 14:6-28, 14:31-32, 14:35-39.) *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) ("the claims of a patent define the invention to which the patentee is entitled the right to exclude.")

The inventors distinguished their claimed particles from formulations or dispersions. For example, when the inventors filed the original parent application, they sought protection for their newly invented particles in some claims and sought protections for dispersions and a composition containing those particles in separate claims. (*See, e.g.*, JX084 at 34-35 (compare original claims 1-11 with original claims 12-14).) The inventors confirmed that distinction throughout prosecution of the parent application, taking care to explain to the examiner that their invention covered particles, not compositions. (*Compare id.* at 52 *with id.* at 121; *see also id.* at 133 (noting that "one skilled in the art does not obtain particles in the critical size range recited in the claims of [the pending application] when following" the prior art).)

When the inventors filed the '363 patent, they continued to distinguish between the particles and formulations. The abstract of the '363 patent describes both "[d]ispersible particles" and "[a]nticancer compositions comprising the particles." (JX081 Abstract.) Similarly, the "Summary of the Invention" distinguishes between particles and formulations containing particles, stating that "in accordance with this invention there are provided particles

consisting essentially of" *and* "[t]his invention *further* provides an anticancer composition comprising the above-described particles." (JX081 1:49-56 (emphasis added).) Despite this intrinsic evidence, Abraxis now asks the Court to rewrite the actual claims—covering "particles"—as new claims for formulations. The Court should reject Abraxis's request.

### 2. The jury reasonably concluded that Abraxane® contains the claimed particles.

In addressing infringement, the jury resolved a factual issue based on testimony and documentation presented at trial: that Abraxane® includes particles having entirely crystalline medicament and a non-crosslinked surface modifier. In particular, Elan presented empirical and analytical evidence indicating that Abraxane® includes crystalline material and that many particles within Abraxane® contain entirely crystalline medicament. Abraxis's own statements reveal that nearly all the particles in Abraxane® have a non-crosslinked surface modifier.

Elan presented ample evidence from which the jury could conclude that Abraxane® includes crystalline medicament. Elan's expert Dr. Manning explained that, according to FDA data, Abraxane® particles lack a glass transition temperature, indicating that the medicament in Abraxane® particles is not purely amorphous, *i.e.*, that Abraxane® contains crystalline material. (Tr. 578:19-585:20, 1573:19-1575:12.) Dr. Cory Berkland testified that Abraxis's cryo-TEM images of Abraxane® particles are consistent with crystalline medicament. (Tr. 943:17- 951:17.)

<br>

REDACTED

<br>

(PX068 ELANP0316443; *see* Tr. 870:25-871:18

REDACTED            *see also* Tr. 306:23-309:4.)

In addition, Dr. Eric Munson testified that he detected crystalline medicament in Abraxane® particles that were analyzed using solid-state nuclear magnetic resonance. (Tr. 660:3-672:14.) Abraxis cannot challenge the sufficiency of Dr. Munson's analysis, given that Dr. Atwood, Abraxis's expert, later testified that he was "quite happy" and had "not found fault with [Dr. Munson's] experiment." (Tr. 1159:24-1160:15.)

**REDACTED**

(Tr. 876:22-882:5

**REDACTED**

JX018 ABRX0296433.)[3] Based at least on this evidence, the jury reasonably concluded that Abraxane® contains crystalline material.

Moreover, the evidence supports the jury's conclusion that many Abraxane® particles have medicament that is entirely crystalline.    Dr. Atwood testified that a single vial of Abraxane® contains between 60 and 100 trillion particles.  (Tr. 1148:6-12.)  Abraxis patents cited on the Abraxane® label[4] acknowledge that crystallinity varies from particle-to-particle— scientific admissions supporting a conclusion by the jury that of the 60 to 100 trillion particles, some will be crystalline, while others will be amorphous.  (See, e.g., DX030 6:25-30 ("While it is recognized that particles produced according to the invention can be either crystalline, amorphous, or a mixture thereof . . . ."); PX211 7:13-16 (same).)

**REDACTED**

---

[3] See also Tr. 610:24-611:10 (testimony of Neil Desai, admitting that VivoRx commissioned testing of Abraxane® using centrifugation); id. at 612:3-9 (Dr. Desai, admitting that Abraxis commissioned centrifugation to separate paclitaxel and adsorbed HSA from free albumin).
[4] See PX148 at ELANP0107566 (Abraxane® label citing U.S. Patent Nos. 6,537,579 and 6,749868); PX125 at ABRX0000825 (same).
[5] See, e.g., PX149 (cross-referencing Investigator IND for Abraxane® with IND for Capxol.).

**REDACTED**

Finally, the jury heard Dr. Munson's opinion that the samples of Abraxane® particles he analyzed included particles that satisfy the limitations of claims 3 and 5. (Tr. 670:11-672:14.) In view of the totality of the evidence, the jury had more than ample reason to conclude that Abraxane® contains many particles that are entirely crystalline.

There was also ample evidence for the jury to conclude that Abraxane® particles have a non-crosslinked surface modifier. Abraxis's own statements show that Abraxane® particles have a non-crosslinked surface modifier adsorbed on their surface. Dr. Desai conceded that Abraxane® particles have molecules of a surface modifier, human serum albumin ("HSA"), adsorbed on their surfaces. (Tr. 627:12-15.) The HSA Abraxis uses to make Abraxane® particles is greater than 95% monomer. (JX006 ABRX0117480.) This monomeric albumin is, by definition, non-crosslinked. (See, e.g., Tr. 553:5-557:4 (testimony of Dr. Mark Manning, analyzing NDA submissions).) Moreover, the jury could reasonably rely on Abraxis's statements to FDA. Specifically, Abraxis told FDA that the process of manufacturing Abraxane® does not result in cross-linked albumin: "Abraxane® is formed using the company's proprietary nanoparticle albumin bound (nab™) technology that combines water insoluble compounds, such

---

[6] Ms. Louie performed her tests two years after the Investigational New Drug Application for Capxol was filed. (PX144 ABRX076973 (IND for Capxol).)

as paclitaxel, with human albumen *without altering either component or forming covalent bonds.*" (PX112 ELANP094858 (ODAC Briefing Package) (emphasis added)[7]; PX009.)

REDACTED

Dr. Manning testified that, if the HSA in Abraxane® formed the crosslinkages Abraxis now claims exist, the HSA would neither be effective in binding the paclitaxel nor permit "rapid disassociation" of the particles after administration, as touted by Abraxis to FDA. (Tr. 567:3-573:17; PX070 ELANP0217185.) [8] Finally, although Abraxis later tried to explain away his statement, Dr. Desai told FDA that "[w]e use the native albumin. And if you start cross-linking the albumin with chemicals and things, I think you might run into problems *but we don't do that.*" (PX070 ELANP0317204 (emphasis added).) In view of all the evidence, the jury reasonably concluded that almost all Abraxane® particles have a non-crosslinked surface modifier and satisfy the limitation in claims 3 and 5 requiring the "individually adsorbed molecules of the surface modifier" to be "essentially free of intermolecular cross-linkages." (D.I. 271 ¶ 5.)

In view of the many trillions of particles in Abraxane®, some of which are entirely crystalline, and which have non-crosslinked albumin adsorbed on their surfaces, the jury reasonably concluded that Abraxane® contains particles with entirely crystalline medicament and non-crosslinked albumin adsorbed on their surface. The jurors had the opportunity to consider the credibility of each witness and weigh all the evidence. They found that Abraxis infringed

---

[7] Drs. Manning and Desai both confirmed the statements. (Tr. 562:24-565:10; 604:20-606:24.)

[8] Dr. Desai confirmed that there is no heat induced cross-linking. (JX015 ABRX0279514.) Dr. Manning also explained that, by maintaining a neutral pH during the process of manufacturing Abraxane®, Abraxis retarded the formation of any crosslinkages. (Tr. 575:14-577:12 (analyzing Abraxene® pH data provided to FDA in JX006).)

claims 3 and 5 of the '363 patent. The Court should not stray from the jury's verdict by granting

Abraxis judgment as a matter of law or a new trial on Elan's direct infringement claims.

**B.    The jury had substantial evidence that the inventors properly described the inventions claimed in the '363 patent.**

Abraxis's written-description challenge against the '363 patent is yet another instance in

which Abraxis asks this Court to substitute Abraxis's view of the facts for the jury's. As a

question of fact, the issue of whether the inventors adequately describe the claimed inventions in

their patent is squarely within the purview of the jury. *Abbott Labs. v. Syntron Bioresearch, Inc.,*

334 F.3d 1343, 1356 (Fed. Cir. 2003) ("Compliance with the written description is a question of

fact . . . ."). Moreover, the "written description requirement does not require the applicant to

describe exactly the subject matter claimed, instead the description must clearly allow persons of

ordinary skill in the art to recognize that he or she invented what is claimed." *Union Oil Co. of*

*California v. Atlantic Richfield Co.,* 208 F.3d 989, 997 (Fed. Cir. 2000) (internal quotes omitted).

The jury correctly decided that Abraxis had not met its steep evidentiary burden to overcome the

validity presumption. *Abbott Labs.,* 334 F.3d at 1356 (denying request to set aside verdict when

accused infringer "failed to prove that, in light of the presumption of validity, no reasonable jury

could have decided that [the accused infringer] failed to prove by clear and convincing evidence

that the claims are invalid for failure to meet the written description requirement").

Again, the inventors included over 23 example preparations of particles according to

embodiments of the invention of the '363 patent. (JX081 8:20-13:65.) These examples illustrate

that the inventors fully grasped and explained their invention in the text of the '363 patent. (*Id.;*

*see also* Tr. 1612:16-1613:10.) The jury could reasonably rely on this disclosure, especially in

view of the high level of skill that was stipulated. (Tr. 1415:19-1416:7.) Moreover, the

statements by Dr. Manning upon which Abraxis relies to show unpredictability at best merely

show that the process of developing a product to satisfy FDA regulations—a process vastly different than preparation of the claimed particles—can be unpredictable. (Tr. 1587:10-1593:2.) Again, testing performed to develop a product satisfying FDA requirements does not bear on the adequacy of the patent's written description when the claims do not claim a product that meets FDA regulations. The jury reasonably concluded that Abraxis had not met its burden of proving that the inventors fail to describe the claimed invention of the '363 patent. The Court should not alter its judgment in favor of Elan on Abraxis's written description challenge against claims 1, 3, 5, 10, and 11 of the '363 patent.

   **C.    The inventors disclosed the invention in the '363 patent so that an ordinarily skilled artisan could practice the claims.**

   Abraxis underestimates the burden it now faces in trying to overturn the jury's rejection of its allegations that claims 1, 3, 5, 10, and 11 of the '363 patent are not enabled. Now that the trial is complete and the jury has reached its verdict, Abraxis must show something *more* than mere clear and convincing evidence to obtain judgment as a matter of law on its enablement counterclaims. It must show that, viewing all evidence in the light most favorable to Elan, no reasonable jury could have found that the evidence was less than clear and convincing. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78 (3d Cir. 2000); *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir. 1999) (noting that, in evaluating a Rule 50 motion, courts should not consider the credibility of witnesses or the weight of evidence and must draw all inferences in favor of the non-moving party). Abraxis failed to satisfy this burden.

   Abraxis first complains that the '363 patent "does not enable uncontaminated nanoparticles"[9] but failed to produce any evidence, never mind clear and convincing evidence, that the claimed particles produced according to the specification will *themselves be*

_____

[9] D.I. 642 7.

*contaminated.* For the reasons discussed in Section IV.A.1 of this brief, *supra*, the scope of the claims Abraxis attacks covers particles and methods of treating animals with those particles, not particular formulations. Thus, the only contamination that could be relevant is contamination within the particles, and Abraxis failed to show such contamination existed. Moreover, in providing a laundry list of exhibits to support its accusation that Elan failed to produce uncontaminated particles (D.I. 642 7-8), Abraxis conveniently glosses over the fact that it failed to establish whether the exhibits relate to experiments performed according to the methods of the '363 patent, rather than some other method.[10] Drs. Gary and Elaine Liversidge testified that FDA has never reported a contamination problem with any product formulated according to the techniques actually taught by the '363 patent. (Tr. 303:12-304:2, 535:5-11.)[11] The jury could have reasonably relied upon this evidence to find '363 patent enables uncontaminated particles.

Abraxis's complaint that the '363 patent fails to enable the full scope of the challenged claims also misses the mark: the question of whether the disclosure requires undue experimentation to perfect the invention is highly fact-specific, and the jury decided that the facts weigh in favor of Elan. Whether the level of experimentation required is "undue" is not a simply a question of "quantity," as Abraxis alleges. (D.I. 642 9.) Rather, the question of what constitutes undue experimentation varies from context to context and involves the evaluation of eight fact-dependent factors, only one of which is quantity. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). (*See also* Tr. 1676:1-21 (listing factors in jury instructions).)

---

[10] *See, e.g.*, D.I. 642 7-8

**REDACTED**

[11] Elan details the flaws in Abraxis's contamination case in its Inequitable Conduct Response.

*Pharmaceutical Resources, Inc. v. Roxane Laboratories, Inc.*, 253 Fed. Appx. 26 (Fed. Cir. 2007), on which Abraxis relies, is easily distinguishable from this case. The claim at issue in that case was a simple "recipe in a pot" claim covering a combination including "*any* surfactant in *any* concentration." *Id.* at 30. Claim 1 of the '363 patent, in contrast, includes (1) tangible structural limitations requiring the surface modifier to be non-crosslinked and adsorbed on the medicament and (2) a functional limitation requiring the surface modifier to constrain the size of the particle. (JX081 14:7-15). These limitations distinguish acceptable surface modifiers from unacceptable ones. (*See id.* at 3:57-60 (instructing that surface modifier should "physically adhere to the surface of the anticancer agent but . . . not chemically bond to the anticancer agent.").) Also, the surface modifier limitation requires a specific concentration. (*Id.*)[12]

Looking at one *Wands* factor as an example—the presence of working examples—shows that the jury heard more than enough evidence to reject Abraxis's allegation that undue experimentation was necessary to practice the claimed invention. The '363 patent includes over 23 example preparations of particles according to embodiments of the invention. (JX081 8:20-13:65.) These examples span six columns of the specification, (*id.*), and more than adequately explain how to prepare a number of the embodiments.

The evidence concerning another *Wands* factor, the relative skill of those in the art, also weighs in favor of enablement. Abraxis stipulated at trial to a high education and experience level for a person of ordinary skill in the art. (Tr. 1415:19-1416:7.) Despite Abraxis's claims to the contrary, to that ordinarily skilled artisan, screening particular combinations for the purposes of identifying compatible combinations is trivial; the difficulty arises in preparing a commercial product that will receive FDA approval. (Tr. 1585:25-1590:19 (testimony of Dr. Manning,

---

[12] Abraxis's label of *Pharmaceutical* as "strikingly similar" underscores its misinterpretation of the claim scope: the claim at issue in that case covered a "suspension," not "particles."

distinguishing between screening for compatible combinations and developing a commercial drug).)  Whether additional work is required to develop a drug for FDA approval is irrelevant: Elan need not reach the level of commercialization—never mind the level of overcoming regulatory hurdles—to have enabled a skilled artisan to practice its invention. "Enablement does not require an inventor to meet lofty standards for success in the commercial marketplace." *CFMT, Inc. v. YieldUP Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003).  FDA applies stringent standards for acceptability that are more rigorous and unrelated to the claimed particles; that is, particles may satisfy the limitations of the claims, but not be suitable for FDA approval.  For this reason, the testing Elan did to develop a product acceptable to FDA is irrelevant.  (D.I. 642 10 (relying on testing done to develop product for FDA).)  Rather than rely on this irrelevant evidence, the jurors reasonably could have relied on relevant testimony they heard from the inventors on this and the other *Wands* factors supporting enablement.[13]

Congress has determined that all patents are presumed valid, and this case is no different. To rebut that presumption, Abraxis needed to present clear and convincing evidence that the '363 patent does not enable a person of ordinary skill in the art to practice claims 1, 3, 5, 10, and 11.  The jury reasonably concluded, based on its evaluation of the credibility of the parties' witnesses[14] and their testimony, that the evidence weighs in favor of rejecting Abraxis's enablement challenge.  The Court should not alter its judgment finding against Abraxis on its claim that the '363 patent does not enable a skilled artisan to practice claims 1, 3, 5, 10, and 11.

---

[13] *See, e.g.*, Tr. 230:14-24 (Dr. G. Liversidge testimony that every anticancer drug Elan attempted to formulate as nanoparticles was so formulated); Tr. 489:3-11 (Dr. E. Liversidge testimony that she uses the disclosed screening process on 10 new chemical entities a week); Tr. 491:1-5 (Dr. Elaine Liversidge testimony that Elan has had a 98% success rate in finding compatible surface modifiers for drug compounds).

[14] *See, e.g.*, Tr. 1424:13-1425:11 (testimony of Dr. Amiji, offering contradictory opinions that confuse written description and enablement).

**D.     The '025 patent enables an ordinarily skilled artisan to practice the claimed inventions and adequately describes those inventions.**

Abraxis challenged the description of the '025 patent as failing to enable or describe the inventions of claims 1-3 and 13-15, but the jury decided that Abraxis failed to meet its burden to prove those allegations by clear and convincing evidence. Rather, the evidence presented at trial supports the jury's verdict in favor of Elan. For example, in response to questions about the scope of the challenged claims, the jury heard testimony from inventors Drs. Gary and Elaine Liversidge from which it could conclude that the testing the inventors performed on dogs is sufficient to support claims covering all mammals because dogs are the best model for observing adverse cardiac effects. (*See, e.g.*, Tr. 446:23-450:16, 496:15-499:7.)[15] The inventors' decision alone to test dogs would demonstrate to an ordinarily skilled artisan that the inventors fully grasped and explained their invention because they chose the best model. Despite four hours of cross-examination of Dr. Gary Liversidge, this testimony stands unrebutted; neither Dr. Amiji nor anyone else provided contrary testimony. As a result, the jury was entitled to believe the inventors' testimony. Given the factual determinations underlying the enablement inquiry, the factual determination that *is* the written-description inquiry, and the jury's decision to find in Elan's favor on both counts, the Court should not grant Abraxis's motion for judgment as a matter of law or a new trial on the invalidity for the '025 patent.

**E.     The Court should not disturb the jury's rejection of Abraxis's inequitable conduct claims.**

Over Elan's objection, Abraxis asked this Court to submit its unenforceability counterclaims for the '363 and '025 patents to the jury, and the jury found those claims to be without merit. The Court should not now enter judgment as a matter of law in favor of Abraxis

---

[15] The jury also heard testimony about testing performed on rabbits that was performed according to the teachings of the '025 patent. (*See id.*)

or grant Abraxis a new trial on its unenforceability claims. As explained in detail in Elan's Inequitable Conduct Answering Brief, Abraxis has waived any right it had to challenge the jury's findings on inequitable conduct. More importantly, Abraxis bore the burden to prove by clear and convincing evidence that the '363 and '025 are unenforceable as a result of inequitable conduct committed during prosecution of those patents—and failed to produce evidence sufficient to meet that burden. Inequitable conduct requires a finding of intent to deceive. This jury's finding that intent was not proved should not be disturbed because intent is a jury issue, and this jury had the chance to evaluate all the witnesses presented by Abraxis. *Eisai Co. v. Dr. Reddy's Lab., Ltd.*, Case Nos. 2007-1397, 2007-1398, slip op. at 5 (Fed. Cir. July 21, 2008) (noting that intent is a question of fact that requires proof by clear and convincing evidence, "a high bar"). Elan therefore submits that the Court should refrain from changing its entry of judgment in favor of Elan on Abraxis's unenforceability counterclaims.

**F.    The jury awarded Elan a reasonable amount of damages that is grounded on the evidence before it and a theory agreed to by Abraxis.**

The jury reasonably relied upon the only testimony it heard on damages issues—testimony based upon a damages theory that Abraxis itself agreed was correct—in awarding Elan a reasonable royalty for infringement of the '363 patent. The Court should reject Abraxis's request to set aside the jury's damages award and reject Abraxis's request for a new trial.

Despite its complaints about Elan's damages calculations, *Abraxis agreed to the theory* upon which Elan's damages expert, John Jarosz, testified and *agreed that the jury could accept different royalty rates based on that theory*:

> Mr. Jacobs: When you came out and asked me if I agreed that there is only one theory of damages, I said, yes, there is only one theory.
>
> The Court: There is only one set of numbers.
>
> Mr. Jacobs: Well, I think the jury doesn't have to accept because, for example, he was cross-examined on this, the jury doesn't have to accept the Elan *quantification*

of the reasonable royalty.  For example, if the jury were to discredit Dr. Jarosz's testimony—

The Court:  They would be free to do that.

Mr. Jacobs:  -- because he decided that a hundred percent of the value was associated with the Elan patents –

The Court:  They could do that.

Mr. Jacobs:  They could go well below six or eight percent.  *So that the jury still has a jury question as to amount.  I agree that there is only one theory of damages.*

(Tr. 1649:15-1650:10 (emphasis added); *see also* Tr. 1632:20-21 ("On the theory, we agree, Your Honor.").)  Abraxis's comment at trial underscores the validity of the jury's verdict:  the parties agreed to the damages theory, so the only question remaining was the amount to award Elan—and Abraxis agreed that question was for the jury to decide.

Putting aside Abraxis's admissions, ample evidence supports the jury's verdict.  Elan provided the jury with testimony and agreements showing that it had successfully licensed the '363 patent to third parties who paid Elan based on revenues accruing from sales of entire products, not just the claimed particles.

## REDACTED

Elan also presented testimony analyzing Abraxis's licensing practices for Abraxane®, (*see, e.g.*, Tr. 804:18-807:16), and testimony analyzing industry licensing practices, (*see, e.g.*, Tr. 807:17-809:11).  Elan's expert explained to the jury his analysis of the appropriate royalty rate in light of this evidence under the *Georgia-Pacific* rubric.  (*See, e.g.*, Tr. 809:12-825:18.)

In contrast, Abraxis withheld from the jury any testimony that it could weigh against the testimony of Elan's damages expert.  Rather, Abraxis chose, as a matter of trial strategy, not to present an expert witness on damages issues.   In a classic "battle of the experts," the Federal Circuit defers to a jury verdict supported by substantial evidence.  *Micro Chem., Inc. v. Lextron,*

*Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003) (affirming the damages award where "[t]he outcome of the case depended to a large extent upon which predicate facts the jury believed, and then on which expert's analysis they believed.) The jury's verdict in this case, for which Abraxis elected not to fight a battle of the experts, should be entitled to even greater deference. Presumably, in making the decision not to present an expert, Abraxis evaluated and accepted the risks associated with leaving the jury without countervailing evidence to evaluate as part of its damages assessment. Having so chosen, Abraxis cannot avoid the consequences.[16]

The jury, after it determined Abraxis infringed, was asked to compensate Elan for the harm it suffered as it saw fit based on the testimony and documentation presented at trial. A patentee is entitled to "damages adequate to compensate for the infringement." 35 U.S.C. § 284. That compensation may take the form of a reasonable royalty or something else entirely, so long as, at an absolute minimum, the patentee receives at least a reasonable royalty, *see id.* After it heard Elan's expert testimony on what a reasonable royalty would be and what the proper base is—and no testimony from a counter expert—the jury was free to accept or reject Elan's theory as it deemed appropriate. Ultimately, the jury awarded damages based on the lowest appropriate royalty rate upon which Elan's expert testified, 6%, and applied the rate to every sale of Abraxane®, just as other companies had paid royalties on the entire revenues resulting from sales of licensed products. That the jury chose the lowest royalty rate is yet again evidence of its critical analysis of the testimony and documentation at trial.

Having agreed to the damages theory and admitted that the amount of the award to Elan was an issue for the jury decide, Abraxis now asks the Court to set aside the jury's verdict.

---

[16] Abraxis's attack on the damages award as "speculative" given that Elan has reported losses is beside the point. The jury correctly disregarded this argument because Abraxis presented no evidence that the losses Elan reported *as a company* implicate the value of the '363 patent.

Congress has set a reasonable royalty as the minimum recovery, and Elan, which succeeded in proving infringement, is entitled to no less than this "basement"-level damages amount. The opportunity to challenge Elan's damages theory with competing evidence arose at trial, not after the jury determined a reasonable award. The jury used the evidence before it to award a reasonable royalty. The Court should not disturb that award and should deny Abraxis's motion.

> **G.    The Court should not reward Abraxis for its willful blindness by granting it a new trial.**

Abraxis should not benefit from its decision to ignore the proper scope of the claims by receiving a new trial. Contrary to Abraxis's claimed "trial by ambush," Elan informed Abraxis it was abiding by the plain meaning of the claims in the initial infringement report of its technical expert, Dr. Munson. Abraxis even filed a paper with this Court indicating that it understood Elan would argue that sale of products containing the claimed particles infringe. Putting aside Abraxis's apparent willful blindness, Abraxis failed to show it suffered any prejudice. As a result, the Court should deny Abraxis's request for a new trial.

> **1.    Abraxis knew about Elan's infringement argument at least a year before trial and cannot properly claim otherwise.**

Abraxis could have been surprised by Elan's arguments that selling product containing more than one of the claimed particles infringes only if Abraxis ignored both the language in the patent itself and the disclosures Elan made prior to trial. Within the first few words of claims 3 and 5, the inventors informed the world that "[w]hat is claimed" is *particles*." (JX081 14:6-28, 14:31-32, 14:35-39.) As discussed earlier in this brief, *see supra* discussion at Section IV.A.1, the summary of the invention and abstract differentiate between the claimed particles and a formulation or composition. (JX081 Abstract, 1:48-56.) The inventors also emphasized that distinction during prosecution. *See supra* discussion at Section IV.A.1.

In September 2007—more than eight months before trial—Elan served Abraxis with the initial expert report of Dr. Munson . In his report, Dr. Munson stated that:

> Samples that are on average from 3.5 to 12 % crystalline, such as those above, *include individual particles that are mostly crystalline.*
>
> . . .
>
> It is my opinion that Abraxane contains *particles* consisting essentially of 99.9% - 10% by weight of a crystalline medicament useful in treating cancer . . . .

(Ex. 1, Expert Report of Eric J. Munson at ¶¶ 27(D, G) (emphasis added).)[17] Only Abraxis is to blame if it failed to realize that claims 3 and 5 cover "particles" or read Dr. Munson's expert opinions focusing on "particles," both indicating that selling a product containing the claimed particles infringes. For these reasons alone, the Court should deny Abraxis's motion.

Abraxis also filed claim construction briefs indicating that the claims cover "particles" and that Elan's infringement arguments would require only that the claimed particles be present. Abraxis's opening claim construction briefing, *filed in May 2007*, complains that "[a]pparently, Elan aims to assert infringement by *particles* in which the drug substance is overwhelmingly amorphous." (D.I. 105 1 (emphasis added).) Later, Abraxis acknowledges that, "[t]hese patents are about nanoparticles and their use." (*See also id.* at 15 ("The structure of the claims of the '363 patent relies on 'consisting essentially of' to transition between the claimed 'particles' and the crystalline medicament and noncrosslinked surface modifier.").)[18] Abraxis knew about Elan's infringement approach at least a year before trial and cannot properly claim otherwise.

---

[17] In its Fifth Amended Answers and Objections to Abraxis's Interrogatory No. 5, Elan explained infringement contentions that focus on particles in Abraxane® to prove infringement:

> [T]he lyophilized powder sold by Abraxis under the trade name Abraxane® . . . literally meets each and every element of the Asserted Claims of the '363 Patent. Specifically, the Abraxane® lyophilized powder contains particles consisting essentially of . . . .

(*See* Ex. 2, Plaintiff Elan Pharma International Limited's Fifth Amended Answers and Objections to Defendant Abraxis's First Set of Interrogatories (No. 1), at § 1.A.)

[18] Abraxis's invalidity expert, Dr. Amiji recognized that the claims covered particles at least by September 2007. (*See also* Ex. 3 (Opening Expert Report of Dr. Mansoor M. Amiji) at ¶ 41

## 2. Abraxis was not prejudiced.

Abraxis failed to show any prejudice resulting from its alleged surprise that selling a product containing the claimed particles in addition to other components infringes. Abraxis's complaint that it "would have put Elan to its proof on other claim limitations" had it known[19] is nothing more than ordinary post-trial hindsight: Abraxis elected not to challenge those limitations as a matter of trial strategy and, as with its decision not to present a witness on damages issues, cannot avoid the consequences. Abraxis's claim construction complaints are similarly unwarranted. Abraxis obtained the clarification it sought for the Court's construction "crystalline medicament useful in treating cancer" when the Court ordered that this term "requires that the entire medicament, not merely a portion, be crystalline." (*See* D.I. 569; Tr. 1667:1-6.) And, as Abraxis notes, the Court precluded Dr. Munson from testifying about subject matter contained only in his second supplemental report. (Abraxis Brief at 18.) At trial, the Court specifically prohibited Dr. Munson from testifying beyond the scope of his original report, which Abraxis received long before trial. (Tr. 670:9-672:14.) Abraxis was neither surprised nor prejudiced and the Court should deny Abraxis's motion for a new trial.

## H.    Abraxis is not entitled to a new trial as a result of Dr. Munson's testimony.

The opportunity to challenge Dr. Munson's testimony arose at trial, but Abraxis failed to preserve its objection: waiving any right it may have had to a new trial on that basis. When counsel for Elan asked Dr. Munson to testify regarding his opinions, counsel for Abraxis asked for, and received, a sidebar conference concerning that testimony. (Tr. 670:9-671:24.) The Court restricted Dr. Munson's testimony to his initial report, as requested by counsel for Abraxis.

---

("The '363 patent describes a drug delivery system of surface modified crystalline nanoparticles used in cancer therapy. Specifically, the '363 patent describes crystalline drug particles . . . ."); *id.* at ¶ 36 "These patents are about nanoparticles for medical applications.").)

[19] *See* Abraxis Brief at 19.

It then allowed counsel for Elan to cure any alleged defect in Dr. Munson's testimony, with the specific instruction that "let's make sure that he has the evidence consistent with his report. If necessary, we will revisit the issue." (*Id.*) When counsel for Elan proceeded to ask curative questions regarding the opinions in Dr. Munson's report, Abraxis accepted the curative testimony. (Tr. 671:25-672:14.) By failing to object again or "revisit the issue," Abraxis failed to preserve its objection to Dr. Munson's testimony. *See, e.g., United States v. Reilly,* 33 F.3d 1396, 1423 (3d Cir. 1994) (holding that "[i]nasmuch as appellants did not object to the curative instruction or request additional instructions" they cannot assert "reversible error").

More importantly, the Court's decision to permit Dr. Munson to testify was correct. Dr. Munson offered opinions that were consistent with the language of the asserted claims and limited his testimony to only the opinions he expressed in his original report. (*See, e.g.,* Tr. 670:9-672:14.) As a result, Abraxis is not entitled to a new trial as a result of Dr. Munson's testimony. *Greenleaf,* 174 F.3d at 366 ("New trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."). Elan respectfully submits that the Court should deny Abraxis's motion.

## V.    CONCLUSION

Having lost on nearly every issue, Abraxis now challenges the jury on every point. As the eight-day trial made clear, the disputes in this case are intensely factual. The jury weighed the evidence carefully, evaluating the credibility of each witness and their testimony, and correctly decided based on this evidence to find in favor of Elan. For the reasons stated in this brief, Elan respectfully submits that the Court should deny Abraxis's motions.

ASHBY & GEDDES

*/s/ John G. Day*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. # 4261)
500 Delaware Avenue, 8th Floor
Wilmington, Delaware 19899-1150
(302) 654-1888 Telephone
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff,*
*Elan Pharma International Limited*

*Of Counsel:*

Stephen E. Scheve
Robert Riddle
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77042-4995
(713) 229-1659 Telephone

Paul F. Fehlner
Jeffrey D. Sullivan
Lisa A. Chiarini
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112-4498
(212) 408-2527 Telephone

Dated: August 4, 2008

{00233681;v1}

# EXHIBITS 1 – 3

# REDACTED IN THEIR ENTIRETY